# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| **RAVGEN, INC.,** | |
| **Plaintiff,** | |
| *v.* | **6:20-CV-00969-ADA** |
| **LABORATORY CORPORATION OF AMERICA HOLDINGS,** | |
| **Defendant.** | |

**MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO EXCLUDE, IN PART, THE EXPERT OPINON OF DR. STEPHEN D. PROWSE [ECF NO. 123]**

Came on for consideration this date is Plaintiff Ravgen, Inc.'s ("Ravgen" or "Plaintiff") Opposed Sealed Motion to Exclude, in Part, the Expert Opinion of Dr. Stephen D. Prowse ("Dr. Prowse") (the "Motion"). ECF No. 123. Laboratory Corporation of America Holdings ("LabCorp" or "Defendant") filed an opposition on July 14, 2022, ECF No. 142, to which Ravgen replied on July 21, 2022, ECF No. 161. The Court heard the parties' arguments on August 31, 2022 and made oral rulings on the Motion during the hearing. ECF Nos. 197, 199. Consistent with the Court's oral rulings and for the reasons set forth below, Plaintiff's Motion is **GRANTED.**

**I. BACKGROUND**

On May 19, 2022, LabCorp served Dr. Prowse's rebuttal report on damages. ECF No. 123-6. As LabCorp's damages expert, Dr. Prowse offered an opinion on a reasonable royalty for LabCorp's infringement of Ravgen's U.S. Patent Nos. 7,727,720 and 7,332,277 (the "'720 Patent" and "'277 Patent", respectively and the "Asserted Patents," collectively). *See id.*

1

Ravgen asserts that LabCorp's Accused Tests[1] infringe certain claims of its '720 and/or '277 Patents, both titled "Methods For Detection Of Genetic Disorders." Each of the Accused Tests is a genetic test that analyzes certain types of cell-free DNA (or "cfDNA") recovered from samples of blood collected from patients. The Asserted Patents' Claimed Methods include some elements or steps that relate to inclusion of a type of chemical—an agent that inhibits or impedes cell lysis ("Agent")—with a sample collected from a patient (hereinafter, the "Agent Element(s)"). *See, e.g.*, '720 Patent cl. 1 ("wherein said sample comprises an agent that impedes cell lysis"); '277 Patent cl. 55 ("wherein said sample comprises . . . an agent that inhibits lysis of cells"). That sample is used as part of the Claimed Methods, including in the methods' other steps. *See, e.g.*, '720 Patent cl. 1 ("said method comprises . . . isolating free nucleic acid from a noncellular fraction of a sample . . . [and] detecting the presence or absence of the free nucleic acid"); '277 Patent cl. 55 ("[a] method comprising determining the sequence of a locus of interest on free fetal DNA isolated from a sample").

Ravgen asserts that the Accused Tests satisfy the Agent Elements because the tests are performed on samples collected in Streck Cell-Free DNA Blood Collection Tubes ("Steck tubes"), which Ravgen asserts include the Agent. *See, e.g.*, ECF No. 123-2 ("Rebuttal Expert Report of Larry J. Dumont") at ¶ 143. According to LabCorp's own expert, the Claimed Methods require more than the Agent Elements in isolation. ECF No. 123-3 ("Expert Report of Larry J. Dumont") ¶¶ 73 ("The claims of the '277 Patent are primarily directed to the isolation, detection, and sequencing of cell-free fetal DNA in maternal blood samples."), 97 ("The claims of the '720 Patent are primarily directed to the isolation, detection, and sequencing of cell-free nucleic acids for diagnosing and treating medical conditions."). Ravgen asserts that the remaining elements of the

---

[1] MaterniT21 PLUS, MaterniT GENOME, informaSeq, and Resolution ctDx Lung Assay ("ctDx").

Claimed Methods are satisfied by performance of the Accused Tests on the samples that were collected in Streck tubes. ECF No. 123 at 2.

