**UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TEXAS**

**MIDLAND-ODESSA DIVISION**

**COBBLESTONE WIRELESS, LLC,**
Plaintiff,

v.

**APPLE INC.,**

Defendant.

Case No. 7:24-cv-00232-DC

**DECLARATION OF YUAN MA REGARDING THE EFFECT OF CHINESE EXPORT CONTROL LAWS ON THE ASSIGNMENT OF PATENT 8,891,347**

I, Yuan Ma, declare:

1. I submit this declaration in support of Plaintiff Cobblestone Wireless, LLC ("Cobblestone"), providing my analysis on issues of Chinese technology export law relating to the effect of Chinese export controls on the assignments of rights associated with U.S. Patent No. 8,891,347 (the "'347 patent") at issue in this case.

2. I am being compensated for the time I spend preparing this declaration and providing consulting services regarding Chinese law. My compensation does not depend on the outcome of this case.

## I. EXPERIENCE AND QUALIFICATIONS IN CHINESE LAW

3. My qualifications and experience in Chinese export control and intellectual property law and practice are set forth below.

4. I hold a Master of Engineering degree in Communication and Information Systems from Tianjin University. I am a licensed attorney in the People's Republic of China with nineteen years of experience in intellectual property law and practice. I have served as a partner at

Tiantong & Partners, Beijing Lingshi Law Firm, and Beijing Highking Law Firm. I have participated in a number of patent disputes involving telecommunications technologies, including Huawei v. Ericsson, Huawei v. ZTE, Qualcomm v. Meizu, and Huawei v. Samsung.

5. Prior to entering private practice, I worked for more than ten years in the Telecommunications Invention Examination Department of the State Intellectual Property Office and in the telecommunications field at the Patent Reexamination Board. During that time, I was extensively involved in the examination, reexamination, and invalidation of telecommunications patents and related matters, and handled hundreds of patent reexamination, invalidation, and related administrative litigation cases.

6. In private practice, I have advised both Chinese and international clients on legal and regulatory issues arising from cross-border transfers of technology, including technology import and export requirements and related export control issues. I have also advised on and helped complete numerous patent transactions involving Chinese and international clients.

7. I have received a number of recognitions for my intellectual property practice, including a special recommendation for Intellectual Property Litigation in the Chambers Greater China Region Guide 2025 and 2026, recognition among LEGALBAND's 2023 China Top 15 Intellectual Property Lawyers, selection by IPR Daily as one of China's Top 50 Under 50 Elite IP Lawyers in 2023, and inclusion in China Business Law Journal's The A-List Legal Elite in 2022, 2023, and 2024.

8. My full biography is provided in Ex. 1 to this declaration.

## II. RELEVANT FACTS, MATERIALS CONSIDERED, AND SUMMARY OF MY OPINIONS

9. Counsel for Cobblestone has provided me with the Rule 44.1 Notice (Dkt. 156) regarding Chinese law submitted by Apple, including the Declarations of Alexandra Yang, the Declaration of Mark Cohen, and the materials accompanying those declarations. I have also reviewed the Chinese laws, administrative regulations, departmental rules, and other normative documents cited in those declarations. I have also spoken with Cobblestone's technical expert, Tim Williams, on August 19, 2026. I have also reviewed the [redacted]

[redacted] I also reviewed all other materials cited in this declaration.

10. Based on my review of the materials provided to me, I understand that the PCT international application at issue was filed on July 28, 2011, with Yin Xuefeng, a Chinese individual, as the original applicant. The relevant application rights were first assigned to Shanghai SAGE Information Technology Co., Ltd. ("SAGE"), which is a Chinese business. Exs. 4-5. The relevant application rights were then assigned by SAGE to U.S.-based Empire Technology Development LLC ("Empire"). Empire assigned the relevant patent rights to Cobblestone in 2012 or on February 15, 2011 per recorded assignment. Yang Decl. at 2.

11. Based on my review of the Declaration of Mark Cohen Regarding Chinese Law (Dkt. 156-26), Mark Cohen offers no opinions about Chinese export control laws. I do not have any responsive analysis about the applicability of Chinese export control laws to the Declaration of Mark Cohen. I offer no other opinions as to the Declaration of Mark Cohen.

