HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS EYES ONLY

# DECLARATION OF EUNICE WU REGARDING CERTAIN ISSUES OF THE LAW OF THE PEOPLE'S REPUBLIC OF CHINA

# Table of Contents

I. *SUMMARY OF OPINIONS* ..... 6

II. *GOVERNING PRC LAW AND AUTHORITY FRAMEWORK* ..... 11

A. Applicable Patent Law and Implementing Regulations ..... 11

B. Article 6 Establishes Two Statutory Bases for a Service Invention-Creation and Expressly Recognizes Non-service Inventions ..... 11

C. Rule 12 Further Defines the First Article 6 Basis ..... 12

D. The "relates to" Analysis in Item (3) of the First Paragraph of Rule 12 Only Applies to Departed Employees ..... 13

E. Article 6 Separately Establishes the Second Basis "Mainly by Using" the Employer's Material and Technical Conditions ..... 14

F. Articles 7 and 72 Affirmatively Protect Non-service Inventions ..... 15

G. PRC Evidentiary Burden for Service-Invention Ownership Disputes ..... 15

H. Status and Use of PRC Judicial Authorities ..... 15

I. Bona Fide Purchaser Property Rights in Mainland China ..... 16

III. *JUDICIAL APPLICATION OF ARTICLE 6 AND THE EVIDENTIARY SHOWING REQUIRED UNDER PRC LAW* ..... 17

A. SPC 1848 Provides the Most Direct Judicial Framework for the Two Article 6 Bases Asserted Here ..... 17

B. PRC Evidentiary Framework: Service-Invention Classification Requires an Evidentiary Basis for the Statutory Nexus ..... 20

C. First Article 6 Basis: The Entity Must Connect Its Actual Duty or Assigned Task to the Substantive Patented Solution ..... 21

D. Second Article 6 Basis: "Mainly by Using" Requires Proof that the Entity's Qualifying Inputs Substantively, and Predominantly, Produced the Invention ..... 23

E. Guiding Case No. 158 Addresses the Inapplicable Post-Departure "Related Invention-Creation" Inquiry ..... 25

F. The Rules Applied Below ..... 26

IV. *APPLICATION OF ARTICLE 6 TO THE '347 INVENTION* ..... 28

A. Apple's Evidence Does Not Establish Either Article 6 Basis ..... 28

B. Contemporaneous Records Identify an External RFI-Linked Problem-Solving and Invention-Submission Path for the '347 Solution ..... 30

C. Conclusion Under Article 6 ..... 34

V. *THE YIN-TO-SAGE ASSIGNMENT CHRONOLOGY AND THE DERIVATIVE*

*NATURE OF APPLE'S bona fide acquisition THEORY* ........................................ *36*

**A. The Contemporaneous Transaction Record Predates the July 16, 2012 USPTO Recordation and Does Not Support Apple's Same-Day-Transfer Premise** ................ **36**

**B. Yang's Attacks on *Bona Fide* Rights Fails at Multiple Successive Stages** ........... **37**

1. Yin to SAGE ........................................ 38
2. SAGE to Empire ........................................ 39
3. Empire to Cobblestone ........................................ 39
4. The Other Two Elements Do Not Supply the Missing Defect ........................................ 40
5. Apple's Cited Cases Do Not Support Automatic Downstream Invalidity ........................................ 40

**C. PRC Choice-of-Law Rules Require a Separate Governing-Law Analysis for the 2022 Empire-to-Cobblestone Transfer** ........................................ **41**

**VI. *CONCLUSION*** ........................................ ***43***

1. I am Eunice Wu, an Equity Partner at Merits & Tree Law Offices in Beijing and a lawyer licensed to practice in the People's Republic of China ("PRC"). My practice focuses on intellectual property and complex technology-related disputes, including patent and technology disputes, intellectual-property ownership, trade secrets, licensing, and cross-border intellectual-property matters. I have advised and represented multinational and Chinese technology and industrial companies in significant matters involving PRC intellectual-property law, including companies such as Intel and Yokogawa. My experience includes disputes concerning ownership of patent rights and other technology-related intellectual-property rights under PRC law, as well as cross-border matters in which PRC intellectual-property issues interact with proceedings or transactions outside China.

2. My recent professional activities reflect my continuing engagement with Chinese intellectual-property adjudication and cross-border practice. In June 2026, I was invited to participate in a closed-door professional symposium hosted by the Supreme People's Court concerning intellectual-property adjudication and practice, at which a patent-ownership matter I had handled was among the matters discussed. In July 2026, I was invited to speak at the first conference organized by the All China Lawyers Association specifically focused on cross-border intellectual-property legal practice, where I addressed lawyers from across China on cross-border intellectual-property issues. I also served as a speaker at IPBC Global 2026 on a China-focused panel concerning intellectual-property issues involving China. I describe these activities as part of my professional background; I do not rely on the symposium, conference invitations, or any views expressed there as legal authority for the opinions in this declaration.

3. My work has also received international professional recognition. I have been named to the IAM Strategy 300: The World's Leading IP Strategists and have been recognized as a leading intellectual-property practitioner by World Intellectual Property Review (WIPR). I have spoken at international intellectual-property conferences and regularly advise on the interaction between PRC intellectual-property law and cross-border litigation and commercial strategy. These professional recognitions likewise form part of my qualifications and are not the basis for the legal conclusions expressed below. My profile listing additional qualifications and accomplishments is provided as Exhibit 1.

4. I have been retained by counsel for Cobblestone Wireless, LLC ("Cobblestone") to provide my independent opinions concerning the PRC-law issues raised in connection with the ownership and asserted chain of title of U.S. Patent No. 8,891,347 (the "'347 Patent"). My role is limited to the PRC-law issues identified below. I am being compensated at my normal, undiscounted hourly rate of $750 per hour for my work. My compensation is not contingent on any aspect of Cobblestone's case and does not depend on any position that I take in this declaration.

5. I understand that Apple Inc. ("Apple") has submitted, among other materials, the Declaration of Pu (Alexandra) Yang (Dkt. 156-1) and the Declaration of Mark A. Cohen (Dkt. 156-26) in the case *Cobblestone Wireless, LLC v. Apple Inc.*, No. 7:24-cv-00232-DC. I have reviewed those declarations and the exhibits attached to those declarations, including the PRC legal authorities on which they rely that are material to the issues addressed in this declaration, and the factual materials identified below. I address their conclusions where necessary in explaining my own

opinions, but my analysis is based on the governing PRC authorities and the evidentiary record I have reviewed.

6. My opinions are limited to three categories of PRC-law issues. First, I address whether the '347 invention constituted a service invention-creation belonging initially to Tongji University under Article 6 of the PRC Patent Law, and I conclude that it is not a service invention-creation belonging initially to Tongji University. Second, I address the PRC *bona fide* acquisition principles invoked by Ms. Yang in connection with the subsequent Yin-SAGE-Empire-Cobblestone chain, and I conclude that Tongji University does not have any rights to the '347 invention under PRC *bona fide* acquisition principles. Third, I address the PRC choice-of-law rules relevant to whether PRC domestic *bona fide* acquisition law may simply be assumed to govern the proprietary consequences of the 2022 Empire-to-Cobblestone transfer of the issued U.S. '347 Patent and conclude PRC law does not automatically apply to the 2022 Empire-to-Cobblestone transfer between two U.S. entities, preventing Tongji University from owning any rights to the '347 invention under PRC *bona fide* acquisition principles. I do not offer an opinion on U.S. constitutional standing, U.S. patent law, U.S. choice-of-law doctrine, infringement, validity, claim construction, or the engineering merits of the '347 Patent. I also do not address the separate technology-export control issue raised by Apple.

7. The principal factual materials I have reviewed include the '347 Patent; [redacted] the Yin-to-SAGE assignment (Ex. 5 at 2); the SAGE-to-Empire assignment and Empire's acceptance (Ex. 5 at 7); the relevant USPTO assignment records (Ex. 8); testimony of Ms. Elizabeth Rudersdorf in this case [redacted] Tongji University's administrative rules produced by Apple (Yang Ex. 7); Tongji's faculty profile for Professor Xuefeng Yin (Yang Ex. 6); materials concerning Professor Yin's research history, projects, publications, and patents (Dkt. 156); Apple's Rule 44.1 Notice (Dkt. 156) including the Declaration of Pu (Alexandra) Yang with Exhibits 1-24 and the Declaration of Mark Cohen with Exhibits 1-7, and the other factual exhibits discussed in this declaration.

8. The principal PRC legal materials I have reviewed include the 2008 version of the PRC Patent Law (Yang Ex. 2 (Chinese) and Yang Ex. 3 (English)); the 2010 Implementing Regulations of the PRC Patent Law; the applicable provisions concerning *bona fide* acquisition and foreign-related choice of law (Yang Ex. 4 (Chinese) and Yang Ex. 5 (English)); Guiding Case No. 158 (Cohen Ex. 7); *Zhengzhou Xincai Technology Co., Ltd. v. Song Junli*, (2020) Zui Gao Fa Zhi Min Zhong No. 1848 ("SPC 1848", Ex. 2); the other PRC judicial decisions cited by Apple or discussed below; and the rules concerning the status and use of Guiding Cases and cases included in the People's Court Case Database (Ex. 10, Ex. 11).

9. In determining PRC law, I begin with enacted national law and applicable administrative regulations and then consider judicial interpretations and relevant judicial authorities according to their status within the PRC legal system and the issue each authority actually addresses. PRC adjudication does not operate under the

same doctrine of stare decisis as United States common law. As explained more fully in Section II.G below, I therefore distinguish between the formal status of a judicial authority and the persuasive or referential significance of its reasoning for the particular statutory issue presented here.

10. Where Apple has submitted an English translation of a PRC authority, I use that translation for the Court's convenience where it adequately conveys the portion on which I rely, while basing my opinion on the Chinese-language text. For additional PRC authorities relied upon in this declaration, the official Chinese text and the corresponding English translation should be considered together.

11. Unless otherwise expressly stated, my factual discussion is based on the documentary materials and recorded testimony identified in this declaration. Where I draw an inference from the documentary record, I identify the underlying materials and limit the inference to what, in my opinion, those materials support.

# I. SUMMARY OF OPINIONS

12. I have been asked to provide my opinions concerning certain issues of PRC law raised by Apple in challenging the ownership chain of U.S. Patent No. 8,891,347 (the "'347 Patent"). My opinions in this declaration concern principally: (1) whether the '347 invention constituted a service invention-creation belonging initially to Tongji University under Article 6 of the PRC Patent Law; (2) the PRC-law *bona fide* acquisition theory advanced by Apple concerning the subsequent Yin-SAGE-Empire-Cobblestone chain; and (3) whether PRC law automatically governs the proprietary consequences of the 2022 Empire-to-Cobblestone transfer of the issued U.S. '347 Patent. I do not express opinions on United States patent or procedural law, and I do not address the separate PRC technology-export issues raised by Apple.

13. My principal disagreement with Ms. Yang and Mr. Cohen is fundamental. PRC law does not make every invention created by an employee during employment the property of the employer. Article 6 expressly distinguishes service inventions from non-service inventions. Only if one of the statutory bases for a service invention is established does the employer obtain the right to apply for the patent; otherwise, Article 6 places that right in the inventor or designer, and Articles 7 and 72 further protect rights in non-service inventions. Thus, Professor Yin's employment by Tongji, the timing of the invention, and technical relatedness to his university research do not establish Tongji ownership. Ex. 3 at 6-7. If Tongji asserts that an invention treated by Professor Yin as a non-service invention actually belonged to Tongji, that assertion does not itself vest title in Tongji. Under the evidentiary rule applied in SPC 1848, Article 64, paragraph 1, of the then-applicable PRC Civil Procedure Law required a party to provide evidence for the factual proposition it asserted and imposed the adverse consequence of failure of proof (Ex. 2 at 39-40). The SPC further instructed that a court should examine whether the entity has a lawful basis for asserting service-invention ownership and should not simply place the burden on the inventor. In my opinion, a Chinese court would **not** have found the '347 Patent to be a service invention of Tongji University under the PRC laws and regulations under the current evidence. In my opinion, under Chinese law, title to the '347 Patent would remain with any *bona fide* purchasers regardless of whether the '347 Patent was a service

invention. I express no opinion concerning the allocation of any procedural burden under United States law.

14. Based on the information available to me, I provide my best understanding of the timeline of relevant facts, inferred from the documents available to me:

2008–present: Xuefeng Yin joins the College of Electronic and Information Technology at Tongji University. Yang Ex. 6 at 1. He continues to work there at the present.

[redacted]

[redacted]

[redacted]

2010-11-3: Tongji promulgated the Employment Contract Measures relied upon by Apple. Yang Ex. 7 (Dkt. 156-8) at 40.

