# Yang Supplemental Ex. 6

MORNINGSIDE
A Questel Company

morningtrans.com

# TRANSLATION CERTIFICATION

Date: 2026/09/03

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- Chinese (PRC)

To:

- English (USA)

The documents are designated as:

- Supp. Ex. 6

Samuel Wu, Managing Director of this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

Signature of **Samuel Wu**, Managing Director

Questel Confidential: Limited External Use

299 South Main Street, Suite 1300
Salt Lake City, UT 84111

**Civil Judgment of Second Instance in the Dispute over Ownership of Invention Patent Rights between a Certain University of Technology in China, a Certain Technology Co., Ltd. in Wuhan, Wang XXX, and Qin XXX**

| | |
|---|---|
| **Court** | The Supreme People's Court |
| **Case No.** | (2023) Supreme People's Court Intellectual Property Civil Final No. 2454 |
| **Date of Judgment** | December 25, 2025 |
| **Cause of Action** | Civil/Intellectual Property and Competition Disputes/Disputes over Intellectual Property Ownership and Infringement/Disputes over Ownership and Infringement of Invention Patent Rights/Disputes over Ownership of Invention Patent Rights |

Appellant (Defendant in the First Instance): A Certain University of Technology in China. Domicile: Hefei City, Anhui Province, People's Republic of China. Legal Representative: Chang XXX, President of the University.

Authorized Litigation Representative: Dai Guangmin, Attorney at Law of Anhui Chinese Lawyers Law Firm.

Appellee (Plaintiff in the First Instance): A Certain Technology Co., Ltd. in Wuhan. Domicile: Donghu New & High Technology Development Zone, Wuhan City, Hubei Province, People's Republic of China.

Legal Representative: Li XXXzhen, Director and Manager of the Company.

Authorized Litigation Representative: Zhang Kai, Patent Attorney of Wuhan Zhiquan Patent Agency. Authorized Litigation Representative: Yu Hao, Patent Attorney of Wuhan Zhiquan Patent Agency.

Defendant in the First Instance: Wang XXX, male, born on a certain year, month, and day, a national of the United States of America, residing in Gulou District, Nanjing City, Jiangsu Province, People's Republic of China.

Third Party in the First Instance: Qin XXX, male, born on a certain year, month, and day, of Han ethnicity, residing in Huangqiao Town, Taixing City, Jiangsu Province, People's Republic of China.

Appellant A Certain University of Technology in China (hereinafter referred to as "University of Technology XXX"), in connection with a dispute over ownership of patent rights among itself, appellee A Certain Technology Co., Ltd. in Wuhan (hereinafter referred to as "Wuhan Company XXX"), defendant in the first instance Wang XXX, and third party in the first instance Qin XXX, was dissatisfied with the Civil Judgment rendered by the Intermediate People's Court of Hefei City, Anhui Province (hereinafter referred to as the "Court of First Instance") on May 12, 2023, namely, Civil Judgment (2020) Wan 01 Min Chu No. 2299 (hereinafter referred to as the "Judgment of First Instance"), and appealed to this Court. This Court docketed the case on November 9, 2023, and, in accordance with the law, formed a collegiate bench and publicly heard the case in court on January 11, 2024. The Authorized Litigation Representative of the appellant University of Technology XXX, Dai Guangmin, and the Authorized Litigation Representatives of the appellee Wuhan Company XXX, Zhang Kai and Yu Hao, appeared in court to participate in the litigation. Defendant in the First Instance Wang XXX and Third Party in the First Instance Qin XXX failed to appear in court to participate in the litigation despite having been lawfully summoned by this Court, and this Court conducted the trial in their absence in accordance with the law. The trial of this case has now been concluded.

Wuhan Company XXX filed an action with the Court of First Instance, which docketed and accepted the case on August 10, 2020. Wuhan Company XXX requested the Court of First Instance to order as follows: 1. Confirm that the right to apply for the invention patent entitled "An Etching Method and Apparatus for P-Type Doped and Undoped Chips," with Application No. 201910316864.7 (hereinafter referred to as the "Patent in Dispute"), belongs to Wuhan Company XXX; 2. Order University of Technology XXX and Wang XXX to jointly pay Wuhan Company XXX RMB 16,600 for reasonable expenses incurred in connection with this case (all amounts hereinafter are denominated in RMB), and impose joint and several liability on them for repayment thereof; 3. Order University of Technology XXX and Wang XXX to bear the litigation costs of this case. Facts and Grounds: Wang XXX was an employee of Wuhan Company XXX. The parties entered into a Labor Contract on January 25, 2016, with the term of service from January 1, 2016 to December 31, 2019. The agreement stipulated that ownership of scientific research achievements obtained by Wang XXX during his employment and the relevant intellectual property rights thereto would belong to Wuhan Company XXX. From July to August 2016, Wuhan Company XXX entered into a one-year internship agreement with Qin XXX, a graduate student enrolled at University of Technology XXX. In February 2018, Qin XXX left Wuhan Company XXX. In October 2018, Wang XXX entered into an Agreement on Termination of Labor Relationship with Wuhan Company XXX and

completed the procedures for his departure and handover during the same month. On January 30, 2019, University of Technology XXX filed an application for the Patent in Dispute, with Wang XXX and Qin XXX as the inventors. The Patent in Dispute is related to the project plans and work and internship activities of Wang XXX and Qin XXX at Wuhan Company XXX. The Patent in Dispute constitutes an invention and creation made for the purpose of completing the work and internship tasks of Wuhan Company XXX. The right to apply for the Patent in Dispute should therefore belong to Wuhan Company XXX, and the acts of University of Technology XXX and Wang XXX have seriously infringed upon its lawful rights and interests.

University of Technology XXX argued in the first instance: (I) Beginning on July 30, 2013, it employed Wang XXX as a professor. During his employment with University of Technology XXX, his principal research areas included semiconductor optoelectronic chip technology and nanofabrication processes, which belonged to the same technical field as the Patent in Dispute. (II) University of Technology XXX successively invested various hardware and software resources, including an electron beam lithography machine, coating machine, etching system, mask-making system, high-vacuum evaporation system, device simulation software, MATLAB software, and mathematical modeling software. The Patent in Dispute constituted an invention and creation made by Wang XXX and the students led by him in the course of performing their regular scientific research work, and the right to apply for the patent should therefore belong to University of Technology XXX. (III) Wuhan Company XXX did not possess the material and technical conditions or experimental foundation necessary to complete the Patent in Dispute. Wuhan Company XXX's contention that the right to apply for the Patent in Dispute belonged to Wuhan Company XXX on the ground that Wang XXX had previously entered into a labor contract with and worked for Wuhan Company XXX had no factual or legal basis.

Wang XXX argued in the first instance: (I) He had continuously been employed by University of Technology XXX since 2014, and scientific research and development and patent applications constituted his regular job duties. In February 2016, he was employed by Wuhan Company XXX. When entering into the contract, Wuhan Company XXX knew that he was a professor at University of Technology XXX, while the contract contained multiple exclusive provisions concerning intellectual property rights, and Wuhan Company XXX was manifestly acting in bad faith in this regard. (II) Wuhan Company XXX had no research and development conditions whatsoever during the period of his part-time employment. The Patent in Dispute was research work that his student was required to undertake in order to pursue a doctoral degree at University of Technology XXX, and all of the conditions utilized were material conditions provided by University of Technology XXX. The evidence submitted by Wuhan Company XXX could only establish that he had a record of part-time employment and had no connection whatsoever with the Patent in Dispute.

Qin XXX did not state an opinion in the first instance.

The Court of First Instance found the following facts:

(I) Relevant Circumstances of the Parties

On July 30, 2013, University of Technology XXX employed Wang XXX as a professor in the School of Physics for a term of four years, with the term of employment commencing on December 31, 2013 and ending on December 31, 2017. The employment contract stipulated that Wang XXX guaranteed that, as of the time of execution of this contract, there were no matters between him and his former employer that would be sufficient to affect the effectiveness or performance of this contract, and that his work for University of Technology XXX during the performance of this contract would not infringe upon the intellectual property rights or other lawful rights and interests of any entity by which he had previously been employed; that he would fully perform all terms stipulated in this contract, complete the predetermined work tasks and work objectives, and accept assessments or inspections by University of Technology XXX, the Chinese Academy of Sciences, or the State; that all teaching, scientific research, and other achievements obtained by Wang XXX at University of Technology XXX during the term of employment constituted service-related achievements, and that when publishing relevant papers or works, or applying for relevant awards, patents, scientific research projects and funding, he was required to simultaneously state the names of both Wang XXX and University of Technology XXX, and University of Technology XXX must be identified as the first author affiliation; and that during the period of employment, all intellectual property rights relating to inventions and creations, technical secrets, and other results generated in the performance of his duties or primarily through the use of the material and technical conditions, scientific research information, and other resources of University of Technology XXX belonged to University of Technology XXX, while Wang XXX was entitled to the right of authorship.

Wuhan Company XXX was established on January 25, 2016, and its principal business scope mainly included the research and development, production, wholesale and retail, repair, and technical consulting of quantum optoelectronic chip products (including single-photon sources, lasers, and detectors). On January 25, 2016, Wuhan Company XXX and Wang XXX entered into a Labor Contract, stipulating a service term from January 25, 2016 to January 24, 2020, for a total term of four years. Wang XXX served as the head of the Device Production Department, with an annual salary of RMB 700,000.

On April 15, 2016, Wuhan Company XXX submitted an application under the Ninth Batch of the "3551 Optics Valley Talent Program." The application materials stated that the applied-for project was a quantum-dot single-photon source, the applicant was Wang XXX, the relevant industry was the optoelectronic information industry, and the professional field of the applicant Wang XXX was nanotechnology. The section on Profile and Expertise stated: "Engaged in research in the field of nanotechnology for a long period of time … familiar with nanoprocess development and large-scale production, proficient in nanoprocesses such as lithography, coating, and plasma etching, and personally participated in the development of the overall chip process, quality control and inspection, and the design of the overall chip architecture." The representative products or services were quantum-dot single-photon sources, quantum-dot lasers, single-photon detectors, nanofabrication equipment, nanolithography, plasma etching, etc.

The section on the Existing Foundation for Project Industrialization in the Project Plan stated: "The core members of the team possess extensive technical expertise and accumulated technical resources in semiconductor processing. The technologies already possessed by the project include epitaxial growth technology, die process technology, device packaging and testing technology, module packaging technology, design and establishment of quantum-dot chip and device production lines, and development of MES manufacturing software."

