# Cohen Supplemental Ex. 3

*Legal Studies* (2025), **45**, 554–576
doi:10.1017/lst.2025.10092

S·L·S
The Society of Legal Scholars

RESEARCH ARTICLE

# Rethinking China's emerging case law system: empirical insights and challenges to prevailing assumptions

Lu Xu†

Lancaster University, Lancaster, UK
Email: lu.xu@lancaster.ac.uk

(Received 30 May 2024; revised 28 January 2025; Accepted 11 August 2025)

**Abstract**

This paper examines China's emerging case law system through an empirical analysis of more than 10,000 court judgments issued between 2019 and 2021. It challenges prevailing academic views that Guiding Cases are 'de facto binding' on Chinese courts and that China's case law system could be interpreted through a common law lens. Instead, the study shows that the Chinese approach is characterised by distinct objectives, methodologies, and applications. The paper further highlights the practice of 'mandatory search for similar cases', which has substantially expanded the role of cases in judicial decision-making. China's case law system remains in its formative stages, marked by notable uncertainties and challenges. This research underscores the importance of sustained empirical inquiry into legal rules and practices to better understand the trajectory of China's case law system and the broader implications of this novel approach for contemporary judicial practice.

**Keywords:** case law; Chinese law; empirical legal analysis; comparative law

## Introduction

Since 2010, there have been significant and foundational shifts in Chinese law regarding 'case law', or the use of past court decisions in judicial practice. While doctrinal interpretations in the past have typically framed case law narrowly as a common law concept,[1] which was often considered inherently unsuitable for China,[2] contemporary scholarship now explores the use of case law more broadly, drawing on Chinese legal history and the civil law tradition.[3] More importantly, the Supreme People's Court began publishing Guiding Cases (*zhidaoxing anli*) in 2011 – cases selected and edited by the Supreme People's

†Senior Lecturer in Property Law, Lancaster University. The project is funded by the Foreign, Commonwealth and Development Office and the British Embassy in Beijing's China Network's International Programme Fund. I am deeply indebted to Vivienne Che, Gao Wei, Huang Chicheng, Li Weitao and Zhang Qi for their invaluable assistance at various stages of the funding and the project. I thank all six research assistants based at Lancaster University Law School and Beijing Jiaotong University Law School who worked on the project. I am grateful to David Campbell, Chen Xuechen and two anonymous reviewers for their insightful comments and constructive suggestions. All mistakes and omissions remain my own.

[1] B Li 李步云 'Several issues about legal systems: with discussion of the application of case law in China' (关于法系的几个问题——兼谈判例法在中国的运用) [1990/1] China Legal Science 1.

[2] Y Gao 高岩 'It is not appropriate to adopt a case law system in our country' (我国不宜采用判例法制度) [1991/3] *China Legal Science* 1.

[3] X Chen 陈兴良 (ed) *Chinese System of Directive Cases* (中国案例指导制度研究) (Beijing: Peking University Press, 2014).

© The Author(s), 2025. Published by Cambridge University Press on behalf of The Society of Legal Scholars. This is an Open Access article, distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivatives licence (http://creativecommons.org/licenses/by-nc-nd/4.0), which permits non-commercial re-use, distribution, and reproduction in any medium, provided that no alterations are made and the original article is properly cited. The written permission of Cambridge University Press must be obtained prior to any commercial use and/or adaptation of the article.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

Court that all courts must 'consult and follow' in subsequent adjudication. The use of cases has been facilitated by the establishment of the world's largest database of court judgments, China Judgments Online (CJO), which launched in 2013. In 2020, the potential scope of case law was greatly expanded with the introduction of mandatory searches for similar cases.[4] Judges are currently instructed to search for and consider 'similar cases' (*lei'an*) from different, hierarchical categories when adjudicating certain cases. The 'emergence of case law' in China, a topic contemplated in English-language literature since the 1990s,[5] has now become increasingly tangible and relevant.

However, as with many Chinese reforms, policymakers have not clearly defined some key terms for these potentially transformative changes. There is no legislative or official explanation of the legal effect of Guiding Cases, how they are consulted and followed, or the consequences if courts do not in fact follow them. Little guidance has been provided on how similar cases can be used for judicial decision-making. This lack of clarity has drawn considerable scholarly attention, focusing not only on legal practice but also on the broader implications for China as a legal and political system distinct from Western liberal democracies. Efforts to establish a system of case law are sometimes seen as extending beyond goals like improving judicial professionalism,[6] and instead as a power struggle by the court to wrestle legislative authorities from the National People's Congress against the larger background of an ideological divide between authoritarian and democratic conceptions.[7] Moreover, many efforts in explaining and interpreting Chinese law have been influenced by common law informed doctrines and conceptions of case law and its application in court proceedings. As observed by Kiun, the two currently dominant paradigms see the Chinese system either as a transplant from common law, or a hybrid of common law mixed with Chinese characteristics.[8]

As a result, some scholarship on the emerging Chinese system has become notably detached from the substance of Chinese law. Key assertions about the purported principles and operation of the Chinese system are often not supported by any reference to law or practice. Indeed, it has become academically acceptable to critically analyse a system of case law without actually examining a single case. To borrow an observation by Zhang and Ginsburg about the current scholarly assessment of Chinese law, the different positions of many scholars in this context are often 'impressionistic rather than empirical'.[9]

This present study strives to provide a more empirical perspective on the increasingly important practice of using cases in Chinese courts. It examines more than 10,000 full-text court judgments from 2019 to 2021, focusing on how cases were used, the weight they carried in decision-making, what judges said about them, and related factors.

The findings challenge some prevalent scholarly assumptions about Chinese case law. Most notably, the Chinese system does not create any 'de facto binding' precedents in practice, contrary to what others have proclaimed – based on the idea that lower courts that do not follow Guiding Cases risk having their decisions overturned on appeal. Rather, the goal in these early stages is to establish a normative model where the use of cases is accepted and encouraged, a goal that has seen modest progress. There are reasons to be realistic about the practical impact of cases, as many Guiding Cases are typically given very narrow and restrictive application that limits their potential for shaping law and legal practice.

[4]Supreme People's Court 'Guiding Opinions of the Supreme People's Court on Unifying Legal Application and Enhancing Searches of Similar Cases (Trial Implementation)' (最高人民法院关于统一法律适用加强类案检索的指导意见(试行)) (27 July 2020) (2020 Opinions).

[5]SB Lubman *Bird in a Cage: Legal Reform in China after Mao* (Stanford: Stanford University Press, 1999) pp 284–285; N Liu 'Legal precedents with Chinese characteristics: published cases in the Gazette of the Supreme People's Court' (1991) 5 Journal of Chinese Law 107 at 118.

[6]B Ahl 'Retaining judicial professionalism: the new guiding cases mechanism of the Supreme People's Court' (2014) 217 The China Quarterly 121.

[7]S Wang 'Guiding Cases as a form of statutory interpretation: expansion of Supreme People's Court's judicial lawmaking authority in China' (2018) 48 Hong Kong Law Journal 1067.

[8]JF Sze Kiun 'Beyond transplantation and hybridisation: the distinctiveness of the system of case guiding' (2022) 10 Peking University Law Journal 75.

[9]T Zhang and T Ginsburg 'China's turn toward law' (2019) 59(2) Virginia Journal of International Law 279 at 295.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

Meanwhile, there are also notable developments and differences in the understanding and use of cases in Chinese courts, as cases may be used to answer both questions of fact and questions of law, largely enabled by the use of modern technology.

The remainder of the paper is structured as follows. Section 1 provides the historical background and current rules governing the use of cases in Chinese court, as well as some of the main viewpoints in current scholarship. Section 2 briefly explains the methodology in selecting cases for this study and its limitations. Section 3 provides the mainly quantitative results of analysis, such as whether Chinese judges respond to or cite Guiding Cases in their judgments. Section 4 follows this up with more substantive critical examination by drawing extensively from important and relevant cases identified in this study. It answers several important questions and challenges the previous consensus with empirical evidence for the first time, such as the nature or effect of Guiding Cases.The conclusion contains a short summary of the findings and their implications for future studies.

## 1. Background, rules and literature

### *(a) Historical background*

For legal historians, the recent attention surrounding 'case law' in Chinese law may seem to be excitement over rather old news. There has long been recognition of the importance of 'precedents' to Chinese law, which 'played a preeminent part' in the history of this 'oldest system in continuous existence'.[10] Precedents could be used as the basis for judicial decisions in the absence of enacted law as early as by the eighth century BC.[11] Numerous compilations of cases were made by different dynasties throughout history, to the extent that, during the Ming (1368–1644) and Qing (1636–1912) dynasties, precedents (*li*) were seen as the more substantial body of law than enacted legal codes (*lü*).[12] However, the use of precedents had such a negative reputation and was often seen as means by which judges could overthrow or replace enacted law, so that reformers and jurists from the early twentieth century were already notably careful to steer clear of such association.[13] The People's Republic, founded in 1949 on the basis of communist beliefs and institutions, naturally distanced itself from the notion of precedents that had deep connections to China's imperial past. Even today, many Chinese judges and scholars prefer to speak of 'prior cases' (*xianli*) rather than 'precedents' (*panli*) in this context.[14]

Nevertheless, after the reconstruction of the legal system following its demise in the Cultural Revolution (1966–1976) and the reform and opening-up since 1978, there were signs that decided cases were beginning to attract attention from the Chinese judiciary in their work, especially since the publication of cases by the Supreme People's Court in its official *Gazette* from the 1980s.[15] Many courts later joined in on the publication of a large variety of cases and collections in the following decades.[16] But the notion of making more substantive use of decided cases was highly controversial among Chinese jurists at the time.[17] As part of judicial practice, judges would not refer to past decisions in their judgments even if they actually consulted them.[18] Indeed, there were court rules in place that explicitly

---

[10]CS Lobingier 'An introduction to Chinese law' (1930) 4 China Law Review 121 at 122; CS Lobingier 'Precedent in past and present legal system' (1946) 44 Michigan Law Review 955 at 956.

[11]Liu, above n 5, at 109.

[12]S Zongling 'Judicial precedents in China today: a comparative study of law' [1994] (special issue) Asia Pacific Law Review 109 at 110.

[13]Ibid; CH Chang et al 'Sources of Chinese civil law' (1925) 2 China Law Review 209 at 211–212.

[14]Q Zhang 张骐 *Study on Chinese Judicial Precedents and the System of Case Guiding* (Beijing: Peking University Press, 2016) p 4.

[15]Liu, above n 5.

[16]Ahl, above n 6, at 126.

[17]Li, above n 1; Gao, above n 2; S Zongling 沈宗灵 'Precedents in contemporary China' (当代中国的判例) [1992/1] China Legal Science 1.

[18]Q Zhang 张骐 'The identification and application of parts with guiding effects in guiding cases' (指导性案例中具有指导性部分的确定和适用) [2008/10] Law Science 89 at 97–98.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

prohibited references to past decisions in judgments.[19] There is little evidence that the hundreds, even thousands, of cases published by different Chinese courts over the course of nearly three decades (1980s to 2000s) ever made much of an impact on judicial decision-making.

The conceptual framework presented by Lewis on the relationship between precedent and the rule of law is particularly useful in explaining the Chinese approach here. Lewis convincingly argues that any model of precedent, whether 'authoritative' or 'persuasive', better advances the rule of law than what is termed the 'null model', 'under which courts are authorised to decide precedent-governed disputes without paying attention, in a normatively significant way, to relevant precedents'.[20] Although a null model can be lawful, Lewis contends that a system of precedent offer benefits like stability, reliability and equality, which is why no legal system studied across common law and civil law adopts the null model, 'at least officially'.[21] Nevertheless, until merely a decade or so ago, Chinese law was both officially and practically a null model.

### *(b) Guiding Cases and similar cases search*

The landmark development that cemented a role for cases in contemporary Chinese law is the creation and formalisation of the new category of 'Guiding Cases' by the Supreme People's Court in 2010, which were supplemented by implementation rules in 2015.[22] Since then, the label of 'Guiding Cases' (*zhidaoxing anli* or *zhidao anli*) is exclusively controlled by the Supreme People's Court and must not be used by other courts when they publish cases.[23] Provincial high people's courts can recommend cases within their jurisdiction to be considered for selection as Guiding Cases, including cases recommended to them by intermediate and basic people's courts. The Case Guidance Office of the Supreme People's Court is responsible for the selecting, editing and recommending of decided cases from any court in China to the Adjudication Committee of the Supreme People's Court, which has the sole authority to endorse them with the status of Guiding Cases.[24] Each confirmed Guiding Case is assigned a unique serial number, and multiple cases are often published together in practice, typically under a mini-theme such as criminal law or environmental protection. As of May 2024, a total of 229 Guiding Cases have been published in 40 batches.

Guiding Cases are given considerable prominence in litigation. Whenever any Guiding Case is cited by litigants, the court shall expressly address this reference in the judgment.[25] More substantively, if any case is found to have similar basic facts and application of law to a Guiding Case, the court shall 'consult and follow' (*canzhao*) the main points of adjudication of the Guiding Case in its judgment.[26]

In practice, since the publication of the first batch of Guiding Cases in 2011, their impact as documented in court judgments has been growing, but at a moderately slow pace. In the first five years

[19] Y Hu and T Yu 胡云腾、于同志 'Examining several major, difficult or controversial issues of the case guidance system' (案例指导制度若干重大疑难争议问题研究) [2008/6] Chinese Journal of Law 3 at 11; Beijing Municipality High People's Court Project Team 北京市高级人民法院课题组 'Research report on improving the case guidance system' (关于完善案例指导制度的调研报告) [2007/19] People's Judicature 66.

[20] S Lewis 'Precedent and the rule of law' (2021) 41 Oxford Journal of Legal Studies 873 at 875.

[21] Ibid, at 879.

[22] Provisions of the Supreme People's Court on Case Guidance (最高人民法院关于案例指导工作的规定) (26 November 2010) (2010 Provisions); Detailed Implementation Rules for the Provisions of the Supreme People's Court on Case Guidance (《最高人民法院关于案例指导工作的规定》实施细则) (13 May 2015) (2015 Rules). The first batch of four Guiding Cases were published in December 2011.

[23] It should be noted that this monopoly covers only the court system, as the Supreme People's Procuratorate started the publication of procuratorial Guiding Cases before the Supreme People's Court. Procuratorial Guiding Cases are nevertheless beyond the scope of this study and will not be discussed further. For an informative account of procuratorial Guiding Cases, including how they are generally ignored by English-language commentators, see C Hawes 'Transforming the culture of Chinese prosecutors through Guiding Cases' (2020) 23 New Criminal Law Review 196 at 198.

[24] 2015 Rules, Arts 4 and 8.

[25] Ibid, Art 11.

[26] Ibid, Art 9; 2010 Provisions, Art 7.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

(2012–2016), only 549 cases in total referred to any Guiding Cases.[27] The numbers increased to over 1,000 cases annually from 2017, peaking at 2,215 cases in 2020.[28] Considering that Chinese courts resolved 28.7 million cases in 2020,[29] that means only one in 13,000 cases referenced a Guiding Case. Moreover, by the end of 2022, only 1,607 out of more than 3,500 discrete courts have cited Guiding Cases in their judgments.[30] In other words, 54% of Chinese courts have never referred to a single Guiding Case in over a decade, despite clear instructions from the Supreme People's Court that they must do so whenever appropriate. More recent empirical studies, aided by linguistic tools, reveal that Guiding Cases are also relied upon by judges tacitly without citation many times more than they are actually cited in judgments.[31] Nevertheless, the limited usage of Guiding Cases confirms longstanding concerns in Chinese scholarship as to the doctrinal and practical difficulties of using cases for Chinese judges, due to factors such as the arguably erroneous perception of the civil law tradition's rejection of case law,[32] the lack of training in the use of cases in judicial and legal education,[33] the judiciary's unfamiliarity with analogical reasoning,[34] and weaknesses of setting out judicial reasoning in judgments.[35]

Undeterred by the limited uptake of Guiding Cases, the Supreme People's Court doubled down on the need to use cases in its fourth 'five-year plan' (2014–2018), in order to achieve better 'uniformity in the application of law'.[36] Following some pilot schemes at local courts, a new mechanism known as mandatory 'similar cases search' (*lei'an jiansuo*) (SCS) was introduced in 2020, considerably broadening the scope of potential 'case law'. From 31 July 2020, all judges are required to conduct an SCS when dealing with cases that are to be discussed by adjudication committees, cases under supervision by court presidents or divisional heads, cases that lack any clearly applicable legal rule or where the applicable rules are not uniform, and any other cases where an SCS is deemed necessary.[37] Although SCS is not required in all cases, the broad scope of internal supervision and the flexibility of the last category quickly render it an integral part of judicial work. A similar case is defined as any in-force judgment of any court that has similarity to the instant case in terms of basic facts, main points of dispute, application of law or other aspects.[38]

Not only is this conception of 'similar cases' remarkably broad, but the Supreme People's Court has also conspicuously stipulated a hierarchy of similar cases to narrow search parameters, thereby creating a

---

[27]Y Guo and M Sun 郭叶、孙妹 'A big data analysis of the application of Guiding Cases – 2016 annual report of judicial application of Guiding Cases from the Supreme People's Court' (指导性案例应用大数据分析—最高人民法院指导性案例司法应用年度报告 2016) [2017/4] China Review of Administration of Justice 40.

[28]Y Guo and M Sun 郭叶、孙妹 '2017 annual report of judicial application of Guiding Cases from the Supreme People's Court' (最高人民法院指导性案例司法应用情况 2017 年度报告) [2018/3] *China Review of Administration of Justice* 108; Y Guo and M Sun 郭叶、孙妹 '2020 annual report of judicial application of Guiding Cases from the Supreme People's Court' (最高人民法院指导性案例2020年度司法应用报告) [2021/5] China Review of Administration of Justice 121.

[29]Supreme People's Court 'National Judicial Statistics for 2020', available at http://gongbao.court.gov.cn/Details/0bce90201fd48b967ac863bd29059b.html.

[30]Y Guo and M Sun 郭叶、孙妹 '2022 annual report of judicial application of Guiding Cases from the Supreme People's Court' (最高人民法院指导性案例2022年度司法应用报告) [2023/4] China Review of Administration of Justice 181.

[31]BM Chen et al 'Detecting the influence of the Chinese guiding cases: a text reuse approach' (2023) 32 Artificial Intelligence and Law 463 at 468.

[32]Q Zhang 张骐 'A discussion of the "guidance" of Guiding Cases' (试论指导性案例的"指导性) [2007/6] Law and Social Development 40, at 41; X Lu 陆幸福 'Legal effect of Supreme People's Court's Guiding Cases' (最高人民法院指导性案例法律效力之证成) [2014/9] Law Science 97 at 100.

[33]J Guo 郭佳琳 'Techniques and methods for consulting and following Guiding Cases' (参照指导性案例的技术和方法) [2014/17] People's Judicature 77 at 77.

[34]R Zhao and X Geng 赵瑞罡、耿协阳 'An empirical study of the difficulty in applying Guiding Cases' (指导性案例"适用难"的实证研究) [2016/3] Law Science Magazine 115 at 119.

[35]L Mu 牟绿叶 'On the effect of Guiding Cases' (论指导性案例的效力) [2014/1] Contemporary Law Review 110 at 114.

[36]Supreme People's Court 'Opinions of the Supreme People's Court on Comprehensively Deepening Reforms of the People' Courts — Outline of Fourth Five-Year Plan for Reform of People's Courts (2014–2018)' (最高人民法院关于全面深化人民法院改革的意见——人民法院第四个五年改革纲要(2014-2018)) (*Fafa* [2015] No 3) Point 23.

[37]2020 Opinions, above n 4, Art 2.

[38]Ibid, Art 1.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

layered framework for cases based on the levels of decisional courts.[39] In descending order of importance, the four tiers of similar cases are: (1) Guiding Cases; (2) typical cases published by the Supreme People's Court and in-force judgments of the Supreme People's Court; (3) referential cases published by the provincial high people's court of the same province as the current court and any in-force judgment of this high people's court; and (4) in-force judgments of a people's court at a level above the current court and in-force judgments of the current court. Once a similar case from a higher tier is identified, the search does not need to continue onto the next tier. Aside from Guiding Cases, searches for other categories of similar cases shall prioritise those from the past three years.[40] Wherever Guiding Cases are identified in SCS, they shall be consulted and followed; while other similar cases 'may' (*keyi*) be used as a reference (*cankao*) by the court in adjudication.[41]

These transformative changes mean that, in just over a decade, the Chinese legal system has evolved from a framework where citing prior cases was explicitly prohibited to one where hundreds of Guiding Cases must be cited, responded to, and consulted and followed where applicable. There are potentially millions more 'similar cases' that judges are required to search for and consider, all organised into a hierarchy where Guiding Cases, decisions from the Supreme People's Court, and decisions from high people's courts take priority over rulings from lower courts. It is no exaggeration to say that a system of case law in China is closer than ever before – a development that has understandably drawn significant scholarly attention.

### *(c) Current scholarship on Chinese case law*

Against such a context, the growing English-language literature on this subject sometimes fails to rigorously convey the principles and practice of Chinese law. For instance, where lower courts are instructed to 'consult and follow' Guiding Cases, the composite verb '*canzhao*' is commonly translated into English as either 'to refer to' or 'to consult'.[42] However, standard Chinese dictionaries and Chinese-English dictionaries make it clear: '*canzhao*' means 'to consult and follow'.[43] Much of the 'confusion' discussed in English-language literature stems from this incomplete translation of a stated legal rule.[44] Chinese scholarship has always distinguished '*canzhao*' from '*cankao*' (meaning to refer to or to consult), as the latter would not convey the enhanced authority of Guiding Cases.[45] There are of course very different questions as to whether Chinese judges – who have not been traditionally trained in the art of using cases – fully understand what 'consult and follow' entails, and whether lower courts consistently follow this instruction.

Prominent Chinese law scholars have often warned about the substantive differences between law-in-the-book and law-in-action, with Jianfu Chen describing such discrepancies as 'the most glaring failure

[39]The Supreme People's Court has a set of different 'measures' in place for its own judicial decision-making that does not extend to the lower courts: 'Supreme People's Court implementation measures on unifying legal application' (最高人民法院统一法律适用工作实施办法)' (*Fa* [2021] No 289).

[40]2020 Opinions, Art 4.

[41]Ibid, Art 9.

[42]Ahl, above n 6, at 128; M Jia 'Chinese common law? Guiding Cases and judicial reform' (2016) 129 Harvard Law Review 2213 at 2224; L Guo and B Jili 'The emergence of Guiding Cases in China' (2018) 6 Peking University Law Journal 273 at 277; Sze Kiun, above n 8, at 78; Chen et al, above n 31, at 464.

[43]*The Oxford Chinese Dictionary* (Oxford: Oxford University Press, 2010) p 68; Institute of Linguistics of the Chinese Academy of Social Science *The Contemporary Chinese Dictionary* (现代汉语词典) (The Commercial Press, 7th edn, 2016) p 123.

[44]See Q Liu 'Chinese "case law" in comparative law studies: illusions and complexities' (2019) 14 Asian Journal of Comparative Law s 97, s 109, which came closest to explaining the term but was inexplicably equivocal about the exact meaning of the word.

[45]J Yong and Z Chen 江勇、陈增宝 'Discussion of the force of Guiding Cases' (指导性案例的效力问题探讨) [2008/9] Research on Rule of Law 31 at 32.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

in modern legal development in China'.[46] What the Supreme People's Court mandates in policy documents may not necessarily reflect the practice of Chinese law in 3,500 courts below it. Given the obvious importance of the subject matter, however, some feel confident enough to analyse, on the basis of policy documents alone, the intentions behind the introduction of the mechanisms of Guiding Cases as well as the fundamental nature of the system. Ahl sees the creation of Guiding Cases not only as a measure to enhance judicial professionalism, but ultimately one to resist extra-legal influence, to promote the institutional interest of the judiciary, and to establish some form of legislative power for the court besides the legislature, the National People's Congress.[47] Shucheng Wang builds on such an interpretation of some power struggle behind the introduction of Guiding Cases, and attributes its lack of success, if not failure, to the lack of judicial independence in China and the authoritarian context that is 'substantially different from any other type of case law in a liberal context'.[48] Wang further argues that any 'supposed merits' of a case law system do not necessarily apply to China, because these are mainly expressed 'from the perspective of common law' or 'from the perspective of liberal democracies of the civil law tradition with judicial independence', which the 'authoritarian regime' of China obviously differs from.[49]

This generalisation is notably ideological rather than juridical and common law-centric. For instance, Wang places particularly emphasis on the fact that Guiding Cases are exclusively published by the Supreme People's Court, as opposed to 'a decentralized model case law system like those in liberal democracies', and 'any attempt to develop the centralized guiding case system into a decentralized type of case law is doomed to be ineffective'.[50] This line of reasoning overlooks the fact that liberal democracies may effectively operate on a partly centralised system of case law. For example, in Germany, the Federal Constitutional Court is the only source of formally binding precedents, which can only be modified by the Court itself.[51]

Kiun observes that the two 'currently dominant paradigms' view the system of Guiding Cases either as a straightforward transplant of the Anglo-American system of precedent into Chinese law, or as a hybrid of common law precedent and existing features of the Chinese legal system, thus a 'distinct but inferior' version of the common law.[52] Comparisons with and attachment to Anglo-American ways are not new in the English-language treatment of Chinese law. Lubman, more than 20 years ago, noted the disappointment when Chinese law turned out to be not like American law.[53]

Nevertheless, the natural dominance of common law does become a problem for legal studies when the analysis moves beyond ideological beliefs into the substance of law. Specifically, when the distinctiveness of the Chinese system and comparisons with common law or 'liberal democracies' overtake the examination of the substance of legal rules and judicial practice, there is a risk that 'what the law is' becomes secondary to 'what the law is not' or what some people hope that Chinese law should be. This echoes Merryman and Pérez-Perdomo's observation that the supposed differences between common law and civil law are often not 'what courts in fact do', but rather 'what the dominant folklore tells them they do'.[54] Such potential for

---

[46] R Peerenboom *China's Long March toward Rule of Law* (Cambridge: Cambridge University Press, 2002) p xiii; S Lubman 'The study of Chinese law in the United States: reflection on the past and present concerns about the future' (2003) 2 Washington University Global Studies Law Review 1 at 35; J Chen 'The transformation of Chinese law – from formal to substantial' (2007) 37 Hong Kong Law Journal 689 at 738.

[47] Ahl, above n 6, at 136–137.

[48] Wang, above n 7; S Wang 'Guiding Cases and bureaucratization of judicial precedents in China' (2019) 14 University of Pennsylvania Asian Law Review 96 at 135.

[49] Wang, above n 7, at 1069.

[50] Wang, above n 48, at 112–114 and 120.

[51] P Stainer and D König 'The concept of *stare decisis* in the German legal system – a systematically inconsistent concept with high factual importance' (2018) 27 Studia Iuridica Lublinensia 121 at 128.

[52] Kiun, above n 8, at 76 and 83.

[53] Lubman, above n 5, p 5.

[54] JH Merryman and R Pérez-Perdomo *The Civil Law Tradition: An Introduction to the Systems of Europe and Latin America* (Stanford: Stanford University Press, 4th edn, 2018) p 47.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

misunderstanding is especially detrimental to any rigorous legal study of such a topic as practical and grounded as a system of case law. Over time, it has become acceptable to critique the Chinese system of case law in leading international law journals without even identifying a single actual court judgment that would support the analysis, despite the fact that there are over 100 million judgments available. An example will illustrate this practice and the gravity of potential misinterpretations. There is a palpable, near consensus in English-language literature that Guiding Cases are 'de facto binding' on Chinese courts.[55] With the exception of Wang, which will be discussed below in detail, none made the effort to identify any actual case that can demonstrate or even suggest how a Guiding Case binds the court. This prevalent misconception will be challenged doctrinally and empirically later in this paper.

It is encouraging to see that a couple of studies more recently have begun to focus on the substance of Chinese legal practice – in other words, to actually examine cases in order to understand the Chinese system of case law.[56] Kiun, for example, focused on three Guiding Cases (No 24, No 15 and No 9) and analysed the usage and impact of such on close to a dozen subsequent court decisions.[57] Chen et al took a different approach, in analysing a large number of both published and unpublished judgments from two municipalities (Beijing and Shanghai), in relation to two Guiding Cases (No 24 and No 60).[58] Both studies offer fascinating insights into the practical influence of Guiding Cases and the weight afforded to them by Chinese judges.

## 2. Methodology and limitations

### *(a) Case selection and numbers*

This present study aims to significantly expand the scope and content of empirical examination by including all court judgments referencing any of the more than 200 Guiding Cases or SCS. Various keywords searches (*zhidaoxing anli*, *zhidao anli*, and *lei'an jiansuo*) were conducted on the CJO database between November 2021 and January 2022 as the first step in identifying relevant cases. For Category A of Guiding Cases, in view of the likely high volume and the timeframe of the practice, which began in 2011, the search was confined to cases with judgment dates in 2019, 2020 and 2021 only, resulting in the collection of 4,794 cases. For Category B of SCS, given the fact that the practice only formally started in mid-2020 nationally, no date restriction was applied. Consequently, 5,311 cases were collected, representing just over half of the 10,105 full-text judgments analysed in this study.

The first round of textual analysis, however, quickly filtered out the majority of cases in Category A. Most of these cases contained references by litigants to 'guiding cases' that were in fact not Guiding Cases as now specifically designated by the Supreme People's Court. Over the years, Chinese courts have published many types of cases of significance, such as typical cases (*dianxing anli*), *Gazette* cases (*gongbao anli*), major cases (*zhongda anli*), and referential cases (*cankao anli*). Adding to the confusion, all of these are part of a broader 'case guidance system' (*anli zhidao zhidu*), which pre-dates and is more expansive than the concept of Guiding Cases.[59] It is understandable for litigants, and occasionally their

[55]Jia, above n 42, at 2223–2234; Y Li 'Practice and theory of the Guiding Case system in China' (2016) 46 Hong Kong Law Journal 307 at 307; M Zhang 'Pushing the envelope: application of Guiding Cases in Chinese courts and development of case law in China' (2017) 26 Washington International Law Journal 269 at 274; F Gao 'China's Guiding Cases system as the instrument to improve China's Case Guidance system, which includes both Guiding Cases and typical cases' (2017) 45 International Journal of Legal Information 230 at 236; Guo and Jili, above n 42, at 278; Wang, above n 7, at 1085.

[56]An earlier effort of empirical examination was largely hindered by the lack of cases at the time, when only nine cases that applied Guiding Cases were found by January 2015: J Deng 'Functional analysis of China's Guiding Cases' (2016) 14 China: An International Journal 44 at 64.

[57]Kiun, above n 8.

[58]Chen et al, above n 31.

[59]Gao, above n 55, at 231. The subtle semantic difference could mask the substantive distinction between the two for commentators who use these phrases interchangeably: JEH Limmer 'China's "new common law": using China's Guiding Cases to understand how to do business in the People's Republic of China' (2013) 21 Willamette Journal of International Law and Dispute Resolution 96 at 122; Ahl, above n 6, at 128.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

lawyers, to mistakenly cite these as Guiding Cases;[60] even the court got it wrong in a rare instance.[61] In other discarded cases, the references to Guiding Cases were too unspecific to allow identification or verification of the status of the cited case.[62] Ultimately, only 1,039 judgments referencing one or more specified or identifiable Guiding Cases remained in Category A for further analysis.

There are far fewer instances of erroneous reference in Category B due to the highly specific and technical composition of the 'Similar Cases Search' term. A total of 4,945 judgments remained relevant. Surprisingly, there was minimal overlap between the two categories, with only 66 cases relating to both Guiding Cases and SCS.

Finally, to avoid distortion in the quantitative results, it was necessary to combine related judgments into unique cases or case series for some of the analyses. There are two situations where this combination is required. First, appellate court judgments typically quote verbatim and at length (ie to copy and paste) the pleas of the parties as well as the reasoning and decision of the first instance court. Thus, a single reference to a Guiding Case may very likely result in its inclusion across two or three judgments (first instance, appeal, and application for retrial), even if no court addresses it. Secondly, there could be a large number of cases involving the same defendant on identical issues, such as multiple lawsuits against a property developer by purchasers of different flats in the same development over the same incident.[63] In these situations, judgments are typically handed down by the same judge or collegial bench on the same or the next working day with identical reasoning and decisions, with only party names and sums awarded being different. If the judge fails to respond to the point about Guiding Cases or similar cases in one judgment, this would apply to all related judgments. Following the combination of all linked judgments, there were 806 unique cases or case series in Category A and 2,883 unique cases or case series in Category B. Table 1 provides an overview of the case-filtering process in this study.

**Table 1.** Number of cases analysed

| | Total | Category A (Guiding Cases) | Category B (Similar Cases Search) |
|---|---|---|---|
| Keywords search results | 10,105 | 4,794 | 5,311 |
| Erroneous reference/irrelevant | | –3,755 | –366 |
| Combining linked judgments/cases in the same series | | –233 | –2,062 |
| Unique cases and case series | | 806 | 2,883 |

[60] Eg 北京京东世纪信息技术有限公司等不当得利纠纷二审民事判决书 (2020)京02民终11101号, Beijing Municipality No 2 Intermediate People's Court (28 December 2020).

[61] 乌鲁木齐市第六十七中学、张振武确认合同效力纠纷一审民事判决书, (2019)新0104民初3837号, Xinjiang Uygur Autonomous Region Urumqi City Xinshi District People's Court (28 December 2019).

[62] Eg 张盈盈与滨州市皓煜置业有限公司商品房销售合同纠纷一审民事判决书, (2020)鲁1602民初5203号, Shandong Province Binzhou City Bincheng District People's Court (24 December 2020); 翟年能、上海爱帛服饰有限公司债权转让合同纠纷再审审查与审判监督民事裁定书, (2020)皖民申4300号, Anhui Province High People's Court (22 October 2020). Judges in both cases explicitly mentioned 'Guiding Cases of the Supreme People's Court' in their reasoning but did not make it clear which cases were being referred to.

[63] One property developer, for example, had at least 57 judgments against it granted by the same court in favour of different claimants on the penalty clause in their contracts: 车宇与大连保利红旗房地产开发有限公司商品房销售合同纠纷一审民事判决书, (2020)辽0211民初4225号, Liaoning Province Dalian City Ganjingzi District People's Court (4 October 2020). The court referred to the same 'similar case' in all these judgments. The developer then appealed at least 35 of these cases, unsuccessfully: 大连保利红旗房地产开发有限公司、丁玉彩商品房销售合同纠纷二审民事判决书, (2021)辽02民终4724号, Liaoning Province Dalian City Intermediate People's Court (21 June 2021). All these 92 cases only count as one unique case series in this study.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

### *(b) Limitations and validity of data*

From the outset, in only examining the explicit use of cases in published judgments, there are clear limitations to this study based on keywords searches. It cannot retrieve information that has not been accurately documented, unlike some of the more creative linguistics-based studies mentioned above.[64] Moreover, citing a case explicitly is also only one way of making use of it. Given the methodology and evidence-based focus, this study does not examine the implicit impact of cases on judicial decision-making.

Beyond the usual caveats regarding omissions, oversights and other human errors in working with thousands of cases, the most important limitation to this study is the quality and representativeness of the database it relies on. To that end, CJO is not a complete database of judicial judgments, despite that being the original intention and stipulated rules of the Supreme People's Court.[65] Only a portion of judgment documents appear on CJO, with estimates suggesting up to 70% coverage in certain years or regions.[66]

There has been substantial scholarly interest in understanding why other cases are missing, with a notable focus on the underlying political and ideological factors.[67] The situation seemingly worsened around 2021 and onwards, where the percentage of cases uploaded onto the database started to drop to below 10% in some areas, such as administrative litigation. This trend has sparked considerable debate in Chinese media and on social media,[68] but the issue ultimately lies beyond the scope of this study. It is, indeed, somewhat fortuitous that the study was designed to collect data from 2019 to 2021, before these changes on the CJO database became more pronounced.

While acknowledging that a study based on the CJO cannot offer an exhaustive examination of all relevant judgments, it is important to compare the findings with other comparable projects utilising different sources. The most authoritative empirical, quantitative studies on the topic in Chinese literature are the annual reports by Guo and Sun, both authors being directors and editors of one of China's largest commercial legal databases.[69] For 2019, 2020 and 2021, Guo and Sun identified 2,006, 2,215 and 1,704 cases that cited Guiding Cases respectively. However, these figures include 'implicit references' where no specific Guiding Case was mentioned, but the legal substance of these cases was nevertheless applied. Such instances will not be captured by the keyword searches used in this study. After removing these implicit references, it is clear that the present study likely uncovered more than 40% of all relevant judgments, as shown in Table 2. This provides a solid foundation for the quantitative and qualitative analyses that follow.

Finally, this study does not account for several significant developments in 2024, including the launching of a new People's Courts Case Database, which contains all Guiding Cases and approximately 4,000 selected and edited 'referential cases' as of November 2024, and a 'Law Answers' database (*fa da wang*) for use by court personnel only. It may take time for the impact of these initiatives to appear in judicial practice before rigorous examination is possible.

---

[64]Chen et al, above n 31.

[65]Supreme People's Court 'Provisions on the publication of judgment documents by people's courts on the Internet' (Judicial Interpretation 2016 No 19) (29 August 2016), Art 4.

[66]L Xu 'The changing perspectives of Chinese law: socialist rule of law, emerging case law and the belt and road initiative' (2019) 5 Chinese Journal of Global Governance 153 at 169; J Yang et al 杨金晶、覃慧、何海波 'Chinese practice of publishing court judgments online' (裁判文书上网的中国实践) [2019/6] China Law Review 125 at 128.

[67]B Ahl et al 'Data-driven approaches to studying Chinese judicial practice' (2019) 19 China Review 1 at 11; BL Liebman et al 'Mass digitization of Chinese court decisions' (2020) 8 Journal of Law and Courts 177 at 185; Chao Xi 'How the Chinese judiciary works: new insights from data-driven research' (2022) 22 China Review 1; Z Liu et al 'Authoritarian transparency: China's missing cases in court disclosure' (2022) 50 Journal of Comparative Economics 221.

[68]B Liebman et al 'Rolling back transparency in China's courts' (2023) 123 Columbia Law Review 2407 at 2420.

[69]Y Guo and M Sun 郭叶、孙妹 '2019 annual report of judicial application of Guiding Cases from the Supreme People's Court' (最高人民法院指导性案例2019年度司法应用报告) [2020/3] China Review of Administration of Justice 88; Guo and Sun (2020), above n 28; Y Guo and M Sun 郭叶、孙妹 '2021 annual report of judicial application of Guiding Cases from the Supreme People's Court' (最高人民法院指导性案例2021年度司法应用报告) [2022/4] China Review of Administration of Justice 199.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

**Table 2.** Number of cases compared to Guo and Sun

| | Number of cases identified by Guo and Sun | Cases with implicit reference | Cases with explicit reference | Number of relevant cases in Category A | Percentage |
|---|---|---|---|---|---|
| 2019 | 2,006 | –1,150 | 856 | 474 | |
| 2020 | 2,215 | –1,310 | 905 | 353 | |
| 2021 | 1,704 | –1,058 | 646 | 212 | |
| Total | | | 2,407 | 1,039 | 43.2% |

## 3. Results and quantitative analysis

Table 3 presents the number of Category A cases in which the court either referred to Guiding Cases spontaneously, responded to the citation of Guiding Cases by litigants positively, responded to the citation of Guiding Cases but chose not to follow or apply them, or failed to respond to the explicit citation of Guiding Cases by litigants.

The majority of 'Other' cases in Table 3 involve litigants submitting Guiding Cases as evidence. This is a somewhat perplexing practice, especially when the litigants are represented by lawyers.[70] In one instance, the Supreme People's Court had to reiterate basic legal rules to a multinational banking group represented by a reputable Beijing law firm, expounding that evidence must meet the triple criteria of authenticity, relevance and legality and must establish facts about the instant case.[71] Obviously, Guiding Cases cannot be used to establish facts about later, unrelated litigation. Several courts appeared uncertain about how to handle such submissions and delivered rather abrupt, and at times amusing, verdicts, such as 'this court confirms the authenticity of the Guiding Case submitted' but 'does not accept it as evidence'.[72]

Most other courts, however, simply ignored citations to Guiding Cases, whether they were erroneous or not. As shown in Table 3, the preponderance of judgments – nearly two-thirds – do not respond to an

**Table 3.** Category A how the court respond to citation of Guiding Cases

| Category A | Number of Cases | Percentage |
|---|---|---|
| Spontaneous citation by the court | 173 | 21.5% |
| Followed Guiding Cases cited by litigants | 24 | 3.0% |
| Responded to the citation but did not follow Guiding Cases | 74 | 9.2% |
| Did not respond to the explicit citation of Guiding Cases by litigants | 524 | 65.0% |
| Other | 11 | |
| Total | 806 | |

[70] 张丙灿与徐州市铜山区人民政府赔偿判决书, (2020)苏03行赔初16号, Jiangsu Province Xuzhou City Intermediate People's Court (4 February 2021); 漯河市郾城区农村信用合作联社与张红军、河南中安信业房地产有限公司案外人执行异议之诉一审民事判决书, (2019)豫1102民初2235号, Henan Province Luohe City Yuanhui District People's Court (22 December 2019).

[71] 阿拉伯及法兰西联合银行(香港)有限公司、凯迈(洛阳)航空防护装备有限公司信用证欺诈纠纷再审审查与审判监督民事裁定书, (2020)最高法民申6923号, Supreme People's Court (1 February 2021).

[72] 贵州雅利丰房地产经纪有限公司与詹某某居间合同纠纷一审民事判决书, (2019)黔0402民初5903号, Guizhou Province Anshun City Xixiu District People's Court (17 December 2019); 彭江华、合肥瑞哲建筑工程有限公司建设工程施工合同纠纷二审民事判决书, (2021)黔26民终33号, Guizhou Province Qiandongnan Miao and Dong Autonomous Prefecture Intermediate People's Court (1 February 2021).

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

**Table 4.** All Guiding Cases cited 20 times or more

| | Spontaneous citation by the court | Citation by litigants followed by the court | Citation responded to but not followed | Other | No response to citation of Guiding Cases by litigants | Total |
|---|---|---|---|---|---|---|
| Guiding Case No 24 | 101 | 14 | 17 | | 115 | 247 |
| Guiding Case No 15 | 24 | 2 | 3 | | 55 | 84 |
| Guiding Case No 23 | 3 | 1 | 8 | | 72 | 84 |
| Guiding Case No 72 | 5 | | 5 | | 66 | 76 |
| Guiding Case No 77 | 1 | 1 | 5 | | 22 | 29 |
| Guiding Case No 54 | 7 | 1 | 2 | 1 | 16 | 27 |
| Guiding Case No 57 | | | 2 | | 20 | 22 |
| Guiding Case No 17 | 4 | | 5 | | 12 | 21 |

explicit citation of Guiding Cases by litigants. This is despite the Supreme People's Court's clear instruction that courts must respond to citations of Guiding Cases and explain whether or not they have been consulted and followed.[73] This point will be revisited later in relation to the legal effects of Guiding Cases.

It is also notable that the majority of cases in which Guiding Cases were substantively considered came from spontaneous citation by the court (173 out of 271, or 64%). In contrast, when litigants initiated the discussion, fewer than a quarter of cases (24 out of 98, or 24%) followed the Guiding Cases cited. This practice and grounds for not following Guiding Cases will be considered below. Moreover, there are substantial differences in the court's attitude towards individual Guiding Cases, as shown in Table 4, which lists all Guiding Cases cited more than 20 times in Category A. For example, courts were much more likely to cite or consider Guiding Case No 24 (101 spontaneous citations by the court, compared to 146 by litigants) than Guiding Case No 23 (3 spontaneous citations by the court, compared to 81 by litigants). Some of these individual cases will be examined to illustrate how the substance of Guiding Cases is being used and developed.

For Category B, Table 5 outlines the number of cases where the court either applied or did not apply similar cases following SCS, as well as how the court responded or did not respond to the submission of similar cases or requests for SCS by litigants. In 85% of the cases, the court appeared to ignore the mention of SCS or submission of similar cases by litigants. This is even more prevalent than the court's non-response to Guiding Cases citations (65%), though it is not surprising. Unlike Guiding Cases, submission of similar cases and request for SCS by litigants are not subject to any directive from the Supreme People's Court requiring courts to explicitly respond to them. As highlighted by an intermediate court, the absence of any mention of similar cases in the judgment should not be interpreted as proof that no SCS was actually conducted by judges.[74]

[73] 2015 Rules, Art 11.

[74] 公某1与朱某1、甘肃禾瑞塑业有限公司等生命权、健康权、身体权纠纷二审民事判决书, (2021)甘07民终194号, Gansu Province Zhangye City Intermediate People's Court (12 April 2021).

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

**Table 5.** Category B Use of SCS and court response to similar cases

| Category B | Number of Cases | Percentage |
|---|---|---|
| Similar cases applied by the court | 171 | 5.9% |
| No similar cases discovered following SCS | 7 | 0.2% |
| SCS conducted but similar cases were not applied | 79 | 2.7% |
| Court responded to submission of similar cases but did not apply them | 168 | 5.8% |
| No response to submission of similar cases or requests for SCS | 2,458 | 85.3% |
| Total | 2,883 | |

Taking into account that the Supreme People's Court gave no instruction or authorisation that similar cases (except Guiding Cases among them) should feature at all in any judgment, the fact that close to 15% of cases identified in Category B explicitly mentioned past court decisions already signals significant changes in judicial practice. The quantitative data here only capture judicial usage and references that contained the keywords SCS. Nevertheless, it reveals that hundreds of judges discussed and referred to past court decisions between August 2020 (after the 2020 Opinions took effect on 31 July 2020) and December 2021 (this study's data collection endpoint), even though they were under no formal obligation or expectation to do so.

Additionally, the comparison between Category A and Category B suggests that SCS may have a bigger impact on judicial practice, at least numerically. The number of cases where courts explicitly discussed SCS and similar cases over 17 months (August 2020 to December 2021) is approximately one and a half times higher than the number of cases in which they explicitly considered Guiding Cases over 36 months (January 2019 to December 2021). Litigants also showed greater enthusiasm: litigants requested SCS in 2,626 unique cases or case series over 17 months, compared with 622 citations of Guiding Cases over three years. This may simply be a reflection of the broader scope and far greater number of similar cases than those 229 Guiding Cases. The different impacts and functions of Guiding Cases and SCS will be analysed in the next section together with important questions about the nature of the emerging system of case law.

## 4. Critical examination of the emerging case law system

### *(a) The fallacy of 'de facto binding' Guiding Cases*

A conspicuous feature, if not a shortcoming, of the system of Guiding Cases is that it does not clearly define the legal effect of Guiding Cases, beyond stating that courts shall consult and follow them. Official sources provide no guidance or explanation on some practical aspects of 'consulting and following', such as how and why a Guiding Case should be followed, or the consequences of noncompliance.

The lack of clear rules largely reflects the absence of consensus among Chinese judges and scholars regarding the effect of Guiding Cases. At least three discernible interpretations exist, each with its own merit.[75] Among them, Hu Yunteng's view that Guiding Cases should be 'de facto binding' is particularly influential.[76] As the Director of the Research Office of the Supreme People's Court at the time the Provisions on Guiding Cases were promulgated, it would not be an exaggeration to call Judge Hu a key architect of the current structure of Guiding Cases. However, many prominent Chinese scholars do not

[75] L Wang 王利明 'A study of several issues regarding the system of case guidance in China' (我国案例指导制度若干问题研究) [2012/1] Law Science 71 at 76.

[76] Hu and Yu, above n 19, at 10.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

necessarily agree with Hu's interpretation of all the important issues.[77] More specifically, Zhang Qi's penetrating assessment, that 'de facto binding' is a normative viewpoint or conception but not the reality,[78] underscores the gap between the intended goals and the actual impact of these reforms on judicial practice.

Interestingly, the lack of agreement among Chinese judges and scholars does not seem to prevent a remarkable consensus in English-language literature as to the effect of Guiding Cases.[79] Jia was among the first to proclaim that Guiding Cases are de facto binding.[80] The theory in support draws inspiration from concepts such as *jurisprudence constante* or 'effective precedent' of civil law countries.[81] Essentially it hinges on the 'fear of appellate reversal', the idea that judges who do not follow de facto binding authorities risk having their decisions overturned on appeal.[82] Initially, this was notably only a 'possibility' in earlier studies,[83] and it has remained underdeveloped and certainly not aligned with the rules and practices of China. Nevertheless, after frequent repetition in English-language literature without objection, the claim that Guiding Cases are de facto binding has become an unquestioned premise in studies of Chinese law.[84]

There are, however, two fundamental problems with this 'theory of de facto binding': one is doctrinal, and the other is empirical. Doctrinally, Chinese appellate courts may not be empowered to overturn first-instance decisions solely because they did not follow Guiding Cases. As a matter of legal practice, Chinese appellate courts do not do so.

Doctrinally speaking, Chinese law explicitly sets out in legislation the grounds on which appellate courts can overturn first-instance decisions.[85] 'Not following Guiding Cases' is not a discrete ground, despite the aforementioned instructions from the Supreme People's Court. Non-compliance by lower courts in this context may contribute to the appeal ground of an 'erroneous application of the law'.[86] But this may require more than simply 'not following Guiding Cases', since there are ongoing debates among Chinese scholars regarding whether Guiding Cases could constitute 'law' or 'sources of law'.[87] The situation is comparable to the typical understanding of civil law: prior judicial decisions are not 'law'.[88] As Hu Yunteng clarified in an interview, an appeal against an 'erroneous application of the law' is possible 'where a judge neither followed a Guiding Case nor gave reasons, leading to stark discrepancies between the judgment and the Guiding Case, and causing obvious injustice'.[89]

---

[77]Wang, above n 75, at 76.

[78]Q Zhang 张骐 'Rediscussion of the nature of validity and guarantee concerning the effects of Guiding Case' (再论指导性案例效力的性质与保证) [2013/1] Law and Social Development 91 at 92.

[79]See above n 55.

[80]Jia, above n 42, at 2232.

[81]Ibid, at 2231–2232.

[82]Ibid, at 2231; Wang, above n 7, at 1084.

[83]Ahl, above n 6, at 129.

[84]R Wang 'Decoding judicial reasoning in China: a comparative empirical analysis of Guiding Cases' (2020) 68 Cleveland State Law Review 521; S Zokaei 'Dispute resolution commercial transactions along the belt and road: creating fair and consistent judgments' (2022) 73 Hastings Law Journal 559 at 571; Y Wang 'Judicial regulation of standard form contracts in China' (2022) 52 Hong Kong Law Journal 641 at 644; M Tang 'Relationship of Guiding Cases to economic development and judicial civilization in China' (2024) 9 Public Goods & Governance 9 at 12.

[85]Civil Procedure Law of the PRC, Art 177; Criminal Procedure Law of the PRC, Art 236; Administrative Procedure Law of the PRC, Art 89.

[86]L Xia 夏黎黎 'On the nature and effect of the system of case guidance of the Supreme People's Court' (论最高人民法院案例指导制度的性质及其效力) [2018/3] Legality Vision 54 at 53.

[87]L Lei 雷磊 'Rethinking the status of Guiding Cases as sources of law' (指导性案例法源地位再反思) [2015/1] China Legal Science 272; W Pan 泮伟江 'On the force of Guiding Cases' (论指导性案例的效力) [2016/1] Tsinghua University Law Journal 20.

[88]Merryman and Pérez-Perdomo, above n 54, p 84.

[89]A Jiang 蒋安杰 'Director Hu Yunteng of the Research Office of the Supreme People's Court – Constructing the case guidance system of the People's Court' (最高人民法院研究室主任胡云腾—人民法院案例指导制度的构建) [2011/1] Legal Information 78 at 81.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

In the absence of such aggravating factors, not following Guiding Cases is rarely a concern for either first-instance or appellate courts, as Table 3 demonstrates. Out of the 524 cases or case series in Category A where the court did not respond to citations of Guiding Cases, 355 of them were on appeal (68%) and 49 were applications for a retrial (9%). Many courts chose not to respond directly to the citation of Guiding Cases as grounds for appeal and focused on other discussions – including the Supreme People's Court itself in multiple cases.[90] On a rare occurrence, an appellate court acknowledged that the first-instance court should have at least responded to the Guiding Case citation, but dismissed this as a 'minor defect' (*xiaci*) procedurally that did not affect the decision.[91]

In terms of empirical evidence, after more than a decade of operation, there has not been a single case that clearly supports the notion that an appellate court will overturn a first-instance decision for not following a Guiding Case. As mentioned above, the argument by Shucheng Wang is the only one that attempts to demonstrate this possibility through actual court decisions, committing two out of a total of three cases discussed in the paper for this very purpose.[92] A closer examination of those two cases, however, suggests that neither could support the 'theory of de facto binding' as argued by Wang.

The first case examined by Wang, *Xian Property Co Ltd*, was on intermediary contract. The claimant appealed on the ground that the first-instance decision erred in the application of the law, citing Guiding Case No 1 in support.[93] What Wang did not mention was that the appellate court never responded to such citation, despite the Implementation Rules of the Supreme People's Court requiring it to do so. Furthermore, rather than overturning the first-instance decision as purported by the 'theory', the appellate judgment only made minor adjustment to the first-instance award (increasing the sum awarded from RMB 3,000, by the first-instance court, to RMB 5,000 in this claim for RMB 21,000) and never confirmed any error in the application of the law. In other words, there is no statement from the court that the Guiding Case made any difference at all, regardless of commentators' interpretations. Many cases in Category A follow this pattern and arguably provide stronger support for any implicit impact,[94] including where the appellate court expressly labelled the first-instance decision as erroneous.[95] But the key point remains: the effect is implicit, and no court has expressly acknowledged that not following a Guiding Case was part of the reason for overturning any decision on appeal.

The second case cited by Wang, *Ningbo Pujie Taxi*, concerning compensation for injuries suffered from a traffic accident and the famous Guiding Case No 24, provides even weaker support to the 'theory'.[96] The first-instance court explicitly cited Guiding Case No 24 alongside laws, local regulations and judicial interpretations. On appeal the defendant taxi company argued that the citation of Guiding

[90]云南苏林建设工程有限公司、昆明世纪华丰发展有限公司等建设工程施工合同纠纷其他民事民事裁定书, (2021)最高法民申2706号, Supreme People's Court (7 June 2021); 陈巧芳、王爱存合资、合作开发房地产合同纠纷二审民事判决书, (2020)最高法民终614号, Supreme People's Court (28 December 2020); 宝丰国际投资有限公司、成都富力熊猫城项目开发有限公司公司解散纠纷再审审查与审判监督民事裁定书, (2019)最高法民申5886号, Supreme People's Court (23 December 2019).

[91]绵阳星鼎建筑劳务有限公司、付华等劳务合同纠纷民事二审民事判决书, (2021)黔04民终984号, Guizhou Province Anshun City Intermediate People's Court (4 August 2021).

[92]Wang, above n 7, at 1084. The same two cases were raised by the same author later: S Wang *Law As an Instrument: Sources of Chinese Law for Authoritarian Legality* (Cambridge: Cambridge University Press, 2022) p 124.

[93]西安某房产信息咨询有限公司与卢某某居间合同纠纷二审民事判决书, (2014)西中民一终字第00498号, Shaanxi Province Xi'an City Intermediate People's Court (27 June 2014).

[94]广安美新再生资源利用有限公司、大连银行股份有限公司成都分行储蓄存款合同纠纷二审民事判决书, (2020)川民终441号, Sichuan Province High People's Court (9 September 2020); 任满仓与东莞市东城新福百货店产品责任纠纷一案民事二审判决书, (2020)粤19民终4670号, Guangdong Province Dongguan City Intermediate People's Court (7 August 2020).

[95]郑小明、信阳天正房地产开发有限公司合同纠纷二审民事判决书, (2020)豫16民终3097号, Henan Province Zhoukou City Intermediate People's Court (28 September 2020); 吉林市城市公共交通集团有限公司与张某1等与马某机动车交通事故责任纠纷上诉案, (2020)吉02民终1401号, Jilin Province Jilin City Intermediate People's Court (25 August 2020).

[96]周秀琴与宁波普捷出租车有限公司出租汽车运输合同纠纷二审民事判决书, (2014)浙甬商终字第474号, Zhejiang Province Ningbo City Intermediate People's Court (18 June 2014).

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

Case No 24 caused a confusion of contractual and tortious liabilities, as the victim was a contracted passenger of the taxi company. The appellate court conceded that it was 'inappropriate' for the first-instance court to apply Guiding Case No 24, as highlighted by Wang. But what Wang again failed to mention was that in view of the correctness of the substantive outcome, the first-instance decision was upheld unscathed and not overturned. Rather than supporting the notion of 'de facto binding', *Pujie Taxi* is actually counterproductive in illustrating that citing Guiding Cases does not preclude criticisms by appellate court. Indeed, multiple Category A cases have seen the appellate courts overturning first-instance decisions that expressly followed Guiding Cases, without directly addressing the question of whether those applications were erroneous.[97]

The key fact remains that there has not been a single instance where an appellate court overturned any decision explicitly due to the erroneous application or non-application of a Guiding Case, which is indispensable to this 'theory of de facto binding'. Zhang's critical observation more than a decade ago rings true even today: the notion of de facto binding lacks de facto support.[98] Until a clear judgment is rendered by a Chinese appellate court, this theory of 'de facto binding' Guiding Cases cannot be considered valid for Chinese law, despite the prevalent acceptance of it in English-language scholarship.

### *(b) Normative functions of guiding cases*

This focus on the possible 'binding' effects of Guiding Cases may be an unnecessary distraction from understanding their true nature and intended purpose. The notion of 'binding' authority in some conception is arguably inherently incompatible with the Chinese framework, which, with respect, has been overlooked by many in this context. Common law traditionally sees the effect of binding precedents in that lower courts 'must conform unconditionally to the law as stated by the court above them, irrespective of their own views on the law'.[99] The binding effect of a precedent may be distinguished from any persuasive effect where a judge is obliged to decide a case in the same way as that in which the precedent was decided, 'even if he can give a good reason for not doing so'.[100] Recent theories have developed different models for more nuanced and comprehensive understanding of precedential constraints and the justifications.[101] Some have even questioned the strict adherence to precedential rules in specific contexts, such as statutory interpretation, and argued against the court's perpetuating previous errors.[102] Still, there are numerous dicta by common law judges explicitly documenting how a binding precedent precluded consideration of arguments or authorities against it.[103]

This approach, or admission, that a lower court under certain circumstances must follow any case decided or endorsed by a higher court is alien to Chinese law and arguably impermissible. Constitutionally, a higher court only supervises (*jiandu*) lowers courts, in contrast to how a higher government or procuratorate leads (*lingdao*) lower governments or procuratorates.[104] Given that the Chinese legislature has never explained the effect of Guiding Cases, the Supreme People's Court may well be accused of 'self-justified' (*ziwo zhengdanghua*) empowerment, should it attempt to impose any 'binding' authority on

[97]彭山县鑫同盛建材经营部与邓恒志等执行分配方案异议之诉二审民事裁定书, (2020)川19民终746号, Sichuan Province Bazhong City Intermediate People's Court (31 August 2020); 深圳华越南方电子技术有限公司、四川嘉宏磁材有限公司公司解散纠纷二审民事判决书, (2019)粤03民终26224号, Guangdong Province Shenzhen City Intermediate People's Court (16 July 2020).

[98]Zhang, above n 78, at 93.

[99]K Llewellyn *The Case Law System in America* (Chicago: University of Chicago Press, 1989) p 25.

[100]R Cross and JW Harris *Precedent in English Law* (Clarendon Press, 4th edn, 1991) p 4.

[101]L Alexander 'Constrained by precedent' (1989) 63 Southern California Law Review 1; JF Horty 'The result model of precedent' (2004) 10 Legal Theory 19; R Mullins 'Protected reasons and precedential constraint' (2020) 26 Legal Theory 40.

[102]N Varsava 'How to realize the value of stare decisis: options for following precedent' (2018) 30(2) Yale Journal of Law & the Humanities 62 at 119.

[103]*Mcquaid v Anderton* [1981] WLR 154, 158 (Roskill LJ); *MF (Nigeria) v Secretary of State for The Home Department* [2013] EWCA Civ 1192, [22]; *Easygroup Ltd v Easy Live (Services) Ltd* [2023] EWCA Civ 1508, [48] (Arnold LJ).

[104]Constitution of the PRC, Arts 132, 108 and 137.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

lower courts through its judicial interpretations and Guiding Cases.[105] The Supreme People's Court is probably under no such illusion that it can command all 3,500 courts to adjudicate strictly in accordance with Guiding Cases, as seen in the wording of the Rules on Guiding Cases. The Rules expressly require that any court shall state *whether or not* (*shifou*) a Guiding Case has been consulted and followed and the reasons for doing so.[106] Presumably, reasons are only really needed where a Guiding Cases cited is not followed by the court. But the fact that the Rules foresee the possibility of Guiding Cases not being followed is a strong indication that a 'binding' system was not the intended goal.

Judicial practice conforms to such an understanding. As shown in Table 3, the most common practices by Chinese judges, numerically speaking, are to not respond to citation of Guiding Cases (65% of all Category A cases) or to respond to but not follow those cited by litigants (75% of all citations by litigants). Moreover, when adopting the latter approach, it is acceptable for the court to make a one-sentence statement, typically along the line of 'the Guiding Case has different facts' or 'the case at hand is not the same as the Guiding Case', as a full account of the reasons for not following the Guiding Case.[107] Brushing off precedents through superficial factual distinctions, taking 'a distinction without a difference', or disregarding an older case without mention, are typically seen as illegitimate techniques for dealing with precedents.[108] The fact that these are the most common occurrences in China illustrates not only the distance between the Chinese mechanisms and any system of binding precedents, but also the different purpose altogether of Guiding Cases.

As mentioned above, in the past China was officially a 'null model' for the use of cases in judgments, where courts had rules in place prohibiting the citation of any case.[109] Before the introduction of the system of Guiding Cases, judges who cited prior decisions risked facing criticisms and appeals, typically reciting the cliché that 'China is not a case law country'.[110] The introduction of Guiding Cases marked a significant step away from this null model. Rather than establishing a 'de facto binding' precedent system, the Supreme People's Court and other advocates for case law seem content that Guiding Cases are now discussed in some courts in a small but growing number of cases. Normatively, before the introduction of Guiding Cases, it was unorthodox and possibly unlawful for judges to cite cases in judgments. Today, citing Guiding Cases aligns with the Supreme People's Court's expectations and the socialist rule of law with Chinese characteristics, making it part of good judicial practice. This is the primary normative function of Guiding Cases and it is making slow but steady progress across China's vast judicial system.

Many Chinese judicial practices will only make more sense with this understanding in mind. Appellate courts, instead of overturning decisions for erroneous application of Guiding Cases, are generally satisfied with some discussion of Guiding Cases by lower courts. If any Guiding Case has been expressly discussed by a lower court, there is no known instance of such interpretation or application being expressly overruled by an appellate court. However, in a couple of cases, when lower courts failed to respond to explicit citations of Guiding Cases by litigants, an appellate court has quashed the decision and ordered a new trial.[111]

---

[105]Zhang, above n 78, at 93.

[106]2015 Rules, Art 11 (emphasis added).

[107]宋美兰与中华人民共和国自然资源部土地处罚复议纠纷再审案, (2019)最高法行申3082号, Supreme People's Court (28 June 2019); 河南国安建设集团有限公司与洛阳市宝来威房地产置业有限公司等侵权责任纠纷再审申请案, (2019)最高法民申3010号, Supreme People's Court (27 June 2019); 王某1、王某2、王某3与金某离婚后财产纠纷二审民事判决书, (2020)吉01民终2983号, Jilin Province Changchun City Intermediate People's Court (24 August 2020).

[108]KN Llewellyn *The Common Law Tradition: Deciding Appeals* (Boston: Little, Brown, 1960) p 85.

[109]See above n 19.

[110]Many litigants still recite the same out-dated line, which is now routinely ignored by the court: 夏津县人力资源和社会保障局与商秀青劳动和社会保障确认纠纷上诉案, (2019)鲁14行终159号, Shandong Province Dezhou City Intermediate People's Court (24 September 2019); 王凤鹏、长青建设集团有限公司等案外人执行异议之诉民事二审民事判决书, (2021)最高法民终969号, Supreme People's Court (26 September 2019).

[111]营口农村商业银行股份有限公司、白丽莎再审民事判决书, (2019)辽08民再19号, Liaoning Province Yingkou City Intermediate People's Court (25 December 2020); 刘阿立牟居芬等机动车交通事故责任纠纷民事申请再审审查民事裁定书,

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

In other words, at this stage the Chinese system is not yet concerned with de facto or de jure binding precedents. It is normatively acceptable for judges to consider, and mention that they have considered, Guiding Cases and similar cases when these are relevant to the cases at hand. The reality of judicial practice, as shown in Tables 3 and 5, is that only between one-third and one-sixth of judges follow this modest ambition when prompted by litigants.

### *(c) Narrow application and restrictive rules of Guiding Cases*

Fundamentally constrained by such a reality, Guiding Cases and Chinese case law more generally serve a very different role from what many might expect of precedents in other jurisdictions. Guiding Cases and SCS are only used by judges when they are found to be useful and helpful, as evidenced by the high percentage of cases where courts prefer to initiate the discussion spontaneously, rather than accepting those raised by litigants. Incidentally, these cases are often given narrow application by judges, which in turn limits their capacity to develop 'case law', in the sense of more sophisticated legal principles based on court decisions rather than statutes. To use Shauer's term, Chinese cases in this context show a very limited 'forward-looking aspect', as they are not viewed as precedents for tomorrow's decision-makers.[112]

This is best illustrated with the example of the application of Guiding Case No 24, which has been the most frequently used Guiding Case in practice by far. The case itself is typically seen as a statement of the 'egg-shell skull rule' in Chinese law – that the tortfeasor must take his victim as he finds him.[113] The facts are unremarkably ordinary. A pedestrian was involved in a minor collision with a car while on a pedestrian crossing and suffered a relatively serious fracture due to old age and osteoporosis. The underlying physical conditions were assessed as contributing 25% to the injuries, but the judgment that formed the basis of Guiding Case No 24 made no reduction to the insurance company's liabilities. As the victim bore no responsibility for the incident, having underlying physical conditions did not constitute 'fault' under relevant laws that could mitigate liabilities of the responsible driver and the insurer.

Rather than establishing any general 'egg-shell skull rule' for tort law, however, the practical application of Guiding Case No 24 is highly fact-sensitive, where even seemingly slight or trivial factual differences could lead to the Guiding Case not being followed. Judges have distinguished between immediate injuries caused by traffic accidents and more prolonged consequences, with the latter often being subject to reduction of compensation.[114] The court also distinguished between osteoporosis, described as natural 'physiological changes' expected with advance age, and pathological 'diseases' such as cardiac conditions, serious hypertension or dementia.[115] The seriousness of diseases or pre-existing physical conditions as well as their contribution to the consequences were scrutinised, which could reduce compensation by as much as 80–90%, despite the Guiding Case.[116]

(2021)辽民申5273号, Liaoning Province High People's Court (17 December 2021). Both cases substantively involved the Liaoning Province High People's Court. It is unknown whether this is coincidental, or whether this court takes a particularly strict approach in this context.

[112]F Schauer 'Precedent' (1987) 39 Stanford Law Review 571 at 573.

[113]Kiun, above n 8, at 98; Chen et al, above n 31, at 473.

[114]曾令双与安盛天平财产保险股份有限公司四川分公司等机动车交通事故责任纠纷再审申请案, (2018)川民申4202号, Sichuan Province High People's Court (6 August 2019); 王某某等诉孙某某等机动车交通事故责任纠纷案, (2020)吉0602民初861号, Jilin Province Baishan City Hunjiang District People's Court (11 August 2020).

[115]中国人民财产保险股份有限公司广州市分公司、广州市悦涛雅苑物业管理有限公司保险人代位求偿权纠纷二审民事判决书, (2020)粤01民终17313号, Guangdong Province Guangzhou City Intermediate People's Court (27 September 2020); 李新川、李新娟与姜涛、中国太平洋财产保险股份有限公司乌鲁木齐中心支公司机动车交通事故责任纠纷再审民事判决书, (2020)新01民再57号, Xinjiang Uygur Autonomous Region High People's Court (30 July 2020); 金永昌与大家财产保险有限责任公司河南分公司、邵书官机动车交通事故责任纠纷一审民事判决书, (2020)沪0115民初88772号, Shanghai Municipality Pudong District People's Court (18 February 2021).

[116]陈某、李晚琼机动车交通事故责任纠纷再审审查与审判监督民事裁定书, (2021)豫民申244号, Henan Province High People's Court (22 March 2021); 李国强、永诚财产保险股份有限公司山东分公司机动车交通事故责任纠纷二审民事判决书, (2021)鲁15民终701号, Shandong Province Liaocheng City Intermediate People's Court (26 March 2021).

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

More importantly, judges are keenly aware of the context of the Guiding Cases and most of them are inherently reluctant to expand the purported principle to a wider realm. Guiding Case No 24 pertains to liabilities arising from a traffic accident, specifically those borne by an insurance company under mandatory third-party liability insurance (colloquially known as *jiaoqiangxian*) in the case. Therefore, the court typically did not apply Guiding Case No 24 for other tortious incidents outside of traffic. Kiun, for instance, finds it 'less persuasive' when a court refused to apply Guiding Case No 24 explicitly on the ground that the instant case was about an eye injury caused by a child playing with a twig rather than a traffic accident.[117] Nevertheless, it was no coincidence that, among all cases examined by Kiun, no non-traffic cases followed the Guiding Case.[118] Indeed, multiple courts have explained the policy concerns behind making no reduction regarding liabilities under mandatory third-party liability insurance, which may not even apply to a different type of vehicle insurance, let alone to non-traffic scenarios.[119]

Thus, instead of being the precedent or equivalent of the 'egg-shell skull rule' for Chinese tort law, Guiding Case No 24 could be extremely narrow and fact specific. It probably only applies to compensation paid out under mandatory third-party traffic liability insurance rather than any other type of insurance. It probably only applies where the victim is not at fault and does not have serious or long-term pathological conditions. It probably only applies if the victim suffers immediate injuries caused directly by the accident rather than any future complications or aggravations. Any deviation from these narrow factual configurations could potentially lead to the non-application of the Guiding Case.

That is not to say that no court has attempted to expand the scope of Guiding Cases. A number of cases outside the context of traffic accidents have mentioned Guiding Case No 24, such as those in relation to injuries resulting from unlicensed medical treatment and physical confrontations.[120] These passing references are always initiated by the court rather than prompted by litigants. They are notably succinct, often amounting to half a sentence without elaboration. Only in one rare instance, concerning injuries caused by animals, did a basic people's court seemingly contemplate expanding Guiding Case No 24 as a more generally recognisable rule in tort law. The decision was upheld by an intermediate court despite criticism of this extension by the appellant, consistent with the observation above that appellate courts never explicitly question the interpretation of Guiding Cases.[121] However, this case is an exception to the general pattern of narrow application.

Such striking 'narrowness' is not exclusive to Guiding Case No 24. In the application of Guiding Case No 60, as another example, the ruling that mislabelling food product is a legitimate cause for the imposition of administrative penalty as a breach of the Food Safety Law does not mean the same breach is a cause for a civil claim on the same ground under the same law.[122] In a sense, Guiding Case No 24 is only remarkable for having the most applications among all Guiding Cases despite its narrowness, because there are so many traffic accident cases that fall squarely into its factual pattern.

Another possible consequence of the narrow application of Guiding Cases in judicial practice is that they may establish unexpected, often restrictive, rules. Rather than creating a forum for the discussion

---

[117] Kiun, above n 8, at 100.

[118] Ibid, at 98–100.

[119] 天安财产保险股份有限公司邯郸中心支公司、中国人民财产保险股份有限公司邯郸市分公司机动车交通事故责任纠纷二审民事判决书, (2019)冀05民终1881号, Hebei Province Xingtai City Intermediate People's Court (24 June 2019); 安盛天平财产保险有限公司重庆分公司与刘茂穆礼敬等机动车交通事故责任纠纷二审民事判决书，(2021)渝05民终944号, Chongqing Municipality No 5 Intermediate People's Court (15 March 2021); 黄昊与中国人民财产保险股份有限公司黄石市分公司机动车交通事故责任纠纷再审案, (2019)鄂民再145号, Hubei Province High People's Court (31 July 2019).

[120] 黄灵龙与肖军、万友朋生命权、健康权、身体权纠纷一审民事判决书, (2019)鄂0202民初2019号, Hubei Province Huangshi City Huangshigang District People's Court (2 March 2021); 任云河与郑世斌健康权纠纷一审民事判决书, (2018)吉2426民初839号, Jilin Province Antu County People's Court (6 June 2019).

[121] 徐某某等与祁某某饲养动物损害责任纠纷二审民事判决书，(2021)京03民终11450号，Beijing Municipality No 3 Intermediate People's Court (30 September 2021).

[122] 刘一岍与陕西华润万家生活超市有限公司宝鸡高新路分公司产品销售者责任纠纷二审民事判决书，(2019)陕03民终293号, Shaanxi Province Baoji City Intermediate People's Court (11 March 2019).

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

and evolution of legal principles, as often seen in common law,[123] the unique and elevated status of Guiding Cases sometimes sets inflexible rules that potentially hinder discussion of other variants. A couple of examples may best illustrate such a possibility.

Guiding Case No 15 is about lifting the corporate veil, where three companies bore joint liabilities due to blurring of corporate personalities. The reasoning of the Guiding Case held that the companies had three 'intermingling' of personnel, business and finance and were therefore jointly and severally liable for debts of any one of them. While this ruling and reasoning are not controversial in principle, Chinese scholarship explores other considerations and possibilities.[124] In practice, however, some judges are more than happy to take the specific framing of the Guiding Case as the only applicable model, so that anything short of all three 'intermingling' dictated by the Guiding Case will not lead to joint liabilities.[125]

Guiding Case No 23 addresses claims for punitive damages by consumers. The decision on which the Guiding Case is based ruled that punitive damages for a defective product were payable even if the consumer had purchased the product with full knowledge of the defects. The reasoning, however, also provides more of an explanation of 'consumer' than the Law on the Protection of Consumer Rights and Interests, specifically that any product purchased by a consumer shall not be for 'production business activities or professional activities'. This detail in the Guiding Case was sometimes emphasised by the court, to deny those who had made multiple claims for different products they had purchased, as these people are often seen as 'professional counterfeit hunters' rather than consumers.[126]

Therefore, both Guiding Cases No 15 and No 23 can be used in unexpected ways. Guiding Case No 15 established *one* model for the blurring of corporate personalities. But it can be taken to represent *the only* model by some judges. Guiding Case No 23 sets out to exclude the consideration of motives or knowledge of consumers in awarding punitive damages. But the few additional lines of reasoning in it can be used by some judges to exclude the status of consumer altogether.

The current judicial practice in China entails that Guiding Cases are not subject to continuous development, clarification or correction through subsequent cases. Any interpretation of Guiding Cases, however narrow or restrictive, is neither questioned nor accepted by later courts. This is notably different from the common law, which purportedly 'works itself pure', by allowing enough room for the correction of mistakes and for sensitivity to new developments and unforeseen situations.[127]

Instead, Guiding Cases are mostly used by Chinese judges when they offer a ready-made solution to highly fact-specific issues, serving as templates of decisions endorsed by the Supreme People's Court. When the template does not perfectly fit the facts of the case, it is easily discounted or procedurally ignored. This may well be an important reason behind the relatively limited use of Guiding Cases in general.

### *(d) Influence of SCS and using case law for fact finding*

The current judicial practice for judgment-writing makes it nearly impossible to analyse whether such an approach of narrow application is used for Category B similar cases retrieved in SCS. Even where judgments explicitly acknowledge the use of SCS and the consideration of similar cases, seen in Table 5, they almost never identify these similar cases. Unlike Guiding Cases, which carry unique serial numbers,

[123] G Lamond 'Do precedents create rules?' (2005) 11 Legal Theory 1 at 6.

[124] J Wang 王军 'Confusion of personality and disregard of legal personality' (人格混同与法人独立地位之否认) [2015/9] Northern Legal Science 43.

[125] 中山住好屋房地产咨询有限公司、肇庆市高要区中天恒基置业有限公司等合同纠纷民事一审民事判决书, (2019) 粤1204民初1838号, Guangdong Province Zhaoqing City Gaoyao District People's Court (30 September 2019); 沈阳大通宝盾自动门有限公司、兰波买卖合同纠纷二审民事判决书, (2020)辽01民终14746号, Liaoning Province Shenyang City Intermediate People's Court (3 March 2021).

[126] 麦树明、浙江天猫网络有限公司网络购物合同纠纷再审审查与审判监督民事裁定书, (2018) 粤民申7505号, Guangdong Province High People's Court (8 July 2019); 金辉、烟台臻缘电子商务有限公司买卖合同纠纷二审民事判决书, (2021) 浙10民终793号, Zhejiang Province Taizhou City Intermediate People's Court (14 April 2021).

[127] K Stevens 'Reasoning by precedent – between rules and analogies' (2018) 24 Legal Theory 216 at 219.

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

courts are under no expectation to state, in the judgment at least, information about any similar case. Analyses of SCS results are typically included by judges in the 'ancillary volume' (*fujuan*) of the case file,[128] which is strictly for internal court use and not disclosed publicly, not even to litigants and their lawyers.[129] Although many more similar cases were considered than Guiding Cases, as shown in Tables 3 and 5, analysing the actual impact of SCS in individual cases is difficult due to the lack of case identification – another notable difference from case law use in other jurisdictions.

Nevertheless, it can be sensed that, given the fact that some similar cases are decided by a particular appellate court, they sometimes exert greater influence on first-instance courts than those Guiding Cases selected by the Supreme People's Court at the tip of the judicial pyramid. One judge explicitly recognised that an in-force decision of the intermediate people's court directly overseeing the basic people's court he was sitting at had 'weak, latent binding force' (*ruo yinxing jushuli*) on him.[130] Appellate courts sometimes also sent cases back for a new trial on the ground of having not conducted SCS, using notably more explicit and stricter wording than cases that omit Guiding Cases.[131]

Moreover, the practice of SCS reveals something very different about Chinese law in the understanding and use of cases. In other jurisdictions, 'case law' helps judges make decisions on questions of law, such as the applicable legal principles and the legal consequences to established facts of the case at hand. No judge turns to prior case law to decide questions of fact – questions of 'reconstructing acts or events which have actually taken place or conditions which have actually existed'.[132]

If that is the boundary of case law, however, then Chinese judges have certainly ventured beyond it with the help of SCS. Or more precisely, no such boundary or limit to what case law is for has ever been set by the Supreme People's Court. Commentaries on the development of case law in China so far seem to assume that what is true in other jurisdiction must apply to China as well. What is often overlooked is the fact that SCS and the emerging case law system in China were born in the era of big data and artificial intelligence, powered by the world's largest judicial database and unrestricted by the understanding of foreign jurisdictions.

SCS enables Chinese judges to quickly find answers to many mundane questions of facts. For example, one judge at a basic people's court expressly stated that SCS was used spontaneously to establish the typical daily compensation rate for the loss of use of one lorry within the prefecture city.[133] The judge also explained that this was done to reduce litigation costs for the parties involved.

Other cases used SCS to establish more salient facts about cases at hand. In a dispute involving the shared debt of a married couple, the court used SCS and explicitly took into consideration some established facts and statements made by the wife about their financial arrangements from two cases regarding a different debt of the couple, decided by a different court in the same municipality six months previously. It was unclear whether the creditor was aware of such litigation or privy to the details of the prior cases. The court, with SCS often powered by AI-assistance for relevance and association, easily uncovered these facts.[134]

---

[128]Supreme People's Court Implementation Measures, above n 39, Art 7.

[129]R Liu 刘仁文 'On reforming the system of ancillary volume in courts' (论我国法院副卷制度的改革) [2017/1] Law Review 170.

[130]程水英、王能坤等与阳新县太子镇筠岭村村民委员会等提供劳务者受害责任纠纷一审民事判决书, (2020)鄂0205民初536号, Hubei Province Huangshi City Tieshan District People's Court (28 September 2020).

[131]沈阳双兴建设集团有限公司、沈阳市和平区靖格建筑设备租赁站建筑设备租赁合同纠纷再审审查与审判监督民事裁定书, (2021)辽民申983号, Liaoning Province High People's Court (27 April 2021); 中国人民财产保险股份有限公司太原市分公司与郭某1、李某2等保证保险合同纠纷二审民事裁定书, (2021)晋01民终1434号, Shanxi Province Taiyuan City Intermediate People's Court (30 March 2021).

[132]DW Robertson 'The precedent value of conclusions of fact in civil cases in England and Louisiana' (1968) 29 Louisiana Law Review 78.

[133]营口市明润能源贸易有限公司与刘强中国人民财产保险股份有限公司营口市分公司机动车交通事故责任纠纷一审民事判决书, (2021)辽0811民初1011号, Liaoning Province Yingkou City Laobian District People's Court (15 May 2021).

[134]王艳茹与李新水等民间借贷纠纷二审民事判决书, (2021)京03民终4733号, Beijing No 3 Intermediate People's Court (29 March 2021).

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

Sometimes such fact-finding ability and practice raise controversial issues. For instance, in the context of punitive damages claim by consumers, discussed above in relation to Guiding Case No 23, it is common practice for courts to use SCS and review the number and nature of the litigant's prior compensation claims, in order to determine whether the person is a consumer or a 'professional counterfeit hunter'. An appellant argued that such examination was an infringement of her privacy, to which the appellate court replied that the first-instance court was simply doing its job.[135]

With mandatory SCS having been in operation for less than 18 months by the end of data collection of this study, it is too early to conclude whether these instances of 'factual usage' of case law are outliers or represent an important new development in the emerging Chinese system. It is worth remembering that there has never been any rule or official explanation on what consulting similar cases actually entails. The commonsensical understanding that case law is about the law not the facts has been neither rejected nor affirmed by Chinese judicial practice as yet.

It is also noteworthy that most of the established case law systems of the world were typically constructed when it was practically difficult, if not impossible, for courts to determine facts such as the average daily compensation for a lorry in Manchester or Milan, or the complete litigation history of any particular litigant across all courts in a large country. Chinese judges with basic computer literacy can now accomplish such tasks in minutes during SCS. The combination of mandatory SCS requirements and technological advances, such as AI-assisted searches, has naturally created and considerably enhanced such unprecedented use of cases. There is no doubt that judges now have the capability to do this, and some of them are explicitly using the results in adjudication. Whether they should do so, however, is a question that remains to be answered by the Supreme People's Court and the legislature. Furthermore, as technology continues to advance, it is submitted that such a jurisprudential question of what cases can be used for may need to be re-examined by other jurisdictions in due course, as technological progress fundamentally alters the interaction between abstract and practical aspects of law.

## Conclusion

Those thousands of cases examined in this study provide clear empirical evidence that a system of case law is being constructed in China. Thousands of judges have openly acknowledged the influence of both Guiding Cases and SCS on their adjudication in recent years. Relative to the scale of Chinese law, such progress is admittedly modest. Even now, only a minority of judges comply with the expectation of referring to Guiding Cases in judgments, as shown in this study. These examples represent only the initial efforts to establish the judicial and jurisprudential framework for the use of cases in the massive Chinese legal system, which largely avoided formalising such a concept until the 2010s.

It is important not to overstate the current importance or impact of cases on Chinese law. Most notably, Guiding Cases published by the Supreme People's Court are not 'de facto binding' on any Chinese court, despite frequent assertions in English-language literature that they are. There is no empirical evidence to support this theory, and numerous examples contradict it, as shown in this study. Guiding Cases are also very different from precedents in common law in that, generally speaking, they neither establish nor develop broadly applicable legal principles. Instead, they are fact-sensitive, narrowly confined and practically helpful templates to resolve very specific issues and disputes. This is an important reason why the majority of Chinese courts have never referred to any Guiding Case in more than ten years, as their limited applicability significantly curtails the practical impact of the small number of Guiding Cases.

At the same time, it is important not to underestimate the progress and potential of China's emerging case law system. Through Guiding Cases, the Supreme People's Court has played a leading role in promoting the normative values of using and citing cases in judicial practice. To use the framework and

[135] 王某、莆田市秀屿区纯爱贸易有限公司买卖合同纠纷二审民事判决书，(2021)赣09民终503号，Jiangxi Province Yichun City Intermediate People's Court (30 March 2021).

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press

terminology of Lewis, China is only now earnestly making efforts to move forward from the 'null model', where precedents carried no normative weight in adjudication.[136] This is a monumental challenge for Chinese judges, most of whom lack significant training in the use of cases. The task is to engineer a fundamental addition to the work and approach of the world's largest judiciary, with minimal disruption to the ongoing adjudication of tens of millions of cases each year. The modest yet substantive progress made among the Chinese judiciary in their use of cases becomes clearer when seen in this context.

Moreover, unlike in almost all other established case law systems, the use of cases in Chinese law is not necessarily limited to exploring legal principles or answering questions of law. The reach of judgment databases and SCS have enabled courts to rely on past decisions to establish important facts in later cases, potentially expanding what a contemporary court can investigate. In practice, SCS is often more influential on lower courts than the small number of Guiding Cases, as evidenced by quantitative and qualitative analyses presented in this study. There are, however, considerable practical obstacles to further studies of the use of SCS, as the relevant case information remains inaccessible to the public under current judicial practices.

This leads to two final points for legal scholars interested in China or in the study of precedents more generally. First, legal scholarship, especially that involving something as concrete and practical as case law, should be grounded in law and cases, rather than in speculative, ideologically driven interpretations. Secondly, the Chinese case law system has been developing for over a decade and will most likely continue to evolve. As observed by Kiun, this could signify the creation of a distinct and unique system of case law.[137] It offers a new perspective on how the use of cases can reshape a major legal system, especially with the aid of modern technology. Both points warrant further scholarly attention and rigorous study of the emerging system of case law in China.

[136] Lewis, above n 20, at 875.

[137] Kiun, above n 8, at 106.

**Cite this article:** L Xu 'Rethinking China's emerging case law system: empirical insights and challenges to prevailing assumptions.' (2025) *Legal Studies* **45**, 554–576. https://doi.org/10.1017/lst.2025.10092

https://doi.org/10.1017/lst.2025.10092 Published online by Cambridge University Press