# Cohen Supplemental Ex. 4

IAM

# Chinese patent litigation data: what it tells us and what it doesn't

13 min read | 17 November 2021

Chris Bailey Douglas Clark Mark Cohen Aria Tian



- **Chinese courts appear to publish only around half of their patent judgments, despite rules requiring that they do so consistently**
- **When decisions are published, they can take quite a bit of time to emerge publicly – even the parties involved in high-profile cases can be left waiting**
- **For major IP owners involved in complex disputes, there is nevertheless significant strategic value in the information we do have about Chinese litigation outcomes**

IP practitioners have long been aware of the lack of consistency and completeness around publication of court decisions in China. It is an issue that we at Rouse have had to constantly revisit since launching the CIELA litigation database in 2009. And it is why we clearly communicate to our users that there is nothing even close to the equivalent of the United States' PACER in China, and it would be misleading for any providers of Chinese litigation data to claim 'complete' or 'up-to-the-minute' data as a selling point.

Data providers are all hampered by the same reality: China's legal system simply does not publicly operate on principles of full transparency, and decisions that are published are often from months in the past.

This issue has recently come under an international spotlight. China is obligated, under Article 63 of TRIPS, to make judicial and administrative decisions "of general application" relating to IP available to the public. The European Union in July this year made a WTO request under TRIPS Article 63.3 for specific disclosure of some highly influential standards-essential patent decisions. China replied with only a brief explanation of its guidelines for posting court decisions online.

So how much publication is there in China, and does a lack of transparency and timeliness reduce the value of the data? Below, we look at both issues: how many decisions are published and, of those that are published, how quickly they are made available.

Even though data collection is hampered by a lack of transparency and the length of time it takes for cases to be published, the available information still provides valuable insight into a key function of China's IP system.

## China's top court requires decisions to be published

The Supreme People's Court (SPC) has long required courts to publish decisions, and various courts have been doing so on an ad hoc basis for years.

In August 2016 the SPC published its most specific guidelines: *Provisions of the Supreme People's Court on Publishing Judgement Documents on the Internet by People's Courts*. This stipulates that judgments must be published online for public access within seven days from the date they become valid and set out criteria for decisions that should not be published, including those involving state secrets, juveniles and, as always in China, a catch-all provision for "other circumstances" in which it would be inappropriate to publish. Following this, the Beijing and Guangdong Higher Courts issued their own rules that mirror the SPC's. Note that the provisions only require publication of final decisions, and there is no publication of other actions of the court, such as granting of interim orders (which are commonplace and would be highly valuable).

A central repository of all civil decisions called "China Judgements Online", known by its Chinese name *Wenshu*, is the ultimate source of all decisions that data providers use. *Wenshu* has a structure that is rudimentary and difficult to use, and it

takes significant effort to search, filter and organise IP decisions into a more easily searchable database.

## Transparency: around half of cases make it to China's public database

Despite the SPC provisions, it appears that the courts, including the SPC itself, are publishing only a portion of their decisions. What cannot be seen cannot be counted, making it difficult to be precise about the total universe of decisions which ought to be published. It is also exceedingly difficult to determine whether important cases are not being published. According to existing legal requirements, cases that are settled on appeal or cases where a preliminary injunction facilitated settlement are not required to be published, leaving a potentially vast body of case decisions unavailable to the public.

The SPC releases annual national statistics on civil IP decisions which serve as the top line data on case volumes and activity. Even so, these statistics are not always clear and consistent. The SPC data counts "cases accepted" and "cases concluded". However, "concluded" cases include those where the case was withdrawn (possibly for private settlement) or mediated by the court, and therefore no judgment was issued.

Unfortunately, the SPC stopped reporting the number of cases concluded through mediation or withdrawal after 2016. The data we have, from 2010 to 2016, records the rate of mediation or withdrawal only for first instance cases, and not at the appeal stage. During this period, an average of 67.35% of first instance IP civil cases concluded by way of mediation or withdrawal, with the figure for 2016 sitting at 64.21%.

From a practitioner's viewpoint, this feels about right – the majority of civil IP cases settle or are mediated before the court rather than reaching judgment. These outcomes are not counted as a "decision" though, and as such are not published. That means they cannot be counted when trying to calculate the proportion of final decisions that are published versus those that should be.

A further blemish in the SPC's annual report is that, if we want to look at, say, patent infringement cases as a subset, the SPC only provides data on the total number of "accepted cases" of patent infringement at first instance in a given year, and not the number of "concluded cases". Clearly, patent cases accepted in one year could well conclude in the following year (especially if they continue to final judgment), and so the "accepted" and "concluded" numbers will not match. Nor do we have data from any period on the number of patent cases that were concluded as a result of being mediated or withdrawn. So even within the subset of patent cases, we have to make a guess as to how many cases were concluded in a given

year at first instance and what proportion of those resulted in a final decision which is eligible to be published.

Taking patent infringement cases at first instance as an example, the data we have from the SPC reports, and the assumptions we must make to estimate the publication rate are summarised in Table 1:

**Table 1: IP and patent cases in the first instance (2016-2020) – public data compared to estimates**

| **Civil IP cases in the 1st Instance** | | | | | |
|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** |
| **(a) Reported number of all accepted IP cases.** | 136,534 | 201,039 | 283,414 | 399,031 | 443,326 |
| **(b) Reported number of accepted patent cases.** | 12,357 | 16,010 | 21,699 | 22,272 | 28,528 |
| **(c) Patent cases as percentage of all accepted IP cases. (c)=(b)/(a)** | 9.05% | 7.96% | 7.66% | 5.58% | 6.43% |
| **(d) Reported number of all concluded IP cases.** | 131,813 | 192,938 | 273,945 | 394,521 | 442,722 |
| *(e) Estimated number of concluded patent cases.*<br>*(e) =(d)*(c)* | *11,929** | *15,358** | *20,984** | *22,014** | *28,467** |
| **(f) Reported *or estimated* % of IP cases** | 64% | *64%*** | *64%*** | *64%*** | *64%*** |

| | | | | | |
|---|---|---|---|---|---|
| mediated or withdrawn. | | | | | |
| *Estimated number of patent cases resulting in a judgment (less estimated proportion of patent cases mediated or withdrawn)*<br><br>*(g)=(e)*[1-(f)]* | *4,294**** | *5,529**** | *7,554**** | *7,925**** | *10,248**** |
| **(h) Number of published patent cases in** ***Wenshu*** | 2,289 | 2,844 | 4,087 | 3,639 | 2,996 |
| *Estimated publication rate (%)*<br><br>*(i)=(h)/(g)* | *53.31%* | *51.44%* | *54.10%* | *45.92%* | *29.23%* |

**The SPC report does not break down the number of patent cases concluded at 1st instance, only the number accepted. This is problematic, as cases accepted in one year may well conclude in subsequent years.*

*** 2016 is the last year in which this data was published, so for subsequent years we extrapolate using the same figure. Based on the previous period 2010-2016, the rate remained relatively stable, so we believe that extrapolating the same rate forward is a justifiable approach.*

**** This is a combination of two assumptions – that the percentage of all IP cases mediated or withdrawn in 2017-2020 remained consistent with 2010-2016, and that this percentage is consistent for patent cases.*

Noting some of the assumptions we have made, we can estimate that from 2016-2019, 46-54% of patent infringement decisions are being published by all courts. The fact that 2020 is significantly lower reflects the lengthy lag in publication.

A further point to note when counting decisions is that only the final binding decision is typically published, not earlier decisions that were appealed. In China's system, there is an automatic right of appeal, and on appeal, earlier instance

decisions are suspended. So a published decision will generally only be the final instance, and earlier instances are not published.

Annual reports put out by the newly-constituted SPC IP Tribunal allow us to see what proportion of the top IP court's decisions are published, without using estimates. The figures in Table 2, based on the SPC IP Tribunal's own reporting, show a slightly higher rate of publication than for first instance cases in the lower courts across the country.

**Table 2: SPC IP Tribunal data on concluded and published cases**

| | Cases accepted | Cases concluded | Cases Mediated / Withdrawn | Published | Publication rate (%)* |
|---|---|---|---|---|---|
| 2019 | 1,945 | 1,433 | 351 | 553 | 51% |
| 2020 | 3,176 | 2,787 | 697 | 1,332 | 64% |

** As in Table 1, this is calculated by number of concluded cases, less the number of cases reported as withdrawn or mediated, versus the number published. A lower rate of mediation/withdrawal at the SPC (30% in 2019, 25% in 2020) compared to lower courts is not surprising, given that parties appealing before the SPC are more likely to be seeking a final judgment than settling at this stage.*

So we can estimate that, for patent cases, around half are being published. From the point of view of statistical analysis, this is not bad, if we also assume that this half are a random representation of the whole.

For the vast majority of cases that involve domestic parties, it is impractical that there would be a nationally-orchestrated program of selecting decisions for publication, however, it is possible that individual courts are taking a similar approach to publication, leaving out large numbers of smaller, "trivial" cases and publishing those that are more important. This is a form of selection bias that will skew statistics, but it is impossible to say how consequential it might be.

However, there are some suspicions that for the much smaller minority of foreign-related cases, there may be selective publication of winning cases, leading the statistics to show that foreign plaintiffs have "win rates" in the region of 80%, depending on the type of case and time period tracked. On the other hand, firms which regularly handle cases brought by foreign plaintiffs have self-reported success rates that are consistent with the published figures.

It should be noted that selection bias may not necessarily occur in publication of cases handled, but in the types of cases that foreign plaintiffs bring in China: they

may be less likely than a Chinese plaintiff to take on a case that has a poor chance of success.

In any event, completeness of publication is not the only challenge, and perhaps not even the most important. There is also an issue with long time lags in publication.

## Latency: decisions take months to appear, even for the parties involved

"Latency" refers to the delay between when a decision is issued and when it is made available on *Wenshu*. Once again, the stats show that the SPC's rules are not being followed.

The *Wenshu* database itself does not actually record the date that a decision is made available on its site, so our only metric is the date written on the document itself. **Again, taking patents as a subset, the most recent published patent civil case on *Wenshu* as of the time of writing, 27 October 2021, is dated 29 September 2021, and there are 36 other patent cases dated in September 2021. For decisions dated August 2021 and July 2021, *Wenshu* has 64 and 83 decisions respectively. Based on monthly caseloads across the country, this is clearly well below the actual number of patent decisions issued in this time period. By comparison, the number of decisions on *Wenshu* for the same period last year – July, August and September 2020 – are 463, 384, and 542 cases respectively.**

Referring back to Table 1, we see that the estimated percentage of published decisions in 2020 is significantly below that of previous years. Decisions issued in the later months of 2020 have yet to be published, and even the percentage of 2019 decisions is slightly lower than the previous three years. This illustrates how decisions trickle into the database over the course of many months, with no consistency between courts or across time periods.

This latency is apparent not only when decisions are made available to the public, but even to the parties-in-suit. A typical example is a recent high-profile case, *U-blox v Techtotop*, handled by Rouse's network firm Lusheng. The litigators involved in the case were, as usual, waiting with bated breath for the decision to come down from the Hangzhou Court. When it was finally issued to the parties on 21 July 2021, the date shown on the decision was 21 May 2021.

Even taking into account the administrative processes of applying the court's stamp and serving the documents to the parties, it is hard to find a reasonable explanation for a delay of two months. However, practitioners report that this phenomenon is quite normal, and the date on the decision has no bearing on the date that the

judgment is "issued", nor does it count in terms of calculating the deadline for appeal.

There have been rumours that politically sensitive cases, and especially those involving foreign parties, may be subjected to an extra level of review that holds up the decision (as well as some that are not published at all). Since foreign-related cases are not subject to statutory procedural deadlines, any such "review" process would be impossible to detect. However, it is implausible that this "review" process is a significant cause of latency, because, based on published decisions, only a small percentage of Chinese IP cases involve foreign parties, whereas publication latency occurs across the board, affecting tens of thousands of purely domestic cases. And with most complex cases, including with the U-blox example, there are usually several months between the last hearing and the decision, during which the supposed "review" could potentially take place. It makes little sense that it would happen only after the decision was finalised and dated.

A recent high-profile patent case that was the subject of an EU inquiry, *Oppo v Sharp*, similarly exhibited a latency period of approximately two weeks from the time it was decided by the SPC until the time it was published. The release of that particular judgment may also have been timed with the Chinese response to the EU's TRIPS request for further information on the case.

The latency issue is most obvious when high-profile cases hit the headlines. There are numerous instances of IP cases reaching mainstream media while the actual decision is not available, leaving practitioners to rely on press reports, or scratching around to see if the decision is circulating privately amongst the IP legal community. These decisions may eventually be published many months later, but even some highly influential cases remain unpublished.

## What does this mean in practice?

China is a civil law jurisdiction, and transparency is not fundamental to Chinese jurisprudence as it is in common law countries. Even so, there are many civil law countries that are highly transparent, since the publication of decisions serves useful purposes apart from establishing legal precedent. More importantly, China is falling short of its WTO obligations to transparency under Article 63 of the TRIPS agreement.

What this means for analysis of IP litigation in China is that there is little currency in talking about "complete" or "fresh" data. The only areas where we are able to obtain up-to-date data is in the hearing schedules published by the individual courts. Though these contain very little information on the case except the parties in suit, they can at least confirm in real time that a dispute is underway.

But these shortcomings do not mean that litigation data in China is unreliable or has no value. While the completeness and speed of publication is lacking, the number of decisions published is not an insignificant sample. And shortcomings in transparency bear no relation to the speed and reliability of the court system for the litigants involved. As Chinese IP lawyers can attest, China provides a generally fast and competent judicial process, and, as stated above, one in which foreign plaintiffs appear to enjoy high rates of success.

It should also be noted that, in a system which lacks a formal precedential mechanism, the higher courts, and especially the SPC in its function as a central patent appellate court, select "highlight" or "typical" cases which serve a useful signalling function as to how the law should be applied. Out of the 4,220 cases which the SPC IP Tribunal has concluded in the past 2 years, it has selected 88 cases on its website which are "essential".

For practitioners representing major IP owners, the outcome of myriad small suits between domestic parties in minor district courts is of little value, except to know how such cases in aggregate generally turn out. Our focus is rather on the smaller subset of high-value and complex cases that most inform how we formulate our own tactics.

In other words, it is the qualitative aspects of the data, and not the velocity or volume, that provide its true value.

---



**Chris Bailey**

Principal
*Rouse*
cbailey@rouse.com

---

**Douglas Clark**

Principal and Global Head of Dispute Resolution
*Rouse*

---

**Mark Cohen**

Senior Fellow at the IP institute of the University of Akron Law School and at the Asia Society of Northern California

---

**Aria Tian**

Head of China Research Unit
*Rouse*

Copyright © 2026 LBR trading as Centellic Company Number: 03281866 VAT: GB 160 7529 10