# Cohen Supplemental Ex. 5

# 2026 Special 301 Report

Office of the United States Trade Representative

# ACKNOWLEDGEMENTS

The Office of the United States Trade Representative (USTR) is responsible for the preparation of this Report. United States Trade Representative Jamieson Greer gratefully acknowledges the contributions of staff to the writing and production of this Report and extends his thanks to partner agencies, including the following Departments and agencies: State; Treasury; Justice; Agriculture; Commerce, including the International Trade Administration and the Patent and Trademark Office; Health and Human Services; and Homeland Security, including the United States Customs and Border Protection, Homeland Security Investigations, and the National Intellectual Property Rights Coordination Center. USTR also recognizes the contributions of the United States Copyright Office.

In preparing the Report, substantial information was solicited from U.S. embassies around the world, from U.S. Government agencies, and from interested stakeholders. The draft of this Report was developed through the Special 301 Subcommittee of the interagency Trade Policy Staff Committee.

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ........ **5**
**SECTION I: Developments in Intellectual Property Rights Protection, Enforcement, and Related Market Access** ........ **12**
**A. Initiatives to Strengthen Intellectual Property Protection and Enforcement in Foreign Markets** ........ **13**
**B. Illustrative Best Intellectual Property Practices by Trading Partners** ........ **14**
**C. Multilateral Initiatives** ........ **16**
**D. Bilateral and Regional Initiatives** ........ **16**
**E. Intellectual Property Protection, Enforcement, and Related Market Access Challenges** ........ **18**
Border, Criminal, and Online Enforcement Against Counterfeiting ........ 18
Online Piracy and Broadcast Piracy ........ 22
Pharmaceutical and Medical Device Innovation and Market Access ........ 24
Trade Secrets ........ 28
Forced Technology Transfer, Indigenous Innovation, and Preferences for Indigenous Intellectual Property ........ 30
Geographical Indications ........ 31
Trademark Protection Issues ........ 34
Copyright Administration and Payment of Royalties ........ 36
Government Use of Unlicensed Software ........ 37
Other Issues ........ 37
**F. Intellectual Property and Sustainability** ........ **37**
**G. Intellectual Property and Health** ........ **38**
**H. Intellectual Property and Standards** ........ **39**
**I. Implementation of the World Trade Organization Agreement on Trade-Related Aspects of Intellectual Property Rights** ........ **40**
**J. Dispute Settlement and Enforcement** ........ **41**
**SECTION II: Country Reports** ........ **43**
**PRIORITY FOREIGN COUNTRY** ........ **43**
**VIETNAM** ........ **43**
**PRIORITY WATCH LIST** ........ **48**
**CHILE** ........ **48**
**CHINA** ........ **50**
**INDIA** ........ **61**
**INDONESIA** ........ **65**
**RUSSIA** ........ **67**
**VENEZUELA** ........ **70**
**WATCH LIST** ........ **71**
**ALGERIA** ........ **71**
**ARGENTINA** ........ **72**

**BARBADOS** .......... **74**
**BELARUS** .......... **75**
**BOLIVIA** .......... **76**
**BRAZIL** .......... **77**
**CANADA** .......... **79**
**COLOMBIA** .......... **80**
**ECUADOR** .......... **81**
**EGYPT** .......... **82**
**EUROPEAN UNION** .......... **83**
**GUATEMALA** .......... **85**
**MEXICO** .......... **86**
**PAKISTAN** .......... **88**
**PARAGUAY** .......... **90**
**PERU** .......... **91**
**THAILAND** .......... **92**
**TRINIDAD AND TOBAGO** .......... **94**
**TÜRKIYE** .......... **95**
**ANNEX 1: Special 301 Statutory Basis** .......... **96**
**ANNEX 2: U.S. Government-Sponsored Technical Assistance and Capacity Building** .......... **98**

# EXECUTIVE SUMMARY

A top trade priority for the Administration is to use all possible tools to address unfair trade practices in foreign markets, including barriers with respect to intellectual property (IP). This means pressing trading partners for robust standards of IP protection so that Americans can secure rights to their IP, such as inventions, creations, and brands. Equally important is having effective enforcement regimes for IP rights in the courts, by law enforcement, and at the border so that U.S. owners of IP can defend their rights when their IP is stolen or infringed and so that the benefits can flow back to the United States economy.

The Special 301 Report (Report) is the result of an annual review of the state of IP protection and enforcement in U.S. trading partners around the world, which the Office of the United States Trade Representative (USTR) conducts pursuant to Section 182 of the Trade Act of 1974, as amended (the Trade Act, 19 U.S.C. § 2242). Congress amended the Trade Act in 1988 specifically "to provide for the development of an overall strategy to ensure adequate and effective protection of intellectual property rights and fair and equitable market access for United States persons that rely on protection of intellectual property rights."[1] In particular, Congress expressed its concern that "the absence of adequate and effective protection of United States intellectual property rights, and the denial of equitable market access, seriously impede the ability of the United States persons that rely on protection of intellectual property rights to export and operate overseas, thereby harming the economic interests of the United States."[2]

This Report provides an opportunity to put a spotlight on foreign countries and the laws, policies, and practices that fail to provide adequate and effective IP protection and enforcement for U.S. inventors, creators, brands, manufacturers, and service providers, which, in turn, harm American workers whose livelihoods are tied to America's innovation- and creativity-driven sectors. The Report identifies a wide range of concerns, including: (a) challenges with border and criminal enforcement against counterfeits, including in the online environment; (b) high levels of online and broadcast piracy, including through illicit streaming devices; (c) inadequacies in trade secret protection and enforcement in China, Russia, and elsewhere; (d) troubling policies on "indigenous innovation" and forced technology transfer (which can range from state-sponsored theft of trade secrets to transfer under pressure from state actors) that may unfairly disadvantage U.S. right holders in markets abroad; and (e) other ongoing, systemic issues regarding IP protection and enforcement, as well as market access, in many trading partners around the world. Combating such unfair trade policies can foster American innovation and creativity and increase economic security for American workers and families.

Specifically, this Administration continues to closely monitor developments in, and to engage with, those countries that have been on the Priority Watch List for multiple years. Over the coming

---

[1] Omnibus Trade and Competitiveness Act of 1988, § 1303(a)(2), 102 Stat. 1179.

[2] *Id.* § 1303(a)(1)(B); *see also* S. Rep. 100-71 at 75 (1987) ("Improved protection and market access for U.S. intellectual property goes to the very essence of economic competitiveness for the United States. The problems of piracy, counterfeiting, and market access for U.S. intellectual property affect the U.S. economy as a whole. Effective action against these problems is important to sectors ranging from high technology to basic industries, and from manufacturers of goods to U.S. service businesses.").

weeks, USTR will review those developments against the benchmarks established in the Special 301 action plans for those countries. For countries failing to address U.S. concerns, USTR will take appropriate actions, which may include enforcement actions under Section 301 of the Trade Act or pursuant to World Trade Organization (WTO) or other trade agreement dispute settlement procedures.

The Report serves a critical function by identifying opportunities and challenges facing U.S. innovative and creative industries in foreign markets and by promoting job creation, economic development, and many other benefits that effective IP protection and enforcement support. The Report informs the public and our trading partners and seeks to be a positive catalyst for change. USTR looks forward to working closely with the governments of the trading partners that are identified in this year's Report to address both emerging and continuing concerns and to build on the positive results that many of these governments have achieved.

**THE 2026 SPECIAL 301 LIST**

The Special 301 Subcommittee received stakeholder input on more than 100 trading partners but focused its review on those submissions that responded to the request set forth in the notice published in the *Federal Register* to identify whether a particular trading partner should be named as a Priority Foreign Country, placed on the Priority Watch List or Watch List, or not listed in the Report. Following extensive research and analysis, USTR has identified 26 trading partners as follows:

| Priority Foreign Country | Priority Watch List | Watch List | |
|---|---|---|---|
| • Vietnam | • Chile | • Algeria | • European Union |
| | • China | • Argentina | • Guatemala |
| | • India | • Barbados | • Mexico |
| | • Indonesia | • Belarus | • Pakistan |
| | • Russia | • Bolivia | • Paraguay |
| | • Venezuela | • Brazil | • Peru |
| | | • Canada | • Thailand |
| | | • Colombia | • Trinidad and Tobago |
| | | • Ecuador | • Türkiye |
| | | • Egypt | |

The Special 301 review of Ukraine has been suspended due to the ongoing war.

**Priority Foreign Country Identification**

In this year's Special 301 Report, USTR identifies Vietnam as a Priority Foreign Country (PFC), marking the first time in thirteen years that a country is listed in that category. The PFC identification is reserved by statute for countries with the most egregious IP-related acts, policies, and practices with the greatest adverse impact on relevant U.S. products, and that are not entering into good faith negotiations or making significant progress in negotiations to provide adequate and effective IP rights protection. While the five specific grounds for Vietnam's identification as PFC are set out below, in general, the 2026 Special 301 review found that Vietnam has demonstrated a persistent failure to resolve long-standing concerns about IP protection and enforcement. The United States first approached Vietnam in 2020 with a proposal for an IP Work Plan to address issues identified in the Special 301 Report, followed by a revised proposal in 2023. However, Vietnam failed to make meaningful progress on these issues in subsequent bilateral engagement, as well as in recent negotiations for an Agreement on Reciprocal, Fair, and Balanced Trade. Vietnam's actions or inactions are causing significant damage to the industries reliant on IP in Vietnam's market, and in other markets as well.

Within 30 days from the date of this identification, USTR will decide whether to initiate an investigation under Section 301 of the Trade Act of 1974 based on the grounds identified in this report as the basis for Vietnam's identification as a PFC. If USTR initiates an investigation, USTR will request consultations with Vietnam and seek to resolve the issues that led to Vietnam's identification as a PFC.

Vietnam's identification as a PFC in this report is solely based on the IP-related concerns identified below as the grounds for the identification, and not on any other aspect of Vietnam's international or domestic actions or policies.

While the United States remains concerned about other issues with Vietnam's IP environment, as discussed in previous Special 301 Reports, the specific grounds for USTR's identification of Vietnam as a PFC are: (1) failure to provide persistent and effective enforcement to combat online piracy; (2) failure to provide sufficient enforcement against widespread counterfeiting; (3) lack of effective border enforcement; (4) lack of enforcement actions against unlicensed software use; and (5) lack of criminal measures against cable and satellite signal theft. The Country Report for Vietnam further describes these grounds and other IP concerns.

**Argentina** is moved from the Priority Watch List to the Watch List in 2026 due to its efforts in addressing significant IP concerns. In February 2026, the United States and Argentina signed the Agreement on Reciprocal Trade and Investment (ARTI), under which Argentina made commitments that will benefit American innovators and creators by enhancing intellectual property protection and prioritizing enforcement against intellectual property theft. This includes moving forward with a number of key international intellectual property treaties and taking steps to resolve many long-standing intellectual property issues identified in the Special 301 Report. Argentina has also committed to robust standards for transparency and fairness regarding the protection of geographical indications (GIs) and to ensure that U.S. products can continue using terms that have been unfairly protected as GIs. Notably, in March 2026, Argentina took a major step under the ARTI with the repeal of unduly broad limitations on patent-eligible subject matter, which included patent examination guidelines that automatically reject patent applications for

categories of pharmaceutical inventions that are eligible for patentability in other jurisdictions and requirements that processes for the manufacture of active compounds disclosed in a specification be reproducible and applicable on an industrial scale. The United States will continue to engage with Argentina to address the remaining IP concerns.

**Bulgaria** is removed from the Watch List this year due to significant enforcement actions and progress in criminal prosecutions during the past year. In August 2023, Bulgaria passed the Act Amending and Supplementing the Criminal Code, which provides for "the criminal prosecution of persons who create conditions for online piracy through the development and maintenance of torrent trackers, web platforms, chat groups in applications for online exchange of pirated content" (Article 172a, paragraph 2). Throughout 2025, the Bulgarian government showed strong engagement and took steps to improve its IP enforcement efforts. In January 2026, Bulgarian law enforcement seized the five most popular Bulgarian piracy domains (one of which was often among the 10 most visited domains in the country), executed search and seizure warrants at 30 locations, and arrested several individuals, some of whom have been charged under Article 172a discussed above.

The **European Union** (EU) is added to the Watch List in 2026. Of particular concern is the recent provisional agreement on the EU General Pharmaceutical Legislation (GPL), as well as issues related to geographical indications (GIs) and the implementation of legislation impacting digital copyright.

**Mexico** is moved from the Priority Watch List to the Watch List in 2026 due to substantial actions it has taken to address significant IP concerns. Ahead of the USMCA Joint Review, the United States and Mexico have intensified engagement to address these long-standing IP concerns. Areas of discussion included pharmaceutical IP, criminal and administrative enforcement, border enforcement, and enforcement against online piracy. In April 2026, Mexico issued amended regulations to provide for protection against the unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for both pharmaceutical products and agricultural chemical products, as well as a system to provide patent term extensions for unreasonable marketing approval delays. Mexico also took steps to partially address concerns regarding the lack of an effective system for the early resolution of potential pharmaceutical patent disputes and the lack of *ex officio* authority for border enforcement, as well as made public commitments to improve criminal enforcement. With respect to market access for U.S. products that use certain cheese names, in March 2026, Mexico published the list of terms from the 2018 cheese side letter to the USMCA in the *Industrial Property Gazette* published by Mexico's Institute of Industrial Property (IMPI), to help address market access concerns, including concerns related to the overbroad protection of geographical indications. Regarding online piracy, the Mexican government has been working on potential amendments to the Federal Copyright Law to better address online piracy concerns. The Mexican government also has been working on potential amendments to the Federal Criminal Code to address concerns regarding a requirement to prove a direct economic benefit to the infringer. The United States continues to engage with Mexico to address remaining concerns.

## OUT-OF-CYCLE REVIEWS

An Out-of-Cycle Review is a tool that USTR uses to encourage progress on IP issues of concern. Out-of-Cycle Reviews provide an opportunity to address and remedy such issues through heightened engagement and cooperation with trading partners and other stakeholders. Out-of-Cycle Reviews focus on identified IP challenges in specific trading partner markets. Successful resolution of specific IP issues of concern can lead to a positive change in a trading partner's Special 301 status outside of the typical period for the annual review. Conversely, failure to address identified IP concerns, or further deterioration as to an IP-related concern within the specified Out-of-Cycle Review period, can lead to an adverse change in status.

USTR may conduct additional Out-of-Cycle Reviews of other trading partners as circumstances warrant or as requested by a trading partner.

## REVIEW OF NOTORIOUS MARKETS FOR COUNTERFEITING AND PIRACY

In 2010, USTR began publishing annually the *Review of Notorious Markets for Counterfeiting and Piracy* (*Notorious Markets List*) separately from the annual Special 301 Report. The *Notorious Markets List* identifies illustrative examples of online and physical markets that reportedly engage in, facilitate, turn a blind eye to, or benefit from substantial copyright piracy and trademark counterfeiting, according to information submitted to USTR in response to a notice published in the *Federal Register* requesting public comments. In 2025, USTR requested such comments on August 18, 2025, and published the *2025 Notorious Markets List* on March 3, 2026. USTR plans to conduct its next Review of Notorious Markets for Counterfeiting and Piracy in the fall of 2026.

## THE SPECIAL 301 PROCESS

The Congressionally mandated annual Special 301 Report is the result of an extensive multi-stakeholder process. Pursuant to the statute mandating the Report, the United States Trade Representative is charged with identifying as Priority Foreign Countries those countries that have the most onerous or egregious acts, policies, or practices and whose acts, policies, or practices have the greatest adverse impact (actual or potential) on relevant U.S. products. (See ANNEX 1.) To facilitate administration of the statute, USTR has created a Priority Watch List and a Watch List within this Report. Placement of a trading partner on the Priority Watch List or Watch List indicates that particular problems exist in that country with respect to IP protection, enforcement, or market access for U.S. persons relying on IP. Provisions of the Special 301 statute, as amended, direct the United States Trade Representative to develop action plans for each country identified as a Priority Watch List country that has also been on the Priority Watch List for at least one year.

### *Public Engagement*

USTR solicited broad public participation in the 2026 Special 301 review process to facilitate sound, well-balanced assessments of trading partners' IP protection and enforcement and related market access issues affecting IP-intensive industries and to help ensure that the Special 301 review would be based on comprehensive information regarding IP issues in trading partner markets.

USTR requested written submissions from the public through a notice published in the *Federal Register* on December 11, 2025 (*Federal Register* notice). In addition, on February 18, 2026, USTR conducted a public hearing that provided the opportunity for interested persons to testify before the interagency Special 301 Subcommittee of the Trade Policy Staff Committee (TPSC) about issues relevant to the review. The hearing featured testimony from witnesses, including representatives of foreign governments, industry, and non-governmental organizations. USTR posted on its public website the testimony received at the Special 301 hearing and offered a post-hearing comment period during which hearing participants could submit additional information in support of, or in response to, hearing testimony.[3] The *Federal Register* notice drew submissions from 38 non-government stakeholders and 19 foreign governments. The submissions filed in response to the *Federal Register* notice are available to the public online at www.regulations.gov, docket number USTR-2025-0243. The public can access the transcript of the hearing at www.ustr.gov.

*Country Placement*

The Special 301 listings and actions announced in this Report are the result of intensive deliberations among all relevant agencies within the U.S. Government, informed by extensive consultations with participating stakeholders, foreign governments, the U.S. Congress, and other interested parties.

USTR, together with the Special 301 Subcommittee, conducts a broad and balanced assessment of U.S. trading partners' IP protection and enforcement, as well as related market access issues affecting IP-intensive industries, in accordance with the statutory criteria. (See ANNEX 1.) The Special 301 Subcommittee, through the TPSC, provides advice on country placement to USTR based on this assessment. This assessment is conducted on a case-by-case basis, taking into account diverse factors such as a trading partner's level of development, its international obligations and commitments, the concerns of right holders and other interested parties, and the trade and investment policies of the United States. It is informed by the various cross-cutting issues and trends identified in Section I. Each assessment is based upon the specific facts and circumstances that shape IP protection and enforcement in a particular trading partner.

In the year ahead, USTR will continue to engage trading partners on the issues discussed in this Report. In preparation for, and in the course of, those interactions, USTR will:

- Engage with the U.S. Congress and U.S. Government agencies, as well as U.S. stakeholders and other interested parties to ensure that USTR's position is informed by the full range of views on the pertinent issues;

- Conduct extensive discussions with individual trading partners regarding their respective IP regimes;

[3] Available at https://ustr.gov/trade-topics/intellectual-property/special-301/2026-special-301-report.

- Encourage trading partners to engage fully, and with the greatest degree of transparency, with the full range of stakeholders on IP matters;

- Develop an action plan with benchmarks for each country that has been on the Priority Watch List for at least one year to encourage progress on high-priority IP concerns; and

- Identify, where possible, appropriate ways in which the U.S. Government can be of assistance. (See ANNEX 2.)

USTR will conduct these discussions in a manner that both advances the policy goals of the United States and respects the importance of meaningful policy dialogue with U.S. trading partners. In addition, USTR will continue to work closely with other U.S. Government agencies to ensure consistency of U.S. trade policy objectives.

## STRUCTURE OF THE SPECIAL 301 REPORT

The 2026 Report contains the following Sections and Annexes:

SECTION I: Developments in Intellectual Property Rights Protection, Enforcement, and Related Market Access discusses global trends and issues in IP protection and enforcement and related market access that the U.S. Government works to address on a daily basis;

SECTION II: Country Reports includes descriptions of issues of concern with respect to particular trading partners;

ANNEX 1: Special 301 Statutory Basis describes the statutory basis of the Special 301 Report; and

ANNEX 2: U.S. Government-Sponsored Technical Assistance and Capacity Building highlights U.S. Government-sponsored technical assistance and capacity building efforts.

April 2026

# SECTION I: Developments in Intellectual Property Rights Protection, Enforcement, and Related Market Access

An important part of the mission of the Office of the United States Trade Representative (USTR) is to support and implement the Administration's commitment to protect American jobs and workers and to advance the economic interests of the United States. USTR works to protect American innovation and creativity in foreign markets employing all the tools of U.S. trade policy, including the annual Special 301 Report (Report).

Fostering innovation and creativity is essential to U.S. economic growth, competitiveness, and the estimated 63 million American jobs that directly or indirectly rely on intellectual property (IP)-intensive industries.[4] IP-intensive industries, defined by the United States Patent and Trademark Office (USPTO) as industries that rely most heavily on IP protections, are a diverse group that include, among others, manufacturers, technology developers, apparel makers, software publishers, agricultural producers, and creators of creative and cultural works.[5] Together, these industries generate 41% of the U.S. gross domestic product (GDP).[6] The 47.2 million workers that are directly employed in IP-intensive industries also enjoy pay that is, on average, 60% higher than workers in non-IP-intensive industries.[7]

IP infringement, including patent infringement, trademark counterfeiting, copyright piracy,[8] and trade secret theft, causes significant financial losses for right holders and legitimate businesses. IP infringement can undermine U.S. competitive advantages in innovation and creativity, to the detriment of American workers and businesses.[9] In its most pernicious forms, IP infringement endangers the public, including through exposure to health and safety risks from counterfeit products, such as semiconductors, automobile parts, apparel, footwear, toys, and medicines. In addition, trade in counterfeit and pirated products often fuels cross-border organized criminal networks, increases the vulnerability of workers to exploitative labor practices, and hinders sustainable economic development in many countries.

This Section highlights developments in 2025 and early 2026 in IP protection, enforcement, and related market access in foreign markets, including: examples of initiatives to strengthen IP

---

[4] USPTO, *Intellectual Property and the U.S. Economy: Third Edition* at 4 (Mar. 2022), https://www.uspto.gov/sites/default/files/documents/uspto-ip-us-economy-third-edition.pdf.
[5] *See id.* at 15 (table listing IP-intensive industries).
[6] *Id*. at 13.
[7] *Id*. at 4 and 9.
[8] The terms "trademark counterfeiting" and "copyright piracy" may appear below also as "counterfeiting" and "piracy," respectively.
[9] The Issue Focus of the *2022 Review of Notorious Markets for Counterfeiting and Piracy* examines the impact of online piracy on U.S. workers. Workers, such as content creators and the creative professionals who support the production of creative works, rely more than ever on adequate and effective copyright protection and enforcement to secure their livelihoods in today's digital era. Online piracy is not only highly detrimental to the U.S. economy as a whole, but it also has a strong impact on the everyday lives of individual workers.

protection and enforcement; illustrative best practices demonstrated by the United States and our trading partners; U.S.-led initiatives in multilateral organizations; and bilateral and regional developments. This Section identifies outstanding challenges and trends, including as they relate to enforcement against counterfeit goods, online and broadcast piracy, protection of trade secrets, forced technology transfer and preferences for indigenous IP,[10] geographical indications (GIs), innovative pharmaceutical products and medical devices, trademark protection issues, copyright administration and royalty payment, and government use of unlicensed software. This Section also highlights the importance of IP to innovation in the environmental sector and considerations at the intersection of IP and health. Finally, this Section discusses the importance of full implementation of the World Trade Organization (WTO) Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS) and developments on the use of WTO dispute settlement procedures by the United States to resolve IP concerns.

### A. Initiatives to Strengthen Intellectual Property Protection and Enforcement in Foreign Markets

The Office of the United States Trade Representative (USTR) notes the following important developments in 2025 and early 2026:

- **Argentina** repealed unduly broad limitations on patent-eligible subject matter, which included patent examination guidelines that automatically reject patent applications for categories of pharmaceutical inventions that are eligible for patentability in other jurisdictions and requirements that processes for the manufacture of active compounds disclosed in a specification be reproducible and applicable on an industrial scale.

- As a result of intensive engagement with the United States, **Mexico** took a number of steps to address long-standing intellectual property (IP) concerns, including amending regulations, making public commitments, and preparing and taking other measures on areas such as pharmaceutical IP, Internet service provider liability, criminal enforcement, and border enforcement.

- In **Korea**, the National Assembly passed amendments to the *Copyright Act* in January 2026 to clarify that knowingly posting links to infringing content for commercial purposes constitutes copyright infringement.

- As of March 2026, there are 63 members of the 1991 Act of the International Union for the Protection of New Varieties of Plants Convention (UPOV 1991). The treaty requires member countries to grant IP protection to breeders of new plant varieties, known as breeder's rights. An effective plant variety protection system incentivizes plant-breeding activities, which leads to increased numbers of new plant varieties with improved characteristics, such as high-yield, tolerance to adverse environmental conditions, and better food quality. In addition, promoting strong plant variety protection and enforcement globally helps improve industry competitiveness in foreign markets, encourages the

[10] In certain countries, preferences or policies on "indigenous IP" or "indigenous innovation" refer to a top-down, state-directed approach to technology development, which can include explicit market share targets that are to be filled by producers using domestically owned or developed IP.

importation of foreign plant varieties, and enhances domestic breeding programs. In 2025, **Nigeria** became the newest member of UPOV 1991.

- As of March 2026, there are 114 parties to the World Intellectual Property Organization (WIPO) Performances and Phonograms Treaty and 118 parties to the WIPO Copyright Treaty (WCT), collectively known as the WIPO Internet Treaties. These treaties, which were completed in 1996 and entered into force in 2002, have raised the standard of copyright protection around the world, particularly with regard to online delivery of copyrighted content. The treaties, which provide for certain exclusive rights, require parties to provide adequate legal protection and effective legal remedies against the circumvention of technological protection measures (TPMs), as well as certain acts affecting rights management information (RMI).

The United States will continue to work with its trading partners to further enhance IP protection and enforcement during the coming year.

### B. Illustrative Best Intellectual Property Practices by Trading Partners

The Office of the United States Trade Representative (USTR) highlights the following illustrative best practices by trading partners in the area of intellectual property (IP) protection and enforcement. Although these best practices are positive examples of IP protection and enforcement, the adoption of best practices in some areas is not an indicator that a country provides adequate levels of IP protection and enforcement in all areas.

- Cooperation and coordination among national government agencies involved in IP issues are examples of effective IP enforcement. Several countries, including the United States, have introduced IP enforcement coordination mechanisms or agreements to enhance interagency cooperation. In January 2025, the **Thailand** Ministry of Commerce, through its Department of Foreign Trade, Department of Business Development, and Department of Intellectual Property, announced a joint initiative with sixteen government agencies and various e-commerce platforms to combat the sale of substandard and counterfeit goods, which includes facilitating more effective identification and prosecution of entities engaged in the sale of such goods. The **Dominican Republic** Interministerial Council of Intellectual Property continued its work coordinating the agencies involved in IP protection and enforcement to advance cooperation and information sharing and published its second annual report in February 2025. In November 2025, the **United Arab Emirates** hosted the 14th Regional Summit to Combat Rising Global IP Crimes, organized by the Emirates Intellectual Property Association and INTERPOL. The event promoted information exchange among agencies and highlighted future capabilities in tackling IP crimes. In **Taiwan,** the High Prosecutors Office convened a third Consultative Meeting on Countermeasures for Online Copyright Infringement Disputes in December 2025, which brought together the National Communications Commission, the Digital Development Ministry, the Taiwan Intellectual Property Office, the Customs Administration of the Ministry of Finance, and other agencies to conduct a review of the current legal and regulatory framework.

- Specialized IP enforcement units and specialized IP courts also have proven to be important catalysts in the fight against counterfeiting and piracy. For example, in March 2024, the **Philippines** launched a new e-Commerce Bureau under the Department of Trade and Industry to support regulatory oversight of e-commerce transactions, which includes protecting against the sale of counterfeit goods online, and the e-Commerce Bureau is finalizing a Memorandum of Understanding with the Intellectual Property Office of the Philippines in 2026. In **Pakistan**, seven IP Tribunals are functional, with additional IP Tribunals planned for other major cities.

- Many trading partners conducted IP awareness and educational campaigns, including jointly with stakeholders, to develop support for domestic IP initiatives. **South Africa** increased its youth outreach and awareness by hosting the 17th session of the WIPO-South Africa Summer School as well as hosting the inaugural IP Youth Awards Gala, both of which highlight the importance of IP education and protection and provide opportunities for students and young professionals to acquire deeper IP knowledge. In December 2025, Dubai Customs organized a series of IP awareness workshops in Dubai that discussed the harmful impact of counterfeit products on public health, consumer safety, and the wider **United Arab Emirates** economy. In **Thailand**, the Department of Intellectual Property launched "Do Not Buy, Do Not Use, Do Not Support Infringing Goods" campaigns at physical markets in February and March 2025, to raise awareness of the legal consequences and commercial risks of counterfeit goods. In the **Philippines**, the Intellectual Property Office of the Philippines promoted a "Pirated Inferno" comic through its seminars and visits to local governments, higher education institutions, and non-government organizations.

- Another best practice is the active participation of government officials in technical assistance and capacity building. In August 2025, the Department of Justice's International Computer Hacking and Intellectual Property (ICHIP) program in partnership with Department of Homeland Security (DHS) Homeland Security Investigations convened an operational in-person event in **Argentina** on targeting Internet Protocol television (IPTV) services, which included 12 participants from **Argentina**, **Ecuador**, and **Colombia**. The agenda combined intensive case presentations with facilitated intelligence sharing and targeted sessions on financial, technical and legal issues.

- The Intellectual Property Office of the **Philippines** conducted a National Judicial Colloquium on Intellectual Property Adjudication, which included participation from judges from the Special Commercial Courts. In **Thailand**, the Department of Intellectual Property organized workshops for law enforcement officers that included trainings on how to examine counterfeit goods. In April 2025, the United States Patent and Trademark Office, in partnership with the International Association for the Protection of Intellectual Property (AIPPI) India, co-hosted a two-day Symposium on Standard Essential Patent (SEP) Policy and Practices in **India**, joined by relevant stakeholders, members of the Indian judiciary, the head of India's IP Office and other India senior officials. In **Bulgaria**, police, prosecutors, and customs officials continued taking part in capacity building efforts hosted by the Department of Justice's ICHIP program, including participating in a September 2025 workshop on improving container security to combat the illegal flow of counterfeit

goods. In December 2025, **Morocco** partnered with the World Intellectual Property Organization (WIPO) Advisory Committee on Enforcement, National Institute of Industrial Property (INPI) of France, the International Criminal Police Organization (INTERPOL), and right holders to hold Rabat-based training on digital piracy investigative techniques and coordination.

- Micro, small, and medium-sized enterprises (MSMEs) play a positive role in the global economy as they contribute widely to innovation, trade, growth, investment, and competition. According to a study by the European Patent Office (EPO) and the European Union Intellectual Property Office (EUIPO) in 2019, small and medium-sized enterprises (SMEs) that have at least one IP right are 21% more likely to experience a growth period.[11] Many trading partners provide capacity building, technical assistance, or other resources to help MSMEs better understand IP and how to protect and enforce their IP. For example, in **Türkiye**, the IP agency TÜRKPATENT organized several workshops with Turkish SMEs to promote including IP in their business plans and better recognizing the strategic value of IP. **Chile** has developed initiatives related to IP toolkits and mentoring for SMEs.

### C. Multilateral Initiatives

The United States works to promote adequate and effective intellectual property (IP) protection and enforcement through various multilateral institutions, notably the **World Trade Organization** (WTO). These efforts are critical, as stakeholders have raised concerns regarding the use of multilateral institutions to undermine IP rights by some member countries.

In 2025, the United States advanced its Intellectual Property and Innovation agenda in the WTO Council for Trade-Related Aspects of Intellectual Property Rights (TRIPS Council) through an initiative by the Friends of IP and Innovation (FOII) Group within the TRIPS Council that highlighted examples of the voluntary transfer of patent-protected or trade secret technology. Over the course of three meetings, the United States and FOII co-sponsors showcased case studies of successful voluntary technology transfer, reflected on "lessons learned" from those studies, and organized a side event on technology transfer partnerships. The discussions illustrated how IP protection facilitates successful technology transfer and showcased real-world examples of such voluntary transfer of technology from developed to developing and least-developed countries.

### D. Bilateral and Regional Initiatives

The United States works with many trading partners on intellectual property (IP) protection and enforcement through the provisions of bilateral instruments, including trade agreements and memoranda of cooperation, and through regional initiatives.

The following are examples of bilateral coordination and cooperation:

- Over the course of the year, the United States engaged in negotiations with trading partners to establish Agreements on Reciprocal Trade (ART) or similar agreements that address the

---

[11] *See* EPO/EUIPO, *High-growth Firms and Intellectual Property Rights: IPR Profile of High-potential SMEs in Europe* (May 2019), https://link.epo.org/web/high_growth_firms_study_en.pdf.

multitude of tariff and non-tariff foreign trade barriers that contribute to the U.S. trade deficit. The ART program has produced new broad-ranging commitments on market access, national and economic security, and important trade standards, including for IP. The United States has completed ARTs with **Argentina**, **Bangladesh**, **Cambodia**, **Ecuador**, **El Salvador**, **Guatemala**, **Indonesia**, **Malaysia**, and **Taiwan**. These agreements include key commitments that will benefit American innovators and creators by enhancing IP protection and prioritizing enforcement against IP theft. USTR is continuing to negotiate with a number of trading partners, including the **European Union**, **India**, **North Macedonia**, **Pakistan**, **Sri Lanka**, **Switzerland** and **Liechtenstein**, **Thailand**, the **United Kingdom**, and **Vietnam**.

Regional coordination and cooperation also increase the effectiveness of engagement on IP protection and enforcement challenges that extend beyond individual jurisdictions:

- In 2025, the United States continued to use the Intellectual Property Experts Group (IPEG) and other **Asia-Pacific Economic Cooperation** (APEC) sub-fora to build capacity and raise standards for the protection of IP rights in the Asia-Pacific region. This included continued discussions with APEC economies on effective practices for enforcement against illicit streaming in a United States-led initiative on illicit streaming, which previously included the joint publication of the *Report on Results of Survey Questionnaire on Domestic Treatment of Illicit Streaming Devices (ISDs) by APEC Economies* and a virtual workshop. The United States also organized workshops on the margins of the IPEG Meeting. In February 2025, the United States organized the second part of a two-part workshop on "Enhancing Innovation with More Efficient Patent Systems: Tools, Resources, and Worksharing." The workshop highlighted the benefits of leveraging the work products of other offices, such as to reduce patent application backlogs, increase patent quality, reduce costs, and reduce time to obtaining patents. The workshop also discussed tools for identifying prior art, formal worksharing arrangements between IP offices, and different worksharing case studies, using actual and hypothetical patent applications. The United States organized a workshop on "Enforcement Against Illicit Streaming: Approaches and Strategies" on the margins of the IPEG meeting in August 2025. A prominent theme was the importance of collaboration among law enforcement agencies and right holders in order to combat illicit streaming and illicit streaming devices. The need for collaboration and to pursue multiple options for enforcement was discussed by representatives from various APEC governments, including law enforcement agencies, a prosecutor, a police investigator, Department of Homeland Security (DHS) Homeland Security Investigations, U.S. Customs and Border Protection, Department of Justice's International Computer Hacking and Intellectual Property (ICHIP) program, and the International Criminal Police Organization (INTERPOL). Representatives from the private sector discussed strategies to develop legal precedents, pursue deterrent penalties, and deploy new technologies against bad actors. The workshop also featured government representatives who presented on the legal systems, enforcement activities, and challenges with respect to illicit streaming in various APEC economies.

- Under its trade preference program reviews, the Office of the United States Trade Representative (USTR), in coordination with other U.S. Government agencies, examines

IP practices in connection with the implementation of Congressionally authorized trade preference programs, including the African Growth and Opportunity Act, the Caribbean Basin Economic Recovery Act, and the Caribbean Basin Trade Partnership Act. USTR continues to work with trading partners to address policies and practices that may adversely affect their eligibility under the IP criteria of preference programs.

In addition to the work described above, the United States anticipates engaging with its trading partners on IP-related initiatives in fora such as the **Group of Seven** (G7), the **World Intellectual Property Organization** (WIPO), the **Organisation for Economic Co-operation and Development** (OECD), and the **World Customs Organization**. USTR, in coordination with other U.S. Government agencies, looks forward to continuing engagement with trading partners to improve the global IP environment.

## E. Intellectual Property Protection, Enforcement, and Related Market Access Challenges

### *Border, Criminal, and Online Enforcement Against Counterfeiting*

Trademark counterfeiting harms consumers, legitimate producers, and governments. Consumers may be harmed by fraudulent and potentially dangerous counterfeit products,[12] particularly medicines, automotive and airplane parts, and food and beverages that may not be subject to the rigorous good manufacturing practices used for legitimate products. Infringers often disregard product quality and performance for higher profit margins. Legitimate producers and their employees face diminished revenue and investment incentives, adverse employment impacts, and reputational damage when consumers purchase fake products. Counterfeiting may also increase costs for firms to enforce their intellectual property (IP) rights. Governments lose the tax revenues generated by legitimate businesses and may find it more difficult to attract investment when illegal competitors undermine their respective markets. For a further discussion on the potential health and safety risks posed by counterfeit goods, please see the Issue Focus section of the *2023 Review of Notorious Markets for Counterfeiting and Piracy (Notorious Markets List)*.

The problem of trademark counterfeiting continues on a global scale and involves the production, transshipment, and sale of a vast array of fake goods. Counterfeit goods, including semiconductors and other electronics, chemicals, medicines, automotive and aircraft parts, food and beverages, household consumer products, personal care products, apparel and footwear, toys, and sporting goods, make their way from **China**[13] and other source countries, such as **India**, **South Korea**, and **Türkiye**, directly to purchasers around the world. As more brands have shifted production from China to Southeast Asia, countries such as **Vietnam** have become more prominent as manufacturers of counterfeit products.

---

[12] *See* Organisation for Economic Co-operation and Development and European Union Intellectual Property Office, *Dangerous Fakes: Trade in Counterfeit Goods that Pose Health, Safety and Environmental Risks* (Mar. 2022), https://www.oecd.org/publications/dangerous-fakes-117e352b-en.htm (identifying types of potentially dangerous counterfeit products, associated health and safety risks, and global trade statistics from 2017 to 2019 for these products).

[13] In fiscal year 2024, China (including Hong Kong) accounted for over 93% of the value (measured by manufacturers' suggested retail price) of counterfeit and pirated goods seized by U.S. Customs and Border Protection.
U.S. Customs and Border Protection, *Intellectual Property Rights (IPR) Seizures Dashboard*, (Apr. 1, 2025), https://www.cbp.gov/newsroom/stats/intellectual-property-rights-ipr-seizures.

The counterfeits are shipped either directly to purchasers or indirectly through transit hubs, including in **Chile**, **Hong Kong**, **Kyrgyz Republic**, **Peru**, **Singapore**, **Türkiye**, and the **United Arab Emirates** to third-country markets such as **Brazil**, **Kenya**, **Mexico**, **Nigeria**, **Paraguay**, and **Russia**, that are reported to have ineffective or inadequate IP enforcement systems.

According to an Organisation for Economic Co-operation and Development (OECD) and European Union Intellectual Property Office (EUIPO) study released in May 2025, titled *Mapping Global Trade in Fakes 2025: Global Trends and Enforcement Challenges*, the global trade in counterfeit and pirated goods reached $467 billion in 2021, accounting for 2.3% of total global imports.[14] The report identified **Bangladesh** as one of the top five source economies for counterfeit clothing globally.[15] In Fiscal Year 2025, **China** and **Hong Kong**, together, accounted for over 87% of the value measured by manufacturers' suggested retail price of counterfeit and pirated goods seized by U.S. Customs and Border Protection.[16] Stakeholders also continue to report dissatisfaction with border enforcement in **Singapore**, including concerns about the lack of coordination between Singapore Customs and the Singapore Police Force's Intellectual Property Rights Branch.

The manufacturing and distribution of pharmaceutical products and active pharmaceutical ingredients bearing counterfeit trademarks is a growing problem that has important consequences for consumer health and safety and is exacerbated by the rapid growth of illegitimate online sales. Counterfeiting contributes to the proliferation of substandard, unsafe medicines that do not conform to established quality standards. The United States is particularly concerned with the proliferation of counterfeit pharmaceuticals that are manufactured, sold, and distributed by numerous trading partners. The top countries of origin for counterfeit pharmaceuticals seized at the U.S. border in Fiscal Year 2025 were **India**, **China**, including **Hong Kong**, the **United Arab Emirates**, and the **Dominican Republic**.[17] A 2020 study by OECD and EUIPO found that **China**, **India**, **Indonesia**, **Pakistan**, the **Philippines**, and **Vietnam** are the leading sources of counterfeit medicines distributed globally.[18] U.S. brands are the most popular targets for counterfeiters of medical products, and counterfeit U.S.-brand medicines account for 38% of global counterfeit medicine seizures.[19] Studies show that somewhere between 9% and 41% of medicines sold in low- and middle-income countries are counterfeit.[20] Furthermore, the increasing popularity of online pharmacies[21] has aided the distribution of counterfeit medicines. A 2020 study by

---

[14] OECD/EUIPO, *Mapping Global Trade in Fakes 2025: Global Trends and Enforcement Challenges*, at 8 (May 2025), https://www.oecd.org/en/publications/mapping-global-trade-in-fakes-2025_94d3b29f-en.html.
[15] OECED/EUIPO, *Mapping Global Trade in Fakes 2025: Global Trends and Enforcement Challenges*, at 26.
[16] U.S. Customs and Border Protection, *Intellectual Property Rights (IPR) Seizures Dashboard*, (Apr. 1, 2026), https://www.cbp.gov/document/annual-report/fy-2024-ipr-seizure-statistics.
[17] U.S. Customs and Border Protection, *Intellectual Property Rights (IPR) Seizures Dashboard*, (Apr. 1, 2026), https://www.cbp.gov/newsroom/stats/intellectual-property-rights-ipr-seizures.
[18] OECD/EUIPO, *Trade in Counterfeit Pharmaceutical Products* at 35 (Mar. 2020), http://www.oecd.org/gov/trade-in-counterfeit-pharmaceutical-products-a7c7e054-en.htm.
[19] *Id*. at 12.
[20] *See* U.S. Centers for Disease Control and Prevention (CDC), *Counterfeit Medicines* (last updated October 2022), https://wwwnc.cdc.gov/travel/page/counterfeit-medicine
[21] *See* Alliance for Safe Online Pharmacies (ASOP Global) / Abacus Data, *2020 National Survey on American Perceptions of Online Pharmacies* (Oct. 2020), https://asopfoundation.pharmacy/wp-

Pennsylvania State University found that illicit online pharmacies, which provide access to substandard or counterfeit drugs, represent between 67% to 75% of web-based drug merchants.[22] The U.S. Government supports programs in sub-Saharan Africa, Asia, and elsewhere that assist trading partners in protecting the public against counterfeit and substandard medicines in their markets. For a further discussion on illicit online pharmacies and the risks and growing availability of counterfeit medicines, please see the Issue Focus section of the *2024 Review of Notorious Markets for Counterfeiting and Piracy (Notorious Markets List)*.

Counterfeiters increasingly use legitimate express mail, international courier, and postal services to ship counterfeit goods in small consignments rather than ocean-going cargo to evade the efforts of enforcement officials to interdict these goods. Approximately 90% of U.S. seizures at the border are made in the express carrier and international mail environments. Counterfeiters also continue to ship products separately from counterfeit labels and packaging to evade enforcement efforts.[23]

Counterfeiters also increasingly sell counterfeit goods on online marketplaces, particularly through platforms that permit consumer-to-consumer sales. The Office of the United States Trade Representative (USTR) urges e-commerce platforms to take proactive and effective steps to reduce piracy and counterfeiting, for example, by establishing and adhering to strong quality control procedures in both direct-to-consumer and consumer-to-consumer sales, vetting third-party sellers, engaging with right holders to quickly address complaints, and working with law enforcement to identify IP violators.[24]

The United States continues to urge trading partners to undertake more effective criminal and border enforcement against the manufacture, import, export, transit, and distribution of counterfeit goods. The United States engages with its trading partners through bilateral consultations, trade agreements, and international organizations to help ensure that penalties, such as significant monetary fines and meaningful sentences of imprisonment, are available and applied to deter counterfeiting. In addition, trading partners should ensure that competent authorities seize and destroy counterfeit goods, as well as the materials and implements used for their production, thereby removing them from the channels of commerce. Permitting counterfeit goods, as well as materials and implements, to re-enter the channels of commerce after an enforcement action wastes resources and compromises the global enforcement effort.

In addition, trading partners should provide enforcement officials with *ex officio* authority to suspend release of suspect goods and to seize and destroy counterfeit goods as part of their criminal

---

content/uploads/2021/07/Survey-Key-Findings_October-2020.pdf (based on a July 2020 poll of 1500 American consumers, "35% of Americans have now reported using an online pharmacy to buy medication for themselves or someone in their care" with "31% [doing] so for the first time this year because of the pandemic").

[22] Journal of Medical Internet Research, *Managing Illicit Online Pharmacies: Web Analytics and Predictive Models Study* (Aug. 2020), https://www.jmir.org/2020/8/e17239/; *cf.* ASOP Global / Abacus Data, *infra* ("At any given time, there are 35,000 active online pharmacies operating worldwide, 96% of which are operating illegally in violation of state and/or federal law and relevant pharmacy practice standards."); FDA, *Internet Pharmacy Warning Letters* (Mar. 2021), https://www.fda.gov/drugs/drug-supply-chain-integrity/internet-pharmacy-warning-letters (listing illegally operating online pharmacies that have been sent warning letters by the FDA).

[23] For more information on these trends, see CBP's intellectual property rights seizure statistics at https://www.cbp.gov/trade/priority-issues/ipr.

[24] For more examples, see DHS, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 2020), https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf.

procedures and at the border during import, export, or in-transit movement without the need for a formal complaint from a right holder. For example, regarding criminal enforcement, **Türkiye** provides its customs officials with *ex officio* authority to seize infringing goods at the border, but its National Police lack such clear abilities. **Pakistan** has not provided criminal enforcement authorities *ex officio* authority to take action against counterfeit goods. Regarding border enforcement, in **Colombia**, for example, the customs police reportedly do not have authority to enter primary inspection zones and lack *ex officio* authority to inspect, seize, and destroy counterfeit goods in those zones. Similarly, in **Ecuador**, stakeholders have reported concerns with a lack of *ex officio* authority. Although **Indonesia** provides *ex officio* authority for its customs authorities and has a recordation system, right holders can only benefit from the system if they meet several stringent requirements, including local permanent establishment requirements and large deposit requirements. Similarly, border authorities in **Canada** have *ex officio* authority to seize suspected counterfeit goods, but they do not consistently use this authority. **Turkmenistan** also lacks *ex officio* authority for border enforcement. In **Mexico**, its National Customs Agency (ANAM) does not have *ex officio* authority to seize products that are suspected as being counterfeit, and they must instead wait for a right holder to file a complaint with Mexico's Institute of Industrial Property (IMPI) or the Attorney General's Office of Mexico who then decides whether or not to take action and notify ANAM.

The United States coordinates with and supports trading partners through technical assistance and sharing of best practices on criminal and border enforcement, including with respect to the destruction of seized goods (see ANNEX 2).

As supply chains have grown more complicated, such increased segmentation has provided more opportunities for counterfeit goods to enter into the sourcing, production, manufacturing, packaging, and distribution process. This practice can taint the supply chain for goods in all countries, harm consumers, and create reputational risk for companies. Countries must work together to detect and deter commerce in counterfeit goods. To this end, the United States strongly supports continued work in the OECD and elsewhere on countering illicit trade. For example, the OECD adopted recommendations for enhancing transparency and reducing opportunities for illicit trade in free trade zones (also known as foreign-trade zones or FTZs).[25] The United States encourages the OECD and our trading partners to build off the *Governance Frameworks to Counter Illicit Trade* OECD report[26] and the International Chamber of Commerce (ICC) *Know Your Customer* initiative[27] aimed at tackling the problem of counterfeit goods transported by international shipping companies. The United States commends these efforts by the OECD and the ICC.

---

[25] OECD, *Recommendation of the Council on Countering Illicit Trade: Enhancing Transparency in Free Trade Zones* (Oct. 2019), https://legalinstruments.oecd.org/en/instruments/OECD-LEGAL-0454.

[26] OECD, *Governance Frameworks to Counter Illicit Trade* (Mar. 2018), https://www.oecd.org/en/publications/governance-frameworks-to-counter-illicit-trade_9789264291652-en.html.

[27] International Chamber of Commerce, *Know Your Customer* (Sept. 2018), https://iccwbo.org/news-publications/arbitration-adr-rules-and-tools/know-your-customer-due-diligence-and-maritime-supply-chain-integrity.

***Online Piracy and Broadcast Piracy***

The increased availability of broadband Internet connections around the world, combined with increasingly accessible and sophisticated mobile technology, has led to the development of legitimate digital platforms for distribution of copyrighted content. This development in turn has allowed consumers around the world to enjoy the latest movies, television, music, books, and other copyrighted content from the United States.

However, technological developments have also made the Internet an extremely efficient vehicle for disseminating pirated content that competes unfairly with legitimate e-commerce and distribution services that copyright holders and online platforms use to deliver licensed content. Online piracy is the most challenging copyright enforcement issue in many foreign markets. For example, during the review period, countries such as **Argentina**, **Canada**, **Chile**, **China**, **Colombia**, **Ecuador**, **Guatemala**, **India**, **Mexico**, **Pakistan**, **Poland**, **Russia**, **Switzerland**, **Thailand**, and **Vietnam** had high levels of online piracy and lacked effective enforcement. A June 2019 report, titled *Impacts of Digital Video Piracy on the U.S. Economy*, estimated that global online video piracy costs the U.S. economy at least $29.2 billion and as much as $71 billion in lost revenue each year.[28]

Stream-ripping software can be used to create infringing copies of copyrighted works from licensed streaming sites, and stream-ripping is now a dominant method of music piracy, causing substantial economic harm to music creators and undermining legitimate online services. During the review period, stream-ripping was reportedly popular in countries such as **Canada**, **Chile**, **India**, **Mexico**, **Nigeria**, **Russia**, and **Switzerland**.

Furthermore, illicit streaming devices (ISDs), also referred to as piracy devices, continue to pose a direct threat to content creators, sports leagues, and live performances, as well as legitimate streaming, on-demand, and over-the-top media service providers. Similarly, illicit Internet Protocol television (IPTV) services unlawfully retransmit telecommunications signals and channels containing copyrighted content through dedicated web portals and third-party applications. Today, there are many illegal IPTV services worldwide, many of which are subscription-based, for-profit services with vast and complex technical infrastructures. Stakeholders continue to report notable levels of piracy through ISDs and illicit IPTV apps, including in **Algeria**, **Argentina**, **Brazil**, **Canada**, **Chile**, **China**, **Guatemala**, **Hong Kong**, **India**, **Indonesia**, **Iraq**, **Mexico**, **Morocco**, **Singapore**, **Switzerland**, **Taiwan**, **Thailand**, and **Vietnam**. China, in particular, is a manufacturing hub for these devices.

Signal theft by cable operators continues to be a problem. In most cases, infringers circumvent encryption systems or otherwise unlawfully access cable or satellite signals to access copyrighted content. Unauthorized distributors may also steal "overspill" broadcast or satellite signals from

---

[28] Blackburn, David et al, *Impacts of Digital Video Piracy on the U.S. Economy* at Foreword, ii (Jun. 2019), https://www.project-scope.org/wp-content/uploads/2020/08/digital-video-piracy.pdf. *See also* Danaher, Brett et al, *Piracy Landscape Study: Analysis of Existing and Emerging Research Relevant to Intellectual Property Rights (IPR) Enforcement of Commercial-Scale Piracy*, USPTO Economic Working Paper No. 2020-2 (Apr. 2020) (evaluating peer-reviewed studies addressing the scope and magnitude of economic harm from piracy, particularly via digital channels, across music and books as well as movies and television), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3577670.

neighboring countries, access broadcast signals, or otherwise hack set-top boxes to allow consumers unauthorized access to copyrighted content, including premium cable channels. Hotels remain common sites of this type of infringement as they may use their own on-site facilities to intercept programing services and retransmit them throughout the hotel without paying right holders. For example, in **Brazil**, signal theft is used as a source of premium live content. Similarly, **Argentina**'s law enforcement authorities do not prioritize prosecuting theft of pay-tv signals. There are also ongoing concerns that a major cable provider in the country is offering unlicensed programming, is using that pirated content to expand its market share, and is now moving to illegal streaming as well.

The proliferation of "camcords" continues to be a significant trade problem. Unauthorized camcording is the primary source of infringing copies found online of newly released movies. The recordings made in movie theaters today are very different from those by a single person sitting in a theater with a bulky videotape recorder. The results are not shaky, inaudible recordings. It is now easy for a surreptitious recording in a movie theater to result in a clean digital copy of a movie with perfect audio that can be quickly distributed online. The pirated version of the newly released movie may be available online while it is still showing in theaters. The economic damage is magnified because movies may be released in different markets at different times. Thus, a camcord of a movie released in one market can be made available unlawfully in another market before the movie enters the theaters there. In addition to theater owners who lose revenue, legitimate digital platforms, which often negotiate for a certain period of exclusivity after the theatrical run, cannot fairly compete in the market due to unauthorized camcording.

Stakeholders continue to report serious concerns regarding unauthorized camcords. For example, in **Russia**, stakeholders continue to report significant levels of camcording. The withdrawal of major U.S. right holders from the market due to the war in Ukraine has only exacerbated the issue. **China** remains a notable source of unauthorized camcords, including live streams of theatrical broadcasts online. China has taken some enforcement actions in recent years but still lacks a specific criminal law to address the issue. Additionally, stakeholders report that unauthorized camcords originating from **India** continue to be a concern.

Countries also need to update legal frameworks to effectively deter unauthorized camcording and keep up with changing practices. For example, the requirement in some countries that a law enforcement officer must observe a person camcording and then prove that the person is circulating the unlawfully recorded movie before intervening often precludes effective enforcement. Countries like **Argentina**, **Brazil**, **Ecuador**, and **Russia** do not effectively criminalize unauthorized camcording in theaters. The United States urges countries to adopt laws and enforcement practices designed to prevent unauthorized camcording, such as laws that have been adopted in **Canada**, **Japan**, **Peru**, the **Philippines**, and **Ukraine**. The Asia-Pacific Economic Cooperation (APEC) has also issued a report titled *Effective Practices for Addressing Unauthorized Camcording*.[29] As the practice of camcording evolves, so too must methods for detecting and preventing camcording. One best practice to supplement, but not replace, such effective legal measures is building public awareness. Another important practice is for the private

[29] APEC, *Effective Practices for Addressing Unauthorized Camcording* (Nov. 11, 2011), https://www.apec.org/docs/default-source/groups/ip/11_amm_014app05.doc.

sector to work on capacity building to help theater managers and employees detect camcording and assist law enforcement.

In addition to the distribution of copies of newly released movies resulting from unauthorized camcording, other examples of online piracy that damage legitimate trade are found in virtually every country listed in the Special 301 Report and include: the unauthorized retransmission of live sports programming online; the unauthorized cloning of cloud-based entertainment software through reverse engineering or hacking onto servers that allow users to play pirated content online, including pirated online games; and the online distribution of software and devices that allow for the circumvention of technological protection measures, including game copiers and mod chips that allow users to play pirated games on physical consoles. Piracy facilitated by online services presents unique enforcement challenges for right holders in countries where copyright laws have not been able to adapt or keep pace with these innovations in piracy.

The availability of recourse to right holders, enforcement procedures, and remedies are critical components of the online ecosystem. For all the above reasons, governments should avoid creating a domestic environment that offers a safe haven for online and broadcast piracy.

***Pharmaceutical and Medical Device Innovation and Market Access***

In order to promote affordable health care for American patients today and innovation to preserve access to the cutting-edge treatments and cures that they deserve tomorrow, USTR has been engaging with trading partners to ensure that U.S. owners of IP have a full and fair opportunity to use and profit from their IP, including by promoting transparent and fair pricing and reimbursement systems. USTR has sought to: (1) ensure robust IP systems; and (2) address any act, policy, or practice that may be unreasonable or discriminatory and that has the effect of forcing American patients to pay for a disproportionate amount of global pharmaceutical research and development, including by suppressing the prices of pharmaceutical products below fair market value in foreign countries.

Among other examples, USTR engagement in the past year included:

- Pursuant to the Executive Order titled *Delivering Most-Favored-Nation Prescription Drug Pricing to American Patients*, published a Federal Register Notice inviting comments from interested parties on acts, policies, or practices by foreign countries that have the effect of forcing American patients to pay for a disproportionate amount of global pharmaceutical research and development;

- Monitored and enforced **China**'s commitments with respect to: (1) a mechanism for the early resolution of potential pharmaceutical patent disputes, including a cause of action to allow a patent holder to seek expeditious remedies before the marketing of an allegedly infringing product; and (2) patent term extensions to compensate for unreasonable patent office and marketing approval delays that cut into the effective patent term;

- Monitored and enforced the implementation of **Canada** and **Mexico**'s IP commitments in the United States-Mexico-Canada Agreement (USMCA), which are important to incentivizing innovation;

- Engaged with **Japan** on the importance of providing regular and sufficient opportunities for the private sector to provide public comments concerning Japan's medical pricing and reimbursement rules.

This year's Report continues to highlight concerns regarding IP protection and enforcement and market access barriers affecting U.S. entities that rely on IP protection, including those in the pharmaceutical and medical device industries.

For example, actions by trading partners to unfairly issue, threaten to issue, or encourage others to issue compulsory licenses raise serious concerns. Such actions can undermine a patent holder's IP, reduce incentives to invest in research and development for new treatments and cures, unfairly shift the burden for funding such research and development to American patients and those in other markets that properly respect IP, and discourage the introduction of important new medicines into affected markets. To maintain the integrity and predictability of IP systems, governments should use compulsory licenses only in extremely limited circumstances and after making every effort to obtain authorization from the patent owner on reasonable commercial terms and conditions. Such licenses should not be used as a tool to implement industrial policy, including by providing advantages to domestic companies, or as undue leverage in pricing negotiations between governments and right holders. It is also critical that foreign governments ensure transparency and due process in any actions related to compulsory licenses. The United States will continue to monitor developments and to engage, as appropriate, with trading partners, including **Colombia**, **India**, **Indonesia**, **Russia**, and **Türkiye**.

Also, measures that are discriminatory, non-transparent, or otherwise trade-restrictive have the potential to hinder market access in the pharmaceutical and medical device sectors, and potentially result in higher product costs. For example, according to an October 2021 Geneva Network report titled *How Tariffs Impact Access to Medicines*, low and middle-income countries maintain the highest tariffs on medicines and pharmaceutical inputs among the World Trade Organization (WTO) Members identified in the report.[30] The report notes that, in particular, large developing countries such as **Brazil**, **India**, and **Indonesia** have the highest tariffs for such products. Also, in Brazil, combined federal and state taxes account for 31% of the cost of medicines.[31]

Moreover, unreasonable regulatory approval delays and non-transparent reimbursement policies also can impede a company's ability to enter the market, and thereby discourage the development and marketing of new drugs and other medical products. The criteria, rationale, and operation of such measures are often non-transparent or not sufficiently disclosed to pharmaceutical and medical device companies seeking to market their products. By contrast, a number of countries have policies in place that speed up regulatory approvals for pharmaceutical products and reduce the complexity and administrative cost of the approval process, which can increase market access.

---

[30] Geneva Network, *How Tariffs Impact Access to Medicines* (Oct. 2021), https://geneva-network.com/research/how-tariffs-impact-access-to-medicines/.
[31] IQVIA, *Market Prognosis Country Report: Brazil* (2021).

For example, "regulatory reliance" approaches, such as the one implemented by **Egypt**, take into account and give significant weight to assessments performed by other stringent health regulatory authorities or trusted institutions. The United States encourages trading partners to provide appropriate mechanisms for transparency, procedural and due process protections, and opportunities for public engagement in the context of their relevant health care systems.

In addition, as noted in the Executive Order titled *Delivering Most-Favored-Nation Prescription Drug Pricing to American Patients*, pricing and reimbursement systems in foreign markets that do not appropriately recognize the value of innovative medicines and medical devices present significant concerns. Such systems do not contribute fairly to research and development for innovative treatments and cures and undermine incentives for innovation in the health care sector. U.S. pharmaceutical stakeholders have expressed concerns about several European Union (EU) Member State policies affecting market access for pharmaceutical products and medical devices, including non-transparent procedures and a lack of meaningful stakeholder input into policies related to pricing and reimbursement. Such lack of transparency and due process creates uncertainty and unpredictability for investment in these markets and can undermine incentives to market and innovate further. These policies have been identified for several EU Member States, including **Austria**, **Belgium**, the **Czech Republic**, **France**, **Greece**, **Germany**, **Hungary**, **Ireland**, **Italy**, **Poland**, **Romania**, **Slovakia**, **Spain**, and **Sweden**. Another concerning policy is the use of "clawback" regimes, which require pharmaceutical companies to reimburse the government when drug spending exceeds a budgetary cap. Stakeholders have also expressed concerns over inconsistent and lengthy time limits for pricing and reimbursement decisions. Industry has grown increasingly concerned about policies that are being made with little opportunity for engagement.

On December 1, 2025, the United States and the **United Kingdom** announced an agreement in principle on pharmaceutical pricing. This agreement will address long-standing imbalances in U.S.–UK pharmaceutical trade and improve the overall environment for pharmaceutical companies operating in the United Kingdom. This has been a positive development and may serve as model for other trading partners.

The IP-intensive U.S. pharmaceutical and medical device industries have expressed concerns regarding the policies of several trading partners, including, **Australia**, **Brazil**, **Canada**, **China**, **Colombia**, **Japan**, **Korea**, **Mexico**, **Russia**, and **Türkiye**, on issues related to pharmaceutical innovation and market access. Examples of these concerns include the following:

- When setting prices for new innovative medicines, **Australia** reportedly uses low and outdated monetary thresholds in its valuation process, leading to artificially low prices for innovative therapies. In addition, Australia's Pharmaceutical Benefits Scheme mandates price cuts for innovative pharmaceuticals at certain intervals if no generic or biosimilar competitor enters the market. These price cuts are applied without considering inflation, production costs, or the ongoing therapeutic value of the medicine. Furthermore, Australia's Risk Share Arrangements—with expenditure caps and a clawback mechanism, requiring drug manufacturers to reimburse the government for up to 100 percent of expenditures exceeding the cap—shift financial risks to the manufacturer. Stakeholders have also continued to express concern about delays by Australia in its implementation of

the notification process as required, for example, under Article 17.10.4(b) of the United States-Australia Free Trade Agreement.

- **Canada's** Patented Medicine Prices Review Board (PMPRB), which is responsible for reviewing the prices of patented medicines and ordering reductions or refunds for prices it deems excessive, excludes the United States and Switzerland from its reference basket when analyzing comparator country pricing. U.S. industry stakeholders have raised concerns that the PMPRB's reference basket artificially devalues innovative medicines in Canada.

- In **Japan**, prices for new drugs are subject to downward pressures while in the market, including through the Ministry of Health, Labor, and Welfare's (MHLW) biennial repricing, which usually lowers listed drug prices, and off-year price revisions that effectively make the biennial repricing an annual revision. Japan further cuts drug prices through the market expansion repricing mechanism, which may unfairly reduce prices if the actual annual sales of a drug significantly exceed the estimated sales submitted to MHLW. In addition, the "huge-seller" repricing mechanism targets drugs with high sales volume that exceed certain thresholds, forcing post-hoc price cuts as high 50 percent. The U.S. pharmaceutical and medical device industry stakeholders also continue to raise serious concerns regarding the lack of transparency and predictability in government decision-making. For example, in the 2026 pricing cycle, stakeholders expressed concerns that changes to the medical device repricing rules were implemented without sufficient consultation just one month after being communicated to the industry. Stakeholders reported that there was no opportunity for public comment before Japan announced off-year drug price revisions for fiscal year 2025.

- **Korea** reduces the prices of drugs over their lifecycle through mechanisms such as actual transaction price (ATP) process and price-volume agreements (PVA). The ATP process allows Korea to reduce the listed price of a drug by up to 10 percent every two years when the actual transaction price of the drug (e.g., the price paid by hospitals or reimbursed by the national health insurance) is lower than the current listed price. Pharmaceutical companies also must enter into a PVA with the National Health Insurance Service (NHIS) for every drug, which stipulates the initial listed price and estimated sales volume. If the actual sales volume exceeds the estimate sales volume by a certain threshold, the NHIS may reduce the drug's list price. U.S. pharmaceutical companies welcomed reports in November 2025 of plans for reform, but pharmaceutical and medical device stakeholders continue raising concerns regarding limited transparency and predictability in pricing and reimbursement decisions, insufficient opportunities for early and meaningful stakeholder input, and opaque criteria for Innovative Pharmaceutical Company accreditation, through which the Ministry of Health and Welfare designates certain companies to receive tax credits, research and development support, and more favorable premiums.

The United States seeks to establish or continue dialogues with trading partners to address these and other concerns and to encourage a common understanding on questions related to innovation and pricing in the pharmaceutical and medical device sectors. The United States also looks

forward to continuing its engagement with our trading partners to promote fair and transparent policies in these sectors.

***Trade Secrets***

This year's Report continues to reflect the growing need for trading partners to provide effective protection and enforcement of trade secrets. Companies in a wide variety of industry sectors, including information and communications technology (ICT), services, environmental technologies, pharmaceuticals, medical devices, and other manufacturing sectors, rely on the ability to protect and enforce their trade secrets and rights in proprietary information. Trade secrets are particularly important to small businesses, which often rely on trade secret protection to preserve the secrecy and value of their technology. Small businesses may not have the resources to obtain and enforce patents, which require disclosure of the technology and risk infringement by others, and therefore rely on the protection of trade secrets for their proprietary technology. Trade secrets, such as business plans, internal market analyses, manufacturing methods, customer lists, and recipes, are often among a company's core business assets. A company's competitiveness may depend on its capacity to protect such assets. Trade secret theft threatens to diminish U.S. competitiveness around the globe and puts U.S. jobs at risk. The reach of trade secret theft into critical commercial and defense technologies poses threats to U.S. national security interests as well.

Various sources, including the National Counterintelligence and Security Center (NCSC), have reported specific gaps in trade secret protection and enforcement, particularly in **China** and **Russia**.[32] Theft may arise in a variety of circumstances, including those involving departing employees taking portable storage devices containing trade secrets, failed joint ventures, cyber intrusion and hacking, and misuse of information submitted by trade secret owners to government entities for purposes of complying with regulatory obligations. In practice, effective remedies appear to be difficult to obtain in a number of countries, including in **China**, **India**, and **Russia**. Lack of legal certainty regarding trade secrets also dissuades companies from entering into partnerships or expanding their business activities in these and other countries. Many countries do not provide criminal penalties for trade secret theft sufficient to deter such behavior. In some foreign countries, certain practices and policies, including evidentiary requirements in trade secrets litigation and mandatory technology transfer, put valuable trade secrets at risk of exposure. Certain data governance regimes (whether proposed or implemented) also raise concerns for intellectual property protection in general and trade secret protection of proprietary data in particular. The United States continues to monitor this trend and its impact on incentivizing innovation and market access.

The United States uses all trade tools available to ensure that its trading partners provide robust protection for trade secrets and enforce trade secrets laws. Given the global nature of trade secret theft, action by our trading partners is also essential. Several trading partners have recently strengthened or have been working toward strengthening their trade secret regimes, including **Taiwan**.

---

[32] NCSC, *Foreign Economic Espionage in Cyberspace* at 5-9 (2018), https://www.dni.gov/files/NCSC/documents/news/20180724-economic-espionage-pub.pdf.

The United States-Mexico-Canada Agreement (USMCA), which entered into force in July 2020, has the most robust protection for trade secrets of any prior U.S. trade agreement. It includes a number of commitments addressing the misappropriation of trade secrets, including by state-owned enterprises: civil procedures and remedies, criminal procedures and penalties, prohibitions against impeding licensing of trade secrets, judicial procedures to prevent disclosure of trade secrets during the litigation process, and penalties for government officials for the unauthorized disclosure of trade secrets. The USMCA requires the Parties to conduct a joint review of the Agreement on July 1, 2026, where the Office of the U.S. Trade Representative (USTR) will be focused on ensuring that it remains in the interest of American workers and businesses. The United States-China Economic and Trade Agreement (Phase One Agreement), signed in January 2020, also includes several trade secret commitments to address a number of long-standing concerns in **China**, including on expanding the scope of civil liability, covering acts such as electronic intrusions as trade secret theft, shifting the burden of producing evidence, making it easier to obtain preliminary injunctions to prevent use of stolen trade secrets, allowing criminal investigations without need to show actual losses, ensuring criminal enforcement for willful misappropriation, and prohibiting unauthorized disclosure of trade secrets and confidential business information by government personnel or third-party experts. USTR has been assessing China's lack of compliance with certain commitments in the Phase One Agreement, including with respect to trade secrets, and is considering potential responses.

Action in international organizations is also crucial. For instance, the United States strongly supports continued work in the Organisation for Economic Co-operation and Development (OECD) on trade secret protection, building off two studies released by the OECD in 2014. The first study, titled *Approaches to Protection of Undisclosed Information (Trade Secrets)*,[33] surveyed legal protection for trade secrets available in a sample of countries. The second study, titled *Uncovering Trade Secrets - An Empirical Assessment of Economic Implications of Protection for Undisclosed Data*,[34] examined the protection of trade secrets for a sample of 37 countries, provided historical data for the period since 1985, and considered the relationship between the stringency of trade secret protection and relevant economic performance indicators. Also, in November 2016, the Asia-Pacific Economic Cooperation (APEC) endorsed a set of *Best Practices in Trade Secret Protection and Enforcement Against Misappropriation*,[35] which includes best practices such as: broad standing for claims for the protection of trade secrets and enforcement against trade secret theft; civil and criminal liability, as well as remedies and penalties, for trade secret theft; robust procedural measures in enforcement proceedings; and adoption of written measures that enhance protection against further disclosure when governments require the submission of trade secrets. In 2024, the World Intellectual Property Organization (WIPO) unveiled the *WIPO Guide to Trade Secrets and Innovation*, which provides a comprehensive, strategic overview of protecting confidential business information and outlines why trade secrets are essential for maintaining a

---

[33] Schultz, M. and D. Lippoldt, *Approaches to Protection of Undisclosed Information (Trade Secrets): Background Paper* (Jan. 2014), https://doi.org/10.1787/5jz9z43w0jnw-en.
[34] Lippoldt, D. and M. Schultz, *Uncovering Trade Secrets - An Empirical Assessment of Economic Implications of Protection for Undisclosed Data* (Aug. 2014), https://doi.org/10.1787/5jxzl5w3j3s6-en.
[35] *Best Practices in Trade Secret Protection and Enforcement Against Misappropriation*, https://ustr.gov/sites/default/files/11202016-US-Best-Practices-Trade-Secrets.pdf.

competitive edge, enabling secure innovation, fostering collaboration, and offering immediate, potentially indefinite protection.[36]

### ***Forced Technology Transfer, Indigenous Innovation, and Preferences for Indigenous Intellectual Property***

Right holders operating in other countries report an increasing variety of government measures, policies, and practices that require or pressure technology transfer from U.S. companies. While these measures are sometimes styled as means to incentivize domestic "indigenous innovation," in practice they disadvantage U.S. companies, conditioning market entry on surrendering their intellectual property (IP). These actions serve as market access barriers and deny U.S. companies reciprocal opportunities to access foreign markets relative to market access provided to foreign companies operating in the United States. Such government-imposed conditions or incentives for technology transfer to domestically owned companies may also introduce non-market distortions into licensing and other private business arrangements, resulting in commercially suboptimal outcomes for the firms involved and for innovation in general. Furthermore, these measures discourage foreign investment in national economies; hurt local manufacturers, distributors, and retailers; and slow the pace of innovation and economic progress. This kind of government intervention in the commercial decisions that enterprises make regarding the ownership, development, registration, or licensing of IP is not consistent with international practice and may raise concerns regarding consistency with international obligations as well.

These government measures often have a distortive effect by forcing U.S. companies to transfer their technology or other valuable commercial information to domestically owned entities. Examples of these policies include:

- Requiring the transfer of technology as a condition for obtaining investment and regulatory approvals or otherwise securing access to a market or as a condition for allowing a company to continue to do business in the market;

- Directing state-owned enterprises in innovative sectors to seek non-commercial terms from their foreign business partners, including with respect to the acquisition and use or licensing of IP;

- Providing domestically owned firms with an unfair competitive advantage by failing to effectively enforce, or discouraging the enforcement of, U.S.-owned IP, including patents, trademarks, trade secrets, and copyright;

- Failing to take meaningful measures to prevent or to deter cyber intrusions and other unauthorized activities;

- Requiring use of, or providing preferences to, products or services that contain domestically developed or owned IP, including with respect to government procurement;

---

[36] World Intellectual Property Organization (WIPO). *WIPO Guide to Trade Secrets and Innovation* (2024). Geneva: WIPO, https://www.wipo.int/web-publications/wipo-guide-to-trade-secrets-and-innovation/en/index.html.

- Manipulating the standards development process to create unfair advantages for domestically owned firms, including with respect to participation by foreign firms and the terms on which IP is licensed; and

- Requiring the submission of unnecessary or excessive confidential business information for regulatory approval purposes and failing to protect such information appropriately.

In **China**, investment and regulatory approvals, market access, government procurement, and the receipt of certain preferences or benefits may be conditioned on a firm's ability to demonstrate that IP is developed in or transferred to China, or is owned by or licensed to a Chinese party. China has made enforceable commitments to address forced technology transfer in the United States-China Economic and Trade Agreement (Phase One Agreement).

In **Indonesia**, it is reported that approvals for foreign companies to market pharmaceuticals are conditioned upon the transfer of technology to Indonesian entities or upon partial manufacture in Indonesia. In October 2024, Indonesia enacted a new *Patent Law*, which reflected amendments made through the *Omnibus Law No. 6 on Job Creation* that modified requirements for patents to be worked in Indonesia so that the requirements can be met by importation or licensing. However, the *Patent Law* includes a new requirement for patent holders to make a statement regarding the implementation of their patents at the end of each year. Although the Directorate General for Intellectual Property (DGIP) introduced an online filing system for annual statements on the implementation of patents, the *Patent Law* lacks clarity about how right holders should meet this requirement to submit annual statements and the potential penalties for non-compliance.

The United States urges that, in formulating policies to promote innovation, trading partners, including **China**, refrain from forced technology transfer and local preferences for indigenous IP and take account of the importance of voluntary commercial partnerships or arrangements on mutually agreed terms. As part of the Phase One Agreement, China agreed to provide effective access to Chinese markets without requiring or pressuring U.S. persons to transfer their technology to Chinese persons. China also made other commitments on forced technology transfer that are described in further detail in Section II of this Report.

***Geographical Indications***

The United States is working intensively through bilateral and multilateral channels to advance U.S. market access interests in foreign markets and to ensure that geographical indications (GI)-related trade initiatives of the **European Union** (EU), its Member States, like-minded countries, and international organizations do not undercut such market access. GIs typically include place names (or words associated with a place) and identify products as having a particular quality, reputation, or other characteristic essentially attributable to the geographic origin of the product. The EU GI agenda remains highly concerning because it significantly undermines protection of trademarks held by U.S. producers and imposes barriers on market access for U.S.-made goods that rely on the use of common names, such as parmesan or feta.

First, the EU GI system raises concerns regarding the extent to which it impairs the scope of trademark protection, including exclusive rights in registered trademarks that pre-date the protection of a GI. Trademarks are among the most effective ways for producers and companies, including micro, small, and medium-sized enterprises, to create value, to promote their goods and services, and to protect their brands, even with respect to food and beverage products covered by the EU GI system. Many such products are already protected by trademarks in the United States, in the EU, and around the world. Trademark systems offer strong protections through procedures that are easy to use, cost-effective, transparent, and provide due process safeguards. Trademarks also deliver high levels of consumer awareness, significant contributions to gross domestic product and employment, and accepted international systems of protection. The EU GI system undermines trademark protection and may result in consumer confusion to the extent that it permits the registration and protection of GIs that are confusingly similar to prior trademarks.

Second, the EU GI system and strategy adversely impact access for U.S. and other producers in the EU market and other markets by granting protection to terms that are considered in those markets to be the common name for products. The EU has granted GI protection to thousands of terms that now only certain EU producers can use in the EU market, and many of these producers then block the use of any term that even "evokes" a GI. However, many EU Member States, such as Denmark and France, still produce products that are claimed as GIs of other European countries, such as feta, and export these products outside of the EU using the protected GIs as the common name of the products. Furthermore, in 2017, the EU granted GI protection to the cheese name danbo, a widely traded type of cheese that is covered by an international standard under the Codex Alimentarius (Codex). Argentina, South Africa, Uruguay, and other countries produce danbo. Similarly, in 2019, the EU granted GI protection to havarti, notwithstanding the long-standing and widespread use of this term by producers around the world. Australia, New Zealand, the United States, and other countries produce havarti. Like in the case of danbo, the Codex established an international standard for havarti in 2007, premised on the fact that havarti is produced and marketed in many countries throughout the world under that name. The EU's approval of GIs for havarti and danbo undermine the Codex standards for these products, and World Trade Organization (WTO) Members have repeatedly challenged the EU to explain its treatment of Codex cheese standards at the WTO, including in the Technical Barriers to Trade Committee. Moreover, havarti is included in the EU's most favored nation tariff rate quota, indicating that havarti was expected to be produced outside of and imported into the EU. Several countries, including the United States, opposed GI protection of these common names, both during the EU's opposition period and at the WTO, but the European Commission granted the protection over that opposition and without sufficient explanation or notice to interested parties.

As part of its trade agreement negotiations, the EU pressures trading partners to prevent any producer, except from those in certain EU regions, from using certain product names, such as fontina, gorgonzola, parmesan, asiago, or feta. This is despite the fact that these terms are the common names for products produced in countries around the world. In the EU and other markets that have protected EU GIs within their own GI systems, U.S. producers and traders either are effectively blocked from those markets or must adopt burdensome workarounds. They either cannot use the descriptors at all, or anything even evoking them, in the market or at best may sell their products only as "fontina-like," "gorgonzola-kind," "asiago-style," or "imitation feta." This

is costly, unnecessary, and can reduce consumer demand for the non-EU products, as well as reduce consumer choice and cause consumer confusion.

The United States runs a significant deficit in food and agricultural trade with the EU. The EU GI system contributes to this asymmetry, which is acute in trade in agricultural products subject to the EU GI system. In the case of cheese, for example, where many EU products enjoy protection under the EU GI system, the EU exported more than $1.2 billion of cheese to the United States last year. Conversely, the United States exported only about $19.4 million of cheese to the EU last year. Based on this evidence, EU agricultural producers exporting to the United States are doing quite well, benefiting considerably from the effective U.S. system of trademark protection of GIs, despite the absence of an EU-style GI system. Unfortunately, U.S. producers, as evidenced by the deficit, are not afforded the same level of market access to the EU.

Despite these troubling aspects of its GI system, the EU continues to seek to expand its harmful GI system within its territory and beyond. Within its borders, the EU is enlarging its system beyond agricultural products and foodstuffs to encompass non-agricultural products, including apparel, ceramics, glass, handicrafts, manufactured goods, minerals, salts, stones, and textiles. The United States continues to remain concerned about certain changes to the EU's Common Agricultural Policy, adopted in November 2021 and entered into force on January 1, 2023, which would transfer much of the GI application review process to interested EU Member States and sharply reduce the period for filing a reasoned basis in support of an opposition to register a GI. As noted above, the EU has also sought to advance its agenda through trade agreements, which impose the negative impacts of the EU GI system on market access and trademark protection in third countries, including through exchanges of lists of terms that receive automatic protection as GIs without sufficient transparency or due process.

The EU has pursued its GI agenda in multilateral and plurilateral bodies as well. For example, in 2015, the EU, several EU Member States, and others expanded the World Intellectual Property Organization (WIPO) Lisbon Agreement for the Protection of Appellations of Origin and their International Registration to include GIs, thereby enshrining several detrimental aspects of EU law in that Agreement. The Geneva Act of the Lisbon Agreement that emerged from these negotiations was the product of a decision led by the EU and certain Member States to break with the long-standing WIPO practice of consensus-based decision-making and to deny the United States and 160 other WIPO countries meaningful participation rights in the negotiations. In 2020, the EU became party to the Geneva Act of the Lisbon Agreement. In other international organizations, such as the United Nations Food and Agriculture Organization, the EU has attempted to pursue its agenda by alleging a connection between GIs and unrelated issues, such as biodiversity, sustainability, and food safety.

In response to the EU's aggressive promotion of its exclusionary GI policies, the United States continues its intensive engagement in promoting and protecting access to foreign markets for U.S. exporters of products that are identified by common names or otherwise marketed under previously registered trademarks. The United States is advancing these objectives through its trade agreements, as well as in international fora, including in the Asia-Pacific Economic Cooperation (APEC), WIPO, and the WTO. In addition to these negotiations, the United States is engaging bilaterally to address concerns resulting from the GI provisions in existing EU trade agreements,

agreements under negotiation, and other initiatives, including with **Argentina**, **Bangladesh**, **Brazil**, **Cambodia**, **Canada**, **Chile**, **China**, **Ecuador**, **El Salvador**, **Guatemala**, **Indonesia**, **Japan**, **Kenya**, **Korea**, **Malaysia**, **Mexico**, **Pakistan**, **Paraguay**, the **Philippines**, **Singapore**, **Sri Lanka**, **Taiwan**, **Thailand**, **Uruguay**, and **Vietnam**, among others. U.S. goals in this regard include:

- Ensuring that the grant of GI protection does not violate prior rights (for example, in cases in which a U.S. company has a trademark that includes a place name);
- Ensuring that the grant of GI protection does not deprive interested parties of the ability to use common names, such as parmesan or feta;
- Ensuring that interested persons have notice of, and opportunity to oppose or to seek cancellation of, any GI protection that is sought or granted;
- Ensuring that notices issued when granting a GI consisting of multiple terms identify its common name components; and
- Opposing efforts to extend the protection given to GIs for wines and spirits to other products.

The United States has reached Agreements on Reciprocal Trade with **Argentina**, **Bangladesh**, **Cambodia**, **Ecuador**, **El Salvador**, **Guatemala**, **Indonesia**, **Malaysia**, and **Taiwan** that contain groundbreaking provisions that will preserve current and future U.S. market access for U.S. cheese and meat producers who rely on the use of common names. This includes ensuring that market access will not be restricted due to the mere use of certain cheese and meat terms. These trading partners have also committed to robust standards for transparency and fairness regarding the protection of GIs. These trading partners have also committed to ensure that U.S. products can continue using terms that have been unfairly protected as GIs or to only protect legitimate GIs.

***Trademark Protection Issues***

Trademarks help consumers distinguish providers of products and services from each other and thereby serve a critical source identification role. The goodwill represented in a company's trademark is often one of a company's most valuable business assets.

However, in numerous countries, right holders consider bad faith trademarks to be a significant challenge, with an overwhelming number of bad faith applications filed and registrations granted. For example, in **China**, although progress has been made over the past years making it easier to challenge problematic registrations, there are still concerns regarding the significant number of bad faith filings companies are facing. China published draft amendments to its *Trademark Law* for public comment in December 2025 that include revisions designed to address bad faith trademark applications, which is a positive step. Stakeholders also raise concerns about the need for improved and reliable opposition procedures in **Indonesia**, as well as decisions that provide

reasoning and evidence, to help prevent counterfeiters from obtaining registrations for similar but not identical trademarks.

Trademark holders also continue to face challenges in protecting their trademarks against unauthorized domain name registration and trademark uses in some country code top-level domain names.

Robust protection for well-known marks, another internationally recognized means of protecting marks outlined in the Paris Convention for Protection of Industrial Property, is also important for many U.S. producers and businesses who have built up the reputation of their brands. Stakeholders report that some countries that do have well-known mark provisions, such as **China**, nevertheless impose significant burdens on brand owners that attempt to establish their marks as well-known.

Another concern includes mandatory requirements to record trademark licenses, such as in **Belize**, **Ecuador**, **Egypt**, and **Turkmenistan**, as they frequently impose unnecessary administrative and financial burdens on trademark owners and create difficulty in the enforcement and maintenance of trademark rights.

Certain formalities and documentation requirements, such as requirements for obtaining traditional pen-and-ink signatures, notarized or legalized powers of attorney, and original documents, can create trade barriers. Numerous countries, including **China**, **Indonesia**, **Iraq**, and the **United Arab Emirates**, require formalities for filing documents, such as intellectual property (IP) applications, registration maintenance, transfer of ownership submissions, and in opposition and cancellation proceedings, even though such formalities do not appear to advance any legitimate public policy goals.

The absence of default judgments in opposition and invalidation proceedings in certain countries, such as **China**, incurs significant costs to U.S. companies. Companies are forced to submit detailed arguments and evidence in proceedings when the owners of the applications and registrations have no interest in or intention of defending their claims to exclusive rights in such marks, particularly in the case of bad faith trademark registrations and trademark squatters. One means of addressing this situation, according to some U.S. stakeholders, is to require owners of challenged trademarks to submit a written statement that they have an ongoing interest in their trademark in order to continue with a full proceeding before the relevant authorities.

A number of countries do not provide the full range of internationally recognized trademark protections. For example, many countries, such as **Belarus** and **Indonesia**, do not provide protection for certification marks that are used to show consumers that particular goods or services, or their providers, come from a specific geographic region; meet standards with respect to quality, materials, or safety, such as respirators that filter at least 95% of airborne particles (N95); or that labor was performed by a union member or member of a specific organization. In some countries, the nature of the requirements imposed for registration of certification marks creates undue burdens on certifying entities. Direct-to-consumer global e-commerce flourished during the COVID-19 pandemic, and certified products have been valued by an ever-growing marketplace of purchasers. Providing for registration of and mechanisms to enforce rights in certification marks are essential to ensure safe, compliant, and reputable products and services.

Companies use letters of consent to resolve potential disputes and overcome refusals based on a likelihood of confusion when multiple trademark owners agree that their marks may coexist in the marketplace without confusion as to the source of the identified goods or services. Some countries refuse to recognize letters of consent. Some countries accept the letters yet view them as informational only. Other countries allow submission of the letters with the caveat that they may be ignored. When letters of consent are rejected, or given little or no effect, companies may be forced to employ alternative measures. Such measures could include additional costs, the submission of detailed arguments and evidence, and even litigation. This could be avoided through the recognition of and deference to letters of consent. Some countries, such as **Türkiye**, now accept letters of consent.

Strict use of the Nice Classification or a country's own sub-classification system to determine conflicts with prior marks does not reflect the realities of the relatedness of underlying goods or services in the current marketplace and introduces uncertainty into the registration process. Goods and services should be considered based on their commercial relationship and not solely in light of classification systems developed for administrative convenience.

Many countries, including **India**, **Malaysia**, **Pakistan**, and the **Philippines**, reportedly have slow opposition or cancellation proceedings, while **Belarus** and **Panama** have no administrative opposition proceedings.

Delays in obtaining registrations present a significant obstacle for protecting IP rights in foreign markets, with stakeholders identifying **Bangladesh**, **Iraq**, and **South Africa** as countries with extreme delays in processing trademark applications.

A number of countries do not consider a likelihood of confusion with previously filed applications and registrations during examination, otherwise known as "relative grounds" refusals. The failure to make these rejections costs U.S. companies millions of dollars a year in unnecessary opposition proceedings. Some countries that do consider relative grounds provide a pre-examination opposition period to allow third parties to submit objections before the national office conducts its own examination, thus resulting in unnecessary expenses to oppose marks the national office would likely refuse during examination.

The absence of adequate means for searching trademark applications and registrations, such as by online databases, makes obtaining trademark protection more complicated and unpredictable. The lack of such online systems leads to additional costs, both in terms of initial filing and in relation to docketing and maintenance of multiple registrations.

***Copyright Administration and Payment of Royalties***

Collective management organizations (CMOs) for copyright can play an important role in ensuring compensation for right holders when CMO practices are fair, efficient, transparent, and accountable. Also, the collection and distribution of royalties to U.S. and other right holders should be carried out on a national treatment basis. Unfortunately, CMO systems in several countries are reportedly flawed or non-operational. In some countries, like **India**, **Kenya**, and

**Nigeria**, withdrawals of, or changes in, a CMO's authorization to operate leave right holders in defunct CMOs and music users confused over whom to pay. However, in the **United Arab Emirates**, two CMOs, the Emirates Music Rights Association and Music Nation, were granted licenses in 2025, addressing a 20-year-plus challenge to introduce CMOs for music rights that has prevented right holders from receiving compensation for their works.

In addition, it is important for right holders of a work or phonogram to be able to freely and separately transfer their economic rights by contract and to fully enjoy the benefits derived from those rights. Unclear limitations on the freedom to contract raise concerns because they reduce the ability of right holders to choose the terms by which they exploit their works or phonograms and reduce public access to the work or phonogram. For example, in the past the United States has raised concerns about vague limitations on assignments that create uncertainty for parties and expansive grants of ancillary rights that depart from current practices in many countries where exceptions are typically confined to special cases.

***Government Use of Unlicensed Software***

The United States continues to work with other governments to address government use of unlicensed software, particularly in countries that are modernizing their software systems or where there are infringement concerns. Considerable progress has been made under this initiative, leading to numerous trading partners mandating that their government agencies use only legitimate software. It is important for governments to legitimize their own activities in order to set an example of respecting intellectual property for private enterprises. Additionally, unlicensed software exposes governments and enterprises to higher risks of security vulnerabilities. Further work on this issue remains with certain trading partners, including **Argentina**, **China**, **Ecuador**, **Indonesia**, **Pakistan**, **Paraguay**, **Turkmenistan**, **Venezuela**, and **Vietnam**. The United States urges trading partners to adopt and implement effective and transparent procedures to ensure legitimate governmental use of software.

***Other Issues***

Stakeholders have expressed views with respect to the use of copyrighted materials in the development of artificial intelligence (AI). The United States supports the development of legal frameworks for AI development that ensure copyrights are respected[37] and supports voluntary licensing regimes for the use of copyrighted works. The United States continues to monitor copyright issues as the AI sector grows globally.

**F. Intellectual Property and Sustainability**

Strong IP protection and enforcement are essential to promoting investment in innovation for the environmental sector. Such innovation not only promotes sustainable economic growth and supports jobs, but also is critical to responding to environmental challenges. IP provides incentives for research and development in this important sector, including through university research.

[37] Executive Order "*Ensuring A National Policy Framework for Artificial Intelligence*", December 11, 2025, https://www.whitehouse.gov/presidential-actions/2025/12/eliminating-state-law-obstruction-of-national-artificial-intelligence-policy/.

Conversely, inadequate IP protection and enforcement in foreign markets discourages broader investment in those markets. This may hinder economic growth, as well as technological advances needed to meet environmental challenges.

### G. Intellectual Property and Health

Numerous comments in the 2026 Special 301 review process highlighted concerns arising at the intersection of intellectual property (IP) policy and health policy. IP protection plays an important role in providing incentives for the development and marketing of new medicines. An effective, transparent, and predictable IP system is important for both manufacturers of innovative medicines and manufacturers of generic medicines.

The United States recognizes the important role of voluntary licensing in promoting greater access to health products. For example, right holders have entered into voluntary licensing agreements with the Medicines Patent Pool (MPP) to enable sublicenses with generic manufacturers in order to help facilitate broad access to many types of medicine in countries all around the world, including those at varying income levels. In some cases, right holders have entered into voluntary licensing agreements directly with generic manufacturers, including agreements that do not require the generic manufacturers to pay a royalty to the right holder.

The 2001 World Trade Organization (WTO) Declaration on the TRIPS Agreement and Public Health (Doha Declaration) recognized the gravity of the public health problems afflicting many developing and least-developed countries (LDCs), especially those resulting from HIV/AIDS, tuberculosis, malaria, and other epidemics. As affirmed in the Doha Declaration, the United States respects a trading partner's right to protect public health and, in particular, to promote access to medicines for all. The United States also recognizes the role of IP protection in the development of new medicines while being mindful of the effect of IP protection on prices. The assessments set forth in this Report are based on various critical factors, including, where relevant, the Doha Declaration.

WTO Members adopted the Ministerial Decision on the TRIPS Agreement in June 2022, which set forth clarifications and a waiver for eligible WTO Members to authorize the use of the subject matter of a patent required for the production and supply of COVID-19 vaccines. This five-year waiver has not increased access to COVID-19 vaccines but instead may actually negatively impact the development of new treatments and cures for the next pandemic by weakening the standard for IP protections and furthering a false narrative about the role of IP and access to medicines.

The United States is firmly of the view that international obligations such as those in the WTO Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS Agreement) have sufficient flexibility to allow trading partners to address the serious public health problems that they may face. The United States urges its trading partners to consider ways to address their public health challenges while also maintaining IP systems that promote innovation.

The United States supports the WTO General Council Decision on the Implementation of Paragraph 6 of the Doha Declaration, concluded in August 2003. Under this decision, WTO Members are permitted, in accordance with specified procedures, to issue compulsory licenses to

export pharmaceutical products to countries that cannot produce drugs for themselves. The WTO General Council adopted a Decision in December 2005 that incorporated this solution into Article 31*bis* to the TRIPS Agreement, and the United States became the first WTO Member to formally accept this amendment. In January 2017, the necessary acceptance by two-thirds of WTO Members was secured, resulting in the formal amendment to the TRIPS Agreement. Additional notifications of WTO Member acceptances of the amendment have followed.

The U.S. Government works to ensure that the provisions of its bilateral and regional trade agreements, as well as U.S. engagement in international organizations, including the United Nations and related institutions such as the World Intellectual Property Organization (WIPO) are consistent with U.S. policies concerning IP and health and do not impede its trading partners from taking measures necessary to protect public health. Accordingly, USTR will continue its close cooperation with relevant agencies to ensure that public health challenges are addressed and IP protection and enforcement are supported as one of various mechanisms to promote research and innovation.

**H. Intellectual Property and Standards**

Numerous comments in the 2026 Special 301 review process highlighted concerns arising at the intersection of intellectual property (IP) policy and collaborative technical performance and/or interoperability standards. IP protection plays an important role in providing incentives for the development of next-generation technology and its inclusion in standards. The efficient, transparent, and predictable licensing of patents essential to a technical standard is critical for both innovative companies engaged in developing standards and contributing their technology to such standards, as well as companies needing a license to integrate such standards into their products. Equally important are enforcement mechanisms to redress patent infringement, including those essential to a standard. American innovation leadership, economic competitiveness, and national security are threatened by proposals or actions that undermine the effective enforcement of patent rights.

Several emerging global trends have the potential to improperly and unfairly harm U.S. innovators:

- *Overbroad Anti-Suit Injunctions*: While anti-suit injunctions (ASIs) can serve legitimate purposes, some foreign courts have issued sweeping ASIs that unfairly prohibit U.S. entities from enforcing their patent rights anywhere else in the world. These sweeping, extraterritorial orders may unduly impede U.S. innovators' ability to exercise their constitutional right to enforce their patents;

- *Sovereignty Impinging Patent Valuation*: Some foreign courts increasingly assert authority to set worldwide licensing rates for standard essential patent portfolios that include U.S. patents without securing consent from both parties. In view of the traditional territoriality of patent rights, such actions may interfere with U.S. patent holders' legal right to seek damages for infringement of their U.S. patents in a U.S. court;

- *Prohibitions on Injunctive Relief*: Effective patent enforcement may be diminished by the adoption (or proposed adoption) of categorical or near-categorical prohibitions on injunctive

relief for patent infringement—whether by legislation, foreign agencies or courts, or multinational tribunals—particularly in the standard essential patent context.

A final concerning development is the emergence and/or sanctioning of “Licensing Negotiation Groups” (LNGs) that could harm competition by enabling technology purchasers, under certain circumstances, to act jointly to lock in potentially subcompetitive or sub-FRAND prices, or agree to engage in “holdout.”

Each of these trends adversely affects U.S. innovators and patent holders and tilts the playing field in favor of foreign companies, many with substantial financial and political support from their home government or acting in concert with government officials. These tactics also violate basic principles of due process and national sovereignty, undermine the foundation of patent rights, and depress the value of U.S. patented technologies.

Accordingly, USTR will continue its close cooperation with relevant agencies, including the United States Patent and Trademark Office in the Department of Commerce, the Antitrust Division of the Department of Justice, and the Federal Trade Commission to ensure that challenges relating to the licensing of patents deemed essential to a technical interoperability standards are addressed and IP protection and enforcement are supported as one of various mechanisms to promote the development and licensing of technical interoperability standards.

## I. Implementation of the World Trade Organization Agreement on Trade-Related Aspects of Intellectual Property Rights

The World Trade Organization (WTO) Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS Agreement), one of the most significant achievements of the Uruguay Round (1986-1994), requires all WTO Members to provide certain minimum standards of intellectual property (IP) protection and enforcement. The TRIPS Agreement is the first broadly subscribed multilateral IP agreement that is subject to dispute settlement provisions.

Developed country WTO Members were required to implement the TRIPS Agreement fully as of January 1, 1996. Developing country WTO Members were given a transition period for many obligations until January 1, 2000, and in some cases until January 1, 2005. Nevertheless, certain WTO Members are still in the process of finalizing implementing legislation, and many are still engaged in establishing adequate and effective IP enforcement mechanisms.

Recognizing the particular issues faced by WTO Members that are least-developed countries (LDCs), the United States has worked closely with them and other WTO Members to extend the implementation date for these countries. Most recently, on June 29, 2021, the WTO Council for the Trade-Related Aspects of Intellectual Property Rights (TRIPS Council) reached consensus on a decision to again extend the transition period under Article 66.1 of the TRIPS Agreement for LDC WTO Members. Under this decision, LDC WTO Members are not required to apply the provisions of the TRIPS Agreement, other than Articles 3, 4, and 5 (provisions related to national treatment and most-favored nation treatment), until July 1, 2034, or until such a date on which they cease to be an LDC WTO Member, whichever date is earlier. Previously, on November 6, 2015, the TRIPS Council reached consensus to extend the transition period for LDC WTO Members to

implement Sections 5 and 7 of Part II of the TRIPS Agreement with respect to pharmaceutical products until January 1, 2033, and reached consensus to recommend waiving Articles 70.8 and 70.9 of the TRIPS Agreement with respect to pharmaceuticals for LDC Members also until January 1, 2033.

At the Fourteenth Ministerial Conference of the WTO in March 2026, the moratorium adopted at the Thirteenth Ministerial Conference on non-violation and situation complaints under the TRIPS Agreement expired. The moratorium was originally introduced in Article 64 of the TRIPS Agreement, for a period of five years following the entry into force of the WTO Agreement (i.e., until December 31, 1999). Historically, the moratorium has been extended from one Ministerial Conference to the next.

The United States participates actively in the TRIPS Council's scheduled reviews of WTO Members' implementation of the TRIPS Agreement and uses the WTO's Trade Policy Review mechanism to pose questions and seek constructive engagement on issues related to TRIPS Agreement implementation.

**J. Dispute Settlement and Enforcement**

The United States continues to monitor the resolution of concerns and disputes announced in previous Special 301 Reports. The United States will use all available means to resolve concerns, including bilateral dialogue and enforcement tools such as those provided under U.S. law, the World Trade Organization (WTO), and other dispute settlement procedures, as appropriate.

Under Section 301 of the Trade Act of 1974, as amended (19 U.S.C. § 2411) (Section 301), the Office of the United States Trade Representative (USTR) has been taking action to address a range of unfair and harmful Chinese acts, policies, and practices related to technology transfer, intellectual property (IP), and innovation. USTR has also successfully pursued dispute settlement proceedings at the WTO to address discriminatory licensing practices. The United States and China signed the United States-China Economic and Trade Agreement (Phase One Agreement) in January 2020, which included commitments to address numerous long-standing concerns in the areas of trade secrets, patents, pharmaceutical-related IP, trademarks, copyrights, geographical indications (GIs), and technology transfer. The United States has been closely monitoring China's progress in implementing its commitments.

Following the 1999 Special 301 review process, the United States initiated dispute settlement consultations concerning the European Union (EU) regulation on food-related GIs, which appeared to discriminate against foreign products and persons, notably by requiring that EU trading partners adopt an "EU-style" system of GI protection, and appeared to provide insufficient protections to trademark owners. On April 20, 2005, the Dispute Settlement Body (DSB) adopted a panel report finding in favor of the United States that the EU GI regulation is inconsistent with the EU's obligations under the WTO Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPS) and the General Agreement on Tariffs and Trade 1994. On March 31, 2006, the EU published a revised GI Regulation that is intended to comply with the DSB recommendations and rulings. There remain some concerns, however, with respect to this revised GI Regulation that the United States has asked the EU to address. The United States continues monitoring this

situation. The United States is also working bilaterally and in multilateral fora to advance U.S. market access interests and to ensure that the trade initiatives of other countries, including with respect to GIs, do not undercut market access for U.S. companies.

# SECTION II: Country Reports

## UKRAINE – REVIEW SUSPENDED

Ukraine was placed on the Priority Watch List in 2021. Despite the ongoing war, Ukraine has continued to engage meaningfully with the United States on long-standing areas of concern with Ukraine's intellectual property regime, including: (1) the administration of the system for collective management organizations that are responsible for collecting and distributing copyright royalties to right holders; (2) the use of unlicensed software by government agencies; and (3) the implementation of effective means to combat widespread online copyright infringement. However, due to the ongoing war, the Special 301 review of Ukraine remains suspended.

# PRIORITY FOREIGN COUNTRY

## VIETNAM

As a result of the 2026 Special 301 Review, the U.S. Trade Representative (USTR) identifies Vietnam as a Priority Foreign Country (PFC). This identification follows extensive bilateral engagement between the United States and Vietnam that has failed to resolve long-standing concerns regarding IP protection and enforcement. Although Vietnam has taken some enforcement actions, these efforts are insufficient to address the full range of serious concerns.

The specific grounds for the USTR's identification of Vietnam as a PFC are: (1) failure to provide persistent and effective enforcement to combat online piracy; (2) failure to provide sufficient enforcement against widespread counterfeiting; (3) lack of effective border enforcement; (4) lack of enforcement actions against unlicensed software use; and (5) lack of criminal measures against cable and satellite signal theft.

***Failure to provide persistent and effective enforcement to combat online piracy***

The United States has repeatedly raised strong concerns about Vietnam's role in online piracy worldwide. Vietnam remains a significant source of online piracy and continues to host popular English-language copyright infringement sites and services that target a global audience. Some of these sites provide piracy services, including extensive libraries of pirated movies and TV shows. A locally popular cyberlocker offering such services also operates within Vietnam. The operators of these sites and services likely based themselves in Vietnam because enforcement efforts there historically lacked the follow-through and substantial penalties needed to deter infringement. For example, after the successful shutdown of Vietnam-based video hosting site 2embed in July 2023 after engagement from right holders, the domain MegaCloud replaced this site and continued its piracy operations in Vietnam. Stakeholders report that Vietnam has the highest incidence of online piracy in the Asia-Pacific region, has high levels of music piracy, and is ranked eighth in the world for piracy of certain mobile video games.

The 2025 *Notorious Markets List* provides illustrative examples of piracy sites or services reportedly operating from Vietnam. For example, as noted above, the hosting platform MegaCloud, which formerly operated under the pirate service site 2embed, reportedly acts as a backend hosting system delivering infringing video files, including more than 46,000 movies and 16,000 TV series, directly to more than 260 pirate streaming sites around the world. The sites using the MegaCloud network reportedly received over 600 million monthly visitors in July 2025. Additionally, MyFlixerz and its network of related streaming sites are one of the most popular pirate streaming networks in the world and reportedly received more than 622 million visits in August 2025.

Vietnam recently had an uptick in criminal prosecutions against piracy operators in collaboration with U.S. enforcement authorities and stakeholders, which the United States hopes will continue. However, despite having criminal laws that provide for substantial fines and years of incarceration for copyright infringement, the defendants in recent criminal prosecutions received suspended sentences and were only ordered to pay relatively low financial penalties. For example, in the case against the operators of Fmovies, one of the most popular piracy sites in the world, the court, over the objection of prosecutors, imposed suspended sentences on both defendants and only ordered them to pay around $2,700 and $770 in criminal fines, respectively, and around $35,000 to compensate right holders. In order to have a greater deterrent effect, Vietnam enforcement authorities should bring more criminal cases against significant piracy sites and Vietnamese courts should impose prison sentences, monetary fines, and other criminal penalties at the higher levels that are available under Vietnamese law, to reflect the harm caused by such piracy operations. Other obstacles to effective criminal enforcement include the lack of clarity regarding the threshold for criminal enforcement under amendments to the 2015 Penal Code, including the proof required to meet that threshold, and regarding how to handle intangible evidence, such as digital assets and domain names.

Vietnam’s continued reliance on administrative enforcement actions over civil or criminal enforcement has been another long-standing concern, particularly as administrative enforcement does not have the same deterrent effect as civil remedies and criminal penalties. Right holders face informal pressure from enforcement authorities to submit complaints for administrative enforcement proceedings instead of directly pursuing civil enforcement or obtaining a referral for criminal enforcement.

Online piracy in Vietnam has caused immense harm to U.S. copyright holders. Vietnam must provide effective enforcement and take persistent and effective enforcement actions to combat online piracy, including by bringing significantly more criminal prosecutions against online piracy operations; seeking deterrent-level prison sentences, monetary fines, and other criminal penalties; and addressing obstacles to pursuing effective enforcement.

***Failure to provide sufficient enforcement against widespread counterfeiting***

The United States has repeatedly conveyed its long-standing concerns about Vietnam’s insufficient enforcement to combat widespread counterfeiting within Vietnam. Counterfeit goods—both locally manufactured and imported—remain widely available and openly sold in physical markets, which persist in major urban and tourist centers. Counterfeit goods are widespread and

increasingly sold through e-commerce platforms and through the use of livestream videos. Stakeholders report the dangerous spread of fraudulent listings on e-commerce platforms for counterfeit products with health and safety risks, such as counterfeit milk, food, and supplements.

In 2025, Vietnam underwent a significant reorganization of its government, which included restructuring of the Market Surveillance Agency (MSA) and transferring most enforcement work by the MSA to local authorities. Stakeholders report that this transition between enforcement authorities has resulted in gaps in enforcement that counterfeit sellers have exploited. Even with multiple enforcement campaigns, administrative enforcement in physical markets and online markets by the reorganized Ministry of Industry and Trade's Department for Domestic Market Management and Development (DMMD) decreased in 2025, with the number of violations involving IP-infringing goods and goods of unknown origin/inferior quality declining by 50% compared to 2024.

As with online piracy, Vietnam's continued reliance on administrative enforcement actions over civil or criminal enforcement has been a long-standing concern, particularly as administrative enforcement does not have the same deterrent effect as civil remedies and criminal penalties. Weak enforcement against counterfeiting has also been due to poor coordination among ministries and agencies responsible for enforcement, delays in initiating enforcement actions, and the lack of familiarity with trademark law among police, prosecutors, and judges.

Vietnam must provide sufficient enforcement against widespread counterfeiting, including by increasing enforcement actions in physical and online markets, improving coordination among enforcement authorities, and addressing other obstacles to effective enforcement.

***Lack of effective border enforcement, including failure to utilize* ex officio *authority for IP seizures and lack of* ex officio *authority over in-transit goods***

The United States has repeatedly raised concerns about the lack of effective border enforcement in Vietnam. Vietnam Customs has demonstrated a lack of consistency in enforcement at the border over the years, and some stakeholders report a lack of transparency and communication. Notably, Vietnam Customs has possessed *ex officio* authority to suspend customs procedures for suspected pirated and counterfeit goods at the border since the 2022 amendments to the *Intellectual Property Law*, but has rarely exercised that authority. Also, Vietnam's laws and decrees do not provide this authority with respect to in-transit goods.

Vietnam must provide effective border enforcement, including by utilizing Vietnam Customs' *ex officio* authority to increase seizures of pirated and counterfeit goods and providing *ex officio* authority with respect to in-transit goods.

***Lack of enforcement actions against unlicensed software use***

The United States has repeatedly raised long-standing concerns about the lack of enforcement against unlicensed software in Vietnam. Vietnam has been recognized by stakeholders as a rapidly growing technology hub in the region. At the same time, Vietnam authorities reportedly have not conducted significant enforcement against the use of unlicensed software by corporate end users

in the past three years. The lack of deterrence has resulted in widespread use of unlicensed software. Vietnam needs to increase enforcement actions against unlicensed software use.

***Lack of criminal measures against cable and satellite signal theft***

The United States has repeatedly raised concerns about the continued lack of criminal laws or decrees against cable and satellite signal theft. Although Article 35 of the *Intellectual Property Law* was amended in 2022 to define infringement of related rights with respect to the unauthorized decoding of encrypted program-carrying satellite signals, the corresponding provision in the *Criminal Law* has not been amended to provide criminal penalties with respect to such signals. The *Intellectual Property Law* and *Criminal Law* also do not expressly address cable signal theft. Vietnam must provide criminal measures against cable and satellite signal theft, such as by amending the *Criminal Law* or issuing a decree.

***Other IP Concerns***

The United States remains concerned about other long-standing IP issues described in previous Special 301 Reports. Persistent concerns include overly broad exceptions to copyright and related rights and the need for effective implementation of the World Intellectual Property Organization (WIPO) Performances and Phonograms Treaty (WPPT) and WIPO Copyright Treaty (WCT), including protections against circumvention of technological protection measures and certain acts affecting rights management information. In addition, right holders have raised concerns about bad faith trademark registrations by counterfeiters who exploit delays in trademark examination. Furthermore, Vietnam lacks an effective system for protecting against the unfair commercial use, as well as the unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for pharmaceutical products.

The United States is also monitoring the implementation of IP provisions pursuant to Vietnam's commitments under trade agreements with third parties. The European Union-Vietnam Free Trade Agreement (EVFTA) grandfathered prior users of certain cheese terms from the restrictions in the geographical indications (GIs) provisions of the EVFTA, and it is important that Vietnam ensures market access for prior users of those terms who were in the Vietnamese market before the grandfathering date of January 1, 2017.

The United States acknowledges enforcement actions to shut down Fmovies and associated piracy sites in 2024, Y2Mate and 11 other stream-ripping websites in 2025, and piracy platforms Xoilac TV and R*phim in 2026, including collaboration between the Ministry of Public Security (MPS), the Supreme People's Procuratorate, and U.S. enforcement authorities and stakeholders in the Fmovies case. In March 2026, after MPS sought feedback on a draft decree on piracy of printed publications in electronic formats, major Vietnamese pirated e-book sharing platforms, including TVE-4U, VCTVEGroup, and Ebookvie, ceased operations or stopped the sharing of copyrighted materials. In April 2026, Vietnam-based HiAnime.to, which was one of the most popular pirate sites in the world and listed in the 2025 *Notorious Market List*, shut down, along with related mirror sites. Continued efforts by Vietnam to investigate and prosecute criminal copyright offenses will make the country a less hospitable host for sites that profit from infringement and will deter piracy operations, increasing the rate of voluntary closure of such sites.

The United States continues to engage with Vietnam on efforts to establish specialized IP courts in Hanoi and Ho Chi Minh City. As the judges assigned to these courts also handle non-IP cases concurrently, the specialized IP courts have completed a limited number of IP cases.

With the passage of the amended *Intellectual Property Law* and the *Law on E-Commerce* in December 2025, stakeholders raised concerns about short public comment periods for the draft legislation and draft implementing decrees, with one comment period being only 24 hours. Vietnam should provide all interested stakeholders with a meaningful opportunity to provide input on draft measures.

The United States will continue to engage Vietnam bilaterally on these and other matters, outside of a Section 301 investigation.

***Priority Foreign Country Identification***

The acts, policies, and practices described as the grounds for PFC have cumulatively resulted in significant financial damage to U.S. copyright-related industries and U.S. brands, including the foregone revenue and market opportunities and the impact on the markets in other countries. Intensive bilateral engagement by the United States has not resulted in sufficient efforts by Vietnam to resolve these long-standing issues.

As a consequence of this PFC identification, the USTR will determine pursuant to Section 302 of the Trade Act of 1974 whether to initiate an investigation of Vietnam’s acts, policies, and practices that are the basis for its identification as a PFC.

# PRIORITY WATCH LIST

## CHILE

Chile remains on the Priority Watch List in 2026.

***Ongoing Challenges and Concerns***

The United States continues to have serious concerns regarding long-standing implementation issues with a number of intellectual property (IP) provisions of the United States-Chile Free Trade Agreement (Chile FTA). Chile must establish protections against the unlawful circumvention of technological protection measures (TPMs), including civil and criminal liability for the act of circumvention, as well as criminal and civil or administrative measures for trafficking circumvention devices and providing circumvention services. The United States continues to urge Chile to ratify and implement the 1991 Act of the International Union for the Protection of New Varieties of Plants Convention (UPOV 1991) and improve protection for plant varieties. The United States also urges Chile to improve its Internet service provider liability framework to permit effective and expeditious action against online piracy. Chile passed legislation in 2018 establishing criminal penalties for the importation, commercialization, and distribution of decoding devices used for the theft of encrypted program-carrying satellite signals, but without clarifying the full scope of activities criminalized in the implementation of the law. The United States also urges Chile to provide remedies or penalties for willfully receiving or further distributing illegally decoded encrypted program-carrying satellite signals, as well as the ability for parties with an interest in stolen satellite signals to initiate a civil action. Concerns remain regarding the availability of effective administrative and judicial procedures, as well as deterrent-level remedies, for right holders and satellite service providers.

Concerns also remain with the lack of copyright enforcement efforts by the Chilean authorities. A July 2024 report from the National Institute of Industrial Property (INAPI) showed a 60% decrease in the number of copyright-related criminal cases initiated in Chile between 2017 and 2022, and efforts to increase criminal enforcement remain lacking. As a result of the lack of enforcement, stakeholders report a deteriorating situation with the high levels of online piracy, including through stream-ripping, streaming, piracy apps, signal theft, and circumvention devices. In addition, pharmaceutical stakeholders continue to raise concerns over the efficacy of Chile's system for resolving patent issues expeditiously in connection with applications to market pharmaceutical products and over the provision of adequate protection against unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for pharmaceutical products.

In September 2024, the National Congress of Chile approved a side letter under the U.S.-Chile FTA regarding market access to Chile for a number of U.S. cheese and meat products and how Chile will treat prior users of certain terms for cheeses with respect to the European Union-Chile Interim Trade Agreement. The United States urges Chile to ensure transparency and due process in the protection of geographical indications (GIs) and to ensure that the grant of GI protection

does not deprive interested parties of the ability to use common names, particularly with respect to protection granted pursuant to trade agreements.

***Developments, Including Progress and Actions Taken***

Chile has made some progress in strengthening IP enforcement. In 2025, the Intellectual Property Brigade of the Chilean Investigative Police reported a significant increase in seizures of counterfeit products, with an increase of over a million seized counterfeit products. The National Customs Service increased the number of enforcement actions by 33% from 2024 to 2025.

The United States appreciates Chile's engagement with the United States and the steps Chile has taken towards resolving ongoing issues pertaining to the Chile FTA. However, it has been over twenty years since the Chile FTA entered into force and it remains important that Chile show tangible progress in addressing the long-standing Chile FTA implementation issues and other IP issues in 2026.

# CHINA

China remains on the Priority Watch List in 2026 and is subject to continuing monitoring pursuant to Section 306 of the Trade Act of 1974, as amended (19 U.S.C. § 2416).

***Ongoing Challenges and Concerns***

In 2025, the pace of reforms in China aimed at addressing intellectual property (IP) protection and enforcement remained slow. The United States continues to have concerns about implementation of the amended *Criminal Law*, *Copyright Law*, and *Patent Law*. Concerns remain about long-standing issues, including technology transfer, trade secrets, counterfeiting, online piracy, copyright law, patent and related policies, bad faith trademarks, and geographical indications. China needs to complete the full range of fundamental changes that are required to improve the IP landscape in China.

Statements by Chinese officials that tie IP rights to Chinese market dominance continue to raise strong concerns. In an October 2024 letter to the 2024 International Association for the Protection of Intellectual Property World Congress, President Xi reiterated China's aspiration to become a global IP powerhouse and noted that China has blazed a path of IP rights development with "Chinese characteristics." In May 2024, the National Inter-Ministerial Joint Meeting on the Construction of an IP Power issued the "2024 Promotion Plan for the Construction of an IP Power," which notes the priority of "deeply participating in global IP governance" and directs the Supreme People's Procuratorate to carry out "prosecution to protect enterprises" in order to serve "technological self-reliance" in key core technologies and emerging industries. During a September 2025 conference hosted by the China National Intellectual Property Administration (CNIPA), China's lead technology enterprises underscored their role in a centralized effort to promote China's IP norms and judgments to shape global IP rules, even arguing that Beijing's judicial and administrative actions should become accepted "world rules." Such statements recall long-standing concerns about requiring or pressuring technology transfer from foreign individuals or companies to Chinese companies, as well as about whether IP protection and enforcement will apply fairly to foreign right holders in China. China should provide a level playing field for IP protection and enforcement, refrain from requiring or pressuring technology transfer to Chinese companies at all levels of government, open China's market to foreign investment, and embrace open, market-oriented policies.

Under Section 301 of the Trade Act of 1974, as amended (19 U.S.C. § 2411) (Section 301), the Office of the United States Trade Representative (USTR) has been taking action to address a range of unfair and harmful Chinese acts, policies, and practices related to technology transfer, IP, and innovation. USTR has also successfully pursued dispute settlement proceedings at the World Trade Organization (WTO) to address discriminatory licensing practices. The United States and China signed the United States-China Economic and Trade Agreement (Phase One Agreement) in January 2020, which included commitments to address numerous long-standing concerns in the areas of trade secrets, patents, pharmaceutical-related IP, trademarks, copyrights, geographical indications (GIs), and technology transfer. China has failed to implement or only partially implemented a number of these commitments. The United States continues to closely monitor China's progress in implementing its commitments under the Phase One Agreement.

*China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation*

In 2018, USTR reported that its investigation under Section 301 found that China pursues a range of unfair and harmful acts, policies, and practices related to technology transfer, IP, and innovation. These include investment and other regulatory requirements that require or pressure technology transfer, substantial restrictions on technology licensing terms, direction or facilitation of the acquisition of foreign companies and assets by domestic firms to obtain cutting-edge technologies, and conducting and supporting unauthorized intrusions into and theft from computer networks of U.S. companies to obtain unauthorized access to IP.

In March 2018, the United States initiated a WTO case challenging Chinese measures that deny foreign patent holders the ability to enforce their patent rights against a Chinese joint-venture partner after a technology transfer contract ends and that impose mandatory adverse contract terms, which discriminate against, and are less favorable for, imported foreign technology as compared to Chinese technology. Consultations took place in July 2018, and a panel was established to hear the case at the United States' request in November 2018. In March 2019, China revised certain measures that the United States had challenged in its panel request, including the *Regulations on the Administration of Import and Export of Technologies*. The United States considered that China's actions had sufficiently addressed U.S. concerns, and the authority of the panel expired on June 9, 2021.

As part of the Phase One Agreement, China agreed to provide effective access to Chinese markets without requiring or pressuring U.S. persons to transfer their technology to Chinese persons. China also agreed that any transfer or licensing of technology by U.S. persons to Chinese persons must be based on market terms that are voluntary and mutually agreed, and that China would not support or direct the outbound foreign direct investment activities of its persons aimed at acquiring foreign technology with respect to sectors and industries targeted by its industrial plans that create distortion. In addition, China committed to ensuring that any enforcement of laws and regulations with respect to U.S. persons is impartial, fair, transparent, and non-discriminatory. USTR continues to work with stakeholders to evaluate whether these commitments have resulted in changes in China's ongoing conduct at the national, provincial, and local levels.

In May 2022, USTR launched a statutorily mandated four-year review of the tariffs that had been imposed on Chinese imports as a result of the Section 301 investigation into China's unfair acts, policies, and practices related to technology transfer, intellectual property, and innovation. As part of this review, USTR examined the effectiveness of the tariff actions in achieving the objectives of the original investigation, other actions that could be taken, and the effects of those actions on the United States economy, including consumers. In May 2024, USTR issued a report that found that China's unfair acts, policies, and practices had continued and, in some cases, had worsened.

In October 2025, USTR initiated a Section 301 investigation to determine whether the rights of the United States under the Phase One Agreement are being denied or an act, policy, or practice of China violates or is inconsistent with the provisions of, or otherwise denies benefits to the United States under, the Phase One Agreement. USTR will examine whether China has fully

implemented its commitments under the Agreement, including those related to technology transfer and intellectual property, and what action, if any, should be taken in response.

*Trade Secrets*

Stakeholders report that the Chinese judicial system's enforcement of trade secret protections continues to be weak, and implementation of the amended *Criminal Law* remains incomplete. On April 24, 2025, the Supreme People's Court (SPC) and Supreme People's Procuratorate (SPP) jointly issued *Interpretation of Several Issues Concerning the Application of Laws for Handling Criminal Cases of Infringement upon Intellectual Property Rights*, which requires a showing of actual losses or illegal gains to meet the criminal threshold for trade secret misappropriation. Further changes are needed to add "other serious circumstances" as an additional, catch-all category for triggering criminal investigations and prosecutions, and to update a related standard issued by the SPC and Ministry of Public Security. Although China amended the *Anti-Unfair Competition Law* in June 2025, the amendments did not increase the administrative penalties for trade secret misappropriation. Also, administrative penalties for trade secret misappropriation are no substitute for strengthening criminal enforcement of trade secrets. Moreover, stakeholders continue to identify significant enforcement challenges, including high evidentiary burdens, limited discovery, difficulties meeting stringent conditions to enforce agreements related to protection of trade secrets and confidential business information against theft, and difficulties in obtaining deterrent-level damages awards.

China needs to address concerns regarding the risk of unauthorized disclosures of trade secrets and confidential business information by government personnel and third-party experts, which continue to be a serious concern for the United States and U.S. stakeholders in industries such as software, manufacturing, and cosmetics. The draft *Guiding Opinions on Strengthening the Protection of Trade Secrets and Confidential Business Information in Administrative Licensing* was published for public comment in August 2020 by the Ministry of Justice but has not been finalized. U.S. stakeholders continue to express concerns about the potential for discriminatory treatment and unauthorized disclosure of their information by local authorities under the proposed expansion of administrative trade secret enforcement. In April 2025, the State Administration of Market Regulation (SAMR) issued draft *Regulations on Protection of Trade Secrets*, but the provisions include broad, undefined exceptions that could undermine trade secret enforcement.

*Manufacturing, Domestic Sale, and Export of Counterfeit Goods*

China continues to be the world's leading source of counterfeit and pirated goods. For example, a 2022 report identified China and Hong Kong as the largest exporters of counterfeit foodstuffs and cosmetics, accounting for approximately 60% of counterfeit foodstuffs customs seizures and 83% of counterfeit cosmetics customs seizures.[38] China and Hong Kong, together, accounted for over 87% of the value measured by manufacturers' suggested retail price of counterfeit and pirated

[38] Organisation for Economic Co-operation and Development and European Union Intellectual Property Office, *Dangerous Fakes: Trade in Counterfeit Goods that Pose Health, Safety, and Environmental Risks* at 68, 70 (Mar. 9, 2022), https://www.oecd.org/social/dangerous-fakes-117e352b-en.htm.

goods seized by U.S. Customs and Border Protection in Fiscal Year 2025.[39] Counterfeiting activities have increased as economic conditions have declined within China. The failure to curb the widespread manufacture, domestic sale, and export of counterfeit goods affects not only right holders but also the health and safety of consumers. The production, distribution, and sale of counterfeit medicines, fertilizers, and pesticides, as well as under-regulated pharmaceutical ingredients, remain widespread in China.

Stakeholders continue to express concerns about the production, distribution, and sale of counterfeit medicines and unregulated active pharmaceutical ingredients (APIs), as well as about the *Drug Administration Law* and *Criminal Law*, which give local officials substantial discretion in allowing companies that export unapproved drugs to escape liability or face lighter penalties. As the top manufacturer and a leading exporter of pharmaceutical ingredients, China still lacks effective regulatory oversight. In particular, China does not regulate manufacturers that fail to declare an intent to manufacture APIs for medicinal use. It also does not subject exports to regulatory review, enabling many bulk chemical manufacturers to produce and export APIs outside of regulatory controls. Furthermore, China lacks central coordination of enforcement against counterfeit pharmaceutical products and ingredients, resulting in ineffective enforcement at the provincial level and with respect to online sales.

*Availability of Counterfeit Goods Online, Online Piracy, and Other Issues*

China's e-commerce markets, the largest in the world, remain a source of widespread counterfeits as infringing sales have migrated from physical to online markets. Right holders also raise concerns about the proliferation of counterfeit sales facilitated by the confluence of e-commerce platforms and social media in China. This trend is now well-established as the popularity of e-commerce has led many sellers to maintain both a physical and online presence, or to shift to online platforms entirely, which offer short-form video, live stream, and e-commerce functionalities that allow sellers of counterfeit goods to evade detection. Right holders continue to report difficulties in receiving information and support from platforms in investigations to uncover the manufacturing and distribution channels of counterfeit goods and sellers, as well as onerous evidentiary requirements and excessive delays in takedowns. Counterfeiters continue to exploit the use of small parcels and minimal warehouse inventories, the separation of counterfeit labels and packaging from products prior to the final sale, and the high volume of packages shipped to the United States to escape enforcement and to minimize the deterrent effect of enforcement activities.

Widespread online piracy also remains a major concern, including in the form of "mini Video on Demand (VOD)" facilities that screen unauthorized audiovisual content, illicit streaming devices (ISDs), and unauthorized copies of or access codes to scientific journal articles and academic texts. As a leading source and exporter of systems that facilitate copyright piracy, China should take sustained action against websites and online platforms containing or facilitating access to unlicensed content, ISDs, and piracy apps that facilitate access to such websites.

---

[39] U.S. Customs and Border Protection, *Intellectual Property Rights (IPR) Seizures Dashboard*, (Apr. 1, 2026), https://www.cbp.gov/newsroom/stats/intellectual-property-rights-ipr-seizures.

There was no progress in 2025 on finalizing amendments to the *E-Commerce Law*, which were issued by SAMR for public comment in August 2021. The draft amendments to the *E-Commerce Law* include changes that would extend the deadline for right holders to respond to a counter-notification of non-infringement, and impose penalties for fraudulent counter-notifications and penalties that restrict the business activities of platforms for serious circumstances of infringement. Although noting improvements under the draft amendments, right holders have raised concerns about the failure to codify the elimination of liability for erroneous notices submitted in good faith, as well as proposed changes that would allow reinstatement of listings upon posting an ambiguous and poorly defined guarantee.

China's most recent version of its *Foreign Investment Negative List*, which entered into force in January 2022, continues to maintain prohibitions on foreign investment in online publishing and online audiovisual programming (with the exception of services under China's WTO accession commitments), as well as radio and TV broadcasting, transmission, production, and operation. The *Foreign Investment Negative List* does not restrict foreign investment in online music services.

Also, right holders report significant obstacles to releasing content in China, including limited windows to submit content for review, a non-transparent content review system, and significantly slowed processing and licensing of content for online streaming platforms. Another challenge has been burdensome requirements for documentation of chain of title and ownership information. These barriers have severely limited the availability of foreign content, prevented the simultaneous release of foreign content in China and other markets, and created conditions for greater piracy. Right holders also report that a draft bill published in March 2021 could restrict participation of foreign companies in production, distribution, and broadcasting of radio and television programs, including when provided online. Also, China's extension of its content review system to cover books intended for distribution in other markets has imposed heavy burdens on foreign publishers.

Additionally, it is critical that China fully implement the terms of the 2012 United States-China Memorandum of Understanding (MOU) regarding the importation and distribution of theatrical films and abide by its commitment to negotiate further meaningful compensation that China owes the United States.

The United States continues to urge all levels of the Chinese government, as well as state-owned enterprises, to use only legitimate, licensed copies of software. The United States also urges the use of third-party audits to ensure accountability, as China committed to provide under the Phase One Agreement.

*Patent and Related Policies*

Right holders raised concerns that, although the *Patent Law* allows the filing of supplemental data to support disclosure and patentability requirements, the rules for accepting post-filing data are opaque and patent examiners have applied an overly stringent standard to reject such data. In addition, the China National Intellectual Property Administration's (CNIPA) administrative Patent Reexamination and Invalidation Department (PRID) and Chinese courts reportedly reject supplemental data based on unduly stringent requirements for acceptance of such data, resulting

in potentially improper invalidity decisions. Such decisions can also lead to automatic dismissal of parallel patent infringement proceedings in China's courts.

Following the implementation of a mechanism for the early resolution of potential pharmaceutical patent disputes in 2021, right holders have expressed concerns about the lack of transparency in decisions issued by CNIPA, the cumbersome registration system, and the lack of any penalties for erroneous patent certification statements. Right holders continue to raise concerns that they had identified prior to implementation, such as regarding the scope of patents and pharmaceuticals covered by the mechanism, the lack of clarity about what could trigger a dispute under the mechanism, potential difficulties in obtaining preliminary injunctions, the length of the stay period, and the possibility of bias in favor of Chinese companies. Stakeholders report that they lack remedies if a follow-on manufacturer submits an erroneous declaration that prevents a patent owner from using the early resolution mechanism, while the manufacturer concurrently seeks to invalidate that same patent at CNIPA's PRID. Stakeholders also report that a follow-on manufacturer is allowed to submit a patent certification statement claiming that a patent is invalidated, even if the CNIPA invalidation decision is still under judicial review.

In January 2024, the *Implementing Regulations of the Patent Law* entered into force. CNIPA also issued supporting documents, such as amended *Patent Examination Guidelines*. Right holders continue to express concern about the implementation of patent term extensions for unreasonable marketing approval delays, including the definition of "new" drugs covered by the system, scope of eligible patents, and limits on the type of protection provided.

Obstacles to patent enforcement continue to include lengthy delays in the court system, the reported unwillingness of courts to issue preliminary injunctions, an undue emphasis on administrative enforcement, burdensome invalidity proceedings, onerous evidentiary requirements, and ambiguity about whether a patentee's right to exclude extends to manufacturing for export.

With respect to patent prosecution, right holders continue to express concerns about the lack of transparency and due process, including a lack of notice of third-party submissions or the opportunity to respond, despite the reliance of examiners on arguments from such submissions. Long-standing concerns also include a lack of harmonization between China's patent grace period and international practices.

Stakeholders continue to express concern regarding the 2019 *Human Genetic Resources Administrative Regulation* and the 2020 *Biosecurity Law*, along with the *Implementing Rules for the Regulations on the Management of Human Genetic Resources* that entered into effect in May 2023. These measures mandate collaboration with a Chinese partner and shared ownership of patent rights arising out of any research generated by using human genetic resource materials in China. According to stakeholders, these measures create uncertainty about the type of research that would trigger the sharing of IP rights, a need for greater clarity on the requirements for approved IP arrangements, and the risk of being pressured to transfer technology to Chinese companies. These measures also impose non-transparent requirements for government approval before any transfer of data outside of China. Right holders continue to raise concerns about the

lack of transparency in government pricing and reimbursement processes for pharmaceutical products.

With respect to standards, China should establish standards-setting processes that are open to domestic and foreign participants on a non-discriminatory basis, eliminate unreasonable public disclosure obligations in standards-setting processes, and provide sufficient protections for standards-related copyrights and patent rights.

The issuance of anti-suit injunctions by Chinese courts in standard essential patent (SEP) disputes has not occurred in recent years, but the issue continues to raise due process and transparency concerns for right holders, including regarding how such rulings may favor domestic companies over foreign patent holders. High-level political and judicial authorities in China have called for extending the jurisdiction of China's courts over global IP litigation and have cited the issuance of an anti-suit injunction as an example of the court "serving" the "overall work" of the Chinese Communist Party and the Chinese State. Moreover, Chinese courts appear increasingly interested in exercising jurisdiction in cases involving SEPs, raising concerns that China seeks to establish itself as the forum for SEP litigation in order to favor domestic companies.

The National People's Congress (NPC) passed amendments to the *Anti-Monopoly Law* (*AML*), which entered into effect in August 2022. Right holders have raised concerns about the implementation of the amended *AML*, particularly regarding the draft implementing rules that define anti-competitive behavior in the development of standards and the licensing and implementation of SEPs. Right holders stated concerns that *AML* enforcement can be misused for the purpose of depressing the value of foreign-owned IP in key technologies, including by finding violations of the law with respect to the licensing of patents without actual harm to competition or the competitive process.

In November 2024, SAMR released the final version of the *Anti-Monopoly Guidelines in the Field of Standard Essential Patents*. Stakeholders have raised concerns about the potential misuse of anti-monopoly enforcement to favor domestic companies, especially in cases involving complex technologies.

It is critical that China's *AML* enforcement be fair, transparent, and non-discriminatory; afford due process to parties; focus on whether there is harm to competition or the competitive process, consistent with the legitimate goals of competition law; and implement appropriate competition remedies to address the competitive harms. China should not use competition law to advance non-competition goals.

*China's "Secure and Controllable" Policies*

China continues to build on its policies for "secure and controllable" information and communications technology (ICT) products under the *Cybersecurity Law* (*CSL*) and the *Cryptography Law*. In 2022, the Cyberspace Administration of China issued final implementing measures for conducting cybersecurity reviews under the *CSL*. Right holders continue to raise concerns about the invocation of cybersecurity as a pretext to require disclosure of trade secrets and other types of IP and to restrict market access. Furthermore, encryption laws, which impose

mandatory approval requirements with unclear exemptions, create an uncertain business environment for foreign companies.

U.S. right holders should not be forced to choose between protecting their IP against unwarranted disclosure and competing for sales in China. Going forward, China must not invoke security concerns in order to erect market access barriers, require the disclosure of critical IP, or discriminate against foreign-owned or -developed IP.

*Industrial Designs*

In 2022, China acceded to the Hague Agreement Concerning the International Registration of Industrial Designs. As a positive development, the *Implementing Regulations of the Patent Law*, which entered into force in January 2024, clarified the connection between international design application procedures and domestic procedures.

*Geographical Indications*

In January 2024, China finalized the *Measures for Protection of Geographical Indication Products*. The new measures fail to require the identification of individual components of multi-component terms that are being considered for GI protection when GI applications that contain multi-component terms are published for opposition. Without this information, interested parties may assume that all individual components of multi-component terms in an application for GI protection will also be protected as GIs, which imposes onerous burdens on parties seeking to oppose such applications. In addition, right holders continue to raise concerns about certain trademark examination cases that involve the use of common names. CNIPA released an *Implementation Plan for the Geographical Indication Protection Project* in January 2024 to promote the development of China's GIs. It is critical that China ensure full transparency and due process with respect to the protection of GIs, including safeguards for common names, respect for prior trademark rights, clear procedures to allow for opposition and cancellation, and fair market access for U.S. exports to China that rely on trademarks or the use of common names.

*Legislative, Administrative, and Judicial Issues*

A long-standing concern has been that Chinese courts publish only selected decisions rather than all preliminary injunctions and final decisions. Moreover, the number of verdicts uploaded online has consistently decreased over the past five years, further hampering transparency and making it more difficult for right holders to determine how China protects and enforces foreign IP. In January 2024, the SPC admitted to the decrease in case publications and announced the launch of a National Court Judgments Database. Initial details shared in December 2023 indicated the database would not be available to the public, and the SPC has yet to clarify the extent to which case decisions will be accessible to the general public or foreign firms. Additional concerns include interventions in judicial proceedings by local government officials, party officials, and powerful local interests that undermine the authority of China's judiciary and rule of law. In January 2024, amendments to the *Civil Procedure Law* entered into effect that expanded the jurisdiction of Chinese courts in cases involving foreign parties. A judiciary truly independent from the Communist Party of China is critical to promote rule of law in China and to protect and

enforce IP rights. Right holders also expressed concerns about the increased emphasis on administrative enforcement, as authorities often fail to provide right holders with information regarding the process or results of enforcement actions. The transfer of administrative IP cases for criminal enforcement remains uneven, as administrative authorities may be reluctant to transfer cases where they can collect large fines and criminal enforcement authorities reportedly lack the budget for warehousing counterfeits and investigations.

China has taken steps to develop "social credit" systems for IP that punish infringers through the use of social credit penalties, such as addition to a blacklist and potential joint punishment by a wide range of agencies. These measures lack critical procedural safeguards, such as sufficient notice to the entity targeted for punishment, clear factors for determinations, and opportunities for appeal. The United States continues to object to any use of the "social credit system," including in the field of IP.

Right holders continue to raise concerns about their ability to meet consularization and notarization requirements for documents submitted to the Beijing Intellectual Property Court and in other IP-related proceedings. As a positive step, the Convention of 5 October 1961 Abolishing the Requirement of Legalisation for Foreign Public Documents (Apostille Convention) entered into force with respect to China in November 2023. However, in 2025, right holders continue to report inconsistent implementation, including instances where Chinese courts still required burdensome legalization procedures for certain court foreign documents, hampering the efficiency of civil litigation to resolve IP disputes.

***Developments, Including Progress and Actions Taken***

*Legislative, Administrative, and Judicial Developments*

In 2025, the NPC and its Standing Committee issued several legislative reforms, including draft amendments to the *Trademark Law* and *Anti-Unfair Competition Law*, but these actions continue to fall short of addressing key IP concerns. Despite some positive reports from right holders of courts issuing higher damage awards for IP infringement, insufficient damage awards are still a concern. China also has yet to address right holder concerns with respect to preliminary injunctive relief, evidence production, evidentiary requirements, establishment of actual damages, burdensome thresholds for criminal enforcement, and lack of deterrent-level damages and penalties.

In December 2025, the NPC released a draft amendment to the *Trademark Law* for public comment. The draft amendment contains some positive changes, including expanded enforcement authority for county-level governments, improved tools to address bad faith trademarks, and greater clarity on registrability, use obligations, and administrative enforcement. However, the draft amendment still falls short of addressing other long-standing concerns, particularly regarding stronger civil remedies and systemic deterrence against repeat bad faith actors.

In June 2025, the NPC issued amendments to the *Anti-Unfair Competition Law*, which came into effect on October 15, 2025. Despite the positive introduction of new restrictions on using influential third-party brands as search keywords, stronger regulation of fake reviews and

malicious online conduct, and increased pressure on platforms to monitor and address IP-related unfair practices, other outstanding concerns were not addressed, such as low penalty ceilings for trade secret misappropriation and the lack of enhanced damages for bad faith violations, among other issues.

The persistent lack of transparency and the potential for political intervention with the judicial system, as well as the continued emphasis on administrative enforcement in China, remain as critical concerns. Adding to these concerns, in March 2025, the State Council of China issued the *Provisions on the Handling of Foreign-Related Intellectual Property Disputes*, a troubling measure that seemingly legitimizes political intervention in IP disputes. This measure authorizes Chinese government agencies to take countermeasures against and impose restrictions on foreign entities that "use intellectual property disputes as an excuse to contain and suppress China" and also to "take discriminatory restrictive measures against Chinese citizens or organizations." The measure further prohibits any organization or individual from implementing or assisting in implementing foreign IP enforcement actions deemed "discriminatory restrictive measures," or else be liable for civil damages. In March 2025, CNIPA released a 2025 Working Plan for IP Administrative Protection that, among other provisions, called for enhanced monitoring and early warning of Section 337 investigations at the U.S. International Trade Commission. In December 2025, China amended the *Foreign Trade Law*, adding provisions that appear to grant the State Council authority to intervene in IP cases.

*Bad Faith Trademarks and Other Trademark Examination Developments*

Bad faith trademarks remain one of the most significant challenges for U.S. brand owners in China. Stakeholders noted a shift within CNIPA in 2025 toward stricter examination standards, presumably to combat bad faith trademark filings, but also noted that no official announcements have been made about changes in examination practices. This shift has also reportedly increased the evidentiary burden on legitimate trademark holders and even resulted in preliminary refusals of legitimate trademark applications in the past year.

Stakeholders also continue to express other concerns relating to trademark examination, including regarding unnecessary constraints on examiners' ability to consider applications and marks across classes of goods and services, as well as the CNIPA Trademark Review and Adjudication Department's increasing refusal to consider co-existence agreements and letters of consent during the trademark registration or appeal process. They also noted that, in 2025, CNIPA's Trademark Office continued to erroneously refuse trademark applications on absolute grounds (such as lacking distinctiveness, being deceptive as to product quality or source, and being offensive to socialist morality), which are much more difficult to overcome on appeal and often lead to refusals in future applications for the same trademark. In addition to denying right holders the ability to register their legitimate trademarks, erroneous refusals on absolute grounds significantly impact business operations because, in such cases, the right holder must immediately cease use of the mark even if the product already has launched or face significant potential penalties by administrative enforcement officials. Right holders also continued to report in 2025 that CNIPA is rejecting defensive filings allowed under the *Guidelines for Trademark Examination and Trial*, denying brand owners a useful proactive tool to defend against bad faith filings.

Stakeholders continue to urge the adoption of reforms to address the difficulties faced by legitimate right holders in obtaining well-known trademark status. The United States urges China to address these concerns from right holders concerning the administration of trademarks.

*Patent and Related Developments*

China continues to impose unfair and discriminatory conditions on the effective protection against unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for pharmaceutical products. The United States and China agreed to address this issue in future negotiations. In March 2025, the National Medical Products Administration (NMPA) issued for public comment draft *Implementation Measures for Drug Clinical Trial Data Protection* and draft *Drug Trial Data Protection Procedures*, but the draft measures would preclude or condition the duration of protection on whether marketing approval is sought first in China. In January 2026, the State Council issued the *Implementing Regulations of the Drug Administration Law*, which will take effect in May 2026. The measure provided an upper limit of six years of protection but did not address what period of protection should apply with respect to drugs first approved outside of China.

In December 2025, the SPC issued for public comment a draft *Judicial Interpretation (III) on Several Issues Concerning the Application of Law in the Trial of Patent Infringement Disputes*. The draft judicial interpretation raises concerns about allowing defendants to relitigate the same prior art issues across multiple forums, creating duplicative proceedings and imposing unnecessary burdens on patent owners.

The large quantities of poor-quality patents that are granted continue to be a concern. Although CNIPA announced in January 2021 the elimination of patent subsidies by 2025, local incentivization mechanisms continue to include subsidies for patent licensing, validity disputes, and litigation that can potentially distort the commercial market for patents.

*Copyright Developments*

Right holders continue to highlight the need for effective implementation and clarification of criminal liability for the manufacture, distribution, and exportation of circumvention devices, as well as new measures to address online piracy. Stakeholders raised concerns about an increase in the export of pirated content, services, and devices from China in 2025, further contributing to the dissemination and accessibility of infringing content around the world. China has yet to issue a draft or final regulations regarding measures related to the 2021 amendments to the *Copyright Law*. Right holders continue to report uncertainty about whether these amendments protect sports and other live broadcasts, and recommend clarification in the copyright regulations. While right holders again welcomed some effective, but limited, enforcement actions, such as the annual Sword-Net Special Campaign that targeted online piracy of copyrighted content, they continue to encourage China to develop these periodic campaigns into sustained, long-term enforcement measures.

# INDIA

India remains on the Priority Watch List in 2026.

***Ongoing Challenges and Concerns***

Over the past year, India has remained inconsistent in its progress on intellectual property (IP) protection and enforcement. Although India has worked to strengthen its IP regime, including by significantly supplementing examination staff at the IP Office, raising public awareness about the importance of IP, and engaging with the United States on IP issues, there continues to be a lack of progress on many long-standing IP concerns raised in prior Special 301 Reports. India remains one of the world's most challenging major economies with respect to the protection and enforcement of IP.

India made some meaningful progress in 2024 to promote IP protection and enforcement in some areas and took steps to partially address long-standing issues by notifying the *Patents (Amendment) Rules, 2024*. The amendments included provisions that are likely to increase the efficiency of the patent regime and reduce current burdens on patent applicants. However, patent issues continue to be of particular concern in India. Among other concerns, the potential threat of patent revocations and the procedural and discretionary invocation of patentability criteria under the *Indian Patents Act* impact companies across different sectors, and has led to significant application delays and rejections. Moreover, patent applicants generally continue to confront long waiting periods to receive patent grants, excessive reporting requirements, and frequent and protracted pre-grant opposition procedures. The United States encourages India to continue moving forward with reform efforts to reduce patent pendency times and improve the patent system for all users.

Despite India's justifications of limiting IP protections as a way to promote access to technologies, India maintains high customs duties directed to IP-intensive products such as information and communications technology (ICT) products, solar energy equipment, medical devices, pharmaceuticals, and capital goods. Stakeholders also continue to raise concerns as to whether India has an effective system for protecting against the unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for pharmaceutical and agricultural chemical products. In the pharmaceutical sector, the United States continues to monitor the restriction on patent-eligible subject matter in Section 3(d) of the *Indian Patents Act* and its impacts. Pharmaceutical stakeholders also express concerns as to whether India has an effective mechanism for the early resolution of potential pharmaceutical patent disputes. In particular, India does not have a system to provide notice to a patent holder or to allow for a patent holder to be notified prior to the marketing of a follow-on product, which limits transparency.

Stakeholders also remain concerned about burdensome requirements that only apply to foreign entities contained in the *Biological Diversity Rules, 2024* that came into force in December 2024. These Rules require that any foreign entity seeking IP protection for inventions derived from research or information, including digital sequence information, based on Indian biological resources, obtain prior approval from the National Biodiversity Authority.

While India continued to take actions against websites with pirated content during the last year, and took steps to improve IP Office operations and procedures, India's overall IP enforcement remains inadequate. Weak enforcement of IP by law enforcement, a lack of familiarity with IP-specific investigation techniques, the continued absence of coordination among India's many national- and state-level law enforcement agencies, and the lack of meaningful deterrent penalties continue to hamper enforcement and prosecution efforts. India remains home to several markets that facilitate counterfeiting and piracy, as identified in the *2025 Review of Notorious Markets for Counterfeiting and Piracy* (*Notorious Markets List*). While some of India's state authorities continue to operate dedicated and effective IP crime enforcement units, similar organization are mostly absent in other states. Given the scale and nature of the IP infringement problem in India, the United States continues to encourage the establishment of more state-run dedicated IP crime enforcement units and adoption of a national-level enforcement task force for IP crimes.

The United States welcomed the establishment of additional Intellectual Property Divisions at the High Courts in 2024, bringing the total to four. The United States continues to monitor these developments and encourages allocating resources for education and staffing. The United States is monitoring India's next steps, including any actions taken on the many recommendations in the Department Related Parliamentary Standing Committee on Commerce (DRPSCC) July 2021 report, *Review of the Intellectual Property Rights Regime in India*.

Overall, the levels of trademark counterfeiting remain problematic. In addition, U.S. brand owners continue to report excessive delays in trademark opposition proceedings and a lack of quality in examination. Initiatives taken by the government to address the backlog of trademark opposition cases include holding stakeholder meetings, developing an action plan, issuing recruitment notices in September and December 2025 for more trademark examiners and other officials, and issuing an office order in October 2025 for restructuring of the Trade Marks Registry. The United States encourages continued efforts toward resolving the extensive trademark opposition backlog pursuant to the directions of the Delhi High Court. Additionally, it remains unclear whether trademark owners need a prior Indian court or trademark office decision in order to apply for recognition of "well-known" trademark status. The United States continues to urge India to join the Singapore Treaty on the Law of Trademarks.

Copyright holders continue to report high levels of piracy, particularly online. In August 2021, the Department for Promotion of Industry and Internal Trade (DPIIT) issued a notice requesting comments on the recommendation of a Parliamentary committee to extend statutory licensing under Section 31D of the *Indian Copyright Act*, which provides statutory licenses for broadcasting sound recordings and literary and musical works, to "internet or digital broadcasters." In August 2024, DPIIT withdrew the Department of Industrial Policy and Promotion (which was renamed to DPIIT) memo of September 2016 interpreting Section 31D to cover "internet broadcasting," which was a welcome step. However, the lack of predictability around Section 31D and overly broad exceptions for certain uses has raised concerns about the strength of copyright protection in India.

Despite India's commitment at the United States-India Trade Policy Forums (TPF) in November 2021, January 2023, and January 2024 to comply with the World Intellectual Property Organization (WIPO) Performances and Phonograms Treaty (WPPT) and WIPO Copyright Treaty (WCT), collectively known as the WIPO Internet Treaties, to which India acceded in 2018,

amendments to the Indian *Copyright Act* are still needed to fully implement the WIPO Internet Treaties and bring India's domestic legislation into alignment with international best practices, including with respect to technological protection measures and right management information. Furthermore, stakeholders have reported continuing problems with unauthorized file sharing of video games, signal theft by cable operators, commercial-scale photocopying and unauthorized reprints of academic books, and circumvention of technological protection measures.

The Indian government previously facilitated a memorandum of understanding between the Indian Singers' and Musicians' Rights Association (ISAMRA) and music labels, including Indian Music Industry (IMI) member labels, as a step to helping performers receive compensation for broadcasts and other performances. The United States encourages India to take necessary additional steps, including authorizing collective management organizations to collect for the use of sound recordings and performances so that royalties can flow to producers and performers, respectively.

***Developments, Including Progress and Actions Taken***

In 2025, positive developments in India's IP landscape included the government's notification of the *Geographical Indications of Goods (Registration and Protection) (Amendment) Rules, 2025* and revision of the notice-and-takedown framework for online intermediaries. The United States will continue to monitor the implementation of these developments.

In December 2025, DPIIT published a *Working Paper on Generative AI and Copyright – Part 1* for public consultation. The paper has raised deep concerns among stakeholders, including copyright holders and creators, as well as tech industry and AI developers, particularly regarding the recommendation for statutory licenses and mandatory extended collective management of rights. The United States will closely follow developments in this area, including the planned publication of a second Working Paper.

Companies also continue to face uncertainty due to insufficient legal means to protect trade secrets in India. The earlier referenced DRPSCC July 2021 report, *Review of the Intellectual Property Rights Regime in India*, recommended "to consider enacting a separate legislation or a framework" and "to examine the relevant and best practices" for protection of trade secrets. The Law Commission of India subsequently undertook a comprehensive study on the desirability and feasibility of legislation on trade secrets in India, and in March 2024 recommended to the Indian government that a *sui generis* legislation be introduced to protect trade secrets. In 2025, DPIIT held meetings with industry following the Law Commission's report and sought industry's perspective on aspects of specific subject matter for protection, experience in other jurisdictions, and issues faced under the current regime. Currently no civil or criminal laws in India specifically address the protection of trade secrets. Criminal penalties are not expressly available for trade secret misappropriation in India, and civil remedies reportedly are difficult to obtain and do not have a deterrent-level effect. U.S. and Indian companies have identified trade secret protection as a growing concern and expressed interest in India eliminating gaps in its trade secrets regime, such as through the adoption of trade secret legislation that comprehensively addresses these concerns. One particular issue highlighted by stakeholders is the requirement for companies to disclose their source code for telecom equipment undergoing required certification

and security testing at designated Indian facilities. The United States encourages India to continue working toward providing adequate and effective protection of trade secrets in India.

The United States intends to continue to engage with India on IP matters, including through U.S.-India Bilateral Trade Agreement negotiations and the TPF's Intellectual Property Working Group.

# INDONESIA

Indonesia remains on the Priority Watch List in 2026.

***Ongoing Challenges and Concerns***

U.S. right holders continue to face challenges in Indonesia with respect to adequate and effective intellectual property (IP) protection and enforcement, as well as fair and equitable market access. Indonesia lacks effective enforcement against widespread piracy and counterfeiting, including lack of enforcement against counterfeit goods, lack of deterrent-level penalties for IP infringement in physical markets and online, and ineffective border enforcement. As manufacturing has moved from China to Indonesia for goods such as footwear, local manufacturing of counterfeits has increased. Counterfeit sales have shifted online, but there are few investigations or enforcement actions against online sellers of pirated or counterfeit goods. Stakeholders have raised concerns over Indonesia's *Copyright Law*, including with respect to overbroad exceptions to provisions that prohibit the circumvention of technological protection measures, and have urged Indonesia to consider revisions to the *Copyright Law*. Online piracy through piracy devices and applications continues to be widespread. Stakeholders report that Indonesia has one of the highest rates of music piracy in the world and that homegrown piracy sites and services have surged in popularity, with limited enforcement efforts against their operations. Unauthorized camcording and unlicensed use of software remain problematic. Judicial delays and lack of expertise among judges also remain as concerns. Although the Directorate General for Customs and Excise (DGCE) holds *ex officio* authority for border enforcement against pirated and counterfeit goods and has instituted a recordation system, few foreign right holders are able to benefit from the system because of local domicile requirements and large deposits that are required to cover the value of seizures during enforcement actions, which would be forfeit if the goods are not proven counterfeit. The effectiveness of the DGCE has been limited because its recordation system only contains a small number of trademarks and copyrights, and the DGCE has not been able to make full use of its *ex officio* authority to detain infringing goods.

Other concerns include Indonesia's law concerning geographical indications (GIs), which raises questions about the effect of new GI registrations on pre-existing trademark rights and the ability to use common food names. Concerns remain about the lack of an effective system for protecting against the unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for pharmaceutical and agricultural chemical products.

The *Patent Law* continues to raise concerns about how applicants can comply with disclosure requirements for inventions related to traditional knowledge and genetic resources and what the grounds and procedures are for issuing compulsory licenses. Although the Directorate General for Intellectual Property (DGIP) introduced an online filing system for annual statements on the implementation of patents, the *Patent Law* lacks clarity about how right holders should meet the requirement to submit annual statements and the potential penalties for non-compliance.

In addition, the United States remains concerned about a range of market access barriers in Indonesia, including certain measures related to motion pictures. Specifically, *Ministry of*

*Education and Culture Regulation 34/2019*, which is an implementing regulation for the 2009 *Film Law*, includes screen quotas and a dubbing ban for foreign films. If enforced, this regulation would restrict foreign participation in this sector.

***Developments, Including Progress and Actions Taken***

In 2025, Indonesia made some progress in IP enforcement, but significant concerns remain. U.S. stakeholders continue to note some progress related to Indonesia's efforts to address online piracy, including increased enforcement efforts and cooperation between the Ministry of Communications and Digital Affairs and the DGIP.

Indonesia's IP Enforcement Task Force has continued efforts to raise awareness of IP challenges among government agencies and pushed for increased investigation of IP cases. The government is reportedly considering the formation of a larger, national task force for trade monitoring and IP enforcement. The United States continues to encourage Indonesia to develop a specialized IP unit under the Indonesian National Police to focus on investigating the Indonesian criminal organizations behind counterfeiting and piracy and to initiate larger and more significant cases. There have been few IP prosecutions relative to the country's population, including reportedly only one criminal conviction in copyright piracy cases for the last five years. Indonesia also has imposed excessive and inappropriate penalties on patent holders as an incentive to collect patent maintenance fees. The United States continues to monitor the issue.

The United States urges Indonesia to ensure transparency and due process in the protection of GIs and to ensure that the grant of GI protection does not deprive interested parties of the ability to use common names, particularly as Indonesia proceeds with the European Union (EU)-Indonesia Comprehensive Economic Partnership Agreement.

Under the U.S.-Indonesia Agreement on Reciprocal Trade, signed on February 19, 2026, Indonesia has agreed to take steps to resolve many long-standing IP issues. These commitments include significantly increasing IP enforcement actions, eliminating local domicile requirements for the recordation system, criminalizing the trafficking of devices that circumvent technological protection measures, criminalizing unauthorized camcording, and extending the term of protection to seventy years since first publication for works for which the term is not based on the life of an author. They also include a commitment to provide protection against unfair commercial use, as well as unauthorized disclosure, of test or other data generated to obtain marketing approval for pharmaceutical and agricultural chemical products. Indonesia has also committed to groundbreaking provisions that will preserve current and future U.S. market access for U.S. cheese and meat producers who rely on the use of common names. This includes ensuring that market access will not be restricted due to the mere use of certain cheese and meat terms. Indonesia also committed to robust standards for transparency and fairness regarding the protection of GIs and to ensure that U.S. products can continue using terms that have been unfairly protected as GIs. The United States will closely monitor Indonesia's progress in implementing its commitments under the Agreement on Reciprocal Trade.

# RUSSIA

Russia remains on the Priority Watch List in 2026.

***Ongoing Challenges and Concerns***

The overall intellectual property (IP) situation in Russia remains extremely challenging, including due to Russia's adoption of legal and regulatory measures to further weaken existing IP protections. Since 2022, Russia has taken measures to target IP rights of foreign right holders from countries designated by Russia as "unfriendly." These include *Decree 299* implemented in 2022, which allows Russian companies and individuals to avoid paying compensation to right holders for the use of inventions, utility models, and industrial designs under Article 1360 of the *Russian Civil Code*, if the right holder comes from a list of countries designated by Russia as "unfriendly" due to factors including publicly supporting or calling for sanctions against Russia. Another measure, *Decree 322*, restricts the ability of foreign right holders from "unfriendly states" to collect license payments for most types of IP, and is supplemented by *Decree 430*, which in 2024 introduced additional restrictions on the acquisition of IP rights from "unfriendly" jurisdictions and on license and royalty payments to foreign right holders from "unfriendly states." Finally, *Decree 422*, also introduced in 2024, establishes the framework to seize any U.S. persons' assets in Russia, including IP rights owned by U.S. companies or individuals.

Challenges to IP protection and enforcement in Russia include continued copyright infringement, trademark counterfeiting, and the existence of non-transparent procedures governing the operation of collective management organizations (CMOs). In particular, the United States is concerned about stakeholder reports that IP enforcement remains inadequate and that Russian authorities continue to lack sufficient staffing, expertise, and, most importantly, the political will to effectively combat IP violations and criminal enterprises.

The lack of robust enforcement of IP rights is a persistent problem, compounded by burdensome court procedures. For example, the requirement that plaintiffs notify defendants a month in advance of instituting a civil cause of action allows defendants to liquidate their assets and thereby avoid liability for their infringement. Additionally, requiring foreign right holders to abide by strict documentation requirements, such as verification of corporate status, hinders their ability to bring civil actions.

Inadequate and ineffective protection of copyright, including with regard to online piracy, continues to be a significant problem, damaging both the market for legitimate content in Russia as well as in other countries. The withdrawal of foreign-based entertainment companies from the Russian market left online content piracy unchecked due to poor enforcement of anti-piracy legislation by the government. Russia remains home to several sites that facilitate online piracy, as identified in the *2025 Review of Notorious Markets for Counterfeiting and Piracy* (*Notorious Markets List*). Stakeholders continue to report significant piracy of video games, music, movies, books, journal articles, and television programming. Mirror sites replicating websites that offer infringing content and smartphone applications that facilitate illicit trade are also major concerns. Russia needs to direct more action against rogue online platforms targeting audiences outside the country. In 2018, right holders and online platforms in Russia signed an anti-piracy memorandum,

which was extended until May 2026, to facilitate the removal of links to websites that offer infringing content. Despite expectations from stakeholders that this memorandum would be implemented as legislation covering all works protected by copyright and applying to all Russian platforms and search engines, no progress has been made since 2021. Although right holders are able to obtain court-ordered injunctions against websites and smartphone applications that offer infringing content, Russia must take additional steps to target the root of the problem, namely, investigating and prosecuting the owners of the large commercial enterprises distributing pirated material, including software. Moreover, prominent Russian online platforms continue to provide access to thousands of pirated films and television shows. Stakeholders report that third-party operators continue to organize illegal screenings of U.S. films in theaters throughout Russia, with content sourced through online piracy. There is also evidence of recording occurring at these illegal screenings, compounding the harm. While an August 2021 government decree on rules for showing films in theaters allows exhibitors to remove viewers attempting to record films illicitly, the decree does not remedy the existing lack of legal liability under Russian law for unauthorized camcording. Stakeholders also report that Russia remains among the most challenging countries in the world in terms of video game piracy.

Royalty collection and distribution by CMOs in Russia continue to lack transparency and do not correspond to international standards. Reports indicate that right holders are denied detailed accounting reports, making it difficult to verify how much money is being collected and distributed. Also, right holders are excluded from the selection and management of CMOs. The United States encourages Russia to update and modernize its CMO regime and institute practices that are fair, transparent, efficient, and accountable.

Russia remains a thriving market for counterfeit goods sourced from China, and stakeholders report that enforcement appears to have substantially decreased since 2022.

Stakeholders also report that, in practice, Russia's trade secret regime places an undue burden on right holders in terms of requiring specific prerequisites for protection that do not reflect the commercial realities of most businesses. In terms of trade secret enforcement, stakeholders report that, despite their availability, deterrent-level penalties and preliminary measures are rarely imposed by courts for trade secret misappropriation.

The United States is also concerned about Russia's implementation of its World Trade Organization commitments related to the protection against the unfair commercial use, as well as the unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for pharmaceutical products. Stakeholders report that Russia is eroding protections for undisclosed data, and the United States urges Russia to adopt a system that meets international norms of transparency and fairness. Stakeholders also report that Russia lacks an effective mechanism for the early resolution of potential pharmaceutical patent disputes and continue to express concerns regarding certain evidentiary standards applied by the judiciary.

***Developments, Including Progress and Actions Taken***

Despite the numerous challenges to IP enforcement and protection in Russia, there were some positive legislative developments over the course of 2025. In July 2025, the Russian government

amended the Civil Code to give courts greater discretion in determining compensation for IP infringement, including doubling the maximum statutory compensation amount for most cases of IP infringement. In June 2025, Russia also adopted legislation that strengthened criminal liability for illegal use or disclosure of trade secrets and introduced mandatory minimum penalties. However, it is unclear if the new measures have been effectively enforced. Stakeholders continue to report that Russia's trade secret regime is overly burdensome and imposes onerous requirements on the right holder as a prerequisite for protection. Stakeholders report that these requirements, such as submitting a specific inventory of the information to be protected and an up-to-date record of those with access to the information, do not reasonably reflect the commercial and operational realities of most businesses.

The United States urges Russia to develop a more comprehensive, transparent, and effective enforcement strategy to reduce IP infringement, particularly the sale of counterfeit goods and the piracy of copyright-protected works. The United States continues to monitor Russia's actions on these and other matters through appropriate channels.

# VENEZUELA

Venezuela remains on the Priority Watch List in 2026.

***Ongoing Challenges and Concerns***

Recognizing the significant challenges in Venezuela at this time, the United States has several ongoing concerns with respect to the country's lack of adequate and effective intellectual property (IP) protection and enforcement. Venezuela's reinstatement several years ago of its 1955 *Industrial Property Law*, which falls below international standards and raises concerns about trade agreements and treaties that Venezuela subsequently ratified, has created significant uncertainty and deterred investments related to innovation and IP protection in recent years. Piracy, including online piracy, as well as unauthorized camcording and widespread use of unlicensed software, remains a persistent challenge. Counterfeit goods are also widely available, and IP enforcement remains ineffective.

***Developments, Including Progress and Actions Taken***

While Venezuela's Autonomous Intellectual Property Service (SAPI) granted new patents and also waived various filing fees for small and medium enterprises to encourage IP system usage in 2021, the country did not make any notable progress toward improving IP protection in 2025. In March 2026, United States recognized the new interim government and reopened the U.S. Embassy in Caracas. The Office of the United States Trade Representative (USTR) looks forward to when improvements in the political situation will allow substantive engagement and improvement on IP issues.

# WATCH LIST

## ALGERIA

Algeria remains on the Watch List in 2026. In 2024, Algeria established a national interministerial committee to review the country's regulatory framework for intellectual property (IP) and recommend updates. The committee's review is scheduled for completion in 2026. Additional initiatives, such as legislative amendments to address outstanding IP concerns, including measures to address counterfeiting, also remain pending. However, counterfeiting and digital piracy remain widespread in the country, and Algeria's existing enforcement procedures are inadequate to address these issues. As Algeria plans to amend and implement its IP-related laws, the United States encourages Algeria to provide interested stakeholders with meaningful opportunities for input. Algeria needs to increase enforcement efforts against trademark counterfeiting and copyright piracy, particularly online and Internet Protocol television (IPTV) piracy. Algeria also needs to provide adequate judicial remedies in cases of patent infringement. Algeria still lacks an effective mechanism for the early resolution of potential pharmaceutical patent disputes, and Algeria does not provide an effective system for protecting against the unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for pharmaceutical products. The United States will continue to engage with Algeria to improve Algeria's IP protection and enforcement environment.

# ARGENTINA

Argentina moves from the Priority Watch List to the Watch List in 2026.

In February 2026, Argentina signed an Agreement on Reciprocal Trade and Investment (ARTI) with the United States, under which Argentina made commitments that will benefit American innovators and creators by enhancing intellectual property (IP) protection and prioritizing enforcement against IP theft. This includes moving forward with a number of key international IP treaties, and taking steps to resolve many long-standing IP issues identified in the Special 301 Report. These steps include preparing reports on the feasibility of a data protection regime and on the causes of delays in the patent granting process, strengthening criminal enforcement by ensuring deterrent-level penalties including enhanced fines and prison sentences for counterfeiting by organized criminal networks, providing *ex officio* authority for border enforcement including for in-transit goods, establishing a coordination body for IP enforcement agencies and assessing the institutional structure and competencies of judicial and prosecutorial bodies, and enacting legislation to support effective civil actions, including injunctions against copyright piracy. Argentina will also take steps to reduce patent pendency, increase raids and seizures at notorious markets and distribution centers, develop a national enforcement strategy to combat piracy and counterfeiting, compile and publish quarterly IP enforcement statistics, enforce landlord liability for tenants engaged in selling counterfeit and pirated goods, amend the criminal code to address circumvention of technological protection measures and removal of rights management information, promote cooperation among Internet service providers (ISPs), right holders, and other stakeholders, and investigate and pursue criminal prosecutions against operators of Argentina-based websites engaged in commercial-scale copyright piracy. Argentina has also committed to groundbreaking provisions that will preserve current and future U.S. market access for U.S. cheese and meat producers who rely on the use of common names. This includes ensuring that market access will not be restricted due to the mere use of certain cheese and meat terms. Argentina has committed to robust standards for transparency and fairness regarding the protection of geographical indications (GIs) and to ensure that U.S. products can continue using terms that have been unfairly protected as GIs.

Notably, in March 2026, Argentina took a major step under the ARTI with the repeal of unduly broad limitations on patent-eligible subject matter for pharmaceutical patents, which included patent examination guidelines that automatically reject patent applications for categories of pharmaceutical inventions that are eligible for patentability in other jurisdictions and requirements that processes for the manufacture of active compounds disclosed in a specification be reproducible and applicable on an industrial scale. The United States will monitor implementation of the ARTI commitments.

However, Argentina continues to present long-standing challenges to IP-intensive industries, including those from the United States. Enforcement of IP rights in Argentina remains a challenge, both at physical markets and online. The physical markets of La Salada and Barrio Once in Buenos Aires were identified as notorious markets again in the *2025 Review of Notorious Markets for Counterfeiting and Piracy* (*Notorious Markets List*), and online orders of counterfeit goods continue through social media platforms associated with La Salada. While a federal prosecutor through a judicial order led 60 simultaneous raids across La Salada and surrounding areas in 2025,

leading to multiple arrests, Argentine police generally do not take *ex officio* actions, and prosecutions can stall and languish in excessive formalities. Also, when a criminal case does reach final judgment, infringers rarely receive deterrent-level sentences.

Regarding online copyright piracy, Argentina has also increased efforts to combat online piracy through several high-profile operations. For example, a multi-agency operation involving the Cybercrime Unit of the Buenos Aires Provincial Prosecutor's Office and the Federal Police dismantled a prominent illegal Internet Protocol television (IPTV) service called Magis TV Pro. This operation has led to four arrests and one conviction. While Argentine law enforcement have made some arrests related to online piracy cases, online piracy continues to grow despite these criminal enforcement efforts. As a result, IP enforcement online in Argentina consists mainly of right holders trying to convince Argentine ISPs to take down specific infringing works, as well as attempting to seek injunctions in civil cases, both of which can be time-consuming and ineffective. The creation of a federal specialized IP prosecutor's office and a well-trained enforcement unit could potentially help combat online piracy as well as prevent lengthy legal cases with contradictory rulings.

To address these enforcement issues, the United States encourages enforcing laws concerning landlord liability and stronger enforcement on the sale of infringing goods at outdoor marketplaces such as La Salada and Barrio Once and to amend the trademark law to increase criminal penalties for counterfeiting carried out by criminal networks. Revisions to the criminal code that had been submitted to Argentina's Congress, including certain criminal sanctions for circumventing technological protection measures, have stalled. The United States also encourages Argentina to create a national IP enforcement strategy to enhance interagency coordination in enforcement efforts and move to having a sustainable, long-lasting impact on IP infringements.

With respect to patent and related issues, stakeholders assert that Argentina's limitations on patentability for biotechnological innovations based on living matter and natural substances differ from the standard in many other countries. Another ongoing challenge to the innovative agricultural chemical and pharmaceutical sectors is inadequate protection against the unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for products in those sectors. The National Institute of Industrial Property (INPI) continues to operate with a reduced number of patent examiners, with limited resources posing challenges to recruitment and retention. In 2025, INPI reported that it reduced the patent application backlog, although stakeholders continue to highlight lengthy delays in processing patent applications, averaging six to seven years.

Regarding geographical indications (GIs), the United States urges Argentina to ensure transparency and due process in the protection of GIs and to ensure that the grant of GI protection does not deprive interested parties of the ability to use common names, particularly as Argentina proceeds with the European Union-MERCOSUR Trade Agreement.

The United States will also continue to engage through the United States-Argentina Innovation and Creativity Forum for Economic Development, which was established under the United States-Argentina Trade and Investment Framework Agreement (TIFA), to continue discussions and collaboration in these areas.

# BARBADOS

Barbados remains on the Watch List in 2026. Barbados acceded to the World Intellectual Property Organization (WIPO) Performances and Phonograms Treaty (WPPT) and WIPO Copyright Treaty (WCT), collectively known as the WIPO Internet Treaties, in 2019. In October 2025, Barbados passed the revised *Copyright Bill* intended to implement the WIPO Internet Treaties. A new government agency, Business Barbados, was established in 2025 to manage the intellectual property (IP) registry and improve enforcement. However, concerns remain regarding insufficient legal resources, staffing shortages, weak enforcement of existing legislation, and long-standing backlogs in the judicial system. The United States continues to have concerns about the unauthorized retransmission of U.S. broadcasts and cable programming by local cable operators in Barbados, particularly state-owned broadcasters, without adequate compensation to U.S. right holders. As a positive development, one local cable provider removed U.S. channels from its lineup due to the enforcement of copyright and licensing requirements. Outstanding copyright infringement cases filed by stakeholders against local media operators remained unresolved in 2025. The United States also has continuing concerns about the refusal of Barbadian television and radio broadcasters and cable and satellite operators to pay for public performances of music. The United States urges Barbados to take all actions necessary to address such cases to ensure that all composers and songwriters receive the royalties they are owed for the public performance of their musical works. The United States looks forward to working with Barbados to resolve these and other important issues.

# BELARUS

Belarus remains on the Watch List in 2026. Belarus was removed from the Watch List in 2016 after demonstrating commitment to improve its laws on intellectual property (IP) protection and enforcement. However, in 2022, Belarus passed a law (*Law No. 241-3*) that legalizes unlicensed use of copyrighted works, including computer programs, broadcasts of a broadcasting organization, audiovisual works, and musical works if the right holder or collective management organization (CMO) is from a government list of foreign states "committing unfriendly actions." Furthermore, the law requires Belarus's National Center of Intellectual Property (NCIP) to collect royalties on this unlicensed use of copyrighted works on behalf of the individuals and entities from "unfriendly" states. While NCIP is instructed to retain this remuneration for three years on behalf of the right holder or CMO, after this period, any royalties not requested by the right holder or CMO will be transferred to Belarus's general budget within three months. In this event, the government of Belarus would directly financially benefit from the unlicensed usage of others' IP. Many U.S. stakeholders have withdrawn from the market since 2022, and U.S. Government engagement with Belarus has been limited. The United States urges Belarus to rescind this law and to ensure that it complies with its international obligations, including with respect to copyright and related rights.

# BOLIVIA

Bolivia remains on the Watch List in 2026. Challenges continue with respect to adequate and effective intellectual property (IP) protection and enforcement in Bolivia. The IP laws in Bolivia are outdated, and constitutional restrictions limit effective IP protection. For example, Bolivia relies on a century-old industrial privileges law, which does not address important areas such as trade secrets. In addition, Bolivia has not acceded to the World Intellectual Property Organization (WIPO) Performances and Phonograms Treaty (WPPT) and WIPO Copyright Treaty (WCT), collectively known as the WIPO Internet Treaties. While the National Intellectual Property Service (SENAPI) announced in 2022 that they would be drafting an updated national IP law, there has been little movement on this initiative. In 2022, Bolivia established new administrative procedures for filing and processing IP infringement complaints. Stakeholders have reported that firms may now only file claims against counterfeit goods that pass through official border points and that they cannot seek action against counterfeit goods entering illegally through uncontrolled border crossings into Bolivia. Similarly, Bolivian Customs lacks *ex officio* authority necessary to interdict potentially infringing goods without an application from the right holder. Additional capacity building could help the customs authority effectively address shipments containing counterfeit goods at Bolivia's international borders. On copyright, a bill modifying *Law No. 1322 of Copyright and Related Rights* was reintroduced and passed in Bolivia's Senate in 2025. The bill would extend the copyright term for literary, artistic, and scientific works for the lifetime of the author plus 75 years. The bill is still pending review in Bolivia's lower chamber. Significant challenges also persist with respect to adequate and effective IP enforcement and communication between SENAPI and customs. Video, music, literature, and software piracy rates are among the highest in Latin America. In 2024, SENAPI digitized its processes, enabling trademark registration certificates to be issued via email. It also expanded online services for trademark, industrial designs, and patent applications as well as the registration of copyrightable works. However, rampant trademark infringement persists, and counterfeit medicines remain prevalent throughout the country. Bolivian law provides for substantial penalties for IP offenses, but criminal charges and prosecutions remain rare. Bolivian Customs has authority under the *Cinema and Audiovisual Arts Law of 2018* to pursue criminal prosecutions for IP violations of foreign and domestic visual works, but Bolivia has not promulgated implementing regulations that are necessary to exercise this authority.

# BRAZIL

Brazil remains on the Watch List in 2026. The United States continues to have long-standing concerns about the widespread importation, distribution, sale, and use of counterfeit goods, modified gaming consoles, illicit streaming devices, and other circumvention devices in Brazil. Counterfeit goods have surged in Brazil through smuggling and a significant increase in small parcels entering Brazil. Local manufacturing and finishing of counterfeit goods have also increased.

Enforcement of criminal laws and customs regulations to address the importation and trafficking of counterfeit goods therefore remains an area of serious concern. Despite large-scale raids and seizures, the Rua 25 de Março area remains one of the largest markets for counterfeit goods, in part because the raids are not followed by deterrent-level penalties and long-term disruption of illicit business practices. The Port of Santos, which is the busiest container port in Latin America, and the Brazil-Paraguay-Argentina tri-border area also continue to be significant entry points for counterfeit goods. Although customs enforcement data shows some increase in seizures through periodic campaigns, stakeholders report a lack of systemic and consistent inspections. Factors that reduce the effectiveness of enforcement against counterfeit goods include the lack of deterrent-level penalties authorized by statute or issued by the courts, insufficient number of customs officers posted at border points, and lengthy prosecution times. Right holders also report difficulties in obtaining information about seized counterfeit goods from customs, which prevents effective follow-on investigations into the source and distribution networks of the counterfeits. Stakeholders have expressed cautious optimism at the issuance in December 2025 by Receita Federal of *Ato Declaratório Interpretativo No. 3/2025*, which confirmed that customs may carry out administrative seizures and forfeiture of counterfeit goods without requiring trademark owners to file lawsuits. However, it remains unclear if this measure will lead to an increase in customs seizures.

Although Brazil reports efforts to decrease the average patent pendency, particularly in some fields, the overall average pendency for biopharmaceutical patent applications remains an area of serious concern. According to stakeholders, the average patent application pendency for pharmaceutical patents granted between January 2020 and November 2025 was 9.15 years. The United States is also concerned about the impact of this high average patent application pendency on the effective patent term. Also, Brazil should provide protection against unfair commercial use, as well as unauthorized disclosure, of undisclosed test and other data generated to obtain marketing approval for pharmaceutical products like it does for veterinary and agricultural chemical products.

Although Brazil continued to conduct some effective enforcement campaigns against online piracy, some of which were in conjunction with enforcement officials in the United States and other countries, piracy remains widespread. Piracy of copyrighted content remains a significant barrier to the adoption of legitimate content distribution channels, and more consistent and continuous enforcement operations are needed throughout the year. The United States encourages Brazil to join, as soon as possible, the World Intellectual Property Organization (WIPO) Performances and Phonograms Treaty (WPPT) and WIPO Copyright Treaty (WCT), collectively known as the WIPO Internet Treaties, which are aimed at preventing unauthorized access to creative works online.

The United States urges Brazil to ensure transparency and due process in the protection of geographical indications (GIs) and to ensure that the grant of GI protection does not deprive interested parties of the ability to use common names, particularly as Brazil proceeds with the European Union (EU)-MERCOSUR Trade Agreement. The United States is also concerned about the additional market access impact of Brazil's determination of entities that qualified as prior users for certain GIs under the EU-MERCOSUR Trade Agreement.

Strong IP protection, available to both domestic and foreign right holders, provides a critical incentive for businesses to invest in future innovation in Brazil. It is critical for Brazil to build a strong IP environment and to address these long-standing concerns.

# CANADA

Canada remains on the Watch List in 2026. The lack of intellectual property (IP) enforcement remains a significant concern, particularly at the border and against online piracy. The low number of seizures of counterfeit goods at the border and lack of training for border enforcement officials suggest that Canadian authorities have yet to take full advantage of expanded *ex officio* powers. For counterfeit goods that are seized in Canada, right holders report that enforcement is frustrated by the courts failing to issue consistent deterrent-level penalties against those responsible for the importation, distribution, and sale of the goods. The Pacific Mall in Toronto is listed in the *2025 Review of Notorious Markets for Counterfeiting and Piracy* (*Notorious Markets List*) for selling pirated and counterfeit goods. Levels of online piracy remain very high in Canada, including through direct downloads and streaming. Piracy devices, apps, and subscription services are reportedly sold throughout Canada, both in physical retail locations and through online channels. The United States remains deeply concerned by continued stakeholder reports that broad interpretation of the fair dealing exception for the purpose of education, which was added to the copyright law in 2012, as well as the relevant case law on the subject, has significantly damaged the market for educational authors and publishers. Other concerns with Canada's IP environment include inadequate transparency and due process regarding geographical indications (GIs) protected through free trade agreements. On pharmaceutical pricing practices, Canada's Patented Medicine Prices Review Board (PMPRB), which is responsible for reviewing the prices of patented medicines and ordering reductions or refunds for prices it deems excessive, excludes the United States and Switzerland from its reference basket when analyzing comparator country pricing. U.S. industry stakeholders have raised concerns that the PMPRB's reference basket artificially devalues innovative medicines in Canada. On patent term extensions for unreasonable marketing approval delays, stakeholders have raised concerns on the limited duration, eligibility, and scope of protection in Canada's system. Stakeholders have also expressed concerns that Canada provides patent term extensions for unreasonable patent office delays and patent term extensions for unreasonable marketing approval delays in a concurrent manner, which may unfairly undercut the compensation for the two separate types of unreasonable delays.

# COLOMBIA

Colombia remains on the Watch List in 2026. In 2025, Colombia made minimal progress on the outstanding provisions related to its obligations under Chapter 16 of the United States-Colombia Trade Promotion Agreement (CTPA), including on provisions regarding enforcement against online copyright infringement. In addition, Colombia's accession to the 1991 Act of the International Union for the Protection of New Varieties of Plants Convention (UPOV 1991) remains outstanding. With respect to concerns raised about Article 72 of the *2014 National Development Plan*, passed as a law in 2015, Colombia issued *Decree 433* in March 2018 and *Decree 710 of April 2018* to clarify that Colombia would not condition regulatory approvals on factors other than the safety and efficacy of the underlying compound. Due to a legal action challenging one of the decrees, the Council of State provisionally suspended *Decree 710* in September 2019. Colombia is still considering how it will resolve the uncertainty remaining from the suspended decree. Innovative pharmaceutical manufacturer stakeholders have also raised concerns regarding transparency and due process with the issuance of compulsory licensing for pharmaceuticals.

Colombia's success in combating counterfeiting and other intellectual property (IP) violations remains limited. High levels of digital piracy persist, and Colombia has not curtailed the number of free-to-air devices, community antennas, and unlicensed Internet Protocol television (IPTV) services that permit the retransmission of otherwise-licensed content to a large number of non-subscribers. Stakeholders also report that piracy of licensed content through mobile apps continues to be a growing concern in Colombia. Colombia continues to face a large number of pirated and counterfeit goods crossing the border or sold at markets, on the street, and at other distribution hubs around the country, and stakeholders report that the number of seizures and criminal raids remains low. The "San Andresitos" physical markets, a collection of over 600 shopping centers across Colombia selling counterfeit goods, such as clothing, shoes, handbags, perfumes, and cell phone accessories, were identified as notorious markets in the *2025 Review of Notorious Markets for Counterfeiting and Piracy* (*Notorious Markets List*). The United States recommends that Colombia increase efforts to address online and mobile piracy and focus on disrupting organized trafficking in illicit goods, including at the border and in free trade zones. The United States encourages Colombia to provide key agencies with the requisite authority and resources to investigate and seize counterfeit goods, such as expanding the jurisdiction of the customs police.

The United States looks forward to continuing to work with Colombia to address outstanding issues, particularly with respect to full implementation of the CTPA, in 2026.

# ECUADOR

Ecuador remains on the Watch List in 2026.

While Ecuador has made some efforts to improve intellectual property (IP) enforcement in 2025, particularly in the area of border enforcement coordination between Ecuador's intellectual property agency (SENADI) and Ecuadorian Customs Service (SENAE), Ecuador continues to lack effective laws and regulations covering IP protection and enforcement. Ecuador's *Organic Code on Social Economy of Knowledge, Creativity, and Innovation* (*Ingenuity Code*) adopted in 2016 governs the protection, exercise, and enforcement of IP rights. The *Ingenuity Code*'s implementing regulations, issued in December 2020, do not address concerns raised by the U.S. Government and various stakeholders on issues related to overly broad or vaguely defined copyright exceptions and limitations, patentable subject matter, and geographical indications (GIs), including opposition procedures for proposed GIs, the treatment of common food names, and the protection of prior trademark rights. Little tangible progress was made in 2025 with respect to additional revisions to the *Ingenuity Code*. The United States remains open to any engagement on this process.

Enforcement of IP rights against widespread counterfeiting and piracy remains weak, including online and in physical marketplaces. Stakeholders report that Ecuador is also a source of unauthorized camcording. Despite some increased enforcement activity, Ecuador needs to take additional steps to address continued concerns regarding online piracy. For example, even though the National Assembly reformed Ecuador's *Penal Code* in 2023 and established a regulatory framework for undercover agents to investigate digital actions online, Ecuador has not approved implementing regulations for this reform. In addition, Ecuador has only one specialized cybercrimes prosecutor.

The United States urges Ecuador to continue to improve its IP enforcement efforts and to provide for customs enforcement on an *ex officio* basis, including actions against goods in transit. The United States also encourages Ecuador to ensure that all government ministries use licensed software.

Under the U.S.-Ecuador Agreement on Reciprocal Trade, Ecuador has made commitments that will benefit American innovators and creators by enhancing IP protection and prioritizing enforcement against IP theft, including moving forward with a number of key international IP treaties and taking steps to resolve many long-standing IP issues identified in USTR's Special 301 Report. For example, these steps include providing *ex officio* authority for border enforcement with respect to in-transit goods, providing deterrent-level sentences and penalties issued against defendants in criminal IP cases, and providing regulations to the *Penal Code* for undercover agents to investigate digital actions online. Ecuador has also committed to groundbreaking provisions that will preserve current and future U.S. market access for U.S. cheese and meat producers who rely on the use of common names. This includes ensuring that market access will not be restricted due to the mere use of certain cheese and meat terms. On GIs, Ecuador has committed to only protect legitimate GIs and to robust standards for transparency and fairness regarding the protection of GIs. The United States will monitor implementation of these commitments.

# EGYPT

Although Egypt has taken several positive steps in intellectual property (IP) protection and enforcement, the country remains on the Watch List in 2026. Following the establishment of the Egyptian Agency for Intellectual Property (EAIP) in 2023, a chairman was appointed in 2024 to lead the agency in implementing Egypt's National IP Strategy. Egypt has also continued successful efforts to combat online piracy by coordinating with stakeholders to take down several popular piracy sites.

Despite these steps, stakeholders report that the overall environment for IP protection and enforcement lacks effective and transparent procedures, and remains a priority issue for Egypt to address. Stakeholders report that Egypt has seen an increase in domestic manufacturing and finishing of counterfeit goods, with high volumes of counterfeit goods easily available in local markets. Additionally, Egyptian customs officials still lack *ex officio* authority to suspend the release of goods without a right holder's request for action, and seizures of counterfeit goods remain relatively rare. Some stakeholders have reacted positively to the establishment of a Customs Notification System, but others report decreased seizures and a costly and time-intensive process for right holders to report goods for interdiction. Stakeholders also report that, despite an increase in specialized IP training for courts, judicial procedures remain slow and cumbersome, and prosecutors and judges do not effectively pursue deterrent-level measures for IP violations. The United States encourages Egypt to join and fully implement the World Intellectual Property Organization (WIPO) Performances and Phonograms Treaty (WPPT) and WIPO Copyright Treaty (WCT), collectively known as the WIPO Internet Treaties, to align its laws, regulations, and enforcement regime with international best practices. Additionally, Egypt does not have an effective system for the early resolution of potential pharmaceutical patent disputes. Finally, Egypt published patent examination guidelines for biotechnology in 2022, but patent examination guidelines covering other sectors, as well as trademark examination guidelines, remain pending. Egypt should finalize and publish all patent and trademark examination guidelines to ensure a consistent and transparent review and appeals procedure. The United States looks forward to continuing engagement with Egypt to address these and other issues.

# EUROPEAN UNION

The European Union (EU) is included on the Watch List in 2026.

The provisional agreement reached on the EU *General Pharmaceutical Legislation (GPL)* in December 2025 raises serious concerns. After formal adoption, the *GPL* will reduce protection against unfair commercial use of undisclosed test or other data generated to obtain marketing approval for pharmaceutical products. It also will condition restoration of the term of protection on criteria such as conducting clinical trials in multiple EU Member States or seeking market authorization in the EU within 90 days of first global submission. Stakeholders raised concerns that both of these criteria present market entry conditions that are beyond an innovative pharmaceutical company's control or are otherwise unreasonable. In addition, the legislation seeks to expand the scope of the Bolar exemption to patent rights to include commercial activities. Such practice could undermine a patent owner's established patent rights in the EU to prevent potential commercial activities by follow-on competitors during the term of a patent and any associated supplementary protection certificate. Without an effective notification mechanism, the expansion could also adversely affect patent enforcement in the EU by making preemptive injunctive relief difficult to obtain. The United States will be monitoring implementation of the *GPL* and urges the EU to engage with all relevant stakeholders to address these concerns.

Stakeholders also have voiced concerns with the EU patent package. For example, the EU continues to consider proposals that would create pre-grant mechanisms for third parties to oppose the grant of Supplementary Protection Certificates (SPCs). This follows amendments in 2019 introducing an export and stockpiling waiver to SPCs for medicinal products that reduces the scope of the exclusive rights conferred by a SPC.

The United States continues to monitor copyright issues in the EU and its Member States. The *Digital Services Act (DSA)*, which entered into force in November 2022 and became fully applicable in February 2024, is intended to regulate certain online services, including through rules for how content is shared online. Stakeholders have expressed concern that the *DSA's* adoption of a framework for limitations of liability included modifications to the eligibility threshold and conditions that had been set in the *E-Commerce Directive*, which may adversely impact their IP rights, in particular for copyrights and trademarks. The *Artificial Intelligence (AI) Act* entered into force on August 1, 2024, with various obligations applying at later stages. The United States is monitoring its implementation and the further development of guidelines and how they impact IP, including copyright and trade secrets.

The United States remains concerned by the EU's overbroad protection of geographical indications (GIs), which adversely impacts both protection of GIs in the EU and market access for U.S. products that use common names in third country markets. For example, *Regulation (EU) 2024/1143* contains numerous problematic provisions governing the scope of protection and enforcement of Protected Designations of Origin (PDOs) and Protected Geographical Indications (PGIs), including expansive rules about evocation, extension, co-existence, and translation, among others. These troubling provisions not only adversely affect trademark rights, but also undermine access to the EU market for U.S. right holders and producers. In addition,

the EU has granted GI protection to thousands of terms that limits use in the EU market to only certain EU producers; the use of any term that even "evokes" a GI is also blocked. Despite this level of protection afforded to products sold within the EU, it appears that some producers in Member States continue to produce products featuring terms that are protected as GIs in other Member States and then export these products outside the EU. The EU has also granted GI protection to the cheese names danbo and havarti, widely traded cheeses that are covered by international standards under the Codex Alimentarius. Several countries, including the United States, opposed GI protection of these terms both during the EU's opposition period and at the World Trade Organization, but the European Commission granted the protection over that opposition and without sufficient explanation to interested parties.

*Regulation (EU) 2024/1143* also serves as the basis for the EU's international GI agenda, which includes requiring EU trading partners to protect and enforce specific EU GIs in their markets, often with only limited due process requirements to safeguard existing producers, right holders, consumers, importers, and other interested parties.

The United States continues to have concerns about the EU's GI regulations and proposals and is carefully monitoring their implementation and effects on bilateral trade. The United States is also concerned about *Regulation (EU) 2023/2411*, which went into effect on December 1, 2025, and expands the scope of GI protection to craft and industrial products. The United States also does not believe that the EU should bargain for specific GI recognition in its bilateral trade agreements in return for market access, because such IP rights should be evaluated independently on their merits, based on the unique circumstances of each jurisdiction. Similarly, the United States is concerned by the EU's attempts to restrict certain terms for wine in third-country markets. The United States is carefully monitoring the EU's GI regulations and proposals as well as the implementation and effects of these regulations and proposals on bilateral trade.

Regarding copyright and related rights, the United States was pleased by the 2020 Court of Justice of the European Union (CJEU) ruling that all Member States are required to provide national treatment to non-EU musical performers and producers. While the majority of Member States have implemented this ruling, six Member States (Belgium, Croatia, Finland, France, Slovakia, and Slovenia) have not. The United States continues to monitor Member State implementation of this ruling.

# GUATEMALA

Guatemala remains on the Watch List in 2026.

Despite a generally strong legal framework in place, resource constraints, inconsistent enforcement actions against counterfeiting of apparel and other products, as well as a lack of coordination among law enforcement agencies continue to result in insufficient intellectual property (IP) enforcement. The United States continues to urge Guatemala to strengthen enforcement, including criminal prosecution, administrative and border measures, and intergovernmental coordination to address widespread copyright piracy and commercial-scale sales of counterfeit goods. The sale of counterfeit goods such as clothing, sports footwear, and accessories continued to occur openly, extensively, and with little interference by Guatemalan law enforcement throughout 2025. The production and sale of counterfeit pharmaceuticals in Guatemala also remains a concern. Signal piracy continues to be a concern as well, especially through illicit Internet Protocol television (IPTV) services. Guatemala signed an Accelerated Patent Grant Agreement with the United States Patent and Trademark Office in 2025, but significant delays in the patent registration process reportedly remain. Although previous delays in notifications of alleged counterfeit cases continued to improve in 2025, the judiciary continues to lack specialization and knowledge to hear and adjudicate IP issues. Under the U.S.-Guatemala ART, Guatemala has made commitments that will benefit American innovators and creators by enhancing IP protection and prioritizing enforcement against IP theft. This includes joining and fully implementing key international IP treaties and addressing issues identified in the 2025 Special 301 Report, including enhancing cooperation among enforcement agencies, increasing criminal prosecutions of IP cases, increasing enforcement actions against IP infringement or misappropriation, and devoting sufficient resources to ensure effective IP enforcement. Guatemala has also committed to robust standards for transparency and fairness regarding the protection of geographical indications (GIs) and to ensure that U.S. products can continue using terms that have been unfairly protected as GIs. The United States continues to urge Guatemala to take effective actions in 2026 to improve the protection and enforcement of IP in Guatemala.

# MEXICO

Mexico moves from the Priority Watch List to the Watch List in 2026.

In 2025, the United States and Mexico intensified engagement ahead of the United States-Mexico-Canada Agreement (USMCA) Joint Review. The United States expects Mexico to fully implement the USMCA and to address long-standing concerns, including with respect to enforcement against counterfeiting and piracy, protection of pharmaceutical-related intellectual property (IP), pre-established damages for copyright infringement and trademark counterfeiting, plant variety protection, and enforcement of IP rights in the digital environment. The United States continues to monitor Mexico's outstanding USMCA commitments, including those with transition periods that ended in 2024 and 2025.

Mexico took a number of steps forward on patent and pharmaceutical IP issues. In October 2025, Mexico began to include use patents in the *Industrial Property Gazette*, which helps address one aspect of concerns regarding the lack of an effective system for the early resolution of potential pharmaceutical disputes, although other concerns remain. In April 2026, Mexico issued amended regulations to provide for protection against the unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for both pharmaceutical products and agricultural chemical products. These amendments also established a system to provide patent term extensions for unreasonable marketing approval delays.

In addition, there were a number of positive developments to address long-standing enforcement issues in March 2026. Regarding online piracy, the Mexican government has been working on potential amendments to the *Federal Copyright Law* with respect to Internet service providers to clarify secondary liability for copyright infringement. The Mexican government also has been working on potential amendments to the *Federal Criminal Code* to address concerns regarding a requirement to prove a direct economic benefit to the infringer. Also, the Mexican Institute of Industrial Property (IMPI) and the National Customs Agency of Mexico (ANAM) signed an agreement to improve coordination as a step toward addressing the lack of *ex officio* authority for border enforcement officials. In addition, Mexico announced commitments to increase administrative and criminal enforcement, establish a working group with the United States on criminal enforcement, and hold stakeholder consultations.

However, many concerns remain. On patents and related issues, the United States continues to have concerns regarding the lack of an effective system for the early resolution of potential pharmaceutical disputes. The United States also continues to urge Mexico to accede to the International Convention for the Protection of New Varieties of Plants of 1991 (UPOV 1991) as early as possible.

On enforcement, Mexico continues to suffer from very high rates of copyright piracy, including through online streaming, peer-to-peer file sharing, direct downloads, stream-ripping, illicit streaming devices and apps, circumvention devices for video games and consoles, and physical media. Mexico also continues to suffer from widespread importation, manufacture, sales, distribution, re-export, and transshipment of counterfeit goods. Although Mexican authorities have conducted some IP enforcement raids against markets across Mexico through *Operación*

*Limpieza*, the markets of El Santuario, Mercado San Juan De Dios, and Tepito, which are listed in the *2025 Review of Notorious Markets for Counterfeiting and Piracy (Notorious Markets List)*, continue to flourish. While administrative actions against counterfeiters through IMPI remain effective, they are very limited due to budget cuts and staffing reductions. To combat growing levels of IP infringement in Mexico, the United States encourages Mexico to restore funding for federal, state, and municipal enforcement, improve coordination among federal and sub-federal officials, prosecute more IP-related cases, and impose deterrent-level penalties against infringers. Right holders also express concern about the length of administrative and judicial IP infringement proceedings and the persistence of continuing infringement while cases remain pending. The submission of a legitimate physical copy of pirated content remains a significant barrier to enforcement. Stakeholders also continue to raise ongoing issues pertaining to bad faith trademark filings and registrations.

Criminal investigations and prosecutions for trademark counterfeiting and copyright piracy appears to be non-existent, with the Attorney General's Office (FGR) failing to report any IP enforcement statistics for the past six years. Right holders report that FGR has imposed an internal ban on seeking search warrants in IP cases, which eliminates an essential tool in IP investigations. The United States hopes that the appointment in December 2025 of a new specialized IP prosecutor will lead to improvements in this area.

In 2024, the Mexican Supreme Court upheld the constitutionality of Mexico's USMCA implementing legislation related to copyright, specifically those that concern criminal sanctions for circumvention of technological protection measures (TPMs) and notice-and-takedown procedures. However, there is no indication that Mexican authorities are applying the provisions that criminalize circumvention of TPMs. In addition, stakeholders continue to report that Mexican authorities are not enforcing certain provisions of the *Copyright Law*.

With respect to geographical indications (GIs), in March 2026, Mexico published the list of terms from the 2018 cheese side letter in IMPI's *Industrial Property Gazette* to help address market access concerns related to GIs. However, the United States urges Mexico to do more to ensure transparency and due process in the protection of GIs and to ensure that the grant of GI protection does not deprive interested parties of the ability to use common names, particularly with respect to protection granted pursuant to trade agreements.

# PAKISTAN

Pakistan remains on the Watch List in 2026. Pakistan has made limited substantive progress on intellectual property (IP) protection and enforcement efforts. In 2024, the Intellectual Property Organization (IPO) launched an initiative to develop a five-year National Intellectual Property Strategy to improve coordination and enforcement of IP laws, and update and strengthen IP legislation. The draft strategy, which was unveiled in late 2024, represents a largely positive and forward-looking development. However, certain aspects pose concerns, and the United States looks forward to engaging with Pakistan in this regard. The effectiveness of the strategy will ultimately depend on sustained commitment, adequate resourcing, strong interagency coordination, and effective implementation and enforcement. The Pakistan Electronic Media Regulatory Authority (PEMRA) has proven responsive to industry complaints, and the Competition Commission of Pakistan's Office of Fair Trade has also undertaken some enforcement actions at the behest of stakeholders. In 2025, the Pakistani Federal Investigation Agency registered 322 cases against IP rights infringers and Pakistani Customs made 178 seizures for IP violations at the border.

However, these efforts have yet to result in significant improvements, and serious concerns remain in the area of IP enforcement. Counterfeiting and piracy remain widespread, including with respect to pharmaceuticals, printed works, toys, clothing, footwear, digital content, and software. Stakeholders report digital platforms have become a major distribution channel for counterfeit goods in Pakistan, operating with limited oversight. There are also reports of numerous cable operators providing pirated content.

Pakistan's establishment of seven IP tribunals in six cities, and plans for additional tribunals in other cities are encouraging developments. However, litigants with experience in these tribunals have raised concerns over inconsistency of rulings, nominal fines, general lack of expertise among tribunal judges, confusion over the standards by which courts review tribunal decisions, and the extensive backlog of cases due to lack of resources and high judicial turnover rates. In addition, judicial bodies in Pakistan have limited jurisdiction to adjudicate criminal complaints for IP violations.

Regarding other issues, effective trademark enforcement also continues to be a challenge due to the lack of *ex officio* authority to commence criminal enforcement actions without a right holder's complaint. Pakistan also does not provide an effective system for protection against unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for pharmaceutical products. Pakistan must address the lack of deterrent-level penalties and focus on judicial consistency and efficiency in order to improve overall IP enforcement. A strong and effective IPO will support Pakistan's reform efforts, yet the United States notes that the IPO continues to face challenges in coordinating enforcement among different government agencies, lacks a clear implementation plan, and suffers from resource constraints.

The United States encourages Pakistan to continue to work bilaterally with the United States government, including through bilateral trade discussions with the Office of the United States Trade Representative (USTR), and to make further progress on IP reforms, with a particular focus

on aligning its IP laws, regulations, and enforcement regime with international best practices. As Pakistan continues to amend its IP laws, the United States encourages Pakistan to undertake a transparent process that provides stakeholders with sufficient opportunity to comment on draft laws. The United States also welcomes Pakistan's interest in joining international treaties, such as the World Intellectual Property Organization (WIPO) Performances and Phonograms Treaty (WPPT) and WIPO Copyright Treaty (WCT), collectively known as the WIPO Internet Treaties, and the Patent Cooperation Treaty (PCT).

# PARAGUAY

Paraguay remains on the Watch List in 2026.

In 2022, the United States and Paraguay agreed on an Intellectual Property (IP) Work Plan that serves as a roadmap to address issues on the protection and enforcement of IP rights in Paraguay. Paraguay has made progress on IP enforcement, including improved coordination through the Interagency Coordination Center (CODEPI), and an increase in seizures of counterfeit goods led by the National Directorate for Intellectual Property (DINAPI). Paraguay also participated in enforcement campaigns against online piracy in conjunction with enforcement officials in Brazil and other countries. However, serious IP enforcement challenges persist in Paraguay, particularly challenges with effective and consistent prosecutions and judicial actions. Despite efforts at interagency coordination, criminal enforcement decreased from 2024 and border enforcement remains weak, with limited inspections, coupled with burdensome procedures. Ciudad del Este, which is listed in the *2025 Review of Notorious Markets for Counterfeiting and Piracy* (*Notorious Markets List*), serves as one of the main distribution and sales hubs for counterfeit goods in the region and has reportedly become a home to manufacturing and finishing facilities for counterfeit goods. The United States urges Paraguay to ensure transparency and due process in the protection of geographical indications (GIs) and to ensure that the grant of GI protection does not deprive interested parties of the ability to use common names, particularly as Paraguay proceeds with the European Union-MERCOSUR Trade Agreement. The United States looks forward to continuing to work with Paraguay to address outstanding IP issues through bilateral engagement, including through the IP Work Plan.

# PERU

Peru remains on the Watch List in 2026.

The primary reasons are the long-standing implementation issues with the intellectual property (IP) provisions of the United States-Peru Trade Promotion Agreement (PTPA). These issues include establishing statutory damages for copyright infringement and trademark counterfeiting, as well as fully implementing a notice-and-takedown and safe harbor system for Internet service providers. In February 2026, Peru attempted to address issues related to establishing a notice-and-takedown and safe harbor system through *Legislative Decree N° 1724*, which modified Peru's Copyright Law. The rushed process Peru used to issue the decree raised concerns regarding the lack of adequate time and opportunities for relevant stakeholders to provide input. The United States will continue to monitor and engage as Peru implements the decree. Provisions regarding statutory damages for copyright infringement and trademark counterfeiting continue to be debated through the normal legislative process.

With respect to IP enforcement, Peru took a number of positive steps in 2025. Stakeholders have noted that Peru's National Institute for the Defense of Competition and the Protection of Intellectual Property (INDECOPI) serves as a model for strong IP enforcement practices in the Andean region. INDECOPI has increasingly taken action to fine individuals and legal entities that violate Peru's copyright laws. Also, in 2024, Peru issued *Decree No. 1649*, amending Article 217 of the Penal Code to criminalize the unauthorized camcording or reproduction of motion picture audiovisual works in cinemas or similar venues without requiring proof of commercial intent.

However, stakeholders have raised concerns regarding *Proyecto de Ley 878/2021-CR*, known as the *General Internet Bill*. The United States recognizes Peru's efforts to increase the number of prosecutions against piracy and counterfeiting, particularly its efforts with respect to the sale of counterfeit medicines. The United States urges Peru to continue these efforts and to expand the imposition of deterrent-level fines and penalties for counterfeiting and piracy more broadly. Furthermore, the United States encourages Peru to continue its public awareness activities about the importance of IP protection and enforcement. The United States also continues to encourage Peru to enhance its border enforcement measures and to continue to build the technical IP-related capacity of its agencies, law enforcement officials, prosecutors, and judges.

The United States looks forward to continuing to work with Peru to address outstanding issues, particularly with respect to full implementation of the PTPA, in 2026.

# THAILAND

Thailand remains on the Watch List in 2026.

Thailand continues to make progress on draft amendments to the *Patent Act* and *Copyright Act*, which are intended to facilitate accession to the Hague Agreement Concerning the International Registration of Industrial Designs and the World Intellectual Property Organization (WIPO) Performances and Phonograms Treaty (WPPT), respectively. The United States continues to urge Thailand to complete the amendment process and accede to both international agreements. Right holders have reported continued good working relationships with Thai police and Thai Customs, increased efficiency in seizures by Thai Customs, and the successful shutdown of major Internet Protocol television (IPTV) piracy services. The Department of Intellectual Property (DIP) and Thai police have been implementing an action plan for high-priority enforcement actions against counterfeit and pirated goods, including raids against warehouses and the termination of rental agreements for tenants arrested on charges of IP violations at the MBK Center, which is listed in the *2025 Review of Notorious Markets for Counterfeiting and Piracy* (*Notorious Markets List*).

While Thailand is making progress in these areas, concerns remain. While some enforcement actions have focused on warehouses and distribution centers, counterfeit and pirated goods are still readily available, particularly online, and right holders express concerns that enforcement authorities focus on small operator offenses instead of targeting high-level distributors and manufacturing operations. Although enforcement actions temporarily reduced the visibility of counterfeit goods in high tourist traffic areas like MBK Center, the volume of such goods has returned to previous levels. The United States urges Thailand to improve on its provision of effective and deterrent enforcement measures and to increase enforcement actions, including criminal enforcement, especially against upstream suppliers. Although some right holders have reported positive results from reporting listings for IP-infringing products to e-commerce platforms for takedown under Thailand's 2021 memorandum of understanding (MOU) with e-commerce platforms, other right holders continue to raise concerns about growing online sales of counterfeit and pirated goods. Right holders also report insufficient enforcement and deterrence against growing online piracy by devices and applications that allow users to stream and download unauthorized content. Furthermore, stakeholders remain concerned that criminal proceedings against online piracy are lengthy and, even if there are ultimately convictions, the penalties are insufficient to deter future infringing behavior. In addition, the United States urges Thailand to consider additional amendments to its *Copyright Act* to address concerns, including regarding procedural obstacles to enforcement against unauthorized camcording, and overly broad exceptions to provisions that prohibit the circumvention of technological protection measures.

In June 2025 and February 2026, Thailand published for public consultation a list of terms for geographical indication (GI) protection exchanged under Thailand–European Union free trade agreement negotiations. In January 2025, Thailand published Ministerial Regulations that would permit the registration of GIs submitted through lists exchanged as part of trade agreement negotiations. The United States urges Thailand to ensure transparency and due process in the protection of GIs and to ensure that the grant of GI protection does not deprive interested parties of the ability to use common names.

Other U.S. concerns include continued use of unlicensed software in the private sector, lengthy civil IP enforcement proceedings, and low civil damages. U.S. right holders have also expressed concerns regarding the *Motion Picture and Video Act* that allows for content quota restrictions for films and urge Thailand to finalize draft amendments to a new *Film Law* published in September 2024 that would remove the quotas. In 2025, DIP began certifying collective management organizations (CMOs) that demonstrate compliance with a voluntary code of conduct by allowing them to use a new certification mark. However, non-compliant and unauthorized CMOs are able to continue operating. Thailand does not provide an effective system for protecting against the unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for pharmaceutical and agricultural chemical products. In addition, although Thailand has reported incremental progress on the backlog in pending patent examinations, the backlog remains high in certain areas such as the pharmaceutical sector.

The United States looks forward to continuing to work with Thailand to address these and other issues through negotiations on an Agreement on Reciprocal Trade, the United States-Thailand Trade and Investment Framework Agreement (TIFA), and other bilateral engagements.

# TRINIDAD AND TOBAGO

Trinidad and Tobago remains on the Watch List in 2026.

In 2025, the Telecommunications Authority of Trinidad and Tobago (TATT) continued to require that domestic broadcasters comply with a concessions agreement that mandates respect for intellectual property (IP) and prohibits broadcasters from transmitting any program, information, or other material without first obtaining all required permissions from relevant IP right holders. In 2025, TATT took positive steps to develop and implement a roadmap to enforce IP protection and end the rebroadcasting of four unlicensed U.S. broadcast networks on subscription television services, including by state-owned telecommunications facilities. Specifically, TATT directed local broadcasters to secure retransmission rights from U.S. networks or remove the programming from their channel line-ups, with deadlines for compliance for each of the four stations in December 2025, April 2026, August 2026, and December 2026, respectively. One Trinidad and Tobago broadcaster, covering a significant percentage of the national market, complied on an accelerated timeline, stopping broadcast of all four U.S. stations on December 12, 2025. The other Trinidad and Tobago broadcasters reportedly complied with removing the first station in December 2025 and committed to ending transmission of the remaining three stations on the agreed timeline. Despite this progress, the United States remains concerned about the long-running violation of the concessions agreement by state-owned telecommunications facilities. Trinidad and Tobago is also still in the process of amending its *Telecommunications Act* to more explicitly require television broadcasters and other concessionaires to remove copyright-infringing materials and allow for greater enforcement powers in relation to IP rights breaches by such companies.

# TÜRKIYE

Türkiye remains on the Watch List in 2026.

Over the last few years, Türkiye has continued to increase efforts to improve enforcement of intellectual property (IP) rights. However, Türkiye remains a significant transit point and source of counterfeit goods and has emerged as one of the world's largest manufacturing sources for counterfeit medicines. Greater coordination and communication and improved training among Turkish enforcement agencies, particularly among the Turkish National Police, Ministry of Trade, and Turkish Customs, will be necessary to effectively tackle the high levels of IP infringement. The Turkish National Police should be given *ex officio* authority over trademark violations to help enhance IP enforcement capabilities. Effective criminal enforcement is also limited by lax penalties and inadequate procedures under current law. While Türkiye has specialized IP courts in five major cities, stakeholders note that a lack of judicial expertise in IP and burdensome evidence requirements to obtain search warrants continue to hamper enforcement efforts.

Additionally, stakeholders continue to report high levels of online piracy. The United States encourages Türkiye to fully implement its obligations under the World Intellectual Property Organization (WIPO) Performances and Phonograms Treaty (WPPT) and WIPO Copyright Treaty (WCT), collectively known as the WIPO Internet Treaties, and to develop effective mechanisms to address online piracy. The United States continues to encourage Türkiye to require that collective management organizations adhere to fair, transparent, and non-discriminatory procedures.

On patent and pharmaceutical issues, U.S. companies also report that Türkiye's national pricing and reimbursement policies for pharmaceutical products continue to suffer from a lack of transparency and due process. Stakeholders also continue to raise concerns that Türkiye does not adequately protect against the unfair commercial use, as well as unauthorized disclosure, of undisclosed test or other data generated to obtain marketing approval for pharmaceutical products and has not done enough to reduce regulatory and administrative delays in granting marketing approvals for products. Furthermore, the United States urges Türkiye to establish an effective mechanism for the early resolution of potential pharmaceutical patent disputes. The United States will seek to engage with Türkiye to address these and other issues.

# ANNEX 1: Special 301 Statutory Basis

Pursuant to Section 182 of the Trade Act of 1974, as amended by the Omnibus Trade and Competitiveness Act of 1988, the Uruguay Round Agreements Act of 1994, and the Trade Facilitation and Trade Enforcement Act of 2015 (19 U.S.C. § 2242), the Office of the United States Trade Representative (USTR) is required to identify "those foreign countries that deny adequate and effective protection of intellectual property rights, or deny fair and equitable market access to United States persons that rely upon intellectual property protection."

The United States Trade Representative shall only identify as Priority Foreign Countries those countries that have the most onerous or egregious acts, policies, or practices and whose acts, policies, or practices have the greatest adverse impact (actual or potential) on the relevant U.S. products. Priority Foreign Countries are subject to an investigation under the Section 301 provisions of the Trade Act of 1974. The United States Trade Representative may not identify a country as a Priority Foreign Country if it is entering into good faith negotiations or making significant progress in bilateral or multilateral negotiations to provide adequate and effective protection of intellectual property (IP). The United States Trade Representative is required to decide whether to identify countries within 30 days after issuance of the annual *National Trade Estimate Report*. In addition, USTR may identify a trading partner as a Priority Foreign Country or re-identify the trading partner whenever the available facts indicate that such action is appropriate.

To aid in the administration of the statute, USTR created a Priority Watch List and Watch List under the Special 301 provisions. Placement of a trading partner on the Priority Watch List or Watch List indicates that particular problems exist in that country with respect to IP protection, enforcement, or market access for persons relying on IP rights. Countries placed on the Priority Watch List are the focus of increased bilateral attention concerning the specific problem areas.

The Trade Facilitation and Trade Enforcement Act of 2015 requires USTR to develop "action plans" for each foreign country that USTR has identified for placement on the Priority Watch List and that has remained on the list for at least one year. The action plans shall include benchmarks to assist the foreign country to achieve, or make significant progress toward achieving, adequate and effective IP protection and fair and equitable market access for U.S. persons relying on IP protection. USTR must provide to the Senate Finance Committee and to the House Ways and Means Committee a description of the action plans developed for Priority Watch List countries and any actions taken by foreign countries under such plans. For those Priority Watch List countries for which an action plan has been developed, the President may take appropriate action if the country has not substantially complied with the benchmarks set forth in the action plan.

Section 306 of the Trade Act of 1974 requires USTR to monitor a trading partner's compliance with measures that are the basis for resolving an investigation under Section 301. USTR may take trade action if a country fails to implement such measures satisfactorily.

The Trade Policy Staff Committee, in particular the Special 301 Subcommittee, in advising the USTR on the implementation of Special 301, obtains information from and holds consultations

with the private sector, civil society and academia, U.S. embassies, foreign governments, and the U.S. Congress, among other sources.

# ANNEX 2: U.S. Government-Sponsored Technical Assistance and Capacity Building

In addition to identifying intellectual property (IP) concerns, this Report also highlights opportunities for the U.S. Government to work closely with trading partners to address those concerns. The U.S. Government collaborates with various trading partners on IP-related training and capacity building around the world. Domestically and abroad, bilaterally and in regional groupings, the U.S. Government remains engaged in building stronger, more streamlined, and more effective systems for the protection and enforcement of IP.

The Office of Policy and International Affairs (OPIA) of the United States Patent and Trademark Office (USPTO) conducts programs through its Global Intellectual Property Academy (GIPA) in the United States, around the world, and through distance learning to provide education and training on IP protection, commercialization, and enforcement. The USPTO advances an America First foreign assistance policy by ensuring that IP training directly benefits American businesses, innovators, and workers. In addition to fulfilling United States objectives in IP, including those set out in 19 USC § 3581(2)-(5), and supporting World Trade Organization (WTO) Trade-Related Aspects of Intellectual Property Rights (TRIPS) obligations, these activities are codified in 35 USC § 2, which enumerates the powers and duties of the United States Patent and Trademark Office Director. Strong protection and enforcement of IP rights helps to: encourage innovation, protect investments, guarantee product quality and safety, promote public health and safety, protect revenue, attract investment, and support job creation. The USPTO's technical IP assistance also reinforces America's leadership in IP protection, ensuring that global IP policies and enforcement standards support U.S. industry, job growth, economic security, and America's competitive advantage in the global marketplace. The primary goal of GIPA programs is to improve the IP systems of other countries to ensure U.S. businesses have predictable, transparent, and fair systems to obtain and enforce their IP rights. Program participants include patent, trademark, and copyright officials, judges and prosecutors, police and customs officials, foreign policy makers, and U.S. right holders. OPIA-designed GIPA programs are frequently conducted in collaboration with Intellectual Property Attachés and other U.S. Government agencies.

Other U.S. Government agencies bring foreign government and private sector representatives to the United States on study tours to meet with IP professionals and to visit the institutions and businesses responsible for developing, protecting, and promoting IP in the United States. One such program is the Department of State's International Visitor Leadership Program, which brings groups from around the world to cities across the United States to learn about IP and related trade and business issues.

Internationally, the U.S. Government is also active in partnering to provide training, technical assistance, capacity building, exchanges of best practices, and other collaborative activities to improve IP protection and enforcement. The following are examples of these programs:

- In Fiscal Year (FY) 2025, USPTO developed and delivered technical assistance programs that addressed a full range of IP protection and enforcement matters, including enforcement

of IP rights, patent and trademark examination, digital piracy, brand protection, and copyright policy. During FY 2025, USPTO provided 77 programs serving over 3,840 individuals, including over 3,370 government officials representing 46 countries and intergovernmental organizations. More information is available at www.uspto.gov/GIPA.

- In addition, the USPTO's OPIA provides capacity building in countries around the world and has formed partnerships with 31 national, regional, and international IP organizations, such as the Japan Patent Office, the European Patent Office, the German Patent and Trademark Office, government agencies of China, the Mexican Institute of Industrial Property, the Korea Ministry of Intellectual Property, the Association of Southeast Asian Nations (ASEAN), the Oceania Customs Organisation (OCO), the African Regional Intellectual Property Organization (ARIPO), the African Intellectual Property Organization (OAPI), and the World Intellectual Property Organization (WIPO). These partnerships help establish a framework for joint development of informational and educational IP content, technical cooperation, and classification activities.

- The Department of Commerce's International Trade Administration (ITA) Office of Standards and Intellectual Property (OSIP) leads and manages the United States government interagency STOPfakes program, which helps U.S. companies navigate IP processes globally. STOPfakes works closely with over 10 U.S. Government partner agencies to provide education and resources to stakeholders focused on guidance regarding protecting IP at home and abroad. U.S. companies can also find specific IP information on the STOPfakes.gov website, including valuable resources on how to protect patents, copyright, trademarks, and trade secrets, as well as targeted information about protecting IP in more than 80 global markets. The website also includes IP highlights on industry- and policy-specific IP topics. Businesses can also find webinars focused on best practices to protect and enforce IP in China. In addition to STOPfakes, ITA develops and shares small business tools to help domestic and foreign businesses understand IP and initiate protective strategies. Under the auspices of the Transatlantic Intellectual Property Rights Working Group, ITA collaborates with the European Union's Directorate-General for Trade to identify areas of cooperation to help protect IP in third countries, as well as in the United States and the EU.

- IP protection is a priority of the government-to-government technical assistance provided by the Department of Commerce's Commercial Law Development Program (CLDP). CLDP programs address numerous areas related to IP, including legislative reform, enforcement, adjudication of disputes, IP protection and its impact on the economy, and IP curricula in universities and law schools, as well as public awareness campaigns and continuing legal education for lawyers. CLDP supports capacity building in creating and maintaining an innovation ecosystem, including technology commercialization, as well as in patent, trademark, and copyright examination and management in many countries worldwide. CLDP also works with the judiciary in various trading partners to improve the skills to effectively adjudicate IP cases and conducts interagency coordination programs to highlight the value of a whole-of-government approach to IP protection and enforcement.

- In FY 2025, CLDP, in conjunction with USPTO, U.S. Customs and Border Protection (CBP), and other Federal agencies as well as U.S. universities and law firms, conducted IP development programs in Armenia, Azerbaijan, Bosnia and Herzegovina, Georgia, Montenegro, Serbia, and Ukraine. CLDP also worked with officials from Kazakhstan, the Kyrgyz Republic, Tajikistan, Turkmenistan, and Uzbekistan through the United States-Central Asia Intellectual Property Working Group.

- In 2025, the Department of Homeland Security (DHS) and its agencies provided trainings, technical legal assistance, and capacity building to law enforcement agencies around the world. In 2025, the Homeland Security Investigations (HSI)-led National Intellectual Property Rights Coordination Center (IPR Center), with support from CBP and the Department of State's Bureau of International Narcotics and Law Enforcement Affairs, hosted regional IP rights investigative training programs focused on the investigative methodologies for criminal enforcement of IP crime. The IPR Center also participated in IP-related international training programs sponsored by partnering U.S. government agencies, to include CLDP, the USPTO, and the Department of Justice (DOJ) International Computer Hacking and Intellectual Property Advisors (ICHIPs), for audiences from Albania, Belize, Bulgaria, Czech Republic, Greece, Hungary, Indonesia, Kosovo, Malaysia, Mexico, the Netherlands, Poland, Romania, Saudi Arabia, Slovakia, South Africa, South Korea, Thailand, Trinidad and Tobago, Türkiye, Ukraine, and Vietnam.

- In FY 2025, with the support of the Department of State's Bureau of International Narcotics and Law Enforcement Affairs, the IPR Center continued its support of the U.S. Transnational and High-Tech Crime Global Law Enforcement Network with the deployment of Temporary Duty Assignment (TDY) ICHIP Agents to support South East Asia and the Eastern European and Caucasus regions. Both were tasked with regional responsibilities to assist foreign law enforcement counterparts and support activities conducted by the IP-focused ICHIP Attorney Advisors. The ICHIP Agents provided practical technical training and case-based mentoring focused on efforts to effectively interdict, investigate, and prosecute IP crime and related cybercrime. Activities included helping foreign partners identify and seize counterfeit goods and gain a better understanding of illicit supply chains, as well as providing training on how to leverage trade and financial data to further IP-focused investigations. These efforts help protect U.S. national and economic security from transnational organized crime threats.

- During FY 2025, the IPR Center hosted and engaged foreign counterparts with an interest in IP enforcement in meetings and various outreach and training efforts throughout the world. Among these were representatives from Albania, Australia, Belize, Bulgaria, Czech Republic, Greece, Hungary, Indonesia, Kosovo, Laos, Malaysia, Mexico, the Netherlands, Poland, Romania, Saudi Arabia, Slovakia, South Africa, South Korea, Thailand, Trinidad and Tobago, Türkiye, Ukraine, and Vietnam, as well as the European Union Agency for Law Enforcement Cooperation (EUROPOL), the European Union Intellectual Property Office (EUIPO), the International Criminal Police Organization (INTERPOL), and the Organisation for Economic Co-operation and Development (OECD).

- CBP officials routinely provide technical legal assistance and capacity building to customs administrations around the world through bilateral engagements, participation in multilateral organization meetings and workshops, such as the Asia-Pacific Economic Cooperation (APEC), EUROPOL, INTERPOL, WIPO, the World Customs Organization (WCO), and the ASEAN Secretariat, and in partnership with other U.S. Government agencies involved in IP enforcement. In FY 2024, CBP provided capacity-building assistance in IP border enforcement to the customs administrations of 60 nations and participated in 8 multilateral organization meetings concerning IP border enforcement such as the OECD Working Party on Countering Illicit Trade.

- DOJ, with funding from and in cooperation with the Department of State's Bureau of International Narcotics and Law Enforcement Affairs and other U.S. Government agencies, provides technical assistance and training on IP enforcement issues to thousands of foreign officials around the globe. As noted above, much of this occurs through the ICHIP programs, which includes a dozen prosecutors, two agents, and two digital forensic examiners who are stationed around the globe. In recent years, ICHIP attorneys and other personnel conducted hundreds of IP enforcement trainings, while also providing numerous individual consultations and supporting other U.S. Government programs. Topics covered in training programs include: investigating and prosecuting IP cases under various criminal law and criminal procedure statutes; disrupting and dismantling organized crime networks involved in trafficking in pirated and counterfeit goods; fighting the distribution of infringing goods that represent a threat to public health and safety; combating online piracy; improving officials' capacity to detain, seize, and destroy illegal items at the border and elsewhere; increasing intra-governmental and international cooperation and information sharing; working with right holders on IP enforcement; and obtaining and using electronic evidence. Major ongoing initiatives include programs in Africa, the Americas, Asia, and Central and Eastern Europe.

- The Department of State provides foreign assistance anti-crime funds each year to U.S. Government agencies that provide cybercrime and IP enforcement training and technical assistance to foreign governments. The agencies that provide such training include the DOJ, USPTO, CBP, and Homeland Security Investigations (HSI). The U.S. Government works collaboratively on many of these training programs with the private sector and with various international entities, such as WIPO and INTERPOL. Department programs feature deployment of a global network of ICHIPs, who are experienced DOJ attorneys dedicated to building international cooperation and delivering training. Additionally, the State Department leads the U.S. delegation to the OECD's Working Party on Countering Illicit Trade, working to establish best practices in free trade zones and addressing the challenges that illicit trade poses.

- The U.S. Copyright Office hosts international visitors, including foreign government officials, to discuss and exchange information on the U.S. copyright system, including law, policy, and registration and recordation functions, as well as various international copyright issues. The Copyright Office also implements a full program of outreach and communications activities, many of which are available to global audiences, in a wide range of formats and media, including live presentations, video tutorials, social media, and

> through our participation in programs hosted by outside organizations. These programs, which include a popular signature public webinar series on Copyright Essentials, educate the public regarding copyright protection and provide important updates about recent changes to U.S. law, such as the Music Modernization Act and the creation of the Copyright Claims Board, as well as initiatives on issues such as Artificial Intelligence.

The United States reports to the World Trade Organization (WTO) on its IP capacity building efforts, including most recently in February 2025 (see Technical Cooperation Activities: Information from Members-United States of America, IP/C/R/TTI/USA/6 at https://docs.wto.org/dol2fe/Pages/SS/directdoc.aspx?filename=Q:/IP/CRTTI/USA6.pdf&Open=True).