In his rebuttal expert report, Dr. Prowse offers an opinion regarding appropriate damages for LabCorp's alleged infringement, "based on applying a 15 percent royalty rate to an apportioned royalty base." ECF No. 123-5 ("Deposition of Stephen D. Prowse") at 13:8–11; ECF No. 123-6 ¶ 6. Dr. Prowse calculates his apportioned royalty base in accordance with his conclusion that the Streck tubes are the smallest salable patent-practicing unit ("SSPPU"). ECF No. 123-5 at 14:4–9, 14:21–15:1; ECF No. 123-6 ¶ 404. Specifically, Dr. Prowse purports to calculate the apportioned base by starting with the cost to LabCorp to purchase Streck tubes for the Accused Tests. *See* ECF No. 123-5 at 142:6–13, 141:22–142:2. According to Dr. Prowse, it was "appropriate and necessary to apportion the hypothetical negotiation royalty base down to the Streck tube" because "the coverage of the patents in suit, [in his] understanding do[es] not go beyond the tubes used to collect the blood." *Id.* at 152:12–24.

While not incorporated directly to Dr. Prowse's royalty calculation, Dr. Prowse also opines in his rebuttal expert report that use of EDTA tubes instead of Streck tubes in the Accused Products would be a technically feasible and commercially acceptable non-infringing alternative. ECF No. 123-6 ¶¶ 285–320. He also provides cost estimates for implementing that alleged alternative. *See id.* Dr. Prowse's opinions, however, that the use of EDTA tubes instead of Streck tubes in the accused products would be commercially acceptable to LabCorp rely entirely on the opinions provided in Mr. Sapeta's Rule 26(a)(2)(C) Disclosure. ECF No. 123-6 ¶ 300. That disclosure, in which counsel for LabCorp provided "expected opinions" from a LabCorp employee, Mr. Sapeta, regarding LabCorp's alleged ability to implement that alternative and the cost of that

implementation, provide the only source of information regarding LabCorp's "ability to implement this alternative and the associated cost." *See id.*; ECF No. 123-5 157:10–14.

## II. LEGAL STANDARD

### A.    *Daubert* Standard

An expert witness may provide opinion testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). The "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). Accordingly, "a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015). A district court shall consider "whether the theory or technique the expert employs is generally accepted; whether the theory has been subjected to peer review and publication; whether the theory can and has been tested; whether the known or potential rate of error is acceptable; and whether there are standards controlling the technique's operation." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (citing *Daubert*, 509 U.S. at 593). Further, a district court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702). The

ultimate inquiry in a Rule 702 determination is whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

"[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire*, 526 U.S. at 147. Thus, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. However, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002) ("'The trial court's role as gatekeeper [under *Daubert*] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." (quoting Fed. R. Evid. 702 advisory committee note)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### B.     Patent Infringement Damages

In a suit for patent infringement, a successful plaintiff is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. To calculate damages for patent infringement under 35 U.S.C. § 284, the Federal Circuit has stated that "estimating a 'reasonable royalty' is not an exact science. As such, the record may

5

support a range of 'reasonable' royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014). However, damages opinions must "separate the value of the allegedly infringing features from the value of all other features." *CSIRO v. Cisco Sys.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015). Thus, unless the case implicates the entire-market-value rule, "principles of apportionment apply." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). "What is taken from the owner of a utility patent (for purposes of assessing damages under § 284) is only the patented technology, and so the value to be measured is only the value of the infringing features of an accused product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

### III. ANALYSIS

**A.    Dr. Prowse Erroneously Relies on Streck Tubes as a Royalty Base**

Dr. Prowse apportioned the royalty base, identifying the SSPPU as the Streck Tubes. This is based on his understanding that "what's allegedly novel . . . relates to the tubes used to collect the blood [the Streck Tubes] and not anything else." *See, e.g.*, ECF No. 123-5 153:10–19. As LabCorp acknowledges, Dr. Prowse contends that "the inventive concept underlying the asserted claims is practiced only in the Streck Tubes, and . . . the price at which [Defendant] purchases the Streck Tubes is the market value of that inventive concept."[2] *See* ECF No. 142 at 9. This, however,

---

[2] "[T]he primary problem" with such a methodology "is the fact that it bases royalties on [component] prices." *See Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, No. 6:11-CV-343, 2014 WL 3805817, at *11 (E.D. Tex. July 23, 2014), *vacated on other grounds*, 809 F.3d 1295 (Fed. Cir. 2015). "The benefit of the patent[s] lies in the ***idea, not in the small amount of [materials] that happen[] to be where that idea is physically implemented***." *See id.* (finding damages model based on accused infringer's costs to purchase unreliable, noting that "[b]asing a royalty solely on [the component] price is like valuing a copyrighted book based only on the costs of the binding, paper, and ink needed to actually produce the physical product. While such a calculation captures the cost of the physical product, it provides ***no indication of its actual value***.").

is inconsistent with LabCorp's position expressed elsewhere "that the alleged 'inventive step' of the asserted claims is adding . . . formaldehyde [to] inhibi[t] cell lysis." *See, e.g.*, ECF No. 142 at 3. It is not necessarily the Streck Tubes themselves that are inventive—it is their use.

The Federal Circuit recently affirmed the exclusion of a damages theory in a case involving only a method directed to "placing an electrical lead in a lateral branch of a coronary sinus vein." *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1343 (Fed. Cir. 2022). The damages expert in that case used—not the method steps themselves—but the leads and the tools for inserting the leads as the royalty base. *Id.* at 1357. The district court struck that report and the Federal Circuit affirmed, stating:

> Mr. Carlson did not even attempt to explain why a royalty based on use of the method would be impractical in this case. He did not attempt to value any efficiencies or patient health advantages gained by practicing the patented method compared to non-patented methods or explain why this could not be done. Nor did he identify any other evidence relating to the value of the claimed method relative to other methods or explain why such a valuation would not be possible.

*Id.* The Court finds this case to be particularly instructive here.

Here, the Asserted Claims are not directed to blood collection tubes nor limited to the Agent used in such tubes. Rather, the Asserted Claims are directed to methods that require performing preparation and analysis steps on samples collected with the Agent. Such Claimed Methods include, for example, a "***method for detecting a free nucleic acid***, wherein said method comprises: (a) ***isolating free nucleic acid*** from a noncellular fraction of a sample, wherein said sample comprises an agent that impedes cell lysis, if cells are present . . . and (b) ***detecting the presence or absence of the free nucleic acid***" and a "***method comprising determining the sequence of a locus of interest*** on ***free fetal DNA isolated from a sample*** obtained from a pregnant female,

7

wherein said sample comprises free fetal DNA and an agent that inhibits lysis of cells, if cells are present . . . ." '720 Patent cl. 1; '277 Patent cl. 55.

Like the expert whose report was struck in *Niazi*, Dr. Prowse does "not even attempt to explain why a royalty based on use of the method would be impractical in this case." *See* 30 F.4th at 1357. Dr. Prowse relied on an understanding of the Asserted Claims that disregards required steps of the Asserted Claims and fails to consider those Method Claims in their entirety. Accordingly, his application of the SSPPU methodology—which led to selection of an SSPPU device that cannot not practice the Asserted Claims—was not properly applied to the facts of the case. *Cf., e.g.*, *Summit 6 LLC v. Rsch. in Motion Corp.*, No. 3:11-CV-367-O, 2013 WL 12124321, at *8 (N.D. Tex. June 26, 2013) (finding expert properly used entire accused device as SSPPU "[b]ecause only the device can practice the patent and no other smaller component is even able to practice the patent"). The "link between the facts and [Dr. Prowse's] conclusion" that the Streck tube is the SSPPU is therefore unreliable, and the apportioned royalty base opinion stemming therefrom should be excluded. *See Knight*, 482 F.3d at 355. (An "expert's testimony must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony," including "the link between the facts and the conclusion"); *ThinkOptics, Inc. v. Nintendo of Am., Inc.*, No. 6:11-CV-455, 2014 WL 2859578, at *1 (E.D. Tex. June 21, 2014); Fed. R. Evid. 702.

Accordingly, it is clear that the Agent-Containing Streck Tubes—Dr. Prowse's SSPPU—cannot practice the patented inventions. Because Dr. Prowse's Streck tube-derived royalty base results from his use of unreliable methodologies, it must be excluded. As shown below, LabCorp's arguments to the contrary are unavailing.

8

*First*, LabCorp attempts to defend Dr. Prowse's SSPPU selection by arguing that "a patentee's obligation to apportion damages only to the patented features does not end with the identification of the smallest salable unit if that unit still contains significant unpatented features." ECF No. 142 at 3 (citing *VirnetX*, 767 F.3d at 1329). But Dr. Prowse does not claim that he apportioned beyond the SSPPU. Instead, his royalty base relies on the unreliable conclusion that "the smallest salable unit here [i]s the Streck blood tube." ECF No. 123-5 at 15:2–14.

*Second*, LabCorp argues that Dr. Prowse's Streck tube-SSPPU royalty base is proper because the Agent Elements, alone, are the allegedly novel or "inventive" concept. *See* ECF No. 142 at 1, 3. According to LabCorp, "in order to properly apportion, the damages expert must identify and isolate the value of the 'inventive aspects of the asserted claims[.]'" *Id.* at 2 (quoting *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1378 (Fed. Cir. 2021)). Yet, this is not the state of the law. Indeed, what the law actually requires is telling.

The cases LabCorp cites in its opposition provide that a damages analysis should account for the incremental benefit conferred by a patent claim taken as a whole, which may include "accounting for" conventional aspects. *See, e.g.*, *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015) (noting that a damages analysis may account for "the relative value of the patentee's invention" by comparing it to the "***conventional elements*** . . . standing alone"—not that the value can be measured by an allegedly novel claim element standing alone); *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (same); *Omega*, 13 F.4th at 1376 (noting that damages analyses should distinguish between patented and unpatented features); *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

Importantly, accounting for conventional aspects is distinct from discarding allegedly conventional claim elements and performing an isolated "inventive concept" valuation, as

LabCorp claims is appropriate. *See, e.g.*, *ThinkOptics*, 2014 WL 2859578, at *2 (the Court had seen no "precedent permitting the complete removal of the value of claimed elements.") Further, LabCorp's reliance on *Eidos Display, LLC v. Chi Mei Innolux Corp.* is equally unavailing. *See* No. 6:11-CV-00201-JRG, 2017 WL 1322550, at *3 (E.D. Tex. Apr. 6, 2017). In that case, the Eastern District of Texas allowed an alleged infringer's damage expert to apportion by calculating the value of a particular step in multistep method claim. *See id.* However, contrary to LabCorp's contentions, the *Eidos* Court allowed that opinion because the expert "focused his analysis ***on the incremental benefit of the claim as a whole***" and "there [wa]s ***no indication that [he] excluded the alleged conventional aspects of the claim***." *Id.* at *4.

And unlike the expert in *Eidos*, Dr. Prowse does not "focus his analysis on the incremental benefit of the claim[s] as a whole." When the Claimed Methods are practiced in their entireties— *e.g.*, using an Agent in the process of preparing and analyzing cell free DNA—they provide benefits not produced by the Agent in isolation. For example, even Dr. Prowse admits that the benefits of the Claimed Methods—the use of the Agent-containing tubes in performance of the Accused Tests—include "logistical benefits to LabCorp" such as benefits "in sample collection, transport, and preparation" and "simplify[ing] the supply chain ***related***" ***to the Accused Tests***. *See, e.g.*, ECF No. 123-6 ¶¶ 63, 297, 386. Dr. Prowse, however, ignores those benefits and thus does not attempt to "focus[] ***on the incremental benefit of the claim[s] as a whole***"— such as by calculating the incremental value of using the claimed invention in the Accused Tests compared to tests using LabCorp's purported non-infringing alternative. *See Eidos*, 2017 WL 1322550, at *4. For example, Dr. Prowse recognizes that if LabCorp used its purported non-infringing alternative, it would need to make "logistical adjustments" such as "requir[ing] the sample to be processed (i.e., centrifuged so that the plasma is separated) in a shorter time fame and locally" "in

10

order to inhibit cell lysis and improve the fetal fraction." ECF No. 123-6 ¶ 299. But he fails to show how the value of avoiding such logistical issues is captured by a royalty base that is "apportion[ed] down" to "capture[] *only* the blood collection tube" (*id.* ¶ 406), and explicitly **"exclude[s] the alleged conventional aspects of the claim[s]**." *Cf. Eidos*, 2017 WL 1322550, at *4. Thus, even if the benefits of the Claimed Methods were limited to *use* of the tubes *in the Accused Tests*, a royalty base *limited to* the tubes themselves does not reliably capture the *value* of those benefits. *See, e.g.*, *ThinkOptics*, 2014 WL 2859578, at *2.

*Third*, LabCorp contends that Dr. Prowse's apportionment calculation is reliably linked to the price of the Streck tubes. ECF No. 142 at 9. In his expert report, Dr. Prowse's royalty base calculation starts with the cost to LabCorp to purchase Streck tubes. As described above, Dr. Prowse recognizes that the use of the Claimed Methods in the Accused Tests provides, at least, "logistical benefits to Labcorp" related to the Accused Tests. In order to show that Dr. Prowse's opinions are reliable, LabCorp must show that Dr. Prowse's royalty base calculation captures the value of those benefits. But the only evidence LabCorp cites are statements from Dr. Prowse's report that describe the steps in his calculation; they do not show how the result of that calculation reliably captures those benefits. *See* ECF No. 142 at 9 n.6, 10. LabCorp's bald proclamation that the logistical benefits are "clearly inherent" in the price of Streck Tubes cannot satisfy LabCorp's burden. *See Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

Accordingly, because Mr. Prowse's Streck Tube-SSPPU royalty base opinion is unreliable, Dr. Prowse's opinions regarding the appropriate royalty base and his application of his purported royalty rate to that base are hereby excluded.

### B.      Dr. Prowse Erroneously Relies on Mr. Sapeta

In his rebuttal expert report, Dr. Prowse opines regarding the use of EDTA tubes instead of Streck tubes in the Accused Products as a technically feasible and commercially acceptable non-

infringing alternative. *See, e.g.,* ECF No. 123-6 ¶¶ 285–320.  Portions of Dr. Prowse's opinions, however, that the use of EDTA tubes instead of Streck tubes in the accused products would be commercially acceptable to LabCorp rely entirely on the opinions provided in Mr. Sapeta's Rule 26(a)(2)(C) Disclosure. ECF No. 123-6 ¶ 300. On June 30, 2022, Ravgen filed a Motion to Strike and Exclude LabCorp's Fed. R. Civ. P. 26(a)(2)(C) Disclosure. ECF No. 122. The Court made an oral ruling granting this Motion on August 29, 2022. ECF Nos. 197, 199. Because this Court has excluded LabCorp's Fed. R. Civ. P. 26(a)(2)(C) Disclosure and because portions of Dr. Prowse's opinions rely entirely on the opinions provided in that Rule 26(a)(2)(C) Disclosure, the Court holds that Dr. Prowse's opinions regarding the use of EDTA tubes instead of Streck tubes in the Accused Products as a technically feasible and commercially acceptable non-infringing alternative are hereby excluded. *Spring St. Apts Waco, LLC v. Philadelphia Indem. Ins. Co.*, No. 6:16-CV-00315-JCM, 2017 WL 2805014, at *6 (W.D. Tex. June 28, 2017) ("If the foundational data underlying opinion testimony is unreliable, an expert will not be permitted to base an opinion on that data because any opinion from that data is likewise unreliable.").

Even if the Court had not struck and excluded the improper 26(a)(2)(C) disclosure, the Court still finds that Dr. Prowse's reliance on the "expected opinions" therein is not "based on sufficient facts or data" and therefore must be excluded. Unlike the report of a retained expert, a 26(a)(2)(C) disclosure need not disclose a complete statement of opinions the expert witness, including the facts, data, and exhibits relied upon, nor the qualifications of that purported expert witness. Fed. R. Civ. P. 26(a)(2)(B)(i)–(iv). Rather it is a document that merely sets forth "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).

12

Here, Dr. Prowse's reliance on the 26(a)(2)(C) disclosure was neither based on sufficient facts or data nor reliable principles and methods. Indeed, the 26(a)(2)(C) disclosure was authored by LabCorp's counsel (not Mr. Sapeta, who did not sign the disclosure). Furthermore, Dr. Prowse did not speak with Mr. Sapeta regarding any of the information provided in the Disclosure. ECF No. 123-5 at 21:2–3. Dr. Prowse testified that he accepted and relied upon the per-patient cost of the proposed alternative provided in the 26(a)(2)(c) disclosure without doing anything to confirm the accuracy of that estimate. ECF No. 123-5 at 159:13–24.

To reliably opine regarding a non-infringing alternative, that non-infringing alternative must be acceptable. *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017). Acceptability requires, among other things, a cost comparison to the patented product and a showing that the non-infringing alternative does not "possess characteristics significantly different from the patented product." *See Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136, 1142 (Fed. Cir. 1991). Dr. Prowse's non-infringing alternative opinions rely solely on the 26(a)(2)(c) disclosure, for at least some of these acceptability requirements—*e.g.*, for the "operational cost" of implementing the non-infringing alternative and "information relating to LabCorp's ability to implement" the non-infringing alternatives. ECF No. 142 at 10–11. Since Dr. Prowse's reliance on the 26(a)(2)(c) disclosure for some of the acceptability requirements is determined to be unreliable, that renders his non-infringing alternative opinion unreliable as a whole—LabCorp's ability to identify other inputs to his non-infringing alternative analysis cannot salvage it. *See Knight*, 482 F.3d at 355 (5th Cir. 2007) (An expert's opinion "must be reliable at each and every step" including "the facts underlying the expert's opinion" "or else it is inadmissible.").

Moreover, although it is true that data relied on by the expert need not be admissible for the opinion to be admitted if experts in the field would reasonably rely on such data. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013) (quoting Fed. R. Evid. 703). The burden to establish reasonable reliance is on the proponent of challenged expert testimony. *See id.* Here, Defendant's expert has not provided evidence establishing that experts in his field reasonably rely on, for example, a disclosure written by counsel or deposition testimony from someone like Mr. Sapeta.

In *Wi-Lan Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1376 (Fed. Cir. 2021), the Court excluded an expert's opinion on unadmitted source code because the expert failed to testify that unadmitted source code is the kind of information experts in his field reasonably relied on. Similarly, Dr. Prowse has not testified that testimony from Mr. Sapeta (or a disclosure identifying his expected testimony) is of the type an expert in Dr. Prowse's shoes would rely upon. Thus, Dr. Prowse's reliance on the 26(a)(2)(c) disclosure is also unreliable for this reason.

Accordingly, Dr. Prowse's opinions regarding the use of EDTA tubes instead of Streck tubes in the Accused Products as a technically feasible and commercially acceptable non-infringing alternative are hereby excluded.

## IV. CONCLUSION

It is therefore **ORDERED** that Plaintiff Ravgen's Opposed Motion to Exclude, in Part, the Expert Opinion of Dr. Stephen D. Prowse is **GRANTED**.

Accordingly, it is further **ORDERED** that Dr. Prowse's opinions regarding the appropriate royalty base and his application of his purported royalty rate to that base are hereby excluded.

It is finally **ORDERED** that Dr. Prowse's opinions regarding the use of EDTA tubes instead of Streck tubes in the Accused Products as a technically feasible and commercially acceptable non-infringing alternative are hereby excluded.

SIGNED this 4th day of October, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

15