12. The Declaration of Pu (Alexandra) Yang (Dkt. 156-1) asserts that the '347 patent falls within "Wireless Communications Technology" listed in the Catalogue of Technologies Prohibited and Restricted from Export of China (Revised 2008) (the "Technology Catalogue"), and that SAGE's assignment of the relevant rights to Empire therefore constituted an export of technology restricted from export. Yang Decl. at 2, 6–9. Ms. Yang further states that she is aware of no evidence that the relevant parties obtained a Technology Export License, and on that basis concludes that the assignment violated China's technology export regulations and was void, and that Cobblestone therefore could not acquire valid rights in the '347 patent through the subsequent assignments. Yang Decl. at 8.

13. I disagree with Ms. Yang's analysis and conclusions. Based on my review of the relevant Chinese law and factual materials, my principal opinions are as follows.

14. First, although the '347 patent concerns the field of wireless communications, the technology embodied in the patent does not satisfy any of the specific "Key control points" under Serial No. 054007X of the Technology Catalogue and therefore does not constitute technology restricted from export. Yang Ex. 16 at 3, 62–63. Significantly, the Technology Catalogue relied upon by Ms. Yang, as well as the English translation she submitted, expressly sets forth the relevant Key control points. Yang Ex. 16 at 3, 62–63. In the exercise of appropriate

professional diligence, Ms. Yang should have compared the specific technical features of the '347 patent at issue against the Key control points set forth in the Technology Catalogue. Yet, inexplicably, Ms. Yang neither analyzed those Key control points nor compared any specific technical feature of the '347 patent to any one of them. Instead, she concluded that the '347 patent constituted technology restricted from export solely because it falls within the broadly stated Technology Name, "Wireless Communications Technology." Yang Decl. at 7–9. This mode of analysis disregards both the objective technical details of the patent and the specific criteria prescribed by the Technology Catalogue for determining whether a technology is subject to restriction. It reduces the analysis to a superficial categorical classification at a high level of abstraction and reflects a fundamental flaw in reasoning. Her conclusion therefore plainly lacks the necessary legal and technical analytical foundation.

15. Second, Ms. Yang's conclusion that the relevant parties "did not obtain" the required technology export approval likewise lacks a factual basis. Yang Decl. at 7–9. Technology Export Licenses, and the specific transaction and technical information associated with them, are not ordinarily made available to the public. Ms. Yang cannot reasonably conclude that a license was never obtained merely because she was unable to locate it in public materials. I have asked for an investigation into whether the applicant ever applied for an export license. Based on the available documents, it appears that an export license was applied for but was unnecessary.

16. My reasons are set forth below.

## III. CHINESE TECHNOLOGY EXPORT LAW DOES NOT PROVIDE A BASIS FOR INVALIDATING THE ASSIGNMENTS OF RIGHTS ASSOCIATED WITH THE '347 PATENT

17. I understand that the assignment from SAGE to Empire at issue here occurred in February 2011 or in 2012. The laws, administrative regulations, and departmental rules in force at that time therefore apply, including:

- Regulations of the People's Republic of China on Administration of Technology Import and Export (Revised 2011)[1] (hereinafter the "Technology Import and Export Regulations") (Yang Ex. 14 (Chinese), 15 (English));
- Catalogue of Technologies Prohibited and Restricted from Export of China (Revised 2008)[2] (hereinafter the "Technology Catalogue") (Yang Ex. 16);
- *Announcement on Approval and Registration Matters Concerning the Assignment of Patent Application Rights or Patent Rights to Foreigners* (No. 94)[3] (Ex. 6A (Chinese), 6B (English),[4] hereinafter "Announcement No. 94"); and
- Regulations of the People's Republic of China on Open Government Information (2007)[5] (Ex. 7A (Chinese), 7B (English), hereinafter the "Open Government Information Regulations").

**3.1 The '347 Patent Is Not Technology Restricted from Export**

18. In my opinion, the technology embodied in the '347 patent does not constitute technology restricted from export under the Technology Catalogue.

19. The "Catalogue Format and Instructions" in the Technology Catalogue (Yang Ex. 16 at 3) expressly show parts that I highlighted:

---

[1] Yang Decl. Ex. 14 & Yang Decl. Ex. 15.

[2] Yang Decl. Ex. 16.

[3] https://www.cnipa.gov.cn/art/2013/10/23/art_74_27986.html

[4] Exhibits numbers used by the translator may be reorganized when compiled for my declaration.

[5] https://www.gov.cn/gongbao/content/2007/content_621230.htm

## Catalog Format and Instructions

**Catalog Format:**

No.: (1)X X X X X X J (X)

Technology name: (2) ______________

Key control points: (3) ______________

**Instructions:**

(1) This catalog is edited and sorted in accordance with the National Economic Industry Classification and Codes (GB/T4754-2002).

(2) No.: 7 places in total

Annual code + Industry classification code + Technology name sequence number + Pinyin code

2 digits 2 digits 2 digits 1 letter

1) The annual code consists of the last two digits of the year in which the catalog is compiled.

2) The industry classification code (in bold) and the technical name sequence number correspond to the numbers in the sorting index table.

3) "J" represents the first letter of the pinyin for technologies prohibited from export , and "X" represents the first letter of the pinyin for technologies restricted from export.

(3) Technology name: A general term for a certain class of technology.

(4) Key control points: The technical contents, characteristics, and scope that need to be controlled in this class of technology.

**Note:** The part in parentheses in the main text is a general explanation of the concept mentioned above.

20. These provisions expressly distinguish between a "Technology Name" and a "Key control point." A Technology Name is merely a general description of a category of technology, whereas the Key control points specifically define the technical contents, characteristics, and scope within that category that are actually subject to control. Accordingly, determining whether a particular technology constitutes technology restricted from export under the Technology Catalogue cannot turn merely on whether the technology falls, in a general sense, within a particular technological field. The analysis must further determine whether the specific

technology falls within one or more of the Key control points listed under that Technology Name.

21. This is further confirmed by the application documents for exports of restricted technology, the Technology Export License itself, and documents issued by the competent authority.

22. The Application for Export of Technology Restricted from Export by China (Ex. 8A (Chinese), 8B (English)) requires the applicant to identify the specific "Key control point" by reference to the Technology Catalogue. Ex. 8B at 4.

23. The Technology Export License of the People's Republic of China (Ex. 9) used by the Ministry of Commerce of the People's Republic of China likewise expressly identifies the applicable "Key control point." Ex. 9 at 1.

24. I obtained copies of Ex. 8A and Ex. 9 from the official website of the Ministry of Commerce of the People's Republic of China.[6]

25. In addition, the Notice of the Ministry of Commerce Soliciting Public Comments on the Revision of the Catalogue of Technologies Prohibited and Restricted from Export of China[7] (Ex. 10A (Chinese), 10B (English), Ex. 10B at 1) expressly stated that: "*This revision makes substantial deletions to the Catalog, refines the control points of some technology items, and creates positive conditions for strengthening international technical cooperation.*"

26. These provisions and documents are consistent: China's technology export control regime does not determine whether a technology is restricted merely by reference to a broadly stated industry or technological field. Rather, the specific Key control points define the actual scope of technology subject to restriction.

27. The Technology Catalogue further provides the following Key control points under Serial No. 054007X, Technology Name: Wireless Communications Technology (Yang Ex. 16 at 62–63):

---

[6] https://fms.mofcom.gov.cn/cms_files/oldfile/fms/202401/20240109111912662.pdf

[7] https://fms.mofcom.gov.cn/zqyjzbzz/art/2022/art_5fb3eccf788a425487954923ed30c91e.html

1. *Antenna array technology*
   *(1) Broadband antenna arrays exceeding one octave [center frequency ≥ 100%]*
   *(2) Precision machining technology for broadband feeds [> 800 MHz, in the C-band]*

2. *Microwave direct modulation frequency division phase-locked solid-state source fabrication technology*

3. *Integrated acousto-optic heterodyne reception technology with bandwidth >100 MHz and dynamic range > 90 dB*

4. *Fast acquisition technology for CDMA burst signals with C/No below 46 dB.Hz*

28. Accordingly, to determine whether a particular technology constitutes technology restricted from export under Serial No. 054007X, it is necessary to determine whether that technology involves any of the specific technical subject matter identified above.

29. Chinese civil procedure law further places the burden of establishing that factual predicate on the party relying upon it.

30. Article 67, Paragraph 1 of the Civil Procedure Law of the People's Republic of China (Ex. 11A (Chinese), 11B (English))[8] provides:

"*A party bears the responsibility to provide evidence for his or her own claims.*"

31. Article 91 of the Interpretation of the Supreme People's Court on the Application of the Civil Procedure Law of the People's Republic of China (Ex. 12A (Chinese), 12B (English)) provides:

"*(2) The party claiming the alteration or extinction of a legal relationship or the infringement of a right shall bear the burden of proof for the basic facts concerning the alteration or extinction of the legal relationship or the infringement of the right.*"

32. Accordingly, under Chinese civil procedure law, a party that asserts a fact and relies upon that fact to contend that another party's rights have been impaired generally bears the burden of proving that fact. Thus, if Apple contends that the technology embodied in the '347 patent constitutes technology restricted from export because it falls within the Key control points under Serial No. 054007X of the Technology Catalogue, and on that basis seeks to invalidate the relevant assignments, Apple bears the burden of establishing the basic facts giving rise to

---

[8] http://www.npc.gov.cn/npc/c2/c30834/202401/P020240108541839745616.pdf

that purported legal impediment. That includes establishing how the specific technology embodied in the '347 patent satisfies at least one of the applicable Key control points.

33. Ms. Yang did not perform this analysis. She concluded that the '347 patent falls within Serial No. 054007X merely because the patent concerns the field of "wireless communications," without identifying any particular claim, technical feature, or technical solution of the patent, or explaining how any such feature satisfies any of the Key control points identified above. Yang Decl. at 7-8.

34. I have been informed by Cobblestone's attorneys that none of Apple's experts, including Apple's technical expert Harry Bims, have offered any opinion regarding whether the '347 patent falls into one of the Key control points 1–4 of Wireless Communications Technology.

35. Based on my review of the '347 patent and the related materials, it is my opinion that the technology embodied in the '347 patent does not fall within any of the Key control points under Serial No. 054007X. The '347 patent therefore does not constitute technology restricted from export under either the Technology Catalogue or the Technology Import and Export Regulations.

36. In addition, I had a spoken conversation with Tim Williams on August 19, 2026. Mr. Williams presented himself as a technical expert retained by Cobblestone. In view of his technical background, Mr. Williams conducted a comparison of the disclosure of the '347 patent (corresponding to PCT application PCT/CN2011/077718) against the Key control points under Serial No. 054007X and concluded that the patent does not teach or improve the knowledge of a POSITA in any technologies in the key control points 1–4 listed above, and would not have been export controlled under these Key control points. The technical expert opinion of Dr. Williams further supports my opinion that the technology embodied in the '347 patent does not constitute technology restricted from export under the Technology Catalogue.

37. More significantly, the Technology Catalogue relied upon by Ms. Yang, as well as the English translation she submitted, expressly sets forth these Key control points. Yang Ex. 16 at 62–63. Yet in her declaration, she entirely bypassed that express standard. For an expert offering professional opinions to the Court on Chinese technology export law, disregarding the specific criteria expressly set forth in the very legal authority she herself relies upon, and substituting a broad categorical label for the necessary legal and technical analysis, plainly falls short of the professional diligence and analytical rigor expected of an expert opinion. Such an analysis

cannot provide a reliable professional foundation for her conclusion that the '347 patent constitutes technology restricted from export.

38. With respect to technology that is neither prohibited nor restricted from export, Article 39 of the Technology Import and Export Regulations (Yang Ex. 15 at 7) provides:

"*Freely exportable technology shall be subject to the contract registration administration. A contract for exporting a technology takes effect from the time when the contract is established according to law without taking the registration thereof as a condition for the contract to be effective.*"

39. Accordingly, in my opinion, regardless of whether the technology export between SAGE and Empire was registered, the contract by which SAGE assigned the patent to Empire was lawful and valid. As a matter of technology export control law, there is therefore no basis to invalidate SAGE's assignment of the relevant patent rights to Empire, or to invalidate Cobblestone Wireless LLC's subsequent acquisition of rights in the '347 patent through later patent transactions.

**3.2 Apple's Expert Lacks a Factual Basis for Concluding That the Relevant Technology Export Approval "Was Never Obtained"**

40. Ms. Yang further states that she is aware of no evidence demonstrating that the relevant parties obtained a Technology Export License and, on that basis, concludes that the parties did not obtain the required technology export approval. Yang Decl. at 8.

41. I disagree with that inference.

42. Announcement No. 94 (Ex. 6B at 1) provides:

"*Article 14 of the Detailed Rules for the Implementation of the Patent Law of the People's Republic of China stipulates that where a Chinese entity or individual assigns the right to apply for a patent or the patent right to a foreigner, it shall be approved by the competent department for foreign economic relations and trade of the State Council in conjunction with the science and technology administrative department of the State Council. With respect to how to implement this provision, upon consultation with the Ministry of Commerce, the matters concerning the examination and approval and registration for the assignment of the right to apply for a patent or the patent right to foreigners in accordance with Article 14 of the Detailed Rules for the Implementation of the Patent Law of the People's Republic of China are hereby announced as follows:*

*II. If the right to apply for a patent or the patent right to be assigned involves a restricted technology, the party shall handle the formalities for examination and approval of technology*

*export in accordance with the provisions of the Regulations on the Administration of Import and Export of Technologies; upon obtaining approval, the party shall handle the assignment registration formalities with our Administration by presenting the Technology Export License.*"

43. In my opinion, Announcement No. 94 governs the assignment by a Chinese entity or individual of a patent application right or patent right to a foreign entity. Even assuming, as Ms. Yang contends, that the technology embodied in the '347 patent constituted technology restricted from export, SAGE's assignment to Empire of the rights associated with the relevant PCT international application would fall within the type of assignment addressed by Announcement No. 94—namely, an assignment of a patent application right from a Chinese entity to a foreign entity—and the relevant parties would therefore have been required to complete the technology export approval procedures under that Announcement.

44. Regardless of how this procedural issue is ultimately understood, however, there is a fundamental flaw in one of the central inferences made by Ms. Yang: she infers that a Technology Export License was not obtained because she was unable to find one. China's relevant legal framework and administrative practice do not support that inference.

45. Article 14 of the Open Government Information Regulations (Ex. 7B at 3) provides:

"*Administrative organs shall not disclose government information involving state secrets, commercial secrets, or personal privacy.*"

46. Technology export approval involves specific technical information, the identities of the parties to the transaction, and information concerning the underlying commercial transaction. Individual Technology Export Licenses and the information contained in them are not ordinarily made available to the general public.

47. Accordingly, the inability of a third party to locate through public sources a particular Technology Export License issued does not mean that the license does not exist, much less establish that the relevant parties failed to complete the required approval procedures at the time.

48. I have also reviewed [redacted]

[redacted]

49. [redacted] That fact is inconsistent with the inference suggested by Ms. Yang that the parties simply failed to undertake, or even consider, the applicable technology export procedures.

50. More fundamentally, the entire license issue depends on the threshold premise that the technology at issue in this case was technology restricted from export in the first place.

51. As explained in Section 3.1 above, the technology embodied in the '347 patent does not fall within any of the specific Key control points under Serial No. 054007X, so the technology embodied in the '347 patent would not have been subject to export controls. Ms. Yang's entire analysis concerning a Technology Export License for restricted technology therefore rests on a premise that is not satisfied here.

52. In my opinion, the most likely account of facts to be inferred from the evidence is that a professional business, Beijing Fuhaihua Import and Export Co., Ltd., applied for an export license, but no export license was needed because it did not fall under any Key control point. Ex. 3.

## IV. CONCLUSION

53. For the foregoing reasons, it is my opinion that the technology embodied in the '347 patent does not satisfy any of the specific Key control points under Serial No. 054007X, "Wireless Communications Technology," of the Technology Catalogue, and therefore does not constitute technology restricted from export. Ms. Yang reached the opposite conclusion based solely on

the broadly stated Technology Name "Wireless Communications Technology," without analyzing the specific Key control points expressly set forth in the very Technology Catalogue on which she relied. Her conclusion therefore lacks an adequate basis in Chinese law.

54. In addition, Ms. Yang infers that the relevant parties failed to obtain the required approval merely because she was unable to locate a Technology Export License in publicly available materials. That inference likewise lacks a factual basis. Technology Export Licenses and the specific technical and transactional information associated with them are not ordinarily made available to the public. The inability to locate a license through public sources does not establish that the license was never obtained. Most likely, [redacted] but no export license was needed because it did not fall under any Key control point.

55. Accordingly, based on the foregoing analysis, it is my opinion that Chinese technology export law would not have prevented SAGE's assignment of the relevant rights of the '347 patent to Empire or Empire's subsequent assignment to Cobblestone.

56. I reserve the right to supplement the foregoing opinions based on materials subsequently obtained.

57. I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 21, 2026 in Beijing, China.

(NO TEXT ON THIS PAGE)

Dated: 2026. August. 21

By: ____________________________

Yuan Ma