[redacted]

2011-02-15: Xuefeng Yin executes an assignment from himself, personally, to SAGE, and accepting it as an authorized person of SAGE, effective as of July 20, 2010. Ex. 5 at 2-6.

2011-02-15: Xuefeng Yin executes an assignment from SAGE to Empire, effective as of January 18, 2011. Ex. 5 at 7-11.

2011-07-28: related application PCT/CN2011/077718 is filed.

2012-07-16: US application 13/522,422 is filed.

2014-11-18: U.S. Pat. No. 8,891,347 issues.

2022: Empire transferred the issued U.S. '347 Patent to Cobblestone (Ex. 7 at 20:4-6).

Two features of this chronology are particularly important: the detailed [redacted] predates the Tongji Employment Contract Measures relied upon by Apple; the documented Yin-SAGE-Empire transaction history substantially predates the July 2012 USPTO recordation.

15. Mr. Cohen's analysis applies legal factors drawn from the wrong Rule 12 category. Article 6 provides two routes to a service invention: (1) an invention accomplished in the course of performing the employee's duties, or (2) one accomplished mainly by using the employer's material and technical conditions. Rule 12 further defines the first route. Items (1) and (2) concern the employee's **own duty** or another **task entrusted by the entity**. Item (3), by contrast, applies only to an invention made within one year **after** departure from employment and asks whether that later invention **"relates to"**[1] the employee's former duty or task. Professor Yin remained employed by Tongji during the relevant period. Guiding Case No. 158, on which Mr. Cohen relies, expressly addresses this separate post-departure item (3) category. Its "relatedness" factors therefore do not apply as the governing legal test here. The question here is not merely whether the '347 technology was related to Professor Yin's work; it is whether the particular '347 R&D was undertaken in performance of his actual Tongji duty or an entrusted Tongji task.

16. The applicable statutory framework is Article 6 and Rule 12, and SPC 1848 (Ex. 2 at 38-43) provides the most directly applicable judicial framework for the two Article 6 bases asserted here. SPC 1848 involved an invention made during continuing employment and addressed both the duty-or-task route and the "mainly by using" route. The employer there had substantially stronger evidence of work-related connection than Apple identifies here: the technical problem arose directly from the employee's work, the employee worked with the relevant equipment, and the employer had instructed him to address that problem. The employee later even identified the patented technology among his own R&D or innovative achievements. **The SPC nevertheless did not infer employer ownership from those facts.** It required proof connecting the employee's actual duty or entrusted task to development of the patented solution and separately required qualifying employer material or technical conditions to have made the substantive, indispensable, and predominant contribution required by Article 6. SPC 1848 is a final SPC appellate

[1] All emphasis is added herein unless otherwise noted.

judgment and was subsequently included in the People's Court Case Database as Reference Case No. 2023-13-2-160-035. Ex. 2 at 23, 43; Ex. 4 at 6-8.

17. The assignment record and assignments from Yin-to-SAGE and SAGE-to-Empire, together with the March 9, 2026 testimony of Ms. Rudersdorf, show [redacted] and that the invention was not made in the course of Professor Yin's actual duties for Tongji University or in execution of a task entrusted to or assigned to him from Tongji University. The Yin-to-SAGE and SAGE-to-Empire assignments themselves confirm this. They are signed and witnessed, and provide the context for Professor Yin's work to develop the invention for Shanghai SAGE [redacted], and they define the assigned invention by reference to the specifically titled solution report/invention disclosure, *A User-Focusing Technique For MIMO And CoMP (Coordinated Multiple-Point) Communication Systems.* The March 9, 2026 testimony of Ms. Rudersdorf further confirms that [redacted] patent, and that the invention was not made in the course of Professor Yin's actual duties for Tongji University or in execution of a task entrusted to or assigned to him from Tongji University. This is additionally confirmed by and corroborated by contemporaneous documentation that predates the assignments, as discussed below. This is further corroborated by other Sage-Empire assignments recorded at the USPTO for Xuefeng Yin's applications. Ex. 8.

18. The record here also contains affirmative, contemporaneous, invention-specific evidence concerning the historical path of the '347 proposal. On [redacted] Where Apple principally relies on employment status and general technical overlap to infer a Tongji source, these contemporaneous documents affirmatively identify an external request for inventive problem-solving and a documented submission path for the particular '347 proposal through [redacted] rather than through Tongji.

19. Applying the correct Article 6 standards, the materials I have reviewed do not establish either route to Tongji ownership. Apple identifies substantial technical

overlap between Professor Yin's Tongji work and the '347 subject matter, and that overlap makes the own-duty issue a legitimate inquiry. But Apple does **not** identify Professor Yin's executed Tongji Engagement Contract, contemporaneous Post Responsibility Statement, project deliverable, task record, internal invention disclosure, work report, or comparable evidence showing that development of this particular user-focusing solution was undertaken in performance of his Tongji own duty or another task entrusted by Tongji. Nor does Apple identify qualifying Tongji funding, equipment, nonpublic technical information, intermediate technical achievements, or other material or technical conditions shown to have made the substantive, indispensable, and predominant contribution required by the second Article 6 route. Because Article 6 expressly places the right to apply in the inventor or designer when the invention is not a service invention, under the record that I have reviewed, the initial right to apply for the '347 invention belonged to Professor Yin rather than Tongji. In my opinion, under Chinese law, due to this lack of evidence, Tongji's ownership cannot be established regardless of whether or not the SAGE-related documents collected from Empire are considered.

20. That initial-ownership issue is only the first necessary link in Ms. Yang's ultimate conclusion that Cobblestone "never lawfully acquired any rights." Yang Decl. at 4, 6, 9. Her PRC-law analysis necessarily depends on the following sequence remaining intact:

→ Tongji held the initial right under Article 6
→ Professor Yin lacked authority to transfer it
→ SAGE did not validly acquire the right
→ Empire did not validly acquire the right
→ Empire still lacked title in 2022
→ PRC domestic unauthorized-disposition and *bona fide* acquisition law governs the 2022 Empire-to-Cobblestone transfer
→ Cobblestone did not validly acquire the U.S. '347 Patent.

**There are independent problems at multiple points in that sequence.** The initial Tongji-ownership premise is not established. Ms. Yang's SAGE analysis relies in part on a Tongji webpage dated years after that transaction. Her principal factual basis for attributing bad faith to Empire—that SAGE acquired from Professor Yin and transferred to Empire "on the exact same day" in July 2012—is materially undermined by primary documents showing a transaction history extending into 2010 and 2011 before later USPTO recordation. Her Cobblestone analysis treats visibility of an assignment chain as notice of a Tongji service-invention defect that the chain itself does not disclose.

21. And even if an upstream defect were assumed to remain through Empire, her analysis does not explain why PRC domestic *bona fide* acquisition law governs the proprietary consequences of a 2022 transaction between two U.S. entities concerning an issued U.S. patent; China's own Articles 48 and 49 require a separate governing-law analysis. Failure of any necessary proposition in this sequence prevents Ms. Yang's PRC-law analysis from establishing her ultimate conclusion.

# II. GOVERNING PRC LAW AND AUTHORITY FRAMEWORK

## A. Applicable Patent Law and Implementing Regulations

22. The 2008 amendment to the Patent Law of the People's Republic of China became effective on October 1, 2009, and the corresponding 2010 amendment to the Implementing Regulations became effective on February 1, 2010. The contemporaneous [redacted], and the international application underlying the '347 Patent was filed on July 28, 2011. Both events therefore occurred after those provisions had taken effect. I accordingly apply the 2008 Patent Law and the 2010 Implementing Regulations to the PRC-law issues addressed in this declaration. Alexandra Yang and Mark Cohen apply the same versions of those authorities.

## B. Article 6 Establishes Two Statutory Bases for a Service Invention-Creation and Expressly Recognizes Non-service Inventions

23. Article 6 of the 2008 Patent Law identifies two alternative statutory circumstances in which an invention-creation is deemed what Apple's certified English translation calls an **"employment invention-creation,"** which I refer to in this declaration as a **"service invention-creation."** Article 6 provides:

> "An invention-creation that is accomplished in the course of performing the duties of an employee, or mainly by using the material and technical conditions of an employer shall be deemed an employment invention-creation."

Yang Ex. 3 (Dkt. 156-4) at 3.

24. Article 6 therefore identifies two statutory bases for classification as a service invention-creation: (1) the invention-creation was accomplished in the course of performing the duties of an employee; or (2) it was accomplished mainly by using the material and technical conditions of an employer. *Id.*

25. For an invention falling within that category, Article 6 provides:

> "For an employment invention-creation, the employer has the right to apply for a patent. After such application is granted, the employer shall be the patentee."

Yang Ex. 3 (Dkt. 156-4)at 3.

26. Article 6 then expressly addresses the opposite category:

> "For a non-employment invention-creation, the inventor or designer has the right to apply for a patent. After such application is granted, the said inventor or designer shall be the patentee."

Yang Ex. 3 (Dkt. 156-4) at 3. Thus, Article 6 allocates the initial right according to the statutory classification of the particular invention; it does not assign every invention made by an employee to the employer. *Id.*

27. Article 6 establishes the substantive allocation of rights; it does not permit an employer to resolve a disputed ownership claim by unilateral declaration. The 2010 Implementing Regulations expressly recognize disputes over the ownership of patent-application rights and patent rights as disputes to be resolved through administrative mediation or litigation before a People's Court, and provide for patent-office procedures to proceed on the basis of an effective mediation document or court judgment. Yang Ex. 5 (Dkt. 156-6) at 20–21. Thus, where the recorded applicant or patentee contests a university's asserted service-invention claim and no consensual resolution is reached, the university must obtain a judicial determination before it can compel recognition or registration of itself as the rights holder. Apple's own *Weifu* case follows precisely that course: the alleged employer filed an ownership action seeking confirmation of title, and the court entered a judgment confirming it as patentee. Yang Ex. 11 (Dkt. 156-12) at 5–7.

28. Ms. Yang states that, because she considers the '347 invention to be a service invention-creation, the right to apply for a patent "vests in the university, not the professor," and that the university became the owner of the patent "automatically upon its grant." Yang Decl. at 4. The antecedent question is whether the particular invention satisfies either statutory basis for that classification. The existence of an employment relationship, by itself, does not eliminate that threshold inquiry.

29. Mark Cohen and Alexandra Yang ultimately invoke both Article 6 bases for qualifying as a service invention. Ms. Yang states that the '347 invention was made in the course of Professor Yin's university duties "and/or by using the material and technical conditions" of Tongji, while Mr. Cohen concludes that the invention satisfies "one or both" of the Article 6 criteria. Yang Decl. at 4; Cohen Decl. ¶ 26. Each basis, however, has its own statutory predicate. A conclusion that one or both criteria are satisfied does not eliminate the need to identify the facts that establish at least one of those criteria.

30. Article 6 further provides that, for an invention-creation accomplished by using the material and technical conditions of an employer, an agreement between the employer and the inventor or designer concerning ownership of the right to apply for the patent or the patent right shall prevail. I acknowledge this provision exists, but I do not rely on it because I have not been provided with any executed agreement between Professor Yin and Tongji allocating ownership of patents. I therefore express no opinion on the effect of any such agreements between Professor Yin and Tongji if one exists.

## C. Rule 12 Further Defines the First Article 6 Basis

31. Rule 12 of the 2010 Implementing Regulations further defines the first Article 6 basis. It provides that "'A service invention-creation made by a person in the execution of tasks of the entity to which he belongs' referred to in Article 6 of the Patent Law" includes an invention-creation made:

(1) **"in the course of performing his own duty";**

(2) **"in execution of any task, other than his own duty, which was entrusted to him by the entity to which he belongs";** or

(3) within one year after retirement, transfer from the entity, or termination of the labor and personnel relationship, where the invention-creation relates to his own duty or another task entrusted to him by the entity to which he previously belonged.

Yang Ex. 5 at 3.

32. Items (1) and (2) therefore address two circumstances within the same first Article 6 basis: the inventor's "own duty" and another task "entrusted to him by the entity." They are not separate alternatives to the second Article 6 basis concerning the employer's material and technical conditions. Item (1) does not require proof that the employer issued a separate, invention-specific assignment if the relevant R&D was already part of the inventor's regular duty. It does, however, require identification of what that regular duty actually encompassed and a determination that the particular invention was accomplished in the course of performing it. Item (2), by contrast, requires identification of another task entrusted by the entity and a determination that the invention was made in execution of that task. Under either item, general professional-field relatedness is relevant context but does not itself answer the statutory inquiry.

33. The wording of the three categories is significant. Items (1) and (2) concern an invention made "**in the course of performing**" the inventor's own duty or "in execution of" another task entrusted by the entity. Item (3), by contrast, addresses an invention made after departure from the entity and asks whether that later invention broadly "**relates to**" the inventor's former duty or assigned task. **General "relatedness" is therefore expressly part of the post-departure inquiry in item (3); "relatedness" is excluded from the statutory wording of items (1) or (2)**.

## D. The "relates to" Analysis in Item (3) of the First Paragraph of Rule 12 Only Applies to Departed Employees

34. Item (3) of the first paragraph of Rule 12 addresses a distinct category of service inventions: inventions made within one year after the inventor retires, transfers from the former entity, or terminates the relevant labor or personnel relationship, where the invention relates to the inventor's former duties or to a task previously assigned by the former entity. The broader, "related to" formulation in item (3) is therefore part of a distinct post-departure statutory inquiry. It is not the textual standard governing items (1) and (2) for an invention made during continuing employment.

35. That category is not implicated here. The record reflects that Professor Yin remained employed at Tongji during the relevant period, including when the international application underlying the '347 Patent was filed in July 2011. This therefore is not a case involving an invention made after Professor Yin retired from, transferred from, or terminated his employment relationship with Tongji. As discussed

in Section III, SPC 1848 illustrates the SPC's application of the Article 6 standards in the continuing-employment setting presented here (Ex. 2 at 38-43).

36. This distinction is particularly relevant to Guiding Case No. 158, on which Mr. Cohen relies. The stated key points of Guiding Case No. 158 specifically address item (3) of the first paragraph of Rule 12-the one-year post-departure category described above. In that case, the inventor's employment relationship with his former employer terminated on April 17, 2013, and he filed the disputed patent application on July 12, 2013, less than three months later.

37. Guiding Case No. 158 therefore addresses a statutory category that is not presented here. Its stated key points concern whether a post-departure invention is sufficiently "related to" the former employee's duties or assigned tasks under item (3). Although some of the factors identified in that case may be informative in examining the factual record, the Guiding Case does not state that general relatedness satisfies items (1) or (2) for an invention made during continuing employment, nor does its key points define the independent Article 6 requirement that an invention be made "mainly by using" the employer's material and technical conditions. In my opinion, the analysis in the Cohen Declaration, ¶ 23, is misleading to the extent it treats those four factors as the governing test here. Those factors are articulated in Guiding Case No. 158 for determining whether a post-departure invention is a "related invention-creation" under item (3) of the first paragraph of Rule 12. Professor Yin remained employed by Tongji during the relevant period, so item (3) is not the applicable statutory category. Items (1) and (2), by contrast, do not use the broader "relates to" formulation and do not incorporate those four factors as their governing legal test.

## E. Article 6 Separately Establishes the Second Basis "Mainly by Using" the Employer's Material and Technical Conditions

38. The second Article 6 basis is separate from the first. Article 6 asks whether the invention-creation was accomplished **"mainly by using the material and technical conditions of an employer."** Yang Ex. 3 at 3.

39. Rule 12 separately defines the corresponding term using the phrase "material and technical means of the entity." It provides that such means include **"the entity's money, equipment, spare parts, raw materials or technical materials which are not disclosed to the public."** Yang Ex. 5 at 3–4.

40. The operative limiting language in Article 6 is **"mainly by using."** As discussed below in Section III.D, SPC 1848 addresses the substantive meaning of that requirement (Ex. 2 at 41-43), and "mainly by using" requires proof that the employer's qualifying inputs substantively and predominantly produced the invention.

41. The potentially applicable Article 6 inquiries here are therefore two-fold: first, whether the '347 invention was accomplished **"in the course of performing the duties of an employee,"** as further defined by items (1) and (2) of the first paragraph of Rule 12 through Professor Yin's own duty or another task entrusted to him by

Tongji; and second, whether the invention was accomplished **"mainly by using the material and technical conditions"** of Tongji.

### F. Articles 7 and 72 Affirmatively Protect Non-service Inventions

42. Article 7 separately provides: "No unit or individual **shall prevent the inventor or designer from filing a patent application for a non-service invention**." Yang Ex. 3 at 3.

43. Article 72 further provides that, if a person **"usurps the right** of an inventor or designer to apply for a non-service invention patent, or usurps any other rights and interests of an inventor or designer specified in this Law," that person "shall be given an administrative sanction" specified in Article 72. Yang Ex. 3 at 14.

44. Articles 6, 7, and 72, therefore do more than define circumstances in which an employer obtains rights to a service invention-creation. Article 6 expressly gives the inventor or designer the right to apply where the invention is non-employment; Article 7 prohibits interference with the filing of such an application; and Article 72 separately addresses the usurpation of that right. I did not see Articles 7 and 72 explicitly addressed in the Yang Declaration or in the Cohen Declaration, only in their cited exhibits.

### G. PRC Evidentiary Burden for Service-Invention Ownership Disputes

45. Article 64, paragraph 1, of the then-applicable PRC Civil Procedure Law provided that "it is the duty of a party to an action to provide evidence in support of his allegations; otherwise, he shall bear the adverse consequences of failure of proof." Ex. 2 at 40. In a dispute over whether an invention is a service invention under Article 6, the evidentiary showing therefore must address the factual predicate of the particular statutory basis being asserted.

46. SPC 1848 applied that burden of proof in a service-invention ownership dispute. The Supreme People's Court instructed that the court should focus on "examining whether the entity has a lawful basis for claiming a service invention-creation" and "the burden of proof cannot simply be placed on the inventor." Ex. 2 at 39–40. Consistent with the two Article 6 routes, the evidence must therefore establish the facts said to connect the disputed invention to the employee's actual duty or entrusted task, or to qualifying employer material and technical conditions used in the manner required by Article 6. Ex. 2 at 40–43. These are PRC-law evidentiary principles relevant to service-invention classification. I express no opinion concerning the allocation of any procedural burden under United States law, including any burden concerning subject-matter jurisdiction or standing in this action.

### H. Status and Use of PRC Judicial Authorities

47. PRC courts do not operate under the common-law doctrine of stare decisis. Statutes, administrative regulations, judicial interpretations, and other applicable normative rules provide the legal basis for adjudication. Judicial cases

nevertheless play an important role in promoting consistent application of law. Within the PRC case-guidance system, Guiding Cases issued by the Supreme People's Court and Reference Cases included in the People's Court Case Database have distinct formal statuses and rules governing their use.

48. **Guiding Cases** are a specifically designated category of cases determined and uniformly issued by the Supreme People's Court. Article 7 of the Provisions of the Supreme People's Court on Guiding Cases Work provides: "People's courts of all levels shall carry out trials of similar cases with reference to the guiding cases issued by the Supreme People's Court." Ex. 10 at 2. The obligation stated in Article 7 therefore applies when the case being adjudicated is similar to the Guiding Case.

49. The People's Court Case Database contains both Guiding Cases issued by the Supreme People's Court and Reference Cases reviewed and included in the Database by the Supreme People's Court. Ex. 11, Art. 3. Reference Cases are final judgments that have "reference and demonstration value for the trial of similar cases." Id., Art. 4. The 2024 Work Procedures therefore give Reference Cases a formal institutional role distinct from ordinary judicial decisions.

50. The Work Procedures also prescribe how cases in the Database are to be used. Article 19 provides that, when adjudicating cases, people's courts at all levels "shall search the Case Database" and render their judgments "upon reference to similar cases included in the Case Database." Ex. 11, Art. 19. Article 21 further provides that the reasoning and essence of a similar included case may be cited as considerations and reasoning in the pending case, "but shall not [be] take[n] ... as the basis for their judgment." Id., Art. 21.

51. The 2024 Work Procedures did not eliminate the separate status of Guiding Cases. Article 29 expressly provides that the "selection, review, deliberation, use, and other matters of guiding cases shall be governed by" the Provisions of the Supreme People's Court on Guiding Cases Work. Ex. 11, Art. 29. Thus, Guiding Cases remain subject to the separate Article 7 rule requiring reference when adjudicating similar cases, while Reference Cases are SPC-reviewed cases included in the Database for reference in similar cases. In evaluating the authorities discussed below, I therefore consider both their formal status and whether the case actually addresses the statutory issue presented here.

## I. Bona Fide Purchaser Property Rights in Mainland China

52. Article 106 of the Property Law of the People's Republic of China provides:

> Where a person untitled to dispose a real property or movable property transfers the real property or movable property to an assignee, the owner has the right to recover the real property or movable property. Except it is otherwise prescribed by law, once it is under any of the following circumstances, the assignee shall obtain the ownership of the real property or movable property:
>
> (1) The assignee accepted the real property or movable property in good faith;

> (2) The real property or movable property is transferred at a reasonable price; or
>
> (3) The transferred real property or movable property shall have been registered in case registration is required by law, and shall have been delivered to the assignee in case registration is not required.
>
> Where an assignee obtains the ownership of a real property or movable property in accordance with the preceding paragraph, the original owner may ask the person untitled to dispose of the real property or movable property to make compensation for his losses. Where a party concerned obtains any other real right in good faith, he shall be governed by the preceding two paragraphs by analogy.

Yang Ex. 9 at 5.

53. For purposes of the analysis below, I agree with Ms. Yang that PRC bona fide acquisition principles may apply to transfers of patent rights when PRC substantive law governs the transfer at issue. Yang Decl. at 5.

54. Article 106 operates only where the transferor lacked authority to dispose of the right in the first place. If the statutory requirements for bona fide acquisition are satisfied, the transferee acquires the right notwithstanding that unauthorized disposition, and the original owner may seek compensation from the person who lacked authority to dispose of the right. Conversely, if the requirements for bona fide acquisition are not satisfied, the unauthorized disposition does not itself transfer the right away from the original owner. Yang Ex. 9 at 5.

# III. JUDICIAL APPLICATION OF ARTICLE 6 AND THE EVIDENTIARY SHOWING REQUIRED UNDER PRC LAW

## A. SPC 1848 Provides the Most Direct Judicial Framework for the Two Article 6 Bases Asserted Here

55. Yang and Cohen formally invoke both Article 6 bases discussed in Section II above. Their factual reasoning, however, principally emphasizes Professor Yin's employment at Tongji, the timing of the '347 invention and patent application, and the relationship between the patent's subject matter and his university research and work. They do not provide proof of either the actual duty or entrusted task required by the first Article 6 basis or the particular material and technical conditions required by the second. In my opinion, neither analysis correctly applies the governing PRC-law framework to the evidence, and neither establishes the factual predicate required for the '347 invention to be classified as a Tongji service invention.

56. In my opinion, Mr. Cohen misapplies Guiding Case No. 158 by treating factors developed for its post-departure "related invention-creation" inquiry as factors governing whether an invention made during continuing employment is a service invention. Guiding Case No. 158's stated key points, however, concerns the distinct post-departure inquiry under item (3) of the first paragraph of Rule 12, i.e., whether a later invention is "related to" the former employee's duties or assigned tasks. A

Guiding Case is to be referred to in a similar case. Ex. 10 at 2. The SPC has further explained in its official English-language materials that **similarity to a Guiding Case is assessed "in terms of basic facts and the application of law,"** and that where those features are similar, the court is to render its decision "by reference to the headnotes" of the Guiding Case. Exhibit 12 at 4. The statutory issue addressed by Guiding Case No. 158 therefore differs from the issue presented here, where the invention was made during continuing employment and the relevant inquiry under the first Article 6 basis is whether the particular invention was made in the course of Professor Yin's actual duty or in execution of a task entrusted to him by Tongji. Accordingly, under PRC law, the factors identified in Guiding Case No. 158 are not the governing legal test for the continuing employment inquiry presented here. Mr. Cohen's statement in ¶ 24 that PRC law would analyze "whether the invention related to the type of work done by the employee" therefore does not state the governing statutory test for an invention made during continuing employment. That broader "relates to" formulation appears in item (3), whereas items (1) and (2) require that the invention be made in the course of the employee's own duty or in execution of another task entrusted by the employer.

57. Among the PRC judicial decisions I have reviewed concerning Article 6, *Zhengzhou Xincai Technology Co., Ltd. v. Song Junli*, (2020) Zui Gao Fa Zhi Min Zhong No. 1848 ("SPC 1848"), provides a particularly applicable judicial framework for the questions presented here. Ex. 2 at 23, 38-43. SPC 1848 involved an invention made while the inventor remained employed by the entity. Ex. 2 at 38-40. The entity asserted that the invention resulted from the employee's work tasks and, alternatively, that it was made mainly by using the entity's material and technical conditions. Ex. 2 at 38. The SPC separately examined and rejected both grounds and affirmed ownership in the inventor. Ex. 2 at 38-43.

58. The facts in SPC 1848 are especially instructive because they demonstrate the difference between general employment-relatedness and the statutory predicates in Article 6. Even though the inventor encountered the relevant technical problem through his employment and worked directly with the employer's equipment associated with that problem, but the inventor's testing and improvements were on his own time, and no R&D had been allocated by the employer. Ex. 4 at 6-7. The SPC nevertheless proceeded to ask what task the employer had actually assigned, whether that task encompassed the substantive patented solution, and what particular employer material or technical conditions actually contributed to that solution. Ex. 2 at 39-43. The court held that the employer's evidence was "insufficient to prove that it provided the principal material conditions for the R&D of the patent in question and that those conditions had a substantive impact on the making of the invention" and dismissed the appeal, such that the inventor remained the owner of the patent. Ex. 4 at 7.

59. SPC 1848 therefore shows that evidence of employment, timing, technical-field overlap, exposure to the same technical problem, or even work directed toward that problem does not itself resolve Article 6. For the first basis, the inquiry remains whether the particular invention was produced in the course of the employee's actual duty or in execution of a task entrusted by the entity. For the second basis, the inquiry separately asks whether identified employer material or technical conditions played the role required by "mainly by using." Ex. 2 at 39-43.

60. **Importantly, SPC 1848 did not analyze the dispute under the post-departure "related invention-creation" category in item (3) of the first paragraph of Rule 12.** The employer's first Article 6 theory on appeal was that the employee had performed a task entrusted by the employer outside his regular duties. In resolving that theory, the SPC examined the employee's documented regular responsibilities to determine what fell within his own duty and then separately examined whether the employer had entrusted him with the additional R&D task it asserted. The employer's second theory was that the invention had been made mainly by using the employer's material and technical conditions, which the SPC analyzed separately. The decision therefore addresses the Article 6 inquiries arising in the continuing-employment setting presented here, rather than the distinct post-departure "relatedness" inquiry addressed by Guiding Case No. 158. Ex. 2 at 38-43.

61. That distinction matters here because Mr. Cohen relies on Guiding Case No. 158 in deriving considerations such as timing, the content of the employment, and whether an invention was related to the type of work performed by the employee. Those considerations arise in Guiding Case No. 158 in determining whether a post-departure invention is "related to" the former employee's duties or assigned tasks under item (3). SPC 1848, by contrast, demonstrates how the SPC analyzes the statutory predicates actually presented where the invention is made during continuing employment: what duty or entrusted task encompassed the patented solution, and what qualifying employer material or technical conditions actually produced it. Ex. 2 at 40-43. Accordingly, whether the invention merely "related to" Professor Yin's duties is not the governing statutory inquiry here, because Professor Yin remained employed by Tongji during the relevant period and item (3)'s post-departure "related invention-creation" standard is not implicated. To the extent Mr. Cohen treats the factors identified in Guiding Case No. 158 as the governing legal test for this continuing-employment inquiry, I disagree with that analysis, although particular factual considerations reflected in those factors may still be informative.

62. SPC 1848 has substantial institutional weight within the PRC judicial system. It is a final appellate judgment of the Supreme People's Court and is published in full on the official website of the SPC Intellectual Property Court. It was subsequently included in the People's Court Case Database as Reference Case No. 2023-13-2-160-035. Ex. 4 at 6. In U.S. terminology, the closest analogy is *highly* persuasive authority rather than binding precedential authority, although the analogy is imperfect. A Reference Case does not itself constitute the legal basis for a PRC court's judgment, but PRC courts are **required** to search the People's Court Case Database and refer to similar included cases, and the reasoning and key holdings of such cases may be used as considerations and reasoning in adjudication. Thus, a Reference Case carries greater institutional significance than an ordinary nonprecedential judicial decision, while remaining subordinate to statutes, judicial interpretations, and other binding normative rules. The full judgment addresses both Article 6 bases. Ex. 2 at 38-43. When the decision was included in the Database, its stated Key Holding specifically distilled the second basis, requiring the employer's material or technical conditions to be indispensable to completion of the invention and predominant in importance relative to conditions from other sources. Ex. 4 at 8.

63. I do not disregard Guiding Case No. 158. Its stated key points, however, concerns a different statutory inquiry. I therefore use SPC 1848 principally to determine what must be shown under the two Article 6 bases actually asserted for an invention made during continuing employment, while using Guiding Case No. 158 below for the fact-specific considerations it identifies to the extent those considerations are informative. Ex. 2 at 38-43.

## B. PRC Evidentiary Framework: Service-Invention Classification Requires an Evidentiary Basis for the Statutory Nexus

64. SPC 1848 frames the two Article 6 bases in terms of the entity's own contribution to the invention. The SPC explained that performance of an employee's regular duties or another task assigned by the entity reflects "the entity's will," while the principal use of the entity's material and technical conditions reflects "the entity's investment." Ex. 2 at 38. The SPC explained that "[p]erforming regular duties or work tasks reflects the entity's will, while mainly utilizing the material and technical conditions of the entity reflects the entity's investment"; and that "what they have in common is that the entity's factors of production played a substantive role in the invention-creation." Ex. 2 at 38.

65. That requirement also defines the evidentiary inquiry. The SPC cautioned that, absent a specific legal basis, ownership cannot be determined merely from the inventor's affiliation with an entity or merely from the fact that the invention was completed while the inventor was working for the entity. In a service-invention ownership dispute, the SPC stated that "the focus should be on examining whether the entity has a lawful basis for claiming a service invention-creation, and the burden of proof cannot simply be placed on the inventor." Ex. 2 at 39. The SPC further warned against allowing an entity to reap an **"unexpected windfall"** merely from the existence of the employment relationship. Ex. 2 at 39; Ex. 3 at 6.

66. SPC 1848 then applied the general evidentiary rule in Article 64, paragraph 1 of the then-applicable PRC Civil Procedure Law: "it is the duty of a party to an action to provide evidence in support of his allegations; otherwise, he shall bear the adverse consequences of failure of proof." Ex. 2 at 40. The relevant proof must address the factual predicate of the particular Article 6 basis asserted. Ex. 2 at 40.

67. Importantly, SPC 1848 did not conduct that inquiry at the level of broad subject-matter similarity. Before determining whether the employer's task or resources generated ownership, the SPC examined **both the technical problem that gave rise to the invention and the substantive features of the patented technical solution**, including the feature that distinguished the patent from the prior art. It then asked whether the asserted employer task or employer resources had played the required substantive role in producing that particular solution. Ex. 2 at 39-43.

68. I therefore understand SPC 1848 to require Tongji University to present **evidence sufficient to establish the statutory nexus on which service-invention classification depends**. For the first Article 6 basis, the evidence must connect the entity's will, manifested through the inventor's actual duty or an assigned task, to the

disputed invention. For the second, the evidence must connect qualifying material or technical conditions of the entity to the invention in the manner required by **"mainly by using."** I address those substantive PRC-law showings separately below. Ex. 2 at 38-43.

69. I express no opinion concerning the allocation of burdens of proof under United States procedural law, **including the burden applicable to Article III standing in this action**. Nothing in my opinion is intended to alter that allocation. My opinion is limited to the substantive PRC-law inquiry: what facts and evidentiary connections PRC law requires before an invention is classified as a service invention-creation under either Article 6 basis.

## C. First Article 6 Basis: The Entity Must Connect Its Actual Duty or Assigned Task to the Substantive Patented Solution

70. According to SPC 1848, the first Article 6 basis reflects the will of the entity, as manifested through the inventor's regular duty or another task entrusted by the entity. The relevant question is whether the entity's will, through the inventor's actual duty or another task assigned by the entity, ***extended to the development of the particular inventive solution***. If the entity relies on the inventor's own duty, the relevant inquiry is the actual content of those regular responsibilities and whether the invention in dispute was made in the course of performing them; a separate *ad hoc* assignment is not required. If the entity relies instead on a task outside the inventor's own duty, the entity must identify the task that it entrusted to the inventor and establish the connection between that task and the invention. In either circumstance, employment status, professional title, and general technical-field overlap are relevant circumstances but do not themselves establish that the R&D producing the particular patented solution was undertaken in performance of the entity's duty or task. Ex. 2 at 38-41.

71. As part of distinguishing the employee's regular duty from the additional task asserted by the employer, SPC 1848 examined concrete evidence of what the employee was actually employed and required to do. The employer submitted the employee's labor contract, meeting minutes, performance evaluation, work summaries, and regular work reports. Those materials showed that the employee performed substantial work involving the relevant equipment, including installation, maintenance, testing, modification, and communications with suppliers. The SPC nevertheless found that the evidence did not establish, through the labor contract, position, or other contemporaneous records, that R&D of the relevant production equipment formed part of the employee's regular duty. The decision therefore illustrates that the content of an employee's "own duty" is determined from evidence of the responsibilities actually assigned to the position, rather than inferred merely from technical proximity between the employee's work environment and the later invention. Ex. 2 at 40-41.

72. Where the employer relied instead on another assigned task, the SPC stated the evidentiary requirement in concrete terms: "Specifically applied to this case, Xincai Company was required to provide valid evidence showing that it expressly assigned Song Junli a work task requiring him to propose a new technical solution to

solve the service-life problem of the conveyor belt of the graphene microwave expansion furnace." The Court then concluded: "Xincai Company failed to fulfill this burden of proof." Ex. 2 at 40.

73. SPC 1848 makes clear that assigning a **problem** is not necessarily the same as assigning the **patented solution**. Although the employer had contemporaneous evidence that the employee was tasked with addressing the same underlying technical problem, the SPC examined the actual scope of that task and found that it did not encompass the materially different technical solution embodied in the patent. The court therefore rejected the assigned-task theory even though the technical problem itself arose directly from the employee's work. Ex. 2 at 40.

74. The SPC also rejected reliance on the employee's later characterization of the patented invention as a work accomplishment. Although his performance evaluation and work summary listed the patented equipment among his R&D or innovative achievements, the SPC held "Therefore, Song Junli's achievement report itself is not sufficient to prove that Song Junli's completion of the invention-creation in question was performing his regular duties or a work task outside of his regular duties.". Ex. 2 at 41. The SPC noted that, during development of the invention, the employee had not reported its R&D progress to the employer or sought the employer's assistance in resolving technical problems. Ex. 2 at 41.

75. SPC 1848 is particularly instructive because the technical problem addressed by the patent admittedly arose from the employee's work, and the patent concerned the same general technical field as the employer's equipment. Even so, the SPC required proof that the employee's actual duty or assigned task extended to the R&D that produced the substantive patented solution. Work-related origin and technical relatedness, standing alone, were insufficient. Ex. 2 at 39-41.

76. Apple's own cited authority in *Weifu* illustrates the result of a fundamentally different fact pattern. Yang Ex. 11. There, the employer had "launched the research and development project for the technology of the disputed patent," the inventors "accepted work assignments" from that employer, and they "participated in and finished all research and development work related to the disputed patent." The court therefore had concrete evidence that the R&D producing the disputed patent was undertaken as work assigned by the entity. Yang Ex. 11 (Dkt. 156-12) at 6.

77. Read together, SPC 1848 and Apple's cited *Weifu* decision illustrate the kind of invention-specific evidence that distinguishes a demonstrated service-invention nexus from general employment and technical relatedness. Where the entity relies on the inventor's own duty, the evidence should establish the content of that duty and that the R&D producing the disputed invention fell within those regular responsibilities. Where the entity relies on another entrusted task, the evidence should identify that task and show that it encompassed the relevant R&D. Relevant evidence may include employment or engagement terms, defined job responsibilities, identified R&D projects and task assignments, and contemporaneous records documenting performance of that R&D. Neither decision suggests that a job description must name the eventual patent; the point is that the evidence must connect the work the entity actually required to the R&D that produced the substantive patented solution. Ex. 2 at 40-41; Yang Ex. 11 (Dkt. 156-12) at 9.

### D. Second Article 6 Basis: "Mainly by Using" Requires Proof that the Entity's Qualifying Inputs Substantively, and Predominantly, Produced the Invention

78. The second Article 6 basis reflects the investment of the entity and is analytically independent of the first. Failure to establish an assigned duty or task does not permit general evidence of an employment-related research environment to substitute for the second statutory basis. The question is whether qualifying material or technical conditions of the entity actually played the role required by "**mainly by using**." Ex. 2 at 38, 41-43.

79. In construing that standard, SPC 1848 relied on both Rule 12, which identifies the entity's money, equipment, components, raw materials, and nonpublic technical materials (Yang Ex. 5 at 3-4), and Article 4 of the SPC's Judicial Interpretation concerning technology-contract disputes. The latter treats material conditions as relevant where all or a substantial part of the entity's qualifying resources were used in the R&D process and those conditions had a **substantive impact on formation of the technical achievement**. The SPC used those authorities to distinguish the mere availability of employer resources from their legally significant contribution to the invention. Ex. 2 at 41-42.

80. The SPC then separately defined material conditions and technical conditions. Material conditions, such as money, equipment, components, and raw materials "**which are directly or indirectly used in R&D activities and, through analysis, verification, and testing, lead to the technical solution of the invention**.", and such use must have "**a substantive impact on the formation of the invention.**" Ex. 2 at 42. Technical conditions, by contrast, refer to undisclosed technical information and materials, including technical achievements not yet disclosed to the public and interim technical achievements, "**which provide technical teaching for the formation of the substantive characteristics of the invention**." Ex. 2 at 42.

81. The word **"mainly"** in "mainly by using the material and technical conditions of an employer" (Yang Ex. 3 at 4) imposes a further and demanding limitation. SPC 1848 held that the entity's material or technical conditions must be **"an indispensable condition"** in the process of creating the invention, such that the invention could not have been achieved without them. Ex. 2 at 42; Ex. 4 at 8. In addition, compared with material or technical conditions from other sources, the entity's conditions must **"hold a primary position in importance"** and outweigh those other sources. Ex. 2 at 42. This aspect of the judgment was later selected as the Key Holding of Reference Case No. 2023-13-2-160-035, i.e., SPC 1848. Ex. 2 at 42; Ex. 4 at 8.

82. SPC 1848's application of those rules shows the degree of invention-specific proof required. The employer in SPC 1848 did not merely allege that relevant resources existed. It asserted that the employee had participated throughout the testing and modification of the employer's equipment and had used the employer's equipment, raw materials, equipment-modification plans, and experimental data. It further argued that the patent and its existing equipment were highly similar in component structure and technical solution. The SPC nevertheless

rejected the claim because those circumstances did not establish that the identified conditions made the legally required contribution to the patent's substantive inventive feature. Ex. 2 at 41-42.

83. With respect to material conditions, the SPC examined the evidence against the patent's **principal innovation**. It found no dedicated funding for development of the disputed patent. It further found that the employer's equipment and components did not embody the patent's principal innovation, and that no identified employer material condition had been used in analysis, verification, or testing directed to development of that patented solution. The SPC therefore concluded that the existing evidence was insufficient to prove that the employer had provided the principal material conditions for the invention. Ex. 2 at 42.

84. With respect to technical conditions, the SPC expressly cautioned that "the technical environment in which the inventor is located during the invention-creation process of the patent in question, or company technical materials known to or possessed by the inventor, should not be confused with the technical conditions stipulated by law." Ex. 2 at 42. Unless the asserted technical material provides technical inspiration for the **substantive features of the patented solution**, it should not, in principle, affect patent ownership. The employer in SPC 1848 failed to prove either that the relevant equipment embodied its own nonpublic technical solution or that the employee used its equipment-modification plans or experimental data to produce the invention. Ex. 2 at 42-43.

85. SPC 1848 separately addressed the source of the **technical problem** itself. The SPC explained that a technical problem may qualify as an entity's technical condition where it forms part of the entity's nonpublic intermediate technical achievement and materially directs or shortens the inventor's R&D process. By contrast, a publicly known problem, or a defect in an externally supplied product that is not shown to constitute the entity's protected nonpublic technical information, does not provide the entity with a basis for ownership merely because the employee learned of that problem at work. Ex. 2 at 43.

86. The distinction is significant because, in SPC 1848, the employee admittedly conceived the motivation for his invention from a technical problem he encountered while working for the employer. Even that direct work-related origin did not establish the second Article 6 basis. The employer still had to prove that the relevant technical problem or other employer inputs constituted qualifying material or technical conditions and that those conditions played the indispensable and predominant role required by Article 6. Ex. 2 at 38-39, 42-43.

87. I therefore understand the second Article 6 basis to require an invention-specific chain of proof. The party asserting this basis must identify the particular employer material or technical condition on which it relies; establish that the condition qualifies under Rule 12; show that it was actually directed to or used in the R&D that produced the disputed invention; and establish that it contributed substantively to the formation of the patent's substantive inventive features. For asserted technical conditions, the evidence must further show that the information was nonpublic and provided technical inspiration for those substantive features. Ex. 2 at 41-43.

88. Even where some qualifying employer condition was actually used, that does not end the inquiry. To satisfy "mainly by using," the evidence must establish that the condition was indispensable to completion of the invention and, when compared with material and technical conditions from other sources, occupied the predominant position in importance. The relevant question is therefore not whether the employer can identify some relationship between its research environment or resources and the inventor. It is whether the evidence traces identified qualifying employer inputs to the substantive inventive features of the disputed patent and establishes that those inputs were indispensable and predominant in producing them. Ex. 2 at 42-43.

## E. Guiding Case No. 158 Addresses the Inapplicable Post-Departure "Related Invention-Creation" Inquiry

89. Guiding Case No. 158 has the formal status of an SPC Guiding Case, but its stated key points expressly address a particular statutory category that does not apply to the facts of this case. Cohen's certified translation begins: "When determining whether an invention-creation falls under the 'related invention-creation' specified in Item (3) of Paragraph 1 of Article 12 of the Implementing Regulations of the Patent Law" in the case of a "departing employee,"[2] the document then sets out the factors for determining whether the **post-departure** invention is related to the former employee's regular duties or assigned tasks. Cohen Ex. 7 at 3. The SPC has separately explained that a Guiding Case is to be used within the scope of its stated key points and in a similar case, with particular attention to whether the issue in dispute is similar. Thus, the formal status of Guiding Case No. 158 does not expand its key points into a general "relatedness" standard for inventions made during continuing employment. In my opinion, it would be incorrect as a matter of PRC law to treat the factors articulated in Guiding Case No. 158 for the post-departure inquiry under item (3) as the governing legal test for an invention made during continuing employment.

90. This distinction matters here because Mr. Cohen expressly relies on Guiding Case No. 158 and, in applying PRC law to the '347 Patent, emphasizes that the patent was issued during Professor Yin's employment, was related to his research and work, and was later listed among his accomplishments. He then concludes that the invention satisfies "one or both" Article 6 criteria. Guiding Case No. 158 does not establish that employment plus technical relatedness is itself sufficient under either Article 6 basis applicable to an invention made during continuing employment.

91. I nevertheless consider Guiding Case No. 158 within the scope of its stated key points because its fact-specific methodology is informative. Cohen's certified translation identifies four considerations:

> "1. Specific contents of the regular duties undertaken or tasks assigned by the original employer to the departing employee; 2. Specific

[2] In the context of Rule 12(3) which begins "within one year after retirement" and refers to "the entity to which he previously belonged," the "departing employee" actually refers to "departed" (past tense) employees. Yang Ex. 5 at 4-5.

> circumstances of the patent in dispute and its correlation with the regular duties or assigned tasks of the departing employee; 3. Whether the original employer carried out technical research and development activities related to the patent in dispute, or whether relevant technologies have other legitimate sources; 4. Whether the patentee and inventor of the patent application in dispute can provide reasonable explanations for the R&D process or technical origin of the patented technology."

Cohen Ex. 7 at 3. These considerations confirm that even the broader post-departure "related invention-creation" inquiry is invention-specific: it examines the actual duties and tasks, the particular patent technology and its relationship to those duties, the employer's actual R&D, possible legitimate alternative technological sources, and the concrete development history of the patent.

92. The evidentiary record in Guiding Case No. 158 illustrates the point. The employee's defined responsibility expressly included R&D of products related to infusion and medicine-dispensing robots; he signed R&D procurement documents and controlled technical drawings; work emails showed that he received testing reports, directed testing, and participated repeatedly in R&D discussions; the disputed patent concerned closely related automated pharmaceutical equipment; the application was filed less than three months after termination of employment; and the inventor had no comparable medical-device experience before joining the former employer. Cohen Ex. 7 at 3-5. The finding of a "related invention-creation" thus rested on a developed, invention-specific evidentiary record, not merely on former employment or broad technical-field similarity.

93. The fourth Guiding Case No. 158 consideration, whether the patentee or inventor can reasonably explain the R&D process or technical origin, should likewise be understood within that statutory context. It is one factor in the item (3) post-departure inquiry; it does not state a general rule requiring an inventor to disprove service-invention status, nor does it replace the proof required for the Article 6 bases applicable during continuing employment. Likewise, Guiding Case No. 158 does not define the separate Article 6 requirement that an invention be accomplished "mainly by using" the employer's material and technical conditions.

## F. The Rules Applied Below

94. Based on the statutory framework and the judicial authorities discussed above, I apply the following principles in evaluating the '347 invention:

> (a) Employment, timing, position, and technical relatedness are not substitutes for an Article 6 basis. A party asserting service-invention ownership must establish the factual predicate of at least one applicable Article 6 basis; the invention is not classified as a service invention merely because it was made during employment or concerns a field related to the employee's work. A party asserting service-invention ownership has the burden of proof. Ex. 2 at 39-40.

(b) For the first Article 6 basis, "own duty" and an entrusted task must be analyzed separately, but both require a connection to the particular invention. If the entity proves that the inventor's own duty involved creating the invention, then the entity need not prove a separate assignment; but that entity must establish the actual content of that duty and that the R&D producing the disputed invention was undertaken in the course of performing it. If the entity relies on another entrusted task, it must establish the task entrusted to the inventor and its connection to that R&D. In either case, general professional-field relatedness does not itself establish that the invention was made in execution of the entity's tasks. Ex. 2 at 40-41.

(c) An assigned technical problem is not necessarily an assigned patented solution. Even where the employer proves that the inventor was instructed to address the same underlying technical problem, the inquiry remains whether the actual duty or assigned task extended to the R&D that produced the substantive technical solution embodied in the disputed patent. Ex. 2 at 40.

(d) For the second Article 6 basis, the asserted employer input must first qualify as a statutory material or technical condition and then be connected to the particular invention. The evidence must identify the specific employer condition, show that it was actually directed to or used in the R&D producing the disputed invention, and establish that it made a substantive contribution to the patent's substantive inventive features. Where technical information is relied upon, the evidence must establish that the information was nonpublic and provided technical inspiration for those features. Ex. 2 at 41-43.

(e) Actual use of some employer resource is not enough to establish "mainly by using." The employer's qualifying material or technical conditions must have been indispensable to completion of the invention and, compared with material and technical conditions from other sources, must have occupied the predominant position in importance. Ex. 2 at 42.

(f) A general research environment does not fill an evidentiary gap under either basis. Technical-field similarity, access to institutional resources, use of employer resources for ordinary work, possession of technical materials, or even exposure through employment to the technical problem does not substitute for the required connection between the entity's duty, task, or qualifying inputs and the substantive patented solution. Nor may failure to establish the first Article 6 basis be cured simply by repackaging the same generalized employment or relatedness evidence as proof of the second. Ex. 2 at 39, 42-43.

(g) Guiding Case No. 158 does not alter those requirements. Its stated key points address the distinct one-year post-departure "related

invention-creation" category. Its considerations concerning specific duties, the relationship between the patent and those duties, relevant employer R&D, alternative legitimate technological sources, and development history may inform the factual inquiry, but they do not replace the statutory and evidentiary showing required for either Article 6 basis applicable here. Cohen Ex. 7 at 3-7; Cohen Ex. 6 at 3 (Rule 12(3)).

95. I apply these principles in the next section to the evidence concerning Professor Yin, Tongji University, the development and technological source of the '347 invention, and the factual bases asserted for treating that invention as a Tongji service invention.

# IV. APPLICATION OF ARTICLE 6 TO THE '347 INVENTION

## A. Apple's Evidence Does Not Establish Either Article 6 Basis

96. Apple's experts Yang and Cohen principally rely on Professor Yin's employment at Tongji, his research and professional background in wireless communications, Tongji's contemporaneous projects in areas like channel modeling, the timing of the '347 invention during his Tongji employment, the later listing of the '347 Patent on his Tongji faculty profile, and Tongji's internal rules concerning service inventions. I regard those circumstances as relevant to the Article 6 inquiry. Ms. Yang's opinion relies substantially on those circumstances in concluding that the invention was made in the course of Professor Yin's Tongji duties and/or by using Tongji's material and technical conditions.

97. With respect to the first Article 6 basis, Apple's evidence makes the own-duty inquiry a relevant one. Professor Yin was employed by Tongji University in 2010-2011 in a wireless-communications-related academic position, and the materials identify Tongji projects on page 2 of Yang Ex. 6 at 2. These research projects (#17-22) relate to "Channel Mapping and Channel Characterization," ""Parametric characterization and estimation," "channel modeling," "Power Spectral Density Estimation and Modeling," and "Characterization, Parameter, Estimation, and Modeling," and "Channel Measurement Data Analysis and Statistical Modeling" in wireless communications. Those circumstances establish work in the same general discipline of wireless communications. They do not, however, complete the Rule 12(1) inquiry. If Apple relies on Professor Yin's **own duty**, the relevant questions are what his regular Tongji responsibilities actually were during the period when the '347 solution was developed and whether the R&D producing that particular user-focusing solution was undertaken in the course of performing those responsibilities. If Apple instead relies on an **entrusted task**, the relevant question is what task Tongji entrusted to him and whether that task encompassed the R&D producing the particular solution.

98. The materials identified by Apple do not establish the necessary next step. They do not include Professor Yin's executed Tongji engagement contract, a contemporaneous Post Responsibility Statement, or another contemporaneous document defining the scope of his regular post responsibilities. Nor do they identify a

Tongji project charter, deliverable, task record, performance record, internal invention disclosure, or work report showing that the R&D producing the user-focusing solution was undertaken as part of those responsibilities or as another task entrusted by Tongji. This omission is particularly relevant in light of Tongji's own employment-contract rules, on which Apple relies for other purposes. Those rules treat the Engagement Contract as the instrument defining the parties' rights and obligations, expressly extend that contractual framework to **Post Responsibility Statements**, require the written contract to specify the engagee's **"post title, category, and responsibility requirements,"** and permit the parties to agree separately on intellectual-property protection. The Tongji project titles identified by Apple establish related research activity, but none of the materials identified by Apple shows that a deliverable of those projects was the particular user-focusing solution documented for the '347 invention. The later faculty profile likewise does not supply that missing contemporaneous nexus. The same profile lists another Professor Yin invention, *Directional Adjustment of Voltage-Controlled Phased Array Structures*, among his "Granted Invention Patents," while the USPTO assignment record for the corresponding U.S. application identifies Professor Yin as the assignor and Empire Technology Development LLC as the assignee. Ex. 8 at 1, 3-7. I therefore regard the faculty profile as evidence of Professor Yin's research and patent accomplishments, not as a Tongji ownership register or a contemporaneous record establishing that development of the '347 solution was part of his Tongji duty.

99. The contemporaneous documents instead identify SAGE as the submitting party for the [redacted], show Professor Yin signing SAGE's acceptance of the Yin-to-SAGE assignment with the title "Inventor," and show that SAGE subsequently issued a written authorization dated June 20, 2011 authorizing Professor Yin to sign documents relating to SAGE. Ex. 5 at 6, 48; Ex. 6 at 3. These contemporaneous documents therefore identify [redacted] path for the '347 solution, while the record identified by Apple does not show that Tongji assigned Professor Yin a task to develop that particular solution.

100. Tongji's internal Article 56 does not supply that missing showing. There are both temporal and substantive reasons. First, the Administrative Measures for the Employment Contract System of Tongji University ("Tongji Employment Contract Measures"), which contain Article 56, state in Article 67 that they "shall come into force on the date of promulgation" and bear the date November 3, 2010. Yang Ex. 7 (Dkt. 156-8) at 31, 43. The contemporaneous [redacted] already sets out in substantial technical detail the user-focusing problem and proposed solution. Article 56 therefore does not itself establish what Professor Yin's own duty was when that solution had already been documented. Second, the same Tongji Measures distinguish institutional rules from the individualized content of an employee's post: they contemplate written Engagement Contracts and Post Responsibility Statements specifying post responsibilities, permit separately negotiated intellectual-property provisions, and generally require modifications to an engagement contract to be made by mutual agreement and in writing. Third, Article 56 itself is expressly qualified

by **"Except where otherwise provided by laws or administrative regulations,"** and Article 66 likewise provides that superior law controls in the event of conflict. Article 57, moreover, addresses the consequence where an achievement has first been verified to be a "Service Invention" and the University affiliation has not been identified; it does not itself determine whether the statutory Article 6 predicate is satisfied. I therefore regard Article 56 as relevant evidence of Tongji's internal policy after its promulgation, but not as evidence that, before that date, the particular '347 R&D formed part of Professor Yin's own duty or as an independent rule vesting patent-application rights in Tongji without satisfying Article 6 and Rule 12.

101. With respect to the second Article 6 basis, Apple's identified evidence likewise does not establish the required chain. It does not identify any particular Tongji funding, equipment, component, raw material, or other material resource actually used in the R&D producing the '347 user-focusing solution and substantively contributing to its inventive features. Nor does it identify any particular nonpublic Tongji dataset, technical report, experimental result, intermediate technical achievement, or other nonpublic technical material that provided technical inspiration for those features. And it does not establish that the technical problem underlying the '347 invention was itself a nonpublic Tongji technical achievement or other qualifying Tongji technical condition.

102. The '347 specification does not provide affirmative support for Apple's second Article 6 theory. Nothing in the specification identifies a Tongji-specific laboratory, equipment, experimental program, proprietary dataset, nonpublic technical material, or other Tongji resource as contributing to development of the user-focusing solution. The specification therefore supplies no additional evidence establishing that a qualifying Tongji condition was actually used, much less that such a condition was indispensable and predominant.

[redacted]

104. Accordingly, the evidence identified by Apple does not establish that the R&D producing the substantive '347 solution was undertaken **in the course of performing an identified Tongji own duty** or **in execution of another task entrusted by Tongji**. Nor does it establish qualifying Tongji material or technical conditions that substantively, indispensably, and predominantly produced that solution. **On the evidentiary record identified here, I therefore do not find either Article 6 basis for a Tongji service invention established.**

### B. Contemporaneous Records Identify an External RFI-Linked Problem-Solving and Invention-Submission Path for the '347 Solution

105. My conclusion does not rest solely on the absence of evidence establishing either Article 6 basis. The contemporaneous record contains invention-specific documents showing that, before the '347 patent application was filed, the particular user-focusing solution had been documented and submitted through a separate [redacted] invention-submission process. Most importantly, [redacted]

[redacted]

107. The record also contains USPTO records of other transactions between SAGE and Empire concerning inventions other than the '347 invention, including transactions predating the '347 transaction. Ex. 8. I rely on those records for the limited purpose of showing that the SAGE-Empire relationship was not documented only in connection with the '347 invention, but involved multiple invention transactions. I do not rely on those other transactions as evidence of the technical source or ownership of the '347 invention.

[redacted]

[redacted]

[redacted]

110. That fact is directly relevant to the first Article 6 basis. As discussed above, SPC 1848 demonstrates that the source of a technical problem and the scope of the employer's actual duty or entrusted task must be examined rather than inferred from employment or technical relatedness alone. In SPC 1848, the relevant technical problem arose directly from the employee's work for the employer, the employee worked with the equipment presenting that problem, and the employer had instructed him to address it. Yet the SPC still examined whether the employer's task actually extended to the R&D that produced the materially different patented solution and concluded that the evidence did not establish that connection. Ex. 2 at 39-43. Here, Apple has not identified comparable contemporaneous evidence showing that Tongji supplied the problem-solving request underlying the user-focusing invention, made development of that solution part of Professor Yin's identified regular duty, or entrusted him with a task encompassing that development. **The invention-specific contemporaneous record instead identifies an external [redacted] to which the '347 proposed solution was submitted in response.** That evidence materially weighs against inferring, merely from Professor Yin's university position or general research field, that the work producing the '347 solution was undertaken in the course of a Tongji duty or entrusted Tongji task.

111. The [redacted] focus[redacted] at the user locat[redacted]on. My [redacted]y [redacted]: [redacted]

112. The same contemporaneous [redacted] Their evidentiary significance is: the contemporaneous external process itself distinguished the problem presented for inventive work from contribution to the proposed technical solution, and identified Professor Yin in the latter role. That distinction is consistent

with the analytical distinction in SPC 1848 between the source of a technical problem and the separate question whether the employer's duty or assigned task encompassed development of the patented solution. Ex. 2 at 39-40.

113. The subsequent contemporaneous documents continue the same invention-specific path. The [redacted] Professor Yin executed the Yin-to-SAGE assignment on February 15, 2011; that instrument states that it is "effective as of July 20th, 2010" and defines the assigned invention by reference to the same specifically titled [redacted]. Ex. 5 at 2-6. A separate SAGE-to-Empire assignment concerning the same invention states that it is "effective as of Jan 18th, 2011," and Empire's acceptance of that assignment is dated February 28, 2011. Ex.5 at 7-11. The PCT application followed on July 28, 2011.

[redacted]

115. The same record is also informative under the methodology of Guiding Case No. 158, even though, for the reasons explained above, its formal key points concerns the distinct post-departure category in Rule 12(1)(3). Among the considerations identified there are whether relevant technology had another legitimate source and whether the inventor or patentee can reasonably explain the R&D process or technical origin of the disputed technology. Here, the historical record is not limited to a later patent assignment or an unexplained assertion of independent invention. [redacted] The Tongji faculty profile relied on by Apple also records that, before joining Tongji in 2008, Professor Yin had worked as a Motorola systems engineer, obtained graduate degrees in digital and wireless communications from Aalborg University, served there as an assistant professor, and had been engaged in radio-wave propagation-channel research since 2002. Yang Ex. 6 at 1. It is relevant because it demonstrates an established source of wireless-communications expertise independent of Tongji and materially differs from the factual setting in Guiding Case No. 158, where the inventor lacked comparable pre-employment experience in the relevant field. Taken together, the records provide a contemporaneous explanation of the [redacted] request to which the '347 proposal responded and the process through which that proposal was documented and taken forward toward patenting.

116. In my opinion, these records affirmatively and persuasively preclude any reasonable inference in Apple's favor, even considering Professor Yin's Tongji employment and the general technical overlap on which Apple relies. Apple identifies Tongji research in related wireless-communications fields, but the materials it

identifies do not contain a contemporaneous Tongji duty description, project deliverable, task record, internal invention disclosure, work report, or other invention-specific document showing that development of the user-focusing solution was undertaken in performance of Professor Yin's Tongji duty or an entrusted Tongji task. The [redacted] record, by contrast, contains an actual July 2010 technical disclosure of that solution within an identified external RFI process. Ex. 5 at 48-56. **That evidence provides affirmative, invention-specific evidence of a non-Tongji source [redacted] for the problem-solving request to which the proposed solution responded, together with a contemporaneous process through which that solution was documented, submitted, and taken forward toward patenting.** Where Apple relies principally on employment status and general technical relatedness to infer a Tongji source, that contemporaneous external evidence is relevant to whether the particular R&D was in fact undertaken in performance of Professor Yin's Tongji duty or an entrusted Tongji task. Under the Article 6 framework discussed above, I do not regard the general employment-and-relatedness inference, without the further invention-specific connection, as sufficient to establish the first Article 6 basis.

## C. Conclusion Under Article 6

117. The Article 6 inquiry ultimately remains an invention-specific one. Professor Yin's employment at Tongji, his position there, Tongji's contemporaneous wireless-communications research, and the technical overlap reflected in projects like channel modeling do not, however, themselves establish a statutory conclusion that the '347 invention arose from a duty to Tongji. The first Article 6 basis still requires a determination that the R&D producing the particular user-focusing solution was undertaken in the course of Professor Yin's actual Tongji duty or in execution of another task entrusted by Tongji; the second separately requires the predominant use of qualifying Tongji material or technical conditions. Apple has not met the burden of proof for either basis.

118. In my opinion, viewed as a whole, the contemporaneous transaction documents, assignments from Yin-to-SAGE and SAGE-to-Empire (Ex. 5 at 2-11), the [redacted] together with the March 9, 2026 testimony of Ms. Rudersdorf (Ex. 7), support the reasonable inference that Professor Yin encountered the relevant technical problem to be solved and developed the inventive solution for Shanghai SAGE [redacted] (Ex. 5 at 16-63), and that the invention was not made in the course of Professor Yin's actual duties for Tongji University or in execution of a task entrusted to or assigned to him from Tongji University. The Yin-to-SAGE and SAGE-to-Empire assignments themselves confirm this. Ex. 5 at 2-11. They are signed and witnessed and provide the context for Professor Yin's work to develop the invention for Shanghai SAGE [redacted], and they define the assigned invention by reference to the specifically titled [redacted], *A User-Focusing Technique For MIMO And CoMP (Coordinated Multiple-Point) Communication Systems*. Ex. 5. The March 9, 2026 testimony of Ms. Rudersdorf further confirms that Professor Yin encountered the relevant technical problem to be solved and [redacted]

[redacted] and that the invention was not made in the course of Professor Yin's actual duties for Tongji University or in execution of a task entrusted to or assigned to him from Tongji University. This is additionally confirmed by and corroborated by contemporaneous documentation that predates the assignments, as discussed. In my opinion, the evidence considered together is consistent with, and supports, this external development and submission path, while the record identified by Apple does not establish a Tongji duty or entrusted task encompassing the particular '347 solution.

119. On the materials identified by Apple, the next invention-specific connection required by either route is not established. The record does not identify the content of Professor Yin's regular Tongji responsibilities through an executed engagement agreement, contemporaneous responsibility statement, or comparable record showing that development of the user-focusing solution fell within those responsibilities; nor does it identify another Tongji task encompassing that R&D. The record likewise does not identify qualifying Tongji funds, equipment, nonpublic technical materials, data, intermediate technical achievements, or other statutory conditions shown to have contributed substantively, indispensably, and predominantly to the formation of the '347 solution. In my opinion, Apple has not met the burden of proving under Chinese law that the '347 patent is a service invention of Tongji University.

120. At the same time, the historical record is not silent as to the particular invention [redacted] the subsequent transaction documents continued to identify that same [redacted]; and the transfer and patenting documents followed before the later July 2012 USPTO recordation. Their narrower significance is that they provide contemporaneous, invention-specific evidence concerning an external problem-solving request and submission path where Apple's Tongji theory rests principally on employment, institutional research overlap, and later descriptions of Professor Yin's accomplishments. In my opinion, the evidence in Ex. 5 would make it unreasonable for Apple to prevail on its service invention theory under Chinese law.

121. Considering those facts together, in my opinion, the materials I have reviewed do not satisfy either statutory predicate for classifying the '347 invention as a Tongji service invention-creation under Article 6. The record does not establish that the particular invention was made in performance of his actual Tongji duty or another task entrusted by Tongji, and it does not establish that qualifying Tongji material or technical conditions were mainly used in the statutory sense discussed above.

122. Article 6 expressly provides the consequence where an invention is not a service invention-creation: the right to apply for a patent belongs to the inventor or designer. Accordingly, on the factual record I have reviewed and for purposes of the Article 6 analysis, the initial right to apply for the '347 invention belonged to Professor Yin rather than Tongji. Whether and when Professor Yin thereafter transferred that right, and the law governing the legal effect of subsequent transfers, are separate

chain-of-title questions addressed below; they do not alter the Article 6 determination of initial entitlement.

# V. THE YIN-TO-SAGE ASSIGNMENT CHRONOLOGY AND THE DERIVATIVE NATURE OF APPLE'S *BONA FIDE* ACQUISITION THEORY

## A. The Contemporaneous Transaction Record Predates the July 16, 2012 USPTO Recordation and Does Not Support Apple's Same-Day-Transfer Premise

123. Ms. Yang describes the chain of title as follows: Professor Yin assigned the '347 Patent to SAGE on July 16, 2012, and SAGE transferred it to Empire on the same day. Yang Decl. at 2. She later relies on that asserted same-day sequence in concluding that the transferees knew or should have known of an ownership problem. Having reviewed the contemporaneous transaction documents, I do not believe that description accurately reflects the chronology preceding the USPTO recordation.

124. The documentary history began substantially earlier than the July 2012 USPTO recordation. [redacted] SAGE-to-Empire assignment concerning the same invention states that it is "effective as of Jan 18th, 2011." Ex. 5 at 7. Professor Yin executed the Yin-to-SAGE assignment on February 15, 2011, and that instrument states that it is "effective as of July 20th, 2010." Ex. 5 at 2-5. Empire's written acceptance of the SAGE-to-Empire assignment is dated February 28, 2011. Ex. 5 at 11. The PCT application was filed on July 28, 2011. The relevant assignments were recorded with the USPTO later, in July 2012. I recite the stated effective, execution, acceptance, filing, and recordation dates for the chronology they document; I do not rely on a stated retroactive effective date to determine the legal moment at which title passed.

125. The Yin-to-SAGE assignment itself confirms the distinction among those events. It defines the assigned invention by reference to the specifically titled [redacted], *A User-Focusing Technique For MIMO And CoMP (Coordinated Multiple-Point) Communication Systems*, and conveys rights relating to the invention and associated patent applications. Ex. 5 at 2-3. The instrument also expressly authorizes the assignee's representative "to insert on this Assignment the filing date and Patent Application Numbers in the table above when known." Ex. 5 at 4. The appearance of the later PCT and U.S. application information in the recorded version therefore does not establish that the assignment instrument was first created when it was recorded in July 2012.

126. The contemporaneous commercial documents also show that the transaction was being conducted through an established invention-acquisition framework rather than appearing for the first time as a rapid succession of transfers in July 2012. [redacted]

[redacted] 36:20-37:7. I do not treat those documents or that testimony as independently resolving title or every element of bona fide acquisition. They are relevant here because they demonstrate that the documented transaction process substantially predated the July 2012 USPTO recordation. [redacted] in Exhibit 8 further show that the parties had a documented course of invention transactions apart from the '347 invention, including before the '347 assignment was recorded with the USPTO.

127. I do not determine in this section the precise legal date on which title passed under either assignment, and I express no opinion here on the retroactive legal effect of the stated "effective as of" dates under United States law or any other law governing those instruments. The narrower factual point is sufficient for present purposes. **July 16, 2012 was a USPTO recordation event, not the beginning of the documented transaction history concerning the '347 invention.** The Yin-to-SAGE instrument bears an earlier execution date and stated effective date, and the primary SAGE-to-Empire instrument likewise contains an earlier stated effective date and a February 28, 2011 acceptance by Empire. The primary documents therefore do not support Ms. Yang's factual premise that two back-to-back transfers first occurred on July 16, 2012. An inference of Empire's knowledge or bad faith that materially depends upon that supposed same-day sequence is correspondingly unsupported by the chronology shown in the primary transaction record.

## B. Yang's Attacks on *Bona Fide* Rights Fails at Multiple Successive Stages

128. Ms. Yang analyzes three successive stages of the asserted chain: Professor Yin to SAGE, SAGE to Empire, and Empire to Cobblestone. Yang Decl. at 4–6. She invokes Article 106 of the former PRC Property Law for the earlier transactions and notes that Article 311 of the PRC Civil Code subsequently adopted materially the same *bona fide* acquisition framework. Under the framework she identifies, an assignee receiving property from a person without disposal authority may nevertheless acquire the right if three conditions are satisfied: (1) the assignee acts in good faith at the time of the transfer; (2) the transfer is made at a reasonable price; and (3) where registration is legally required, the required registration is completed. Yang Decl. at 4-5. For purposes of responding to Ms. Yang's analysis, I assume without deciding that this framework applies to the particular patent-related rights and transactions at issue. Ms. Yang's ultimate conclusion as to Cobblestone is therefore derivative in two respects: it depends first on the antecedent Article 6 premise and then on the asserted defect remaining uncured through each subsequent acquisition stage. In summary, bona fide acquisition is relevant at any

stage only if the transferor at that stage lacked authority to dispose of the right. I therefore do not treat an asserted defect at the Yin-to-SAGE stage as automatically carrying through the later SAGE-to-Empire and Empire-to-Cobblestone transactions. As to the 2022 Empire-to-Cobblestone transaction specifically, if PRC bona fide acquisition law were assumed to govern that transaction, it is my opinion, based on the record I have reviewed, that Cobblestone would qualify as a bona fide transferee under that law. I do not, however, offer an opinion that PRC bona fide acquisition law governs the 2022 transfer of the U.S. '347 Patent from Empire to Cobblestone.

129. Two aspects of that doctrine are important to the successive-transfer theory asserted here. First, *bona fide acquisition* presupposes that the transferor **lacked authority to dispose of the right**. As explained in Section IV, Apple has not established the antecedent Article 6 proposition that Tongji held the initial right and that Professor Yin consequently lacked authority to dispose of it. If that premise fails, the Yin-to-SAGE transaction is not an unauthorized disposition on the service-invention theory advanced by Apple, and no later transferee needs *bona fide* acquisition to cure that asserted defect.

130. Second, even if an unauthorized disposition were assumed at some stage of the chain, the *bona fide* acquisition inquiry is necessarily **transaction-specific**. Under the rule Ms. Yang herself invokes, when a transferee satisfies the requirements for *bona fide* acquisition, that transferee obtains the right notwithstanding the transferor's lack of disposal authority. The doctrine therefore does not operate as an automatic defect that passes irreversibly through every later transaction. Applied sequentially here: if Professor Yin had authority to transfer the initial right, SAGE's acquisition was authorized; if he did not, SAGE's acquisition would have to be examined under the *bona fide* acquisition requirements. If SAGE thereby obtained the right, its subsequent disposition would no longer be unauthorized. If SAGE did not obtain the right, Empire's acquisition would require its own analysis. And if Empire obtained valid title-either from a validly entitled SAGE or independently through *bona fide* acquisition-its later transfer to Cobblestone would likewise be an authorized disposition. Only if Empire itself lacked title would Cobblestone need to rely on *bona fide* acquisition. Each link, therefore, must be analyzed on its own facts; the conclusion that an earlier transfer was defective does not by itself establish that every later transferee lacked title.

### 1. Yin to SAGE

131. Ms. Yang concludes that SAGE lacked good faith based in part on Professor Yin's Tongji employment and the Tongji faculty profile listing the '347 Patent among his accomplishments. Professor Yin's Tongji employment was a contemporaneous fact, but employment and technical relatedness do not themselves establish Tongji ownership under Article 6. Nor does the later faculty profile, standing alone, establish that conclusion. SPC 1848 is instructive: **even where the inventor's own performance evaluation and work summary identified the patented technology as an R&D or innovative achievement, the SPC held that such characterization was insufficient by itself to establish that the invention was made in performance of his own duty or an entrusted task.** Ex. 2 at 41. Here, on its face, the faculty profile lists Professor Yin's academic and patent accomplishments and does not state that Tongji owns each patent listed there. Indeed, the same profile

lists another Professor Yin patent for which the corresponding U.S. publication identifies Empire Technology Development LLC as the assignee. Ex. 8 at 1, 3. In addition, Apple's exhibit identifies the webpage as dated **July 21, 2020**, and does not establish that the same webpage or patent-list content was publicly available in 2010 or 2011.

132. Ms. Yang also identifies no contemporaneous Tongji ownership demand, proceeding, or notice showing that Tongji was asserting ownership of the '347 invention when SAGE acquired the relevant rights. [redacted] The evidence on which Ms. Yang relies does not establish that the contemporaneous record disclosed information establishing or indicating the asserted Tongji service-invention defect. More fundamentally, *bona fide* acquisition becomes relevant only if the antecedent Article 6 premise is first established that Professor Yin lacked the initial right to dispose of the invention.

### 2. SAGE to Empire

133. Ms. Yang's principal factual basis for finding Empire non-*bona fide* is that SAGE transferred the patent to Empire **"on the exact same day"** that SAGE acquired it from Professor Yin, from which she infers that Empire necessarily knew the full background and the asserted title defect. The primary SAGE-to-Empire instrument now in the record does not support that premise. It states that the assignment is **"effective as of Jan 18th, 2011,"** and Empire's acceptance is dated **February 28, 2011**, whereas the USPTO recordation occurred later in July 2012. I do not rely on the stated effective date to determine when title legally passed. But the document itself demonstrates that the transaction history cannot accurately be described as first arising through two back-to-back transfers on July 16, 2012. **The principal factual inference on which Ms. Yang bases Empire's alleged lack of good faith is therefore materially undermined by the primary transaction record.**

[redacted] submission; the subsequent transaction documents addressed the acquisition and transfer of that specifically identified Proposed Solution; and Empire formally accepted the SAGE-to-Empire assignment in February 2011, before the July 2011 PCT filing. The documents materially differ from Ms. Yang's portrayal of Empire as a transferee appearing for the first time in two back-to-back transactions on July 16, 2012, and she identifies no contemporaneous Tongji ownership demand, proceeding, or notice to Empire demonstrating that Empire had actual notice of the service-invention defect she now asserts.

### 3. Empire to Cobblestone

135. Ms. Yang separately concludes that Cobblestone lacked good faith because it had **"full visibility of the entire patent assignment chain"** and therefore was reasonably capable of identifying a service-invention issue concerning Professor

Yin. Yang Decl. at 6. This is not true because Cobblestone did not have possession or visibility into the unrecorded Empire documents collected as Ex. 5. Additionally, Yang's conclusion does not follow from visibility into the chain itself. The relevant question is whether the information available to Cobblestone provided objective notice that the transferor lacked title-not merely whether the original inventor had once been employed by a university. As explained in Sections II through IV, PRC law does not make university employment or general technical relatedness sufficient to establish a service invention.

136. Ms. Yang identifies no evidence that, before Empire's 2022 transfer to Cobblestone, Tongji had asserted ownership of the '347 invention, commenced an ownership proceeding, demanded assignment, recorded an adverse claim, or otherwise placed Cobblestone on notice of an existing Tongji title dispute. Nor does visibility into the recorded assignment chain itself establish notice of the particular defect she alleges. That chain documents transfers of the relevant rights; it does not on its face state that Tongji claimed those rights or that a transferor lacked title because of PRC service-invention law. The underlying SAGE transaction documents likewise contain representations of ownership rather than a disclosed competing Tongji claim. Ms. Yang's assertion that Cobblestone had "full visibility" of the assignment chain does not itself identify information in that chain establishing, or placing Cobblestone on notice of, the unasserted Tongji service-invention defect on which her conclusion depends.

#### 4. <u>The Other Two Elements Do Not Supply the Missing Defect</u>

137. Although Ms. Yang identifies three requirements for *bona fide* acquisition, her application to SAGE, Empire, and Cobblestone focuses principally on alleged lack of **good faith**. Ms. Yang does not separately analyze the failure of those elements as the basis for her conclusions, and the good-faith propositions she does advance must be assessed on the particular facts of each transaction. [redacted]

#### 5. <u>Apple's Cited Cases Do Not Support Automatic Downstream Invalidity</u>

138. The cases cited by Ms. Yang reinforce the need for a transaction-specific inquiry rather than automatic downstream invalidity. In *Weifu*, the appellate court first determined service-invention ownership on a record showing formal employment, technical-project R&D duties, and an employer-initiated and approved R&D project for the disputed patent. Yang Ex. 11 (Dkt. 156-12) at 9-10. It then separately analyzed the *bona fide* acquisition defenses of successive transferees Lin and Furunde, applying the relevant requirements to the circumstances of each acquisition. Id. at 10-11. The other cases cited by Ms. Yang likewise assess *bona fide* acquisition by reference to the circumstances of the particular transaction, including such matters as the transferee's knowledge, the parties' relationships and conduct, consideration, and

completion of the relevant registration procedures. Those authorities therefore do not establish that the mere existence of an earlier title defect, if one is assumed, eliminates the need to examine whether a later transferee independently acquired the right under the applicable *bona fide* acquisition rule.

139. The operation of Article 106 itself confirms the same point. When a transferee qualifies for *bona fide* acquisition, that transferee **obtains ownership**, while the former owner is left **with a claim for compensation** against the person who lacked disposal authority. The legal effect of a successful *bona fide* acquisition is therefore to vest the right in that transferee; it does not leave the right permanently defective for purposes of all future transactions.

140. Apple's chain-of-title theory therefore requires more than the assertion that Professor Yin was originally unauthorized and that every subsequent transaction was consequently unauthorized as well. It must first establish the Article 6 predicate that Professor Yin lacked the initial right. If that predicate is not established, the asserted service-invention defect does not arise at all. Even if an upstream unauthorized disposition were assumed, the legal position of SAGE, Empire, and Cobblestone must be examined **at the respective acquisition stage**, and a valid acquisition at an intermediate stage would prevent the same defect from simply being carried forward as though no intervening acquisition had occurred. The 2020 faculty webpage does not establish what was publicly available in 2010 or 2011; Ms. Yang's inference against Empire materially depends on a same-day chronology contradicted by the primary transaction documents; and her inference against Cobblestone treats visibility of an assignment chain as notice of a service-invention defect that the chain itself does not disclose. Those propositions do not establish that the same asserted defect necessarily remained uncured through every successive transfer.

## C. PRC Choice-of-Law Rules Require a Separate Governing-Law Analysis for the 2022 Empire-to-Cobblestone Transfer

141. Ms. Yang separately concludes that Empire's 2022 assignment of the '347 Patent to Cobblestone constituted an unauthorized disposition and that Cobblestone acquired no rights because it did not satisfy PRC-law requirements for *bona fide* acquisition. She expressly characterizes that conclusion as one reached **"from the perspective of China's legal system."** In my opinion, her analysis does not address a necessary part of China's legal system: the PRC rules determining which jurisdiction's substantive law applies to a foreign-related intellectual-property relationship.

142. *Law of the People's Republic of China on the Law Applicable to Foreign-Related Civil Relationships* addresses intellectual-property ownership and intellectual-property transfer agreements separately. Article 48 provides that "The laws at the locality where protection is claimed shall apply to the ownership and contents of the intellectual property right." Ex. 9B at 4. Article 49 provides that "A party may choose the laws applicable to the assignment and licensed use of intellectual property right by agreement. If the parties do not choose, the relevant provisions on contracts of this Law shall apply." Ex. 9B at 4-5. And, absent such a choice, the Law's provisions concerning contracts apply. These provisions do not

state that PRC substantive property law automatically governs a later transfer merely because an earlier stage in the history of the invention involved a Chinese inventor or Chinese entity. Ex. 9B at 4.

143. That statutory structure is important because PRC choice-of-law law distinguishes between rules governing the ownership and content of intellectual-property rights and rules governing an agreement for the transfer or licensed use of intellectual-property rights. Article 48 addresses the former category, while Article 49 separately addresses the latter. Ex. 9B at 4-5. The precise characterization of every issue arising from the 2022 Empire-to-Cobblestone transaction-including the distinction between contractual questions and proprietary consequences-is itself part of the choice-of-law analysis. My narrower point is that the applicable issue and governing law must first be identified before PRC domestic *bona fide* acquisition rules can simply be used to determine the legal effect of the 2022 transfer. Ex. 9B at 4.

144. That step is particularly significant because the right involved in the 2022 Empire-to-Cobblestone transaction is an **issued United States patent**. The protection asserted in this action is protection under that United States patent in the United States. I therefore do not understand Article 48 to support an automatic assumption that PRC domestic property rules determine ownership of that foreign patent merely because Apple alleges an earlier defect arising under PRC service-invention law. Nor does Article 49 support such an assumption with respect to the assignment agreement. Article 49 permits the parties to choose the applicable law and, absent such a choice, directs the analysis to the Law's provisions concerning contracts. Ex. 9B at 4. Article 41, in turn, provides the general choice-of-law rule for contracts, including party choice and, absent such choice, the law identified by the statutory connecting factors. Ex. 9B at 4.

145. The PRC *bona fide* acquisition cases cited by Ms. Yang do not answer that choice-of-law question. *Weifu* concerned ownership and successive transfers of a **PRC patent**, including the registration of changes in ownership within the PRC patent system. *Meiji* likewise concerned a **PRC patent** and a domestic ownership dispute. Those decisions may be relevant to the operation of *bona fide* acquisition principles when PRC substantive law governs the right at issue, but neither decision determines that PRC *bona fide* acquisition law governs the proprietary consequences of a subsequent transfer of a United States patent. They therefore do not eliminate the choice-of-law inquiry required before applying those substantive rules here. Yang Ex. 11 (Dkt. 156-12) at 4, 10-11.

146. This distinction is independent of the upstream analysis in Sections IV and V.B. For the reasons explained there, Apple has not established the predicate proposition that Professor Yin lacked the initial Article 6 right, and Ms. Yang's good-faith analysis also does not establish a continuous defect through the Yin-SAGE-Empire-Cobblestone chain. **But even if an upstream defect were assumed solely for purposes of analysis, a further question remains before Ms. Yang can conclude that Cobblestone acquired no proprietary rights in the U.S. '347 Patent in 2022: what substantive law governs the effect of that particular transfer?** Her declaration does not perform that analysis.

147. I, therefore, disagree with Ms. Yang's conclusion insofar as it assumes that **"from the perspective of China's legal system,"** Empire's alleged lack of title necessarily means that the 2022 Empire-to-Cobblestone assignment is governed by PRC unauthorized-disposition and *bona fide* acquisition rules and that Cobblestone consequently **"never lawfully acquired any rights."** Yang Decl. at 6. China's own choice-of-law statutes do not support simply assuming PRC domestic *bona fide* acquisition law for that separate foreign-related transaction without first identifying the relevant issue and the law applicable to it. Article 48 provides a choice-of-law rule concerning the ownership and content of intellectual-property rights, while Article 49 separately addresses agreements for the transfer and licensed use of intellectual-property rights. Ex. 9B at 4-5.

148. I do not offer an opinion as to which United States federal or state law ultimately governs the proprietary consequences of the 2022 Empire-to-Cobblestone assignment, whether that assignment transferred valid title under United States law, or whether any purchaser, recording, estoppel, or similar doctrine under United States law applies. Nor do I determine here the law governing every contractual issue under the Empire-to-Cobblestone assignment. My PRC-law opinion is narrower: PRC law does not provide a basis for automatically applying PRC *bona fide* acquisition rules to determine whether Cobblestone acquired proprietary rights in the U.S. '347 Patent through the 2022 Empire-to-Cobblestone transfer. Ex. 9B at 4.

## VI. CONCLUSION

149. For the reasons set out above, it is my opinion that the materials I have reviewed do not establish either statutory basis under Article 6 for classifying the '347 invention as a service invention-creation belonging to Tongji University. Professor Yin's Tongji employment, his academic position, Tongji's related wireless-communications research, and the technical overlap between that research and the subject matter of the '347 Patent are relevant circumstances. They do not, however, establish that the '347 Patent is a service invention of Tongji under Article 6 and Rule 12. Ex. 2 at 39-43.

150. With respect to the first Article 6 basis, the record does not establish that the R&D producing the particular user-focusing solution was undertaken in the course of Professor Yin's identified regular Tongji duty or in execution of another task entrusted by Tongji. With respect to the second basis, the record does not identify qualifying Tongji material or technical conditions shown to have contributed substantively, indispensably, and predominantly to formation of that solution. Tongji's later internal service-invention rule and faculty profile do not supply those missing statutory connections.

151. In my opinion, viewed as a whole, [redacted] the Yin-to-SAGE and SAGE-to-Empire themselves, [redacted] together with the March 9, 2026 testimony of Ms. Rudersdorf, support the reasonable inference that Professor Yin encountered the relevant technical problem to be solved and developed the inventive solution for Shanghai SAGE [redacted] and that the invention was not made in the course of Professor Yin's actual duties for Tongji University or in execution of a task entrusted to or assigned to him from Tongji

University. The Yin-to-SAGE and SAGE-to-Empire assignments themselves confirm this. They are signed and witnessed and provide the context for Professor Yin's work to develop the invention for Shanghai SAGE [redacted] and they define the assigned invention by reference to the specifically titled [redacted], *A User-Focusing Technique For MIMO And CoMP (Coordinated Multiple-Point) Communication Systems*. The March 9, 2026 testimony of Ms. Rudersdorf further confirms that Professor Yin [redacted] and that the invention was not made in the course of Professor Yin's actual duties for Tongji University or in execution of a task entrusted to or assigned to him from Tongji University. In my opinion, the evidence considered together is consistent with, and supports, this external development and submission path, while the record identified by Apple does not establish a Tongji duty or entrusted task encompassing the particular '347 solution.

152. The contemporaneous invention-specific evidence also confirms and corroborates this. [redacted] the history of this invention is not left to inference from Professor Yin's employment or general research field alone. I rely on it for the narrower proposition that it is affirmative, invention-specific evidence relevant to the source and development-history inquiry reflected in the PRC judicial authorities discussed above, including SPC 1848 and, as an informative cross-check, Guiding Case No. 158.

153. Accordingly, under Article 6 and on the factual record I have reviewed, the initial right to apply for a patent on the '347 invention belonged to Professor Yin rather than Tongji University. Apple's downstream unauthorized-disposition theory depends upon the contrary premise. If Professor Yin held the initial right, his transfer of that right was not unauthorized merely because Tongji was his employer, and the PRC *bona fide* acquisition doctrine is not required to cure that asserted service-invention defect.

154. Even if an upstream unauthorized disposition were assumed solely for purposes of analysis, Ms. Yang's ultimate PRC-law conclusion would still require the asserted defect to remain uncured through each relevant acquisition stage. I do not agree that her analysis establishes such an unbroken chain. The inquiry is transaction-specific. Moreover, the primary transaction documents do not support the factual premise that the Yin-to-SAGE and SAGE-to-Empire transactions first occurred as back-to-back transfers on July 16, 2012; the documentary history extends into 2010 and 2011, and July 2012 reflects later USPTO recordation. Nor does visibility into a facial assignment chain, without information disclosing a Tongji ownership claim or service-invention defect, itself establish lack of good faith by Cobblestone.

155. There is a separate limitation on Ms. Yang's analysis of the 2022 Empire-to-Cobblestone transaction. Even from the perspective of PRC law, the applicable substantive law cannot simply be assumed. Articles 48 and 49 of the PRC *Law on the Application of Laws to Foreign-Related Civil Relations* separately address intellectual-property ownership and content and agreements for the transfer or licensed use of intellectual-property rights. Accordingly, even if an upstream title defect were assumed, determining the proprietary effect of the 2022 transfer of the issued U.S. '347 Patent requires a separate governing-law analysis before PRC domestic *bona fide* acquisition rules can be applied.

156. My opinions are limited to the PRC-law issues described in this declaration. I do not express an opinion as to the ultimate application of United States procedural law, the legal effect of the relevant assignments under United States law, or the resolution of the separate technology-export issues addressed by others. Subject to those limitations, I disagree with the proposition that PRC law establishes either that Tongji owned the initial right to the '347 invention or that Cobblestone necessarily failed to acquire rights in the '347 Patent because of the service-invention and *bona fide* acquisition theories addressed in this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 21st in Beijing, CHINA.

Eunice Wu Eunice WU 吴锦琴
August 21, 2026 2026.8.21