On July 11, 2016, Wuhan Company XXX and Wang XXX entered into an Expert Appointment Agreement, pursuant to which Wang XXX was appointed as the Head of the Device Production Department for a service term of four years, from January 1, 2016 to December 31, 2019. The agreement further stipulated that ownership of the scientific research achievements obtained during the term of appointment and the relevant intellectual property rights thereto would belong to Wuhan Company XXX, that Wang XXX was prohibited from providing, in any form, technical support for similar projects to enterprises competing with Wuhan Company XXX, and that Wang XXX assumed the responsibilities of not infringing upon the intellectual property rights of Wuhan Company XXX, as well as confidentiality obligations. The principal work tasks to be completed included, but were not limited to, the following: completing the process flow for avalanche photodiodes (abbreviated in English as APD) by December 2016 and producing qualified 10G APD samples by March 2017; completing 80,000 qualified APD mass-production units with a yield rate of not less than 20% by December 2017; completing the design of single-photon sources and single-photon detectors by December 2018; and producing the first single-photon detector by December 2019. The work duties consisted of serving as the Head of the Device Production Department, formulating the work plan for the Device Production Department in accordance with the Company's operational work plan, and being responsible for the results of the work of the Device Production Department; being responsible for team development and team building for the Device Production Department, and having direct recommendation authority with respect to position planning, staffing, recruitment, and other matters of the Device Production Department. At the same time, Wuhan Company XXX and Wang XXX entered into an Employee Commercial Secret Confidentiality Agreement, pursuant to which technical secrets included, but were not limited to, technical solutions, engineering designs, circuit designs, manufacturing methods, process flows, technical specifications, computer software, databases, research and development records, technical reports, inspection reports, experimental data, test results, drawings, samples, prototypes, models, molds, operation manuals, experimental data, test results, technical documents, relevant correspondence, project applications, implementation plans, patent applications, etc.; the parties confirmed that, during the period of Wang XXX's employment with Wuhan Company XXX, the relevant intellectual property rights in product drawings, technical secrets, or other commercial secret information generated as a result of the performance of his duties or through the use of the material and technical conditions, business information, and other resources of Wuhan Company XXX would belong to Wuhan Company XXX. Without the consent of Wuhan Company XXX, Wang XXX was prohibited from enabling any third party to know any technical secrets or other commercial secret information belonging to Wuhan Company XXX or belonging to another party but subject to a confidentiality obligation undertaken by Wuhan Company XXX, by means of disclosure, notification, announcement, publication, dissemination, transfer, or any other means, and was also prohibited from using such secret information outside the performance of his duties; the term of the confidentiality obligation after departure from employment was two years after departure.

On August 2, 2016, Wuhan Company XXX, Qin XXX, a graduate student enrolled at University of Technology XXX, and Wang XXX entered into an Internship Agreement, stipulating that the internship term would be from August 1, 2016 to August 1, 2017, and that Wuhan Company XXX would, based on Qin XXX's actual circumstances and work needs, arrange for Qin XXX to engage in cooperative research in the Quantum Communications Department.

Since its establishment, Wuhan Company XXX has publicly disclosed 23 patent applications, of which the application dates of 11 patents were prior to the application date of the Patent in Dispute, including the invention patent with Application No. 201710631297.5. The patent document discloses: "A Method for Etching InP Material Using RIE Equipment and Etching InP Material," with Yan XXXping, Qin XXX, Wang XXX, and Wang XXXzhong as the inventors, and an application date of July 28, 2017. The invention relates to the field of dry etching of semiconductor materials, and specifically relates to a method for etching InP material using RIE equipment, which resolves the problem of contamination of samples by polymer by-products generated during the etching of InP using reactive ion etching equipment. The invention patent with Application No. 201610824183.8. The patent document discloses: "A Quantum-Dot Single-Photon Source and Preparation Method Therefor," with an application date of September 14, 2016, and Wang XXX, Wang XXXzhong, Qin XXX, and Li XXXping as the inventors. The invention relates to the field of single-photon sources and provides a quantum-dot single-photon source and a preparation method therefor, which can rapidly and accurately locate the positions of quantum dots and facilitate industrial production.

(II) Work of Wang XXX and Qin XXX at Wuhan Company XXX

On October 27, 2016, Wang XXX was selected for the Ninth Batch of the "3551 Optics Valley Talent Program" and received special funding support under the "3551 Optics Valley Talent Program" from the Administrative Committee of Wuhan East Lake New & High Technology Development Zone.

According to the 2017 organizational structure and division of responsibilities of Wuhan Company XXX, the principal responsibilities of the Second R&D Department were as follows: responsible for the research and development, product manufacturing, and project management of Geiger-mode APD detectors and Geiger-mode arrays. 1. Responsible for the research and development of the Geiger-mode APD project; 2. Responsible for the research and development of Geiger-mode arrays; 3. Responsible for the development and establishment of the technical team for the project; 4. Responsible for external coordination related to the project; 5. Responsible for the overall management of the project; 6. Responsible for the production of project products and physical product quality management; 7. Complete other work assigned by the leadership.

The 2017 Work Progress Report of the Second R&D Department of Wuhan Company XXX, the Minutes of the Regular Meeting for Issue 1 of 2017, and the Minutes of the Regular Meeting for Issue 2 of 2017 all recorded the work contents of the Second R&D Department: the GM-APD process flow, involving etching processes and light exposure processes, and reverse engineering analysis of GM-APD.

In March 2017, Wuhan Company XXX commenced the GM-APD project and entered into a Technical Services Agreement with Huagong XX Photonic Technology Co., Ltd. (hereinafter referred to as “Huagong XX Company”), under which it leased part of the capacity of the Die Department of Huagong XX Company to conduct research and development and small-batch production of 10G APD photodetectors. Wang XXX signed the project expense statement.

On November 1, 2017, Qin XXX entered into an Intern Talent Training Agreement with Wuhan Company XXX, under which Wuhan Company XXX provided an educational assistance subsidy. Qin XXX subsequently terminated the training agreement in June 2019 due to his academic planning. The Statement issued by Qin XXX stated that, during his employment with Wuhan Company XXX, his principal work included the research and development of 10Gbps APD and GM-APD, involving zinc diffusion processes, wafer fabrication processes, epitaxial wafer structural optimization and design, theoretical simulation, and other work, and that he participated in the project defenses for Wuhan Company XXX’s “Geiger-Mode Avalanche Diode” and “High-Sensitivity APD Chip and Focal Plane Imaging Array” projects.

From May 11 to August 20, 2017, Qin XXX, in his capacity as a R&D Engineer of Wuhan Company XXX, communicated with YochWeng (Weng XXX) and YeZhong (Zhong Ye XXX) of Aisi Materials Technology (Shanghai) Co., Ltd. (hereinafter referred to as “Aisi Company”) regarding the progress of CrosssectionSEM (SEM, scanning electron microscopy) and SIMS testing and issues concerning adjustments to the testing. The emails also stated that the chips used for testing were mailed by Qin XXX to Aisi Company. From May 11 to September 1, 2017, Qin XXX communicated with YochWeng (Weng XXX) and YeZhong (Zhong Ye XXX) regarding issues related to the electron microscopy test results. Among the email attachments, the file “etch.rar” contains Figure 3 of the drawings of the description of the Patent in Dispute. The files “H0HWS364-2#etchresult.xlsx” and “2#beforeEtch.rar” in the attachments contain Figure 2 of the drawings of the description of the Patent in Dispute.

On August 29, 2017, Qin XXX sent an email to Wang XXX, with the GM Work Plan attached, specifying the tasks assigned to Zhang XXXjian, Qin XXX, and Xu XXX and the progress toward completion thereof.

On October 18, 2017, Sun XXXyue sent an email to Xu XXX: “Attached is the first draft of the GM-APD process flow. Please take a look and see whether the process flow is consistent with the one you designed. If there is anything inconsistent, I will make further revisions.” On October 19, Xu XXX replied: “Except that the etching for the first Zn diffusion is wet etching, I have not found any other problems for the time being.”

On October 18, 2017, Sun XXXyue sent an email to Wang XXX: “Professor Wang, hello. Attached is the first draft of the GM-APD process flow. Please review it.” The attachment contained the R&D process steps for GM-APD.

On October 31, 2017, Wang XXX used the email account of Wuhan Company XXX to send an email to Liu XXXrong and Sun XXXyue. The email stated: “Please see the attached SEM photographs. The results are OK. From now on, use wet etching for SiN etching. Sun XXXyue, please make the corresponding revisions to your process documentation.” On the same day, Wang XXX sent an email to Sun XXXyue, stating: “Please also complete the MOCVD conditions.”

On November 1, 2017, Xu XXX sent an email to Zhang XXXjian and Sun XXXyue, with Wang XXX copied, with “OVQT Mask 2.rar” attached.

On November 15, 2017, Wang XXX’s response to Wang Yanyan included “APD-FPA Epitaxial Structure Quality Report, Process Flow Report, Test Results Report, Wafer Fabrication Quality Control Standards, Quality Inspection Specifications, Process Operating Specifications, Epitaxial Structure Design Drawings, Chip Process Drawings, and Photolithography Template Drawings.”

On November 25, 2017, Wang XXX replied to Liu XXXrong: "The templates and epitaxial wafers will arrive shortly. Please make preparations for wafer fabrication. We plan to first verify the process on silicon wafers. You need to make sure that we have sufficient materials."

On December 15, 2017, Liu XXXrong sent an email to Wang XXX: "Professor Wang, attached are the organized microscopy images from yesterday's silicon nitride wet etching experiment. The etching uniformity is very poor. Do you think the samples still need to undergo SEM?" Wang XXX replied: "Repeat this experiment. In addition, replace SiN with SiO2 and try it. When will the next Zn diffusion zy be?"

On January 24, 2018, Qin XXX sent an email to Wang XXX: "Professor Wang, attached is the schedule for the next zinc diffusion experiment, compiled based on the results of this morning's discussion by the Second Department. Please review it." Wang XXX replied: "Will the SiN growth again be impossible to carry out as before?"

On February 8, 2018, Qin XXX completed the 2017 Work Progress Report and sent it to Wang XXX. This work progress report included process flowcharts, as well as TCAD simulations, Matlab simulations, epitaxial wafer parameters, and simulations contained in the laboratory work report without a cover page.

On March 5, 2018, Wang XXX completed the 2017 Work Progress Report (II) and sent it to Qin XXX. After adding the zinc diffusion test plan, Qin XXX sent it to Wang XXX. This work progress report included the determination of important parameters of microlenses, experimental background, experimental content, microscopic examination results, etching rate experiments, and other contents.

On July 6, 2018, Qin XXX sent an email to Sun XXXyue, with the GM-APD Test Parameters of Wuhan Company XXX attached thereto.

On October 8, 2018, Wang XXX tendered his resignation for personal reasons and entered into an Agreement on Termination of Labor Relationship with Wuhan Company XXX. On October 24, 2018, Wuhan Company XXX agreed to Wang XXX's resignation and completed the handover procedures. The Resignation Approval Form and Resignation Handover Form stated that his department was the Second R&D Department and that the contents of the work handover were technical materials concerning the R&D progress of GM-APD.

From January 2016 to October 2018, during the period when Wang XXX worked at Wuhan Company XXX, Wuhan Company XXX paid social insurance contributions for him and paid him his salary. During his employment, if Wang XXX took personal leave, he was required to submit a leave application form, and if he traveled on business, he was required to complete the reimbursement procedures for business travel expenses.

From June 2016 to June 2018, Qin XXX interned at Wuhan Company XXX. Wuhan Company XXX paid him labor remuneration. During his internship, if Qin XXX took personal leave, he was required to submit a leave application form, and if he traveled on business, he was required to complete the reimbursement procedures for business travel expenses.

(III) Circumstances Concerning the Patent in Dispute

The application date of the patent in dispute was April 18, 2019, the applicant was University of Technology XXX, and the inventors were Wang XXX and Qin XXX. The patent in dispute disclosed an etching method and apparatus for P-type doped and undoped chips, comprising: S1, providing a grinding line on the P-type doped and undoped chip; S2, vertically disposing the plane provided with the grinding line above the grinding liquid and keeping the grinding line parallel to the surface of the grinding liquid, and grinding the P-type doped and undoped chip to the grinding line; S3, placing the ground P-type doped and undoped chip obtained in step S2 into an etching solution for immersion for a preset period of time, while simultaneously applying illumination. S4, placing the chip immersed in step S3 under a scanning electron microscope for observation, stopping the immersion if the cross-sectional profile of the immersed chip meets the requirements, and if the cross-sectional profile does not meet the requirements, placing the chip into the etching solution again for etching. The patent in dispute relates to the technical field of optoelectronic detector fabrication, and the technical problem to be solved is to provide an etching method and apparatus for P-type doped and undoped chips, and to provide a simple and convenient etching solution for P-type doped InP material chips having different diffusion windows. Drawings 2 (schematic structural diagram of the ground P-type doped and undoped chip) and 3 (schematic structural diagram of the etched P-type doped and undoped chip) of the specification of the patent in dispute are identical to the files contained in the attachments to the emails sent by Qin XXX to Aisi Company during the period when Qin XXX worked at Wuhan Company XXX. The patent in dispute has been granted an invention patent right by the China National Intellectual Property Administration, with the date of the announcement of the grant being December 14, 2021.

(IV) Circumstances Concerning the Scientific Research Equipment Purchased by University of Technology XXX and the Equipment Used During the R&D Process of the Patent in Dispute

From 2011 to 2018, the principal scientific research equipment purchased by University of Technology XXX included: an electron beam lithography system, a plasma-enhanced chemical vapor deposition coating machine, a reactive ion metal etching system and submicron ultraviolet exposure machine, a mask-making system, a high-vacuum evaporation system, a compact spin coater, an upright metallographic microscope,

an optical vibration isolation platform, a surface-light-source UV-LED light-curing apparatus, a Zaber motorized XY microscope translation stage, a UV double-sided imprint lithography machine, a Shuguang server, and a probe set; starting in 2016, it purchased the IEL database, Sicessic database, ScienceDirect database, PQDT Full-Text Dissertation Database, PQDT-B database, and Engineering Village database; during the period from 2018 to 2020, it purchased epitaxial wafers on multiple occasions. The equipment of the Micro/Nano Research and Manufacturing Center of University of Technology XXX included a wet etching system, a cold-field emission scanning electron microscope (brand/model: Hitachi SU8220), an SEMCoater scanning electron microscope coating instrument, and SEM equipment for characterizing the etching results. The Center's expense settlement forms and machine-hour and material settlement forms recorded that Qin XXX used the SEM-Hitachi8220 equipment and SEM-Coater-Leica equipment and incurred related machine-hour and equipment usage fees on November 10, 2017, and the above records indicated that Wang XXX was the supervisor.

The Court of First Instance held:

First, regarding the identity of the inventor Wang XXX. Wang XXX had employment relationships with both Wuhan Company XXX and University of Technology XXX. According to Wang XXX's résumé on the website of University of Technology XXX, Wang XXX's field of work was semiconductor photolithography technology and equipment. The patent in dispute relates to the APD field and encompasses chip design, fabrication processes, and testing. The list of courses taught by Wang XXX submitted by University of Technology XXX was insufficient to prove that Wang XXX's primary job duties at University of Technology XXX consisted of APD chip R&D, and there was no evidence in this case proving that Wang XXX's primary job duties at University of Technology XXX before joining Wuhan Company XXX were related to the patent in dispute.

Second, considering Wang XXX's job positions, scope of responsibilities, specific work content, and other circumstances, Wang XXX was employed by Wuhan Company XXX from January 25, 2016 to October 24, 2018. As a managerial employee of the Device Production Department and the Second R&D Department, his scope of responsibilities included APD-related technical R&D and management. On the one hand, Wang XXX directly engaged in APD R&D during his employment, as specifically evidenced by the following: 1. The inventors of the invention patents "A Method for Etching InP Material Using RIE Equipment and Etching InP Material" and "A Quantum-Dot Single-Photon Source and Preparation Method Therefor," for which Wuhan Company XXX was the patent holder, both included Wang XXX. 2. Internal emails of the company proved that Wang XXX began participating in the R&D of Wuhan Company XXX's APD project in 2016 and, in April 2017, served as the head of the Second R&D Department of Wuhan Company XXX and was responsible for the GM-APD project, directly managing the personnel, financial resources, and R&D progress of the Second R&D Department. 3. As an employee of Wuhan Company XXX, Wang XXX was responsible for performing Wuhan Company XXX's contracts with foreign parties, attending industry conferences, and participating in the company's relevant projects. On the other hand, Wang XXX successively served as the head of the Device Production Department and the Second R&D Department of Wuhan Company XXX, leading and participating in the R&D of the APD project, as specifically evidenced by the following: 1. During Wang XXX's employment, Wuhan Company XXX commenced the R&D of the GM-APD project. According to the organizational structure and division of responsibilities established in 2017, the principal responsibilities of the Second R&D Department were to be responsible for the R&D, product production, and project management of GM-APD and arrays. The project commenced preliminary research in 2017, and the R&D progress of GM-APD was recorded in the minutes of the regular meetings of the Second R&D Department and the annual work report of the Second R&D Department. 2. The contents of Wang XXX's reply to Wang Yanyan on November 15, 2017 included the APD-FPA Epitaxial Structure Quality Report, Process Flow Report, Test Results Report, Wafer Fabrication Quality Control Standards, Quality Inspection Specifications, Process Operating Specifications, Epitaxial Structure Design Drawings, Chip Process Drawings, and Photolithography Template Drawings. 3. The technical personnel of the Second R&D Department sent weekly reports to Wang XXX by email; in 2017, Wang XXX signed the expense statement concerning the project for the development and small-scale production of 10G APD photodetectors between Huagong XX Company and Wuhan Company XXX. At the same time, the talent program application materials, Expert Appointment Agreement, organizational structure and division of responsibilities, meeting minutes, and other materials provided by Wuhan Company XXX also reflected that Wuhan Company XXX had formulated specific work plans for Wang XXX to conduct APD R&D work.

Third, the patent in dispute was created by Wang XXX within one year after he left Wuhan Company XXX and was related to the primary job duties undertaken by Wang XXX during his employment with Wuhan Company XXX. This was mainly reflected in the following aspects: on the one hand, the technology of the patent in dispute relates to the technical field of optoelectronic detector fabrication, and the optoelectronic detector includes an avalanche photodiode. The patent in dispute provided an etching method and apparatus for P-type doped and undoped chips, with the inventive concept being to etch P-type doped chips made of InP material through grinding, etching with an etching solution, and illumination. According to the R&D achievement records concerning Wang XXX and Qin XXX during their employment with Wuhan Company XXX provided by Wuhan Company XXX, when the patent in dispute was compared with such records, the technical problems solved, purposes of the invention,

and technical effects of the two were basically consistent. On the other hand, in the emails exchanged among Wang XXX, Qin XXX, and the employees of Wuhan Company XXX, the contents discussed were related to the technical solution of the patent in dispute. Therefore, it may be determined that the patent in dispute was related to the primary job duties undertaken by Wang XXX during his employment with Wuhan Company XXX.

Fourth, during Wang XXX's employment with Wuhan Company XXX, an employment relationship still existed between Wang XXX and University of Technology XXX, and his status was dual in nature. In addition, Wang XXX and University of Technology XXX had agreed that the rights relating to service inventions and creations would belong to University of Technology XXX. Although the patent in dispute was not necessarily directly related to Wang XXX's work tasks at University of Technology XXX, the relevant evidence submitted by University of Technology XXX in this case was sufficient to prove that the scientific research equipment purchased by University of Technology XXX was used for the experiments and simulations necessary for the patent in dispute, and the machine-hour fee records of the Micro/Nano Research and Manufacturing Center of University of Technology XXX also proved that the inventors had used the principal equipment and core software, demonstrating that Wang XXX relied on the equipment, components, and other material and technical conditions of University of Technology XXX during the research and development process. Taking into consideration, in addition, Wang XXX's own scientific research responsibilities and Qin XXX's academic requirements as a student of University of Technology XXX, it should be confirmed that the patent in dispute mainly utilized the material and technical conditions of University of Technology XXX.

Based on the foregoing analysis, the patent in dispute was an invention and creation completed by Wang XXX in performing the work tasks of Wuhan Company XXX while at the same time mainly utilizing the material and technical conditions of University of Technology XXX, and both Wuhan Company XXX and University of Technology XXX made creative contributions to the completion of the invention and creation. In view of the fact that the patent in dispute had been granted during the trial of this case, the Court of First Instance therefore confirmed in accordance with the law that the patent right in dispute was jointly owned by Wuhan Company XXX and University of Technology XXX. With respect to the reasonable expenses claimed by Wuhan Company XXX as having been paid to prevent the infringement, since this case was a dispute over ownership of patent rights rather than an infringement dispute, such portion of the claim had no legal basis, and the Court of First Instance did not support it.

In accordance with Article 6, Paragraph 1 of the Patent Law of the People's Republic of China as amended in 2008 (hereinafter referred to as the "Patent Law"), Article 12 of the Implementing Regulations of the Patent Law of the People's Republic of China as revised in 2010 (hereinafter referred to as the "Implementing Regulations of the Patent Law"), and Article 67, Paragraph 1 of the Civil Procedure Law of the People's Republic of China as amended in 2021, the Court of First Instance rendered the following judgment: "1. It is confirmed that the invention patent right for the invention entitled 'An Etching Method and Apparatus for P-Type Doped and Undoped Chips,' Patent No. 201910316864.7, is jointly owned by the plaintiff Wuhan Company XXX Technology Co., Ltd. and the defendant University of Technology XXX in China; 2. The other litigation claims of the plaintiff Wuhan Company XXX Technology Co., Ltd. are dismissed. The case acceptance fee of RMB 215 shall be borne by the plaintiff Wuhan Company XXX Technology Co., Ltd. in the amount of RMB 107.5 and by the defendant University of Technology XXX in China in the amount of RMB 107.5."

University of Technology XXX was dissatisfied with the judgment of the Court of First Instance and appealed to this Court, requesting: 1. that Item 1 of the judgment of the Court of First Instance be revoked and the judgment be amended to dismiss all of the litigation claims of Wuhan Company XXX in the first instance; 2. that the case acceptance fees for the first and second instances be borne by Wuhan Company XXX. Facts and grounds: (I) The judgment of the Court of First Instance failed to truly understand the legislative intent and mechanically applied the law with respect to such issues as work tasks, material conditions, technical conditions, and the substantive contribution of the foregoing factors to the invention and creation, without clarifying the distinction between Wang XXX's primary scientific research and teaching duties and his part-time work for Wuhan Company XXX. 1. Wang XXX has continuously engaged in scientific research and teaching at University of Technology XXX from 2013 to the present, and his responsibilities for supervising Ph.D. students such as Zhang XXXjian and Qin XXX to graduation naturally include various responsibilities such as publication of papers and patent applications within his professional field. The judgment of the Court of First Instance simply determined the ownership of the patent right in dispute based on the inventors' formal status or on the fact that the invention was completed during the period of employment, which is inconsistent with the legislative intent and substantive requirements of the Patent Law. 2. The judgment of the Court of First Instance failed to clarify the distinction between Wang XXX's specific role in the R&D of APD during his employment with Wuhan Company XXX and his specific role in the patent in dispute. The judgment of the Court of First Instance that the evidence submitted by University of Technology XXX was insufficient to prove that Wang XXX's primary job duties at University of Technology XXX consisted of APD chip R&D, and that there was no evidence proving that Wang XXX's primary job duties at University of Technology XXX before joining Wuhan Company XXX were related to the patent in dispute, was entirely erroneous. (II) Having already determined that the patent in dispute mainly utilized the material and equipment conditions of University of Technology XXX, the Court of First Instance nevertheless determined, pursuant to Article 12 of the Implementing Regulations of the Patent Law, that University of Technology XXX and Wuhan Company XXX jointly owned the patent right in dispute. This constituted a misunderstanding of the legal provisions, deviated from the spirit of the law, and should be revoked and the judgment should be amended accordingly.

Wuhan Company XXX argued in response: Wang XXX's primary job duties at Wuhan Company XXX included the R&D, sample fabrication, and mass production of APDs. Wang XXX's principal place of work was at Wuhan Company XXX, where he was subject to the management of Wuhan Company XXX. Wuhan Company XXX possessed R&D capabilities in the field related to the patent in dispute and had also substantively carried out R&D activities. The patent in dispute was directly related to both Wang XXX's primary job duties and the R&D achievements already obtained by Wuhan Company XXX. The judgment of the Court of First Instance was based on clear findings of fact and correctly applied the law. It requested that the appeal be dismissed and the original judgment be upheld.

Neither Wang XXX nor Qin XXX made any statement.

During the second-instance proceedings, none of the parties submitted any new evidence.

The facts ascertained by the Court of First Instance were basically true, and this Court hereby confirms them.

This Court further found:

According to the résumé of Wang XXX submitted by Wuhan Company XXX, he was familiar with nanoprocess development and large-scale production and had more than eight years of work experience in the R&D and production departments of international major companies. He was proficient in nanoprocesses such as lithography, coating (PVD, CVD), and plasma etching (RIE), and personally participated in the development of the overall chip process, quality control/inspection, and the design of the overall chip architecture. He had extensive experience in corporate management and the industrialization of research achievements, and multiple technologies he proposed had obtained international patent grants and had already been adopted by a number of top technology companies.

According to Wuhan Company XXX's "2017 Organizational Structure and Division of Responsibilities," Wuhan Company XXX had a total staffing complement of 34 employees in 2017, including 1 senior executive of the company, 5 experts (3 of whom concurrently served as senior executives of the company), 6 managerial personnel, and 22 technical personnel, and had six departments: General Administration Department, Financial Management Department, First R&D Department, Second R&D Department, Third R&D Department, and Process Technology Department. According to the "Expert Resignation Approval Form," Wang XXX's department at the time of his resignation was the Second R&D Department, and his position was Department Head.

In March 2017, Wuhan Company XXX (Party A) and University of Technology XXX (Party B) entered into a "Technical Development (Cooperation) Contract" (hereinafter referred to as the "Contract in Dispute") for a cooperative R&D project concerning micro/nano processing technology for high-performance optoelectronic detectors. Article 1 of the Contract stipulated that Party B shall assist Party A in carrying out cooperation in the field of R&D of high-performance optoelectronic detector devices, optimize the high-sidewall-angle etching process for InP, address the characteristic of relatively low optical-field absorption efficiency during high-frequency response of avalanche diodes, develop InP-based microlens arrays to improve optical-field utilization efficiency and thereby increase detector sensitivity, and optimize the radius of curvature and height of the microlens arrays so as to achieve light-concentrating characteristics at a specified focal length in the near-infrared wavelength band (around 1550 nm), with the focal-length error not exceeding 1 μm. Article 2 stipulated: 1. Where Party A provides samples, Party B shall assist Party A in completing the characterization of process parameters and developing laboratory improvement schemes. 2. Party B shall also assist Party A in developing process parameters for ICP etching of InP substrates in the laboratory, provide Party A with feasible etching recipes for laboratory fabrication, and provide SEM images reflecting the etching results. The etching depth shall reach 4 μm, and the sidewall angle shall be greater than 85 degrees. In addition, Party B shall also provide an ICP etching recipe for laboratory fabrication of InGaAs materials, with the requirement that the etching depth reach 1 μm and the sidewall angle be greater than 85 degrees. 3. Party B shall utilize a double-sided exposure machine to conduct R&D of the laboratory fabrication process for backside lenses. Upon acceptance, Party B shall provide process parameters for fabricating lenses with a diameter of 120 μm, including photolithography process parameters and etching recipes. Article 3 stipulated: From February 2017 to August 2017, the ICP laboratory fabrication etching processes for InP substrates and InGaAs shall be completed, so as to provide laboratory research support for Party A's development of the 10G APD production process. From September 2017 to July 2018, the hot-melt method using photoresist shall be employed to prepare curved structures, the changes in the viscosity coefficient of the photoresist during the temperature-increasing process shall be studied, and the contact changes between the InP and photoresist system shall be optimized. The experimental fabrication of backside lenses shall be completed using a double-sided exposure machine. From August 2018 to February 2019, the physicochemical mechanisms involved in the ICP etching process of InP shall be explored, the etching-rate ratio of photoresist to InP at 1:1 shall be optimized, and high-quality convex transfer shall be completed. From August 2019 to February 2020, Party A shall provide laboratory research support for the development of detector arrays and conduct relevant technology reserve research. Article 4 stipulated: The development funds for this project shall be borne entirely by Party A, which shall provide RMB 1 million in research funding for Party B's R&D work. Article 5 stipulated: The equipment, instruments, and materials purchased for Party B to conduct technical design and experiments shall be owned by Party B. Article 9 stipulated: Party A and Party B shall jointly enjoy the rights to apply for patents, use rights, rights of authorship, rights to honor, and rights to apply for awards arising from the technical achievements under this Contract, and any patent transfer shall require the consent of the other party. The project contact person recorded by Party B was Wang XXX.

During the second-instance proceedings before this Court, Wang XXX continued to be employed by University of Technology XXX.

The foregoing facts are supported by such evidence on file as Wang XXX's résumé, Wuhan Company XXX's "2017 Organizational Structure and Division of Responsibilities," the Contract in Dispute, and the statements of the parties.

This Court holds that this case is a dispute over ownership of patent rights involving foreign-related factors. Pursuant to Article 48 of the Law of the People's Republic of China on Application of Laws for Foreign-Related Civil Relations, the law of the place where protection is sought, namely, the People's Republic of China, shall apply to this case. The patent application in dispute was filed after the effective date of the 2008 amended Patent Law (October 1, 2009) and before the effective date of the 2020 amended Patent Law (June 1, 2021). Therefore, this case shall be governed by the relevant provisions of the 2008 amended Patent Law and the 2010 revised Implementing Regulations of the Patent Law. The issue in dispute in the second instance of this case is: How should the ownership of the patent right in dispute be determined?

Article 6, Paragraph 1 of the Patent Law provides: "An invention or creation made in the execution of the tasks of an entity to which the inventor belongs or mainly by utilizing the material and technical conditions of such entity shall be a service invention or creation. The right to apply for a patent for a service invention or creation shall belong to the entity. After the application is approved, such entity shall be the patent owner." Article 8 provides: "For an invention or creation completed by two or more entities or individuals in cooperation, or an invention or creation completed by an entity or individual entrusted by another entity or individual, unless otherwise agreed, the right to apply for a patent shall belong to the entity or individual that completed or jointly completed the invention or creation; after the application is approved, the applicant entity or individual shall be the patent owner." Article 12, Paragraph 1 of the Implementing Regulations of the Patent Law provides: "The service invention or creation completed in the execution of the tasks of the entity to which the inventor belongs as referred to in Article 6 of the Patent Law means: (1) an invention or creation made in the course of performing one's primary job duties; (2) an invention or creation made in performing a task assigned by the entity other than one's primary job duties; or (3) an invention or creation made within one year after retirement from, transfer from the original entity, or termination of the labor or personnel relationship, which is related to the primary job duties undertaken by the inventor at the original entity or the tasks assigned by the original entity."

The foregoing provisions establish the fundamental basis for determining the ownership of service inventions and creations between an individual and the entity by which the individual is employed. The special feature of this case is that Wang XXX entered into employment contracts with both University of Technology XXX and Wuhan Company XXX, and Wang XXX's primary job duties at University of Technology XXX also included scientific research. In light of Wang XXX's professional background and work experience, in addition to being an invention or creation completed mainly by utilizing the material and technical conditions of University of Technology XXX, as determined by the Court of First Instance, the patent in dispute also fell within the scope of Wang XXX's primary job duties at University of Technology XXX. At the same time, however, the patent in dispute was also an invention or creation completed by Wang XXX and others within one year after leaving Wuhan Company XXX. Therefore, this case involves the issue of a potential conflict in the ownership of the patent right for a service invention or creation arising from the fact that Wang XXX entered into employment contracts with University of Technology XXX and Wuhan Company XXX successively, while the periods of the employment contracts partially overlapped. Generally speaking, in such circumstances, with respect to the ownership of the patent right involved in a service invention or creation, the agreement between the two employing entities concerning the ownership of the patent right should be respected; where there is no such agreement, the ownership of the patent right should be determined by comprehensively considering such factors as the chronological order in which the employment relationships between the employee and the different entities were established, the extent of the contributions made by the different entities, and whether any fault existed. In light of the specific circumstances of this case, the patent right in dispute should be owned by University of Technology XXX. The specific reasons are as follows:

First, the patent in dispute does not fall within the scope agreed upon in the Contract in Dispute. In this case, although University of Technology XXX and Wuhan Company XXX entered into the Contract in Dispute, according to the provisions of the Contract in Dispute, the R&D content involved mainly consisted of two aspects: first, the R&D and laboratory improvement of the high-sidewall-angle etching process, namely, optimizing the high-sidewall-angle etching process for InP and addressing the characteristic of relatively low optical-field absorption efficiency during high-frequency response of avalanche diodes; second, the R&D of microlens arrays, namely, optimizing the radius of curvature and height of the microlens arrays so as to achieve light-concentrating characteristics at a specified focal length in the near-infrared wavelength band (around 1550 nm), with the focal-length error not exceeding 1 μm. The technical problem solved by the patent in dispute, however, was to provide an etching method and apparatus for P-type doped and undoped chips, and to provide a simple and convenient etching solution for P-type doped InP material chips having different diffusion windows. Therefore, the patent in dispute does not fall within the R&D content agreed upon in the foregoing contract, and the ownership of the patent right in dispute should not be determined in accordance with the provisions of the Contract in Dispute.

Second, from the perspective of the chronological order in which the employment relationships were established, the patent right for a service invention should, in principle, be owned by the entity in the earlier employment relationship. In view of the fact that the patent right for a service invention is originally acquired on the basis of the provisions of the Patent Law, once a service invention or creation is completed, the right to apply for a patent immediately belongs to the entity in the earlier employment relationship. Where two employment relationships coexist concurrently and there is no other agreement, the entity in the later employment relationship cannot alter the original ownership status of the patent right for a service invention on the basis of the employment contract subsequently entered into with the employee. In this case, University of Technology XXX entered into an employment contract with Wang XXX earlier,

and the patent in dispute constitutes a service invention made by Wang XXX during his employment with University of Technology XXX. Therefore, the patent right originally belonged to University of Technology XXX. In the absence of any other agreement between Wuhan Company XXX and University of Technology XXX, Wuhan Company XXX has no right to alter the original ownership status of the patent right in dispute on the basis of the employment relationship subsequently established.

Third, from the perspective of the extent of the contributions made by the two parties, the contribution made by University of Technology XXX to the completion of the technical solution related to the patent in dispute was greater than that made by Wuhan Company XXX. Although the technical solution of the patent in dispute was related to the primary job duties of Wang XXX and Qin XXX during their employment with Wuhan Company XXX, the patent in dispute was applied for after Wang XXX and Qin XXX left Wuhan Company XXX. The inventor Wang XXX was a professor employed by University of Technology XXX, while Qin XXX was a student of University of Technology XXX. Based on their respective scientific research duties or academic requirements, the patent in dispute was related to their work and research content. Moreover, the evidence on file proves that, during the research and development of the patent in dispute, University of Technology XXX provided the principal hardware and software technical conditions, such as experimental equipment and databases, for the R&D of the patent in dispute. By comparison, University of Technology XXX made a greater contribution to the completion of the technical solution related to the patent in dispute.

Fourth, from the perspective of the degree of fault of and nature of the conduct of the two parties, Wuhan Company XXX failed to exercise its duty of prudent care in the process of entering into the employment contract with Wang XXX and was manifestly at fault. University of Technology XXX entered into an employment contract with Wang XXX earlier, and the employment contract between University of Technology XXX and Wang XXX expressly stipulated that "all intellectual property rights relating to inventions and creations, technical secrets, and the like generated in the performance of duties or mainly by utilizing the material and technical conditions, scientific research information, and other resources of University of Technology XXX shall be enjoyed by University of Technology XXX." Wuhan Company XXX knew that Wang XXX was a professor employed by University of Technology XXX and had an employment contract with University of Technology XXX. It should therefore have known that any invention or creation completed by Wang XXX constituted a service invention belonging to University of Technology XXX. Moreover, there was no evidence proving that Wuhan Company XXX communicated with University of Technology XXX regarding the matter of entering into an employment contract with Wang XXX, much less that it consulted with University of Technology XXX regarding any potential conflict concerning the ownership of intellectual property rights. Wuhan Company XXX was therefore manifestly at fault subjectively. As the party at fault, Wuhan Company XXX was insufficiently entitled to obtain the patent right in dispute merely on the basis of the employment contract subsequently entered into.

In summary, the appeal claims of University of Technology XXX are well-founded and should be supported. The judgment of the Court of First Instance was based on substantially clear findings of fact, but it erred in the application of law and should therefore be corrected. In accordance with Article 48 of the Law of the People's Republic of China on Application of Laws for Foreign-Related Civil Relations, Article 6, Paragraph 1 and Article 8 of the 2008 amended Patent Law of the People's Republic of China, Article 12, Paragraph 1 of the 2010 revised Implementing Regulations of the Patent Law of the People's Republic of China, and Article 177, Paragraph 1, Item 2 of the Civil Procedure Law of the People's Republic of China, the judgment is hereby rendered as follows:

I. The Civil Judgment (2020) Wan 01 Min Chu No. 2299 of the Intermediate People's Court of Hefei City, Anhui Province is revoked;

II. The litigation claims of Wuhan Company XXX Technology Co., Ltd. are dismissed.

The case acceptance fee for the first instance in the amount of RMB 215 shall be borne by Wuhan Company XXX Technology Co., Ltd. The case acceptance fee for the second instance in the amount of RMB 1,000 shall be borne by Wuhan Company XXX Technology Co., Ltd. University of Technology XXX in China has prepaid RMB 1,000, which shall be refunded in the amount of RMB 1,000, and Wuhan Company XXX Technology Co., Ltd. shall pay an additional RMB 1,000.

This judgment is a final judgment.

Presiding Judge: Zhu Yan

Judge: Ling Zongliang

Judge: Ma Qinghua

December 25, 2025

Judge Assistant: Wang Lishang

Judge Assistant: Hao Xiaojuan

Court Clerk: Guo Chengjuan

Scan the QR code for a more convenient mobile reading experience

# 中国某技术大学；武汉某技术有限公司；王某；秦某发明专利权权属纠纷二审民事判决书

**审　理　法　院:**最高人民法院

**案　　　　号:**(2023)最高法知民终 2454 号

**裁　判　日　期:**2025. 12. 25

**案　　　　由:**民事/知识产权与竞争纠纷/知识产权权属、侵权纠纷/发明专利权权属、侵权纠纷/发明专利权权属纠纷

上诉人（一审被告）：中国某技术大学。住所地：中华人民共和国安徽省合肥市。

法定代表人：常某，该校校长。

委托诉讼代理人：代光敏，安徽华人律师事务所律师。

被上诉人（一审原告）：武汉某技术有限公司。住所地：中华人民共和国湖北省武汉市东湖新技术开发区。

法定代表人：李某振，该公司董事、经理。

委托诉讼代理人：张凯，武汉智权专利代理事务所专利代理师。

委托诉讼代理人：余浩，武汉智权专利代理事务所专利代理师。

一审被告：王某，男，某年某月某日出生，美利坚合众国国籍，住中华人民共和国江苏省南京市鼓楼区。

一审第三人：秦某，男，某年某月某日出生，汉族，住中华人民共和国江苏省泰兴市黄桥镇。

上诉人中国某技术大学（以下简称中某大）因与被上诉人武汉某技术有限公司（以下简称武汉某公司）、一审被告王某以及一审第三人秦某专利权权属纠纷一案，不服安徽省合肥市中级人民法院（以下简称一审法院）于 2023 年 5 月 12 日作出的（2020）皖 01 民初 2299 号民事判决（以下简称一审判决），向本院提起上诉。本院于 2023 年 11 月 9 日立案后，依法组成合议庭，并于 2024 年 1 月 11 日公开开庭审理了本案。上诉人中某大的委托诉讼代理人代光敏，被上诉人武汉某公司的委托诉讼代理人张凯、余浩到庭参加诉讼。一审被告王某，一审第三人秦某经本院合法传唤未到庭参加诉讼，本院依法缺席审理。本案现已审理终结。

武汉某公司向一审法院提起诉讼，一审法院于 2020 年 8 月 10 日立案受理。武汉某公司起诉请求：1. 确认名称为“一种 P 型掺杂与非掺杂芯片的刻蚀方法及装置”、申请号为 201910316864.7 的发明专利（以下简称涉案专利）申请权归其所有；2. 判令中某大、王某共同向武汉某公司支付因本案支出的合理费用人民币 1.66 万元（以下币种均为人民币），并互负连带清偿责任；3. 本案诉讼费由中某大、王某承担。事实与理由：王某系武汉某公司员工，双方于 2016 年 1 月 25 日签订劳动合同，服务期限自 2016 年 1 月 1 日至 2019 年 12 月 31 日止，协议约定王某在任职期间取得的科研成果所有权和相关知识产权归武汉某公司所有。2016 年 7 月至 8 月，武汉某公司与中某大在读研究生秦某签订了为期一年的实习协议。2018 年 2 月，秦某离开武汉某公司。2018 年 10 月，王某与武汉某公司签订解除劳动关系协议，并于当月办理

离职及交接手续。2019 年 1 月 30 日，中某大提出涉案专利申请，发明人为王某和秦某。涉案专利与王某、秦某在武汉某公司的项目计划、工作实习内容相关，涉案专利系为完成武汉某公司工作及实习任务所作出的发明创造，涉案专利申请权应归武汉某公司所有，中某大及王某的行为已严重侵害其合法权益。

中某大一审辩称：（一）2013 年 7 月 30 日起，其聘用王某为教授。王某在中某大任职期间，主要研究内容包括半导体光电芯片技术与纳米加工工艺，与涉案专利属于同一技术领域。（二）中某大先后投入电子束光刻机、镀膜机、刻蚀系统、掩膜制版系统、高真空蒸发系统、器件仿真软件、MATLAB 软件、数学建模软件等各项软硬件资源，涉案专利属于王某及其所带领的学生在履行本职科研工作中作出的发明创造，申请权应当属于中某大。（三）武汉某公司并不具备完成涉案专利的物质技术条件及实验基础，武汉某公司以王某曾与其签订过劳动合同并任职为由，认为涉案专利申请权归武汉某公司所有无事实和法律依据。

王某一审辩称：（一）其自 2014 年开始一直任职于中某大，科研研发和申请专利是其本职工作。2016 年 2 月其受聘于武汉某公司。武汉某公司在签订合同时明知其系中某大教授，而合同中含有多项对知识产权的排他约定，武汉某公司对此明显存在恶意。（二）武汉某公司在其兼职期间没有任何研发条件，涉案专利是其学生在中某大攻读博士学位所必须的研究工作，利用的条件均为中某大物质条件，武汉某公司所提供的证据只能说明其有兼职记录，与涉案专利没有任何关联性。

秦某一审未陈述意见。

一审法院认定以下事实：

（一）各方当事人的相关情况

2013 年 7 月 30 日，中某大聘用王某为教授，所在部门为物理学院，聘期四年，聘用期限自 2013 年 12 月 31 日起至 2017 年 12 月 31 日止。聘用合同约定：王某保证在本合同签订之时与原单位之间没有任何足以影响本合同生效和履行的事宜，本合同履行期间从事中某大的工作亦不会侵犯此前曾受聘单位的知识产权及其他合法权益；全面履行本合同约定的各项条款，完成预定工作任务和工作目标，接受中某大、中国某学院和国家的考核或检查；王某在聘期内在中某大所取得的教学、科研等成果均属职务成果，其发表有关论文、著作或申报有关奖励、专利和科研项目及经费等，均须同时署王某及中某大名称，且中某大必须为作者第一单位；在受聘期间，因履行职务或者主要是利用中某大的物质技术条件、科研信息等产生的发明创造、技术秘密等有关的知识产权均属于中某大享有，王某享有署名权。

武汉某公司成立于 2016 年 1 月 25 日，经营范围主要包括量子电光芯片（包括单光子源、激光器、探测器）产品研发、生产、批发兼零售、维修及技术咨询。2016 年 1 月 25 日，武汉某公司与王某签订劳动合同，约定服务期限为 2016 年 1 月 25 日至 2020 年 1 月 24 日止，共四年。王某从事器件生产部部长工作，年薪为每年 70 万元。

2016 年 4 月 15 日，武汉某公司申报第九批“3551 光谷人才计划”，该申报材料记载：申报项目为量子点单光子源，申报人才为王某，所属产业为光电子信息产业，申报人王某的专业领域为纳米技术。简介及专长中记载：“长期从事纳米技术方向研究……熟悉纳米工艺开发和大规模生产，精通光刻、镀膜等离子刻蚀等纳米工艺，并亲自参与了芯片整体流程开发，质量控制检测以及对芯片整体架构的设计。”代表性产品或服务为量子点单光子源、量子点激光器、单光子探测器、纳米加工设备、纳米光刻、等离子刻蚀

等。项目计划书中的项目产业化已有基础，并记载：“团队骨干具备深厚的半导体加工的技术储备。项目已有技术包含外延生长技术，管芯工艺技术、器件封装测试技术、模块封装技术、量子点芯片及器件生产线设计及组建、MES 生产制造软件开发。”

2016 年 7 月 11 日，武汉某公司与王某签订了专家聘任协议书，约定王某担任器件生产部部长，服务期限为四年，自 2016 年 1 月 1 日至 2019 年 12 月 31 日，并约定任职期间取得的科研成果所有权和相关知识产权归武汉某公司所有，不得以任何形式为与武汉某公司有竞争关系的企业提供同类项目的技术支持，承担不侵害武汉某公司知识产权等责任及保密义务。主要完成但不限于以下工作任务：2016 年 12 月前完成雪崩光电二极管（英文简称 APD）工艺流程并于 2017 年 3 月前制出 10GAPD 合格样品；2017 年 12 月前完成 APD 量产合格品 8 万只且优良率不低于 20%；2018 年 12 月前完成单子源和单光子探测器的设计；2019 年 12 月前制出第一个单光子探测器。工作内容为担任器件生产部部长，按照公司经营工作规划制定器件生产部工作规划，对器件生产部工作结果负责；负责器件生产部的团队培养和建设，对器件生产部岗位规划、人员编制、招聘等有直接建议权。同时武汉某公司与王某签订了员工商业秘密保密协议书，约定技术秘密包括但不限于：技术方案、工程设计、电路设计、制造方法、工艺流程、技术指标、计算机软件、数据库、研究开发记录、技术报告、检测报告、实验数据、试验结果、图纸、样品、样机、模型、模具、操作手册、实验数据、试验结果、技术文档、相关的函电、项目申报、实施方案、专利申报等；双方确认王某在武汉某公司任职期间，因履行职务或者利用武汉某公司的物质技术条件、业务信息等产生的产品图纸、技术秘密或者其他商业秘密信息，有关的知识产权均属于武汉某公司所有。未经武汉某公司同意，不得以泄露、告知、公布、发布、出版、传授、转让或者其他任何方式使任何第三方知悉属于武汉某公司或者属于他人但武汉某公司承诺有保密义务的技术秘密或者其他商业秘密信息，也不得在履行职务之外使用这些秘密信息；离职后承担保密义务的期限为离职后二年。

2016 年 8 月 2 日，武汉某公司、中某大在读研究生秦某及王某签订实习协议，约定实习期限为 2016 年 8 月 1 日至 2017 年 8 月 1 日，武汉某公司根据秦某的实际情况和工作需要，安排秦某到量子通讯部门从事合作研究工作。

武汉某公司自成立以来已经公开的专利申请有 23 件，其中，11 件专利的申请日在涉案专利申请日之前，包括申请号为 201710631297.5 的发明专利，该专利文本公开了：一种使用 RIE 设备刻蚀 InP 材料的方法及刻蚀 InP 材料，发明人晏某平、秦某、王某、王某中，申请日为 2017 年 7 月 28 日，该发明涉及半导体材料干法刻蚀领域，具体涉及一种使用 RIE 设备刻蚀 InP 材料的方法，解决了反应离子刻蚀设备刻蚀 InP 过程中产生的聚合物副产物污染样品的问题。申请号为 201610824183.8 的发明专利，该专利文本公开了：一种量子点单光子源及其制备方法，申请日 2016 年 9 月 14 日，发明人王某、王某中、秦某、李某平，该发明涉及单光子源领域，提供一种量子点单光子源及其制备方法，能够快速准确定位量子点的位置，便于工业生产。

（二）王某、秦某在武汉某公司的工作情况

2016 年 10 月 27 日，王某入选第九批“3551 光谷人才计划”，获得武汉东湖新技术开发区管理委员会的“3551 光谷人才计划”专项资金支持。

在武汉某公司 2017 年组织机构设置及职责分工中，研发二部主要职责为：负责盖革模式 APD 探测器、盖革模式阵列的研发、产品生产及项目管理工作。1.负责盖革模式 APD 项目的研发工作；2.负责盖革模式阵列的研发工作；3.负责该项目技术团队建设工作；4.负责该项目有关的对外协调；5.负责该项目综合管理；6.负责该项目产品生产及实物质量管理工作；7.完成领导安排的其他工作。

武汉某公司研发二部 2017 年度工作进展汇报、2017 年第 1 期例会会议纪要及 2017 年第 2 期例会会议纪要均记录了研发二部工作内容：GM-APD 工艺流程，涉及刻蚀工艺以及光照工艺，GM-APD 反向工程分析。

2017 年 3 月，武汉某公司开始启动 GM-APD 项目，并与华工某某光子技术有限公司（以下简称华工某某公司）签订技术服务合同，租用华工某某公司管芯部的部分产能，对 10GAPD 光探测器开展研发与小批量生产。王某在该项目费用表上签字。

2017 年 11 月 1 日，秦某与武汉某公司签订实习生人才培养协议，武汉某公司提供助学补助金，后秦某因学业规划于 2019 年 6 月解除培养协议。秦某出具的《陈述书》记载其在武汉某公司工作期间主要从事的工作包括 10GbpsAPD 和 GM-APD 的研发工作，涉及锌扩散工艺、流片制程、外延片结构优化设计、理论仿真等工作，并参与武汉某公司“盖革模式雪崩二极管”“高灵敏度 APD 芯片与焦平面成像阵列”项目答辩。

2017 年 5 月 11 日-8 月 20 日期间，秦某以武汉某公司研发工程师的身份与埃某思材料科技（上海）有限公司（以下简称埃某思公司）的 Yo*ch*Weng（翁某某）、Ye*Zhong（钟叶某）沟通 CrosssectionSEM（SEM 系扫描电子显微镜）和 SIMS 测试进度及测试调整的问题，并且邮件中提到测试用到的芯片为秦某邮寄给埃某思公司。2017 年 5 月 11 日-9 月 1 日期间，秦某与 Yo*ch*Weng（翁某某）、Ye*Zhong（钟叶某）沟通电镜测试结果的相关问题。其中，邮件附件中“etch.rar”文件包含涉案专利说明书附图 3。附件中“HOHWS364-2#etchresult.xlsx”和“2#beforeEtch.rar”文件包含涉案专利说明书附图 2。

2017 年 8 月 29 日，秦某发送邮件给王某，附件为 GM 工作计划，注明了张某健、秦某、许某负责的任务及完成进度情况。

2017 年 10 月 18 日，孙某月发送邮件给许某：“附件是 GM-APD 工艺流程初稿，你看看流程和你设计的是否一致，如果哪里不一致，我再修改。”10 月 19 日，许某回复：“除了第一次 ZN 扩散的刻蚀为湿法刻蚀外，暂没发现别的问题。”

2017 年 10 月 18 日，孙某月发送邮件给王某：“王教授，您好，附件是 GM-APD 工艺流程初稿，请查阅。”附件内容为 GM-APD 的研发工序。

2017 年 10 月 31 日，王某使用武汉某公司的邮箱发送邮件给刘某蓉、孙某月，邮件内容为：“SEM 照片见附件。结果 OK，以后用湿法刻蚀做 SiN 刻蚀，孙某月，请对你的工艺文件做相应的修改。”同日，王某发送邮件给孙某月，内容为“把 MOCVD 的条件也补充完整”。

2017 年 11 月 1 日，许某发送邮件给张某健、孙某月、抄送王某，附件为 OVQT 掩膜版 2.rar。

2017 年 11 月 15 日，王某答复王艳艳的内容包含“APD-FPA 外延结构质量报告、工艺流程报告、测试结果报告、流片质量管控标准、质量检测规范、工艺操作规范、外延结构设计图纸、芯片流程图纸、光刻模板图纸”。

2017 年 11 月 25 日，王某给刘某蓉的回复内容为："模板和外延片会在近期到货，请你们做好流片的准备。计划先在硅片上验证流程，你们要确定我们有足够的材料。"

2017 年 12 月 15 日，刘某蓉发送邮件给王某："王教授，附件是昨天进行的氮化硅湿法腐蚀实验镜检图整理，腐蚀均匀性很差，您看样品还需要看 SEM 么？"王某答复："重复这次实验。另外将 SiN 换成 SiO2 试一下。下次 Zn 扩散 zy 是什么时候？"

2018 年 1 月 24 日，秦某发送邮件给王某："王老师，附件是根据二部今天上午讨论结果整理的下一次锌扩散实验安排，请查收。"王某回复："SiN 生长会不会又和以前一样做不了？"

2018 年 2 月 8 日，秦某制作完成 2017 年工作进展汇报发送给王某，该工作进展汇报包括工艺流程图以及无封面页文件中的 TCAD 模拟、Matlab 的仿真和外延片参数以及实验室工作汇报中的模拟。

2018 年 3 月 5 日，王某制作完成 2017 年工作进展汇报（二）发送给秦某，秦某添加了锌扩散试验方案之后发给王某，该工作进展汇报包括微透镜重要参数的确定、实验背景、实验内容、镜检结果、刻蚀速率实验等。

2018 年 7 月 6 日，秦某发送邮件给孙某月，附件为武汉某公司 GM-APD 测试参数。

2018 年 10 月 8 日，王某由于个人原因提出离职，并与武汉某公司签订解除劳动关系协议书。2018 年 10 月 24 日，武汉某公司同意王某离职并办理交接手续，离职审批单与离职交接单记载部门为研发二部、工作交接内容为 GM-APD 研发进展技术资料。

2016 年 1 月-2018 年 10 月，王某在武汉某公司处工作期间，武汉某公司为其缴纳社会保险，向其发放工资，王某在职期间因私请假需提交请假申请单，因公出差费用报销履行报销手续。

2016 年 6 月-2018 年 6 月期间，秦某在武汉某公司实习，武汉某公司为其发放劳务费，秦某在职期间因私请假需提交请假申请单，因公出差费用报销履行报销手续。

（三）涉案专利情况

涉案专利申请日为 2019 年 4 月 18 日，申请人中某大，发明人王某、秦某。涉案专利公开了一种 P 型掺杂与非掺杂芯片的刻蚀方法及装置，包括：S1，在 P 型掺杂与非掺杂芯片上设置研磨线；S2，将设有研磨线的平面垂直设于研磨液上方并使研磨线与研磨液表面平行，并将 P 型掺杂与非掺杂芯片研磨至研磨线处；S3，将步骤 S2 中所得研磨后的所述 P 型掺杂与非掺杂芯片放入刻蚀溶液中浸泡预设时间，同时加光照。S4，将步骤 S3 浸泡后的芯片放于扫描电子显微镜下观察，若浸泡后的芯片的截面轮廓满足要求则停止浸泡，若截面轮廓不满足要求则再次将芯片放于刻蚀溶液中刻蚀。涉案专利涉及光电探测器制备技术领域，所要解决的技术问题是提供了一种 P 型掺杂与非掺杂芯片的刻蚀方法及装置，针对不同扩散窗口的 InP 材料 P 型掺杂芯片，提供一种简单、便捷的刻蚀方案。涉案专利说明书附图 2（研磨后的 P 型掺杂与非掺杂芯片的结构示意图）、附图 3（刻蚀后的 P 型掺杂与非掺杂芯片的结构示意图）与秦某在武汉某公司工作期间发送给埃某思公司邮件附件中的文件一致。涉案专利已被国家知识产权局授予发明专利权，授权公告日为 2021 年 12 月 14 日。

（四）中某大购置科研设备及涉案专利研发过程中使用设备的情况

2011 年至 2018 年间，中某大购买的主要科研设备有：电子束光刻机、等离子体增强化学气相沉积镀膜机、反应离子金属刻蚀系统及亚微米紫外曝光机、掩膜制版系统、高真空蒸发系统、小巧型匀胶机、正

置金相显微镜、光学隔振平台、面光源型 UV-LED 光固化装置、Zaber 电动 XY 显微位移台、紫外双面压印光刻机、曙光服务器、探针组；从 2016 年起购买了 IEL 数据库、sicessic 数据库、sciencedirect 数据库、PQDT 学位论文全文数据库、PQDT-B 数据库、EngineeringVillage 数据库；2018 年-2020 年期间多次采购外延片。中某大微纳研究与制造中心的设备有湿法刻蚀系统、冷场扫描电镜（品牌型号 Hitachi，SU8220）、扫描电镜镀膜仪 SEMCoater 等，以及对刻蚀结果进行表征的 SEM 设备。该中心费用结算单及机时材料结算单记载有秦某 2017 年 11 月 10 日使用 SEM-Hitachi8220 设备、SEM-Coater-Leica 设备及机时、费用的相关记录，上述记录中王某为导师。

一审法院认为：

第一，关于发明人王某的身份。王某与武汉某公司、中某大均有劳动关系。根据中某大网页上王某的简历，王某的工作领域为半导体光刻技术和设备，涉案专利涉及 APD 领域，涵盖芯片设计、制备工艺和测试。中某大提交的王某授课清单并不足以证明王某在中某大处的本职工作是 APD 芯片研发，本案也没有证据证明王某进入武汉某公司前在中某大处的本职工作内容与涉案专利相关。

第二，结合王某的工作岗位、职责范围、具体工作内容等来看，王某自 2016 年 1 月 25 日至 2018 年 10 月 24 日就职于武汉某公司，作为器件生产部和研发二部的管理人员，其工作职责范围包括 APD 相关技术研发和管理工作。一方面，王某任职期间直接从事 APD 的研发工作，具体体现在：1.武汉某公司作为专利权人的“一种使用 RIE 设备刻蚀 InP 材料的方法及刻蚀 InP 材料”以及“一种量子点单光子源及其制备方法”的发明专利，发明人均包括王某。2.公司内部邮件往来证明王某自 2016 年开始参与武汉某公司 APD 项目的研发，并于 2017 年 4 月作为武汉某公司的研发二部部长负责 GM-APD 项目，直接管理研发二部人员、财物和研发进度。3.王某作为武汉某公司员工，负责履行武汉某公司与外方的合同，参加行业会议，并参与公司相关项目。另一方面，王某先后作为武汉某公司器件生产部和研发二部的部长领导、参与 APD 项目研发工作，具体体现在：1.武汉某公司在王某任职期间启动 GM-APD 项目的研发工作，2017 年组织机构设置及分工中研发二部主要职责为负责 GM-APD 及阵列的研发、产品生产及项目管理工作。该项目自 2017 年开始预研，在研发二部例会会议纪要和研发二部年度工作汇报中记载有 GM-APD 的研发进度。2.2017 年 11 月 15 日王某答复王艳艳的内容包含 APD-FPA 外延结构质量报告、工艺流程报告、测试结果报告、流片质量管控标准、质量检测规范、工艺操作规范、外延结构设计图纸、芯片流程图纸、光刻模板图纸。3.研发二部技术人员通过邮件方式向王某发送周报；2017 年，王某在华工某某公司与武汉某公司关于 10GAPD 光探测器研制与小规模量产项目费用表上签字。同时，武汉某公司提供的人才计划申报、专家聘任协议书、组织机构设置及分工、会议纪要等也能够反映武汉某公司为王某进行 APD 研发工作制定了具体的工作计划。

第三，涉案专利是王某从武汉某公司离职后一年内作出的，与王某任职武汉某公司期间承担的本职工作具有关联性。主要体现在：一方面，涉案专利技术涉及光电探测器制备技术领域，该光电探测器包括雪崩光电二极管。涉案专利提供了一种 P 型掺杂与非掺杂芯片的刻蚀方法及装置，发明点为通过研磨、刻蚀溶液的刻蚀以及光照对 InP 材料 P 型掺杂芯片进行刻蚀。根据武汉某公司提供的王某、秦某在武汉某公司任职期间的研发成果记录文件，将涉案专利与该记录文件相比，二者解决的技术问题、发明目的、技术效

果基本一致。另一方面，在王某、秦某与武汉某公司工作人员的往来邮件中，讨论的内容是与涉案专利技术方案相关的内容。因此，可以认定涉案专利与王某任职武汉某公司期间承担的本职工作具有关联性。

第四，王某在任职武汉某公司期间与中某大仍存在劳动关系，其身份具有双重性，且王某与中某大对涉及职务发明创造的权利约定归属于中某大。涉案专利虽不必然与王某在中某大的工作任务直接相关，但是中某大在本案中所举相关证据能够证明中某大购买的科研设备用于涉案专利所必需的实验和模拟仿真，中某大微纳研究与制造中心机时费用记录也证明发明人使用了主要设备及核心软件，能够说明王某在研究开发过程中，依赖中某大的设备、零部件等物质技术条件，再结合王某自身科研职责及秦某作为中某大学生的学业要求的情况，应当确认涉案专利主要利用了中某大的物质技术条件。

综合上述分析，涉案专利是王某执行武汉某公司的工作任务，同时又主要利用了中某大的物质技术条件完成的发明创造，武汉某公司与中某大对该发明创造的完成都作出创造性贡献。鉴于涉案专利在本案审理过程中已获得授权，故一审法院依法确认涉案专利权属于武汉某公司和中某大共有。关于武汉某公司主张的为制止侵权行为所支付的合理开支，由于本案系专利权权属纠纷而非侵权纠纷，故该部分请求没有法律依据，一审法院不予支持。

一审法院依照 2008 年修正的《中华人民共和国专利法》（以下简称专利法）第六条第一款、2010 年修订的《中华人民共和国专利法实施细则》（以下简称专利法实施细则）第十二条、2021 年修正的《中华人民共和国民事诉讼法》第六十七条第一款之规定，判决：“一、确认名称为‘一种 P 型掺杂与非掺杂芯片的刻蚀方法及装置’、专利号为 201910316864.7 的发明专利权归原告武汉某技术有限公司和被告中国某技术大学共有；二、驳回原告武汉某技术有限公司的其他诉讼请求。案件受理费 215 元，由原告武汉某技术有限公司负担 107.5 元，被告中国某技术大学负担 107.5 元。”

中某大不服一审判决，向本院提起上诉，请求：1.撤销一审判决第一项，改判驳回武汉某公司一审全部诉讼请求；2.一、二审案件受理费由武汉某公司负担。事实与理由：（一）一审判决未能真正理解立法精神，对工作任务、物质条件、技术条件及前述要素对于发明创造的实质性贡献等法律适用问题生搬硬套，没有厘清王某本职科研、教学工作与武汉某公司兼职行为的区别。1.王某自 2013 年起至今一直在中某大从事科研和教学工作，其指导张某健、秦某等博士研究生毕业的职责中当然包括专业领域内论文发表、专利申请等各项职责。一审判决简单地以形式上发明人的身份归属或以工作期间完成发明而决定涉案专利权归属，不符合专利法规定的精神实质。2.一审判决没有厘清王某在武汉某公司任职期间从事 APD 的研发工作中的具体作用与其在涉案专利中的具体作用之间的区别。一审判决认定中某大不足以证明王某在中某大的本职工作是 APD 芯片研发、没有证据证明王某进入武汉某公司前在中某大的本职工作内容与涉案专利相关完全错误。（二）一审判决既已认定主要利用了中某大的物质设备条件，却根据专利法实施细则第十二条认定中某大与武汉某公司共有涉案专利权，实属对法律规定的误解，背离了法律精神，应予撤销并改判。

武汉某公司辩称：王某在武汉某公司的本职工作包括 APD 的研发、样品制作和量产。王某的主要工作地点在武汉某公司，受武汉某公司的管理。武汉某公司具有涉案专利相关领域的研发能力，也实质性开展了研发活动。涉案专利与王某的本职工作和武汉某公司已经取得的研发成果均直接相关。一审判决认定事实清楚，适用法律正确，请求驳回上诉，维持原判。

王某、秦某均未作陈述。

二审期间，当事人均未提交新的证据。

一审法院查明的事实基本属实，本院予以确认。

本院另查明：

根据武汉某公司提交的王某简历记载，其熟悉纳米工艺开发和大规模生产，有在国际大公司的研发和生产部门 8 年以上的工作经验。精通光刻（lithography）、镀膜（PVD，CVD）、等离子刻蚀（RIE）等纳米工艺，并亲自参与了芯片整体流程开发、质量控制/检测以及对芯片整体架构的设计。其具有丰富的公司管理和将研究成果产业化的经验，提出的多项技术已经取得国际专利授权，并已经被多家顶级科技公司采用。

根据武汉某公司《2017 年组织机构设置及职责分工》记载，武汉某公司 2017 年人员编制共 34 人，其中公司高管 1 人，专家 5 人（兼公司高管 3 人），管理人员 6 人，技术人员 22 人，设六个部门：综合管理部、财务管理部、研发一部、研发二部、研发三部、工艺技术部。根据《专家离职审批单》的记载，王某离职时所在部门为研发二部，职务为部长。

2017 年 3 月，武汉某公司（甲方）与中某大（乙方）就高性能光电探测器微纳工艺的合作研发项目签订《技术开发（合作）合同书》（以下简称涉案合同）。其中第一条约定：乙方需协助甲方在研发高性能光电探测器器件领域展开合作，优化 InP 高侧壁角刻蚀工艺，解决雪崩二极管高频率响应时光场吸收效率较低的特性，研发 InP 基微透镜阵列，提升光场利用效率，进而提高探测器的灵敏度，优化微透镜阵列的曲率半径与高度，实现在近红外波段（1550nm 附近），在指定焦距处的聚光特性，焦距误差不得超过 1μm。第二条约定：1.乙方在甲方提供样品的情况下，协助甲方完成工艺参数的表征，并研发实验室改进方案。2.乙方还需要帮助甲方开发 InP 衬底 ICP 刻蚀实验室制作的工艺参数，需要向甲方提供切实可行的实验室制作刻蚀配方，并反馈刻蚀结果的电镜图。刻蚀深度需达到 4μm，侧壁大于 85 度。此外，乙方还需要提供 InGaAs 材料实验室制作的 ICP 刻蚀配方，要求刻蚀深度达到 1μm，侧壁大于 85 度。3.乙方需利用双面曝光机开展背面透镜的实验室制作工艺研发。验收时需提供直径 120μm 的透镜加工工艺参数（包括光刻工艺参数与刻蚀配方）。第三条约定：2017 年 2 月-2017 年 8 月，完成 InP 衬底与 InGaAs 的 ICP 实验室制作刻蚀工艺，为甲方开发 10GAPD 生产工艺提供实验室研究支撑。2017 年 9 月-2018 年 7 月，开展光刻胶热熔法制备曲面结构，研究光刻胶的粘度系数在升温过程中的变化情况，优化 InP 与光刻胶体系的接触变化。使用双面曝光机完成背部透镜实验制作。2018 年 8 月-2019 年 2 月，探索 ICP 刻蚀 InP 过程中的物理化学机制，优化光刻胶与 InP1：1 的刻蚀速率比，完成高质量的凸形转移。2019 年 8 月-2020 年 2 月，甲方为探测器阵列的开发提供实验室研究支撑，并开展相关技术储备研究。第四条约定：本项目开发经费全部由甲方承担，需要为乙方的研发工作提供研究经费 100 万元。第五条约定：用于乙方进行技术设计和实验而购置的设备、器材和资料归乙方所有。第九条约定：甲乙双方共同享有本合同技术成果产生的专利申请权、使用权、署名权、荣誉权和申请奖励权，专利转让需经另一方同意。乙方记载的项目联系人为王某。

本院二审期间，王某仍在中某大任职。

以上事实有王某简历、武汉某公司《2017 年组织机构设置及职责分工》、涉案合同、当事人陈述等在案佐证。

本院认为，本案系具有涉外因素的专利权权属纠纷，根据《 中华人民共和国涉外民事关系法律适用法》 第四十八条的规定，本案应当适用被请求保护地即中华人民共和国的法律。涉案专利申请行为发生于 2008 年修正的专利法施行日（2009 年 10 月 1 日）之后、2020 年修正的专利法施行日（2021 年 6 月 1 日）之前，故本案应适用 2008 年修正的专利法及 2010 年修订的专利法实施细则的相关规定。本案二审的争议焦点为：涉案专利权的归属应如何确定。

专利法第六条第一款规定：“执行本单位的任务或者主要是利用本单位的物质技术条件所完成的发明创造为职务发明创造。职务发明创造申请专利的权利属于该单位；申请被批准后，该单位为专利权人。”第八条规定：“两个以上单位或者个人合作完成的发明创造、一个单位或者个人接受其他单位或者个人委托所完成的发明创造，除另有协议的以外，申请专利的权利属于完成或者共同完成的单位或者个人；申请被批准后，申请的单位或者个人为专利权人。”专利法实施细则第十二条第一款规定：“专利法专利法第六条六条所称执行本单位的任务所完成的职务发明创造，是指：（一）在本职工作中作出的发明创造；（二）履行本单位交付的本职工作之外的任务所作出的发明创造；（三）退休、调离原单位后或者劳动、人事关系终止后 1 年内作出的，与其在原单位承担的本职工作或者原单位分配的任务有关的发明创造。”

上述规定为个人与其所在单位就职务发明创造的归属确立了基本依据。本案的特殊性在于，王某与中某大、武汉某公司均签订了劳动合同，王某在中某大的本职工作也包括科研工作。结合王某的专业背景以及工作经历，涉案专利除了一审判决所认定的主要利用中某大的物质技术条件完成以外，亦属于王某在中某大的本职工作内容，但涉案专利同时也是王某等人离开武汉某公司 1 年内完成的发明创造。因此，本案存在王某与中某大及武汉某公司先后签订劳动合同，而因劳动合同期间部分重叠导致职务发明的专利权归属可能产生冲突的问题。通常而言，就此情形职务发明创造所涉专利权的归属，应当尊重两工作单位之间有关专利权归属的约定；没有约定的，应当综合考虑员工与不同单位劳动关系形成的先后、不同单位的贡献大小、是否存在过错等因素确定专利权的归属。结合本案具体情况，涉案专利权应当归属于中某大所有。具体理由如下：

第一，涉案专利并不属于涉案合同约定的范围。本案中，中某大和武汉某公司虽然签订了涉案合同，但依照涉案合同约定，涉及的研发内容主要包括两个方面：一是关于高侧壁角刻蚀工艺的研发及实验室改进，即优化 InP 高侧壁角刻蚀工艺，解决雪崩二极管高频率响应时光场吸收效率较低的特性；二是关于微透镜阵列的研发，即优化微透镜阵列的曲率半径与高度，实现在近红外波段（1550nm 附近），在指定焦距处的聚光特性，焦距误差不得超过 1μm。而涉案专利解决的技术问题是提供一种 P 型掺杂与非掺杂芯片的刻蚀方法及装置，针对不同扩散窗口的 InP 材料 P 型掺杂芯片，提供一种简单、便捷的刻蚀方案。因此，涉案专利并不属于上述合同约定的研发内容，不应按照涉案合同的约定确定涉案专利权的归属。

第二，从劳动关系的形成先后看，职务发明专利权原则上应归在先劳动关系中的单位所有。鉴于职务发明专利权系基于专利法规定而原始取得，职务发明创造一旦完成，申请专利的权利即归在先劳动关系中的单位所有。在前后两个劳动关系同期并存、且没有其他约定的情况下，在后劳动关系中的单位无法基于其与员工在后签订的劳动合同改变职务发明专利权的原始归属状态。本案中，中某大与王某签订劳动合同

在先，涉案专利属于王某在中某大工作期间的职务发明，专利权原始即归中某大所有。在武汉某公司与中某大并无其他约定的情况下，武汉某公司无权基于在后形成的劳动合同关系改变涉案专利权的原始归属状态。

第三，从双方的贡献大小看，中某大对于涉案专利相关技术方案的完成作出的贡献相比武汉某公司更大。虽然涉案专利技术方案与王某、秦某在武汉某公司工作期间的本职工作具有相关性，但涉案专利系王某、秦某离开武汉某公司后申请，发明人王某系中某大聘任的教授，秦某系中某大的学生，基于二人自身的科研职责或学业要求，涉案专利与其工作及研究内容具有相关性。而且，在案证据证明，在涉案专利的研究开发过程中，中某大为涉案专利的研发提供了主要的实验设备、数据库等软硬件技术条件。两相比较，中某大对于涉案专利相关技术方案的完成具有更大的贡献。

第四，从双方的过错程度及行为性质看，武汉某公司在与王某签订劳动合同过程中未尽到审慎注意义务，存在明显过错。中某大与王某签订劳动合同在先，且中某大与王某的劳动合同明确约定“因履行职务或者主要是利用中某大的物质技术条件、科研信息等产生的发明创造、技术秘密等有关的知识产权均属于中某大享有”。武汉某公司明知王某系中某大聘任教授，与中某大存在劳动合同，其应当知道王某完成的发明创造系归属于中某大的职务发明，且并无证据证明武汉某公司就与王某签订劳动合同事宜与中某大进行沟通，更未就知识产权归属可能产生的冲突与中某大进行协商，主观上存在明显过错。武汉某公司作为过错方，仅仅基于在后劳动合同不足以获得涉案专利权。

综上所述，中某大的上诉请求成立，应予支持。一审判决认定事实基本清楚，但适用法律有误，应予纠正。依照《中华人民共和国涉外民事关系法律适用法》第四十八条，2008 年修正的《中华人民共和国专利法》第六条第一款、第八条，2010 年修订的《中华人民共和国专利法实施细则》第十二条第一款和《中华人民共和国民事诉讼法》第一百七十七条第一款第二项之规定，判决如下：

一、撤销安徽省合肥市中级人民法院（2020）皖 01 民初 2299 号民事判决；

二、驳回武汉某技术有限公司的诉讼请求。

一审案件受理费人民币 215 元，由武汉某技术有限公司负担。二审案件受理费人民币 1000 元，由武汉某技术有限公司负担，中国某技术大学已预交人民币 1000 元，应退人民币 1000 元，武汉某技术有限公司应补交人民币 1000 元。

本判决为终审判决。

审 判 长：朱燕

审 判 员：凌宗亮

审 判 员：马清华

二〇二五年十二月二十五日

法官助理：王力上

法官助理：郝小娟

书 记 员：郭成娟

扫一扫，手机阅读更方便