# Cohen Supplemental Ex. 6

Artificial Intelligence and Law (2024) 32:463–486
https://doi.org/10.1007/s10506-023-09358-7

ORIGINAL RESEARCH

# Detecting the influence of the Chinese guiding cases: a text reuse approach

**Benjamin M. Chen[1] · Zhiyu Li[2] · David Cai[3] · Elliott Ash[4]**

Accepted: 4 April 2023 / Published online: 6 May 2023
© The Author(s) 2023

**Abstract**
Socialist courts are supposed to apply the law, not make it, and socialist legality denies judicial decisions any precedential status. In 2011, the Chinese Supreme People's Court designated selected decisions as Guiding Cases to be referred to by all judges when adjudicating similar disputes. One decade on, the paucity of citations to Guiding Cases has been taken as demonstrating the incongruity of case-based adjudication and the socialist legal tradition. Citations are, however, an imperfect measure of influence. Reproduction of language uniquely traceable to Guiding Cases can also be evidence of their impact on judicial decision-making. We employ a local alignment tool to detect unattributed text reuse of Guiding Cases in local court decisions. Our findings suggest that Guiding Cases are more consequential than commonly assumed, thereby complicating prevailing narratives about the antagonism of socialist legality to case law.

**Keywords** Socialist legality · Precedent · Courts · Judicial decisionmaking

## 1 Introduction

Cases do not have any precedential status in socialist legal systems. In the People's Republic of China, 'judges do not have law-making power and the courts generally do not follow precedent' (Zhang 2017). In the last decade, however, the SPC

✉ Zhiyu Li
zhiyu.li@durham.ac.uk

1 University of Hong Kong Faculty of Law, Hong Kong SAR, China

2 Durham Law School, Durham, UK

3 London School of Economics and Political Science, London, UK

4 ETH Zurich Centre for Law and Economics, Zurich, Switzerland



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

has sought to interpret and unify law by promulgating Guiding Cases ('*zhidaoxing anli*'). Guiding Cases must be consulted by all judges in the course of their adjudicatory duties. Guiding Cases have therefore been described as 'a new source of "judge-made law" in China' (Liu 2021) and 'the remarkable *terminus a quo*' of China's trend 'toward embracing case law' (Wang 2020). One commentator has even speculated that '"judicial activists" might be able to assert greater SPC authority by developing a body of model interpretive approaches' through Guiding Cases (Jia 2016).

At the same time, a substantial body of research contends that Guiding Cases have not altered the fundamental tenets of socialist legality. The terms 'Guiding (*zhidaoxing*)' and 'Cases (*anli*)' signify that 'the SPC does not intend to establish a system of binding precedents', that is, cases that 'can be directly referred to as a legal basis for a court decision' (Ahl 2014). Ambiguity about the binding quality of Guiding Cases is also reflected in the SPC's requirement that lower courts 'refer to (*canzhao*)' these decisions when resolving similar disputes (Deng 2015). Ostensibly, the verb 'refer to (*canzhao*)' implies that the requirement is 'neither compulsory nor discretionary' (Peng 2018) and that Guiding Cases occupy an intermediate status between codified law and prior judicial decisions (Lei 2015). These theoretical debates have been reinforced by empirical studies confirming that Guiding Cases are very seldom cited to by lower courts (Gechlik et al. 2016; Guo and Sun 2021; Ma 2019; Cohen 2017; Daum 2017). The paucity of citations has conventionally been interpreted as evidence of the futility of transplanting stare decisis into a socialist legal regime (Wang 2019).

Citations, however, are an imperfect measure of the influence of cases, especially in jurisdictions that do not recognize judicial opinions as a source of law. This article proposes to quantify the impact of Guiding Cases on adjudicatory outcomes by looking at unattributed text reuse. The unattributed reuse of text from Guiding Cases in lower court judgments is detected using computational methods and validated by trained humans. To preview our results, we find more instances of unattributed text reuse than citations for the two Guiding Cases studied here. Guiding Cases seem to have a bearing on judicial outcomes even when they are not invoked by name. Our findings not only illuminate the practical operation of the Chinese legal system but also contribute to a more sophisticated understanding of legal culture and tradition. From a comparative perspective, the apparent reticence of Chinese courts to cite judicial decisions provides a foil to the rich literature analyzing citation networks using computational methods, focused mostly on common law jurisdictions (Frankenreiter and Livermore 2020). That literature has addressed whether and how citations evince better decision-making, for example (Baker et al. 2009; Ash and MacLeod 2021), or how citations manifest the partisan attitudes of judges (Frankenreiter 2017; Gulati and Choi 2008). We demonstrate here one technique for detecting the influence of cases in jurisdictions that reject the notion of stare decisis.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

## 2 Background

In 2011, the SPC formally established the Guiding Case system '[i]n order to summarise adjudication experiences, unify the application of law, enhance adjudication quality, and safeguard judicial impartiality.'[1] Guiding Cases address a wide variety of legal topics ranging from breach of contract to homicide to unfair competition to liability for traffic accidents. Each Guiding Case consists of seven key sections, namely 'Title', 'Keywords', 'Main Points of the Adjudication', 'Related Legal Rules', 'Basic Facts of the Case', 'Results of the Adjudication', and 'Reasons for the Adjudication'. Beginning in 2015, the 'Main Points of the Adjudication' of Guiding Cases ('Main Points') must be 'refer[red] to (*canzhao*)' by courts at all levels when adjudicating similar cases.[2] The Main Points are abstract rules distilled by the adjudication committee of the SPC from the original judgments (Hu 2014).

Take Guiding Case No. 18. This case involves a labour contract dispute resolved by a basic people's court in Zhejiang Province in December 2011 and designated by the SPC as a Guiding Case on November 8, 2013.[3] The employee Wang Peng, was assigned a C2 grade in the semi-annual performance assessments for the second half of 2008, the first half of 2009, and the second half of 2010. Under the employer ZTE's corporate policy, a grade of C2 meant that the employee's 'performance need[ed] improvement' and that the employee would be deemed, in principle, 'incompetent for the job'. ZTE eventually terminated Wang Peng's services on the grounds that he was incompetent for the job after the reassignment of his role in January 2009. In 2011, Wang Peng filed for labour arbitration and was awarded compensation for ZTE's unlawful termination of his labour contract. ZTE then challenged the arbitration decision in a local court based on Article 40 of the Labour Contract Law which permitted an employer to terminate a labour contract if 'the employee [was] incompetent to his position or remain[ed] so after training or changing his position'.[4] The Basic People's Court of Binjiang found that the C2 grade did not establish an employee's 'incompeten[ce] for the job' and that ZTE had also failed to prove the reassignment was due to Wang Peng's incompetence. It therefore upheld the arbitral award. The SPC selected the original judgment as a Guiding Case, appending to it the following Main Points:

> A worker being ranked at the bottom in an employer's grade assessment is not equivalent to [him] being "incompetent for the job" and does not meet the stat-

[1] Provisions of the Supreme People's Court Concerning Work on Case Guidance (2010), Zuigao Renmin Fayuan Gongbao.

[2] Detailed Rules for the Implementation of the 'Provisions of the Supreme People's Court Concerning Work on Case Guidance', art 9 (2015), Zuigao Renmin Fayuan Gongbao ('Detailed Rules').

[3] Guiding Case No. 18 *ZTE (Hangzhou) Company Limited v. Wang Peng*, Zuigao Renmin Fayuan Zhidaoxing Anli [8 Nov. 2013].

[4] Labour Contract Law of the People's Republic of China, art 40 (2007), Zuigao Renmin Fayuan Gongbao.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

utory requirements for unilateral termination of a labour contract. An employer cannot rely on this ground to unilaterally terminate a labour contract.[5]

As illustrated by this example, a Guiding Case narrates the facts of the case and lends the SPC's imprimatur to the result and to a particular interpretation of the law.

According to the 'Detailed Rules for the Implementation of the Provisions of the Supreme People's Court on Case Guidance', courts must quote in the reasoning sections of their decisions the serial number and Main Points of an applicable Guiding Case.[6] The Guiding Case system thus represents an attempt to introduce case-based adjudication into the Chinese legal system (Shao and Guo 2022; Yu and Gurgel 2012). Proponents argue that 'illustrating the law through [Guiding] Cases' can help judges 'discern adjudicatory rules' and 'provide supporting reasoning for their judgments" (Sun 2021). If successful, Guiding Cases might also become an instrument of judicial policymaking. By carefully picking the judgments to be designated as Guiding Cases and hence, to be referred to by all courts, the SPC could not only fill the interstices of legislation but do so in an advised and deliberate manner.

On the one hand, this development is not a complete break from the past. Since 1985, the SPC Gazette has published exemplary cases for the edification of lower courts.[7] Compared to legislation and other normative documents, exemplary cases may be released with little procedure or consultation, making them an especially suitable vehicle for developing the law in evolving socio-economic circumstances (Zhang 2017). Yet, exemplary cases were never meant to be binding on lower courts. Guiding Cases, on the other hand, are supposed to be referred to by all courts when adjudicating similar disputes. This aspect of Guiding Cases has provoked controversy because socialist legality denies judicial decisions any precedential status. Some jurists have tried to square the circle by positing an intermediate status for Guiding Cases. Guiding Cases are sometimes characterized as a 'quasi-legal source', enjoying a status that is subordinate to enacted laws but superior to other judicial opinions (Lei 2015; Peng 2018). Other jurists are more sceptical of the legal authority of Guiding Cases. For instance, a then-director of the SPC's research office reasoned straightforwardly that since legislative powers are solely vested in the National People's Congress and its standing committee, any changes to existing law should be made through the legislative process (Zhou 2010). 'China does not belong to a "separations of powers" country', he elaborated, and 'the SPC cannot formulate new legal norms' (Zhou 2010).

Empirically, researchers have documented the marginal impact of Guiding Cases on judicial practice. Citations to Guiding Cases are sparse, and many Guiding Cases are never cited at all (Daum 2017). One study counted only 181 citations to Guiding Cases in all decisions handed down between 2010 and 2015 (Gechlik et al. 2016). Another counted 2818 citations to Guiding Cases among all judgments published on

[5] ibid (n 3).

[6] Detailed Rules for the Implementation of the 'Provisions of the Supreme People's Court Concerning Work on Case Guidance', arts. 9–11 (2015), Zuigao Renmin Fayuan Gongbao ('Detailed Rules').

[7] 'Cases' (The Gazette of the People's Republic of China) <http://gongbao.court.gov.cn/ArticleList.html?serial_no=al> accessed 30 June 2022.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

Chinalawinfo as of December 31, 2020 (Guo and Sun 2021). A search for the term 'Guiding Cases' on the official portal *China Judgments Online* returned 561 hits out of the 8,723,182 files uploaded to the site as of 2016 (Cohen 2017). Using keywords—'*zhidaoxing anli*', '*zhidao anli*', and '*anli zhidao zhidu*'—to query the same national database, another investigator identified 1545 cases among those decided from December 2011 to May 2017 as having cited Guiding Cases (Zhang 2018). To illustrate the limited relevance of Guiding Cases to the day-to-day practice of the lower courts, a judge in a provincial high court performed a similar analysis and found approximately 620 judgments in 2016 and 810 judgments in 2017 referring to these cases (Ma 2019). As she noted, '[c]ompared to around 20 million cases closed by courts nationwide each year, the above figures are almost negligible' (Ma 2019).

The 'extremely low' incidence of citations is taken as symptomatic of 'the dysfunction of the [G]uiding [C]ase system as a type of case law' (Wang 2019) and as proof of the incongruity of case-based adjudication in China (Ahl 2014; Zuo and Chen 2015; Finder 2017; Jia 2016). This 'lack of enthusiasm' (Zhang 2017) for Guiding Cases has been imputed to legal culture and tradition, including the unfamiliarity of Chinese judges with analogical reasoning (Xiang 2016; Research Team of High People's Court of Sichuan Province 2012).

Citations, however, do not always demonstrate persuasiveness, even in common law jurisdictions. Judges may discuss a case in their opinions only to distinguish it. Indeed, courts have declined to follow Guiding Cases because of differences in case types and material facts (Tan and Shen 2021). In the context of Chinese socialist legality, the doctrine that judicial decisions are not a source of law may inhibit courts from citing Guiding Cases even when they are treated as conclusive (Zhang 2017). Indeed, some judges claim that they avoid citing Guiding Cases for fear that it exposes their judgments to another ground of attack on appeal (Lin 2015).

To overcome these difficulties, a research team at Peking University looked for cases where (1) the parties referred to Guiding Cases, and although (2) the judgments rendered did not cite these Guiding Cases, (3) 'the judicial outcomes were consistent with the spirit of the Guiding Cases'. The study reported 4196 cases satisfying these criteria (Guo and Sun 2021). It is plausible that reference by the parties to Guiding Cases influenced the judicial outcomes in these disputes. Even so, the reported count—like all methods for quantifying the impact of judicial decisions—could be over- or under-inclusive. It would be over-inclusive if courts were already disposed to rule the same way independently of Guiding Cases. It would be under-inclusive if judges adhered to Guiding Cases even when they were not raised by the litigants. This latter possibility is not remote given the SPC's commitment to the Guiding Case system. Since 2020, the SPC has required a presiding judge to locate and list similar cases for filing purposes.[8] Hence, empirical research that relies solely on explicit mentions of Guiding Cases in court or litigation documents

[8] Notice of the Supreme People's Court on the Guiding Opinions concerning Unifying the Application of Laws and Strengthening the Retrieval of Similar Cases (for Trial Implementation) (2020), Zuigao Renmin Fayuan Gongbao.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

may fail to draw a fair conclusion as to the true impact of the Guiding Case system on Chinese adjudicative practice.

## 3 Method

We bring fresh evidence to the debate on Guiding Cases by looking at the diffusion of their reasoning in the judicial system. The method adopted here searches for instances of text reuse between the Main Points of Adjudication of Guiding Cases and the legal rationales given by lower courts. Our premise is that reuse of text uniquely ascribable to the Main Points of Adjudication is a strong indicium of the influence of Guiding Cases on judicial decision-making. This idea is implemented by applying the Basic Local Alignment Search Tool (or BLAST) algorithm to Chinese legal text.

BLAST was originally developed to identify regions of similarity between genomic or protein sequences (Altschul 2014).[9] But the algorithm can also be used to locate the replication of text fragments in large document collections. BLAST and its derivatives have been employed by researchers in the digital humanities to analyse the reuse of text in Denis Diderot and Jean d'Alembert's *Encyclopédie* (Olsen et al. 2011), in over a hundred and fifty years of Finnish newspapers (Salmi et al. 2021), and in the classic novels of Chinese literature (Vierthaler and Mees 2019). In particular, Vierthaler and Gelein adapt BLAST to quantify and visualise intertextuality in late imperial Chinese prose, finding, among other things, extensive copying from the middle section of *Water Margin* in the first part of *Plum in the Golden Vase* (Vierthaler and Mees 2019).

Following Vierthaler and Gelein, we apply the BLAST algorithm to Chinese characters. Intuitively, the algorithm builds the longest shared sequence as measured by common characters while penalising character differences between two sequences. The starting point is the Levenshtein distance between the sequences, given by the minimum number of single-character substitutions, deletions, or additions needed to transform one sequence to the other (Levenshtein 1966). Table 1 shows how the Levenshtein distance is computed for a pair of text snippets. In the example, the Levenshtein distance between the two snippets is four: two substitutions, an insertion and a deletion. The BLAST similarity score between two sequences is defined as $1 - \frac{d}{l}$ where $d$ is the Levenshtein distance and $l$ the length of the sequences. Keeping the same example, the similarity score between the two snippets is $1 - \frac{4}{17}$ which is approximately 0.765. The algorithm runs on a source text and a target text and comprises the following steps:

- Decompose the two texts to be compared into overlapping n-grams. These n-grams are called seeds.

[9] There are other local alignment algorithms such as FASTA (Lipman and Pearson 1985) and Smith–Waterman (1981). We adopt BLAST because of its advantage in searching for ungapped sequences and its lower complexity.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

**Table 1** Illustration of Levenshtein distance for Chinese legal text

| Operation | Source Sequence | Target Sequence |
|---|---|---|
| | 市场价格或营养成分应高于其他配料。<br>[*shichang jiage huo yingyang chengfen ying gaoyu qita peiliao.*] | 市场价格、营养成分往往高于其他配料[45]<br>[*shichang jiage*、*yingyang chengfen wangwang gaoyu qita peiliao*] |
| Substitution | 市场价格、营养成分应高于其他配料。<br>[*shichang jiage*、*yingyang chengfen ying gaoyu qita peiliao.*] | 市场价格、营养成分往往高于其他配料<br>[*shichang jiage*、*yingyang chengfen wangwang gaoyu qita peiliao*] |
| Substitution | 市场价格、营养成分往高于其他配料。<br>[*shichang jiage*、*yingyang chengfen wang gaoyu qita peiliao.*] | 市场价格、营养成分往往高于其他配料<br>[*shichang jiage*、*yingyang chengfen wangwang gaoyu qita peiliao*] |
| Insertion | 市场价格、营养成分往往高于其他配料。<br>[*shichang jiage*、*yingyang chengfen wangwang gaoyu qita peiliao.*] | 市场价格、营养成分往往高于其他配料<br>[*shichang jiage*、*yingyang chengfen wangwang gaoyu qita peiliao*] |
| Deletion | 市场价格、营养成分往往高于其他配料~~。~~<br>[*shichang jiage*、*yingyang chengfen wangwang gaoyu qita peiliao~~.~~*] | 市场价格、营养成分往往高于其他配料<br>[*shichang jiage*、*yingyang chengfen wangwang gaoyu qita peiliao*] |

The source sequence – 市场价格或营养成分应高于其他配料 – corresponds to the phrase 'the market price or nutritional components should be higher than other ingredients'. The target sequence – 市场价格、营养成分往往高于其他配料 – corresponds to the phrase 'the market price and nutritional components are often higher than other ingredients'.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

- Record the occurrence of each seed in either text in an index.
- For every seed that occurs in both texts, go to the respective seed locations in the texts. The similarity score at this point is 1 since the seed occurs identically in both texts.
- While the similarity score between the two sequences is above the threshold, expand the sequence in each text rightwards by one character and compute the similarity score between the two expanded sequences.
  - If the length of the expanded sequences exceeds a maximum number *m*, then only the last *m* characters of the sequences are used to compute the similarity score.
- Once the similarity score between the two sequences falls below the threshold, return the match if the sequences exceed a minimum length. The match consists of the two sequences at the last point where their similarity scores increased.

We deploy this algorithm to generate matches between Guiding Cases and local court decisions.

The BLAST algorithm could in principle be applied to all Guiding Cases and all local court decisions. However, to make human validation of the machine-generated matches feasible, we restrict the scope of our analysis along two dimensions. First, we limit our attention to Guiding Cases 24 and 60. Guiding Case 24 concerns a tortfeasor's liability for a traffic accident when the harm caused is magnified by the victim's own pre-existing physical condition.[10] Guiding Case 60 clarifies the circumstances under which the amount of a "special and valuable ingredient," emphasised in the labels or manuals of a food product, should be disclosed to the consumer.[11] We select these two Guiding Cases because prior research has identified them as being among the most cited (Zhang 2020; Guo and Sun 2019). This means that there will be a healthy number of overt citations to serve as a baseline for assessing the prevalence of unattributed text reuse.

Second, we look only for text reuse by the Beijing and Shanghai courts. Courts in both municipalities pioneered the consultation of previously decided cases even before a similar case search mandate was implemented nationwide in July 2020. For example, in 2019, the Beijing High People's Court issued an Opinion instructing judges on how to search for analogous cases and identify inconsistent adjudicatory standards in civil litigation.[12] The Opinion lists several types of prior judicial

[10] Guiding Case No. 24 *Rong Baoying v. Wang Yang and the Jiangyin Branch of Alltrust Insurance Co., Ltd.*, Zuigao Renmin Fayuan Zhidaoxing Anli [26 January 2014].

[11] Guiding Case No. 60 *Dongtai Branch of Yancheng City of Aokang Food Co., Ltd. v. Dongtai Administration for Industry and Commerce of Yancheng City*, Zuigao Renmin Fayuan Zhidaoxing Anli [6 June 2016].

[12] Opinions of the High People's Court of Beijing Municipality on Regulating Discretion in Civil Cases and Unifying Judgment Criteria (For Trial Implementation) (2019), Beijing Gaoyuan Fabu Guanyu Guifan Minshi Anjian Ziyou Cailiangquan Tongyi Caipan Chidu de Shixing Yijian.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

decisions to be considered, ranking Guiding Cases as the most persuasive.[13] Back in 2015, the Beijing Intellectual Property Court had already established a research database of prior judicial decisions and encouraged parties to submit relevant cases in support of their claims (Guo et al. 2017; Yang 2017). In Shanghai, too, judges have been checking internal court databases for similar cases for several years (Yu and Wu 2019). Because Beijing and Shanghai promoted judicial consideration of past cases early on, there is reason to suppose that the proportion of citations to unattributed text reuse will be higher in these two municipalities as compared to other Chinese jurisdictions.

The full texts of the Guiding Cases are publicly available, including those for Guiding Cases 24 and 60. However, only the Main Points of Adjudication are used as source texts.[14] In addition, names of statutes or regulations are deleted from the Main Points of Adjudication. This step pre-empts candidate matches that are merely common references to legislative and regulatory materials. Most significantly, we excise the first paragraph of the Main Points of Adjudication of Guiding Case 60 because it merely restates a provision of an administrative document promulgated by a national agency. It would be quite impossible to tell whether a local judgment reproducing that language was influenced by the administrative document or the Guiding Case. We therefore elect the more conservative approach of precluding all such references from being matched.

Our text reuse algorithm analyses the texts of Beijing and Shanghai local court decisions. The full texts of these decisions are not publicly available for bulk download. We obtained a dataset under licence from Chinalawinfo. The corpus of decisions from January 1970 to September 2021 comprises approximately 3 million documents. The number of decisions per year has increased markedly over time due to the burgeoning caseload of these courts and also to judicial reforms promoting transparency and disclosure. To ensure that any language reused from the Guiding Cases is integral to the adjudicative outcome, we use only the reasoning sections of decisions as target texts. That section is segmented via regular expressions and then extracted for further, minimal pre-processing.[15] Special characters are stripped from the decisions. We then execute a complete set of pairwise comparisons between the Main Points of Adjudication of Guiding Cases 24 or 60 and the reasoning sections of decisions issued by local courts in Beijing and Shanghai from January 1970 to September 2021.

As a benchmark, we also conduct string searches for citations to the Guiding Cases by local courts. Queries consist of the terms '*zhidao anli'*, '*anli zhidao*', or '*zhidaoxing anli*', preceded or followed by the number of the Guiding Case in question, i.e., '24 *hao*', '*di* 24 *hao*', '*ershisi hao*', or '*di ershisi hao*' for Guiding Case 24

[13] ibid, art 9.

[14] Recall that under the Detailed Rules for the Implementation of the 'Provisions of the Supreme People's Court Concerning Work on Case Guidance', the Main Points of Adjudication is the section of Guiding Cases that shall be referred to and quoted when judges adjudicate a similar case; Detailed Rules, arts 9–11.

[15] We define the seasoning section as the section of each judgment beginning with the phrase '[t]he court finds (benyuan renwei)' and ending with the phrase 'the verdict is as follows (panjue ruxia)'.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

and ‘60 *hao*’, ‘*di* 60 *hao*’, ‘*liushi hao*’, or ‘*di liushi hao*’ for Guiding Case 60. These string searches can be conducted over the reasoning sections or entire texts of local judgments. The former option risks undercounting the number of decisions which explicitly mention the Guiding Cases. The latter option might produce an overcount since the Guiding Cases could have been discussed but found inapposite—hence their omission from the reasoning section. In the interest of completeness and transparency, we will report both counts.

## 4 Results

### 4.1 Unvalidated matches

After some experimentation, the parameters for the algorithm are calibrated at 4 for the length of the n-grams or seeds, 0.5 for the similarity score threshold, 30 for the minimum length of a match, and 30 for *m*, the maximum number of characters used to compute the similarity score. These parameters are adopted throughout. The BLAST algorithm identifies 488 decision-level matches for Guiding Case 24 and 103 decision-level matches for Guiding Case 60. By comparison, the string searches return 46 decisions citing Guiding Case 24 and 22 decisions citing Guiding Case 60 in their reasoning sections. The counts stand at 78 and 95 respectively if taken over entire decisions.

Some decisions cite the Guiding Cases and also recite their Main Points. These are instances of attributed text reuse. By contrast, some decisions reproduce the Main Points but do not credit the Guiding Cases. These instances of unattributed text reuse are of primary interest here, and their decision-level counts are given in Table 2. For Guiding Case 24, the number of decisions engaging in unattributed text reuse is approximately six to ten times the number of decisions citing the Guiding Case. For Guiding Case 60, the number of decisions engaging in unattributed text reuse is approximately four times the number of decisions citing the Guiding Case in the outcome sections. It is approximately four fifths the number of decisions citing the Guiding Case anywhere in the judgment.[16]

The BLAST algorithm may generate false positives, that is matches that do not actually capture references by local court decisions to the Guiding Cases. For example, the algorithm identifies matches between the Main Points of Adjudication of Guiding Case 24 and local court decisions that predate the issuance of the Guiding Case itself. These decisions could not possibly be applying Guiding Case 24. The textual similarity between the matched sequences can only be coincidental.

[16] The disparity between the number of decisions citing Guiding Case 60 in the reasoning section and the number of decisions citing Guiding Case 60 elsewhere is due to the relatively numerous occasions where the applicability of the Guiding Case is raised by one of the parties but passed over in silence by the court.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

## 4.2 Validated matches

To validate our matches, all sequence pairs are manually inspected and labelled. A match is labelled as a true positive if the Guiding Case appears to have supplied the basis of the local court decision and a false positive otherwise. This is a task calling for legal skill and judgment. All matches are labelled twice by human coders who either hold a Chinese law degree or have passed the Chinese bar examination. These human coders see only the matched sequences and the relevant source and target texts. In particular, they are blinded from the similarity scores computed by the algorithm. For our purposes, a match is labelled as a true positive even if the matched sequence is not the most suggestive nexus between the local court decision and the Guiding Case. All differences between the human coders are resolved by consensus.

### 4.2.1 Matches for Guiding Case 24

Is a tortfeasor liable for the entirety of a victim's injuries when those injuries are exacerbated by the victim's pre-existing condition? In Guiding Case 24,[17] the Binhu Basic People's Court reduced the damages for a pedestrian's injuries by 25% because of a pre-existing medical condition. The defendant had grazed the pedestrian while driving his car and there was no dispute that the former bore full responsibility for the accident. The trial court concluded, however, that the victim's osteoporosis also contributed to the severity of his fractures and was a factor that must be accounted for in the calculation of damages. The Wuxi Intermediate People's Court overturned the decision below. Invoking Article 26 of the Tort Liability Law[18] and Article 76 of the Road Traffic Safety Law,[19] the appellate court reasoned that a reduction in damages could only be awarded if there were fault on the victim's part. The physical condition of the victim did not constitute such fault, 'osteoporosis from old age being an objective element of the accident's consequences and not having a causative relationship in law'. The Main Points of Adjudication of Guiding Case 24 affirmed that where 'the victim of a traffic accident is faultless, the effect of his physical condition on the consequences of the harm is not a legal circumstance that can reduce the responsibility of a rights infringer'. In endorsing the decision of the Wuxi Intermediate People's Court, the SPC articulated a version of the eggshell-skull rule familiar to the common law.

Of the 488 machine-generated matches for Guiding Case 24, 282 are true positives; the remainder are false positives. Most of the false positives feature generic legal phrases contained in the applicable rules, such as 'the consequences of the harm' or 'the responsibility of a rights infringer'. For example, the BLAST algorithm matched the following snippet from a local judgment to a similar one from

[17] Guiding Case 24 (n 10).
[18] Tort Liability Law of the People's Republic of China, art 26 (2009), Zuigao Renmin Fayuan Gongbao.
[19] Law of the People's Republic of China on Road Traffic Safety Law, art 76 (2011), Zuigao Renmin Fayuan Gongbao.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

**Table 2** Decision-level counts for citations to and unattributed text reuse from Guiding Cases 24 and 60

| | Guiding Case 24 | Guiding Case 60 |
|---|---|---|
| Citation in reasoning section | 46 | 22 |
| Unattributed text reuse given citation in reasoning section | 452 | 92 |
| Citation anywhere | 78 | 95 |
| Unattributed text reuse given citation anywhere | 441 | 72 |

Guiding Case 24: 'is also at fault for the consequences of the harm, [it] can reduce the responsibility of a rights infringer. Infringing others causes physical injuries'.[20] On closer examination of the legal reasoning of that decision, however, it transpires that the local court did and could not have taken the Guiding Case into account because the victim there did not suffer from a pre-existing physical condition nor were the facts somehow analogous.

Of the true positives, many are straightforward instances of local judgments reusing language from the Main Points of Adjudication of Guiding Case 24. In some of these cases, the local courts followed Guiding Case 24 despite potentially distinguishable facts, such as the victim and the tortfeasor both being at fault. Finally, 139 matches are labelled as true positives because the local judgments recited some of the arguments given in the Reasons for the Adjudication section of the Guiding Case. Even though these judgments might not always have repeated the most distinctive or critical phrases of the Main Points, it is evident on inspection that they were retracing the legal logic of Guiding Case 24.

Table 3 gives the decision-level incidence of citations to and validated, unattributed text reuse of Guiding Case 24. Figures 1 and 2 show the counts over time. Overall, the number of decisions that engaged in validated, unattributed text reuse is approximately four to six times the number of decisions citing the Guiding Case. How significant are these numbers in the broader scheme of things? Guiding Case 24 is about pre-existing conditions and was published on 26 January 2014. A string search for the phrases 'pre-existing condition' and 'Tort Liability Law' turned up 397 decisions rendered in or after January 2014 containing both those terms. On a conservative estimate then,[21] between 11.6 and 19.6% of decisions that could have applied the Guiding Case cited it and between 67.7 and 70.5% of them reproduced language from the Guiding Case without acknowledging so.

[20] *Rencheng Fang v. Tianqian Ding, Shanghai Mingcai Industrial Co., Ltd, and Hangzhou Medusa Decoration Construction Co., Ltd* [2018]. The corresponding snippet from the Main Points of Guiding Case 24 is 'the effect on the consequences of the harm is not a legal circumstance that can reduce the responsibility of a rights infringer'; see Guiding Case 24 (n 10).

[21] The estimate is conservative because we assume that all decisions containing the searched terms are cases presenting the same question answered by the Guiding Case.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

**Table 3** Decision-level counts for citations to and validated, unattributed text reuse from Guiding Cases 24

| Type of reference | Count |
|---|---|
| Citation in reasoning section | 46 |
| Validated, unattributed text reuse given citation in reasoning section | 280 |
| Citation anywhere | 78 |
| Validated, unattributed text reuse given citation anywhere | 269 |




**Fig. 1** Decision-level counts for citations to and validated, unattributed text reuse from Guiding Case 24 over time, citations being counted only if they occur in the reasoning sections of local court decisions

#### 4.2.2 Matches for Guiding Case 60

Guiding Case 60 concerns a dispute arising under Article 20 of the Food Safety Law which defines national food safety standards to include '[r]equirements concerning food safety and nutrition labels, markings and user instructions'.[22] The *General Principles for the Labeling of Prepackaged Foods* ('*General Principles*') mandated that '[i]f food labels or food manuals particularly emphasise the addition of some type or amount of valuable or special ingredients, then the amount added of such

[22] Food Safety Law of the People's Republic of China, art 20 (2009), Zuigao Renmin Fayuan Gongbao.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

Case 7:24-cv-00232-DC Document 214-26 Filed 09/04/26 Page 15 of 26






**Fig. 2** Decision-level counts for citations to and validated, unattributed text reuse from Guiding Case 24 over time, citations being counted if they occur anywhere in the local court decisions

emphasised ingredients should be indicated'.[23] The *General Principles* was promulgated by General Administration of Quality Supervision, Inspection, and Quarantine and the Standardization Administration and implemented on October 1, 2005—before the Food Safety Law came into effect. In Guiding Case 60,[24] the Yancheng Intermediate People's Court upheld the penalty levied by the Dongtai Administration for Industry and Commerce on the Aokang Company. In packaging its blended oil product, the Aokang Company had prominently displayed the word 'olive', accompanied by graphic depictions of 'olives', and had also represented on hangtags that the product was made 'with 100% extra virgin olive oil from Italy'. Olive oil, the appellate court also noted, had a market price and nutritional value that are on average higher than that of other edible oils. The Aokang Company should have but did not state the amount of olive oil added to the blend. This amounted to a violation of food safety standards.

Of the Main Points of Adjudication of Guiding Case 60, the first essentially restates the rule stated in the *General Principles* and declares violation of the rule to be a violation of the Food Safety Law. The second expounds 'emphasise' as encompassing 'names, differences in colour, font, font size, graphics, order of arrangement,

[23] General Principles for the Labelling of Prepackaged Foods (2005), Zhonghua Renmin Gongheguo Fagui Huibian.
[24] ibid (n 11).



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

written explanations, identical content that repeatedly appears, different content pointing to the same thing'. 'Valuable and special ingredients', on the other hand, 'refers to special ingredients which are different from general ingredients, have a higher nutritional value for the human body, and have a market price and nutritional components that are often higher than other ingredients'.

Because of the legislative and regulatory background to Guiding Case 60, the validation of its matches presents some unique challenges. As a preliminary matter, recall that we excised that part of the Main Points of Adjudication of Guiding Case 60 which restates Article 4.1.4.1 of the *General Principles*. Hence, none of the sequences is matched based on language which appears extensively in both the Guiding Case and the *General Principles*. There is, however, another difficulty which is that *GB7718-2011 Implementation Instrument* also elucidates the meaning of 'particularly emphasise (tebie qiangdiao)' and 'valuable and special (youjiazhi youtexing)'.[25] The *Instrument* provides guidance for interpreting the *General Principles* and predates the publication of Guiding Case 60. Specifically, the *Instrument* instructs that 'particularly emphasise' encompasses a food producer 'attracting consumers' attention to the product, ingredients, or components through the publicity of such ingredients or components' and 'highlighting or implying the addition or inclusion of one or more types of ingredients or components in the form of words on labels other than the contents of ingredient lists'.[26] The *Instrument* also specifies that 'valuable and special' refers to 'relatively special ingredients or components'.[27] For ingredient or components to qualify as 'valuable and special', 'the extent to which... [they] are beneficial to human body [has to be] beyond the extent that should be achieved by the food under normal circumstances'.[28] They also have to be 'different in nature from normal ingredients or components of the food'.[29] The *Instrument* thus addresses the very issues touched on in Guiding Case 60 and employs the same vocabulary and concepts to do so.[30] There are, however, subtle differences between the explanations furnished in the *Instrument* and the Guiding Case and our human coders can tell them apart. Of the 103 matches returned by the algorithm, 78 are true positives and 25 are false positives. Most false positives involve repetition of the term 'valuable and special'. Many of the true positives, on the other hand, reprise the Guiding Case's explanation of 'emphasise' and 'valuable and special ingredients'.

Table 4 gives the decision-level incidence of citations to and validated, unattributed text reuse of Guiding Case 24. Figures 3 and 4 plot the counts over time. Once again, how significant are these numbers? Guiding Case 60 was published

25 Implementation Instrument for the National Standard for Food Safety and General Principles for the Labeling of Prepackaged Foods (2014), Zhonghua Renmin Gongheguo Fagui Huibian.

26 ibid.

27 ibid.

28 ibid.

29 ibid.

30 There is some variation in how the *Instrument* and Guiding Case 60 refer to the statutory terms. The former uses the terms 'particularly emphasise (tebie qiangdiao)' and 'valuable and special (youjiazhi youtexing)' whereas the latter uses the terms 'emphasise (qiangdiao)' and 'valuable and special ingredients (youjiazhi youtexing de peiliao)'.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

**Table 4** Decision-level counts for citations to and validated, unattributed text reuse from Guiding Cases 60

| Type of reference | Count |
|---|---|
| Citation in reasoning section | 22 |
| Validated, unattributed text reuse given citation in reasoning section | 76 |
| Citation anywhere | 95 |
| Validated, unattributed text reuse given citation anywhere | 62 |




**Fig. 3** Decision-level counts for citations to and unattributed text reuse from Guiding Case 60 over time, citations being counted only if they occur in the reasoning sections of local court decisions

on 20 May 2016 and our analysis here only looked at the second of the two Main Points, i.e. what it means for an ingredient or component to be 'valuable and special'. A string search for the phrase 'valuable and special' across all local decisions yielded 650 opinions rendered in or after May 2016 containing that term. So, on a conservative estimate, between 3.4 and 14.6% of decisions that could have applied the Guiding Case cited it and between 9.5 and 11.7% of them reproduced language from the Guiding Case without acknowledging so. These figures are lower than those for Guiding Case 24, perhaps because of the comparative recency of Guiding Case 60.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.




**Fig. 4** Decision-level counts for citations to and unattributed text reuse from Guiding Case 60 over time, citations being counted if they occur anywhere in the local court decisions

## 5 Discussion

Do Guiding Cases influence judicial outcomes in China? How do Chinese judges who are reticent to cite Guiding Cases as a legal source nevertheless enforce their authoritative guidance? Our observations here are limited to the text of judicial documents but several patterns emerge from a close reading of all the validated matches.

The first is the practice of statutory ventriloquy. Consider Guiding Case 60. Of the 78 true positives, 76 local judgments quietly adopted the Guiding Case's gloss of the terms 'emphasise' and 'valuable and special ingredients' while referencing either the *General Principles* or the *Instrument*. As a variation on the theme, 22 of those judgments concatenate phrases from the *General Principles* or the *Instrument* and the Guiding Case and attribute the ensuing collage to the former set of materials. For example, in *Liu Jia v. Beijing Yonghui Supermarket Co., Ltd.*, the court, in determining whether a label for tea seeds and olive oil particularly emphasised olive oil as a component, stated that.

> 'particularly emphasise' refers to a [food] producer attracting consumers' attention to the product, ingredients, or components through the publicity of such ingredients or components and stressing in labels through various forms of demonstration, including names, differences in colour, font, font size, graph-



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

Case 7:24-cv-00232-DC Document 214-26 Filed 09/04/26 Page 19 of 26



> ics, order of arrangement, written explanations, identical content that repeatedly appears, and different content pointing to the same thing.[31]

Article 4.1.4.1 of the *General Principles* was cited as the source of these propositions but the elaboration of 'particularly emphasise'—the very term at issue—comes in part from the Main Points of Guiding Case 60. The reproduction of the Main Points was not gratuitous. The court held that the food product in question did not emphasise olive oil as a component because the fonts and the sizes of 'tea seeds' and 'olive' in the label were the same. The court also considered that the tagline on the product label—'Jinhao Tea Oil Eat Less Oil Eat Better Oil'—did not amount to a claim that olive oil was more beneficial to human body than normal food. In so doing, it applied the part of the Main Points it did not recite.

Another example is given by *Shoulan Li v. China Resources Vanguard Shop* where the questions were whether olive oil was emphasised by a label for edible olive and sunflower oil and whether olive oil constituted a 'valuable and special' component.[32] Invoking the Food Safety Law and the *General Principles* as legal bases, the court asserted that

> [e]mphasise means that food producers attract consumers' attention to the product, ingredients, or components through the publicity of such ingredients or components and highlight or imply the addition or inclusion of one or more types of ingredients or components in the form of words on labels other than the contents of ingredient lists. Valuable and special ingredients refer to [ingredients which] have a higher nutritional value for the human body and have a market price and nutritional components that are often higher than other ingredients.[33]

The definition of 'emphasise' is drawn from the *Instrument* and the definition of 'valuable and special ingredients', from Guiding Case 60. The court proceeded to deem olive oil as a valuable and special ingredient since

> [t]he Duoli olive and sunflower edible blended oil Shoulan Li purchased was made of two ingredients olive oil and sunflower seed oil. The nutritional value and market price of olive oil were higher than sunflower seed oil.[34]

More interestingly, the court, despite quoting the language of the *Instrument* rather than the Guiding Case, also turned to the Main Points to determine whether olive oil was 'emphasised' as a component. Answering in the affirmative, the court noted, among other things, that 'olive oil' repeatedly featured on the packaging through graphics, font and written explanations.

Besides statutory ventriloquy, judges also frequently retrace the jurisprudential grounds of the Guiding Cases. Rather than quote the Main Points of Adjudication, some local judgments simply rehearsed the underlying reasoning as given by the Guiding Cases. Consider Guiding Case 24. As previously related, courts are

---

31 *Liu Jia v. Beijing Yonghui Supermarket Co., Ltd.* [2017].

32 *Shoulan Li v. China Resources Vanguard Shop* [2017].

33 ibid.

34 ibid.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

supposed to 'refer to' the Main Points when adjudicating similar cases and according to the Main Points of Adjudication of Guiding Case 24, if 'the victim of a traffic accident is faultless, the effect of his physical condition on the consequences of the harm is not a legal circumstance that can reduce the responsibility of a rights infringer'.[35] But many judges do not reiterate the Main Points, even if they have taken instruction from them. Indeed, they often do not even mention the Guiding Case at all. Instead, they recapitulate the legal-doctrinal arguments advanced in Guiding Case 24, for example that 'a physical condition does not constitute the victim's fault prescribed by the Tort Liability Law', 'a physical condition is not a legal cause of the consequences of the harm' and hence that 'China's legislation on traffic insurance does not warrant a mitigation of tort liability due to the victim's physical condition'. *Chunhua Zhang v. Ning Bian & China Pacific Property Insurance Co. Ltd.* is illustrative.[36] The plaintiff dislocated her hip in a motor accident and claimed RMB 386,587.72 yuan in tort damages. At trial, the defendant's insurance company submitted that a femoral neck fracture suffered by the plaintiff fifteen years ago exacerbated her injury and that the defendant's liability should therefore be reduced. The court replied that

> in traffic accidents, when calculating whether disability damages should be reduced, the analysis should be based on whether the victim is at fault for the occurrence or amplification of the injuries. Even if the old injury that plaintiff in this case had fifteen years ago, to some extent, affected the occurrence of the consequences of the harm, this does not constitute fault as prescribed by the Tort Liability Law or other laws. Plaintiff Zhang Chunhua should not, due to [the fact that his] personal physical basic condition had a certain effect on injuries and disabilities caused by the traffic accident, bear corresponding liability.[37]

This response differs in only a few words from the following passage of the Reasons for the Adjudication section of Guiding Case 24:

> in traffic accidents, when calculating whether disability damages should be reduced, the analysis should be based on whether the victim is at fault for the occurrence or amplification of the injuries. In this case, although the personal physical condition of plaintiff Rong Baoying, to some extent, affected the occurrence of the consequences of the harm, this does not constitute fault as prescribed by the Tort Liability Law or other laws. Rong Baoying should not, due to [the fact that his] personal physical condition had a certain effect on injuries and disabilities caused by the traffic accident, bear corresponding liability.[38]

[35] Guiding Case 24 (n 10).

[36] *Chunhua Zhang v. Ning Bian & China Pacific Property Insurance Co. Ltd.* [2020].

[37] ibid.

[38] Guiding Case 24 (n 10).



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

But nowhere does the judgment mention the Guiding Case. *Chunhua Zhang* is not an isolated example. Of the 282 true positives, there are a total of 139 cases like it.[39]

## 6 Conclusion

Alien to the socialist conception of judicial power, the Guiding Case system allows the SPC to make policy through cases by picking—and, sometimes recasting—the judgments that must be 'refer[red] to' by all judges when adjudicating similar disputes. Previous empirical studies find, however, that Guiding Cases have had very little sway on the lower courts. Many of these studies reach this conclusion after counting the number of citations to Guiding Cases. By looking beyond citations to the reuse of text in the judgments of lower courts, we offer another perspective on the influence of Guiding Cases on the Chinese legal system. Our results indicate that formal citations represent only a fraction of judicial decisions relying on Guiding Cases. Guiding Cases are more influential than suggested by past studies.

Why do judges apply Guiding Cases but not invoke them by name? The best explanation lies in the confluence of bureaucratic incentives and legal tradition and culture (Howson 2008). The percentage of first-instance cases appealed, reversed, or petitioned is an important component of assessing judicial performance (Ng and Chan 2021).[40] Inconsistency between a judicial decision and a Guiding Case will be challenged by litigants and their lawyers at second instance, thereby hurting the evaluation and advancement of the responsible judge (Peng 2017; Liu and Xing 2018; Sun 2018a, b). Chinese judges are therefore professionally—and financially—rewarded for following Guiding Cases.

But there are no rewards for citing Guiding Cases, over and above following them. The prevailing party would certainly not complain about the court's omission in mentioning a Guiding Case. The unsuccessful party would not be able to criticize the court for departing from a Guiding Case. And a judgment that otherwise conforms to a Guiding Case would not be disapproved for failing to make its adherence express (Wang 2022). Under these circumstances, judges may prefer to keep their reliance on Guiding Cases tacit. This preference could be strategic. As alluded to at the beginning, some judges believe that basing their decisions on Guiding Cases makes them more vulnerable on appeal (Lin 2015). The reticence to cite Guiding Cases might also stem from a lack of confidence in their own analogical reasoning

[39] We include *Chunhua Zhang* in the count. To check that this phenomenon does not pre-date the publication of Guiding Case 24, we re-ran the BLAST algorithm using the legal-doctrinal arguments as source texts and the reasoning sections of all local court decisions as target texts. Of the more than 300 matches thus obtained, none of the decisions repeating the legal-doctrinal arguments was issued before the promulgation of Guiding Case 24.

[40] Notice of the Supreme People's Court on Issuing the Guiding Opinions on Strengthening and Improving the Work of Judicial Appraisal, art. 11 (2021), Zuigao Renmin Fayuan Yinfa Guanyu Jiaqiang he Wanshan Faguan Kaohe Gongzuo de Zhidao Yijian de Tongzhi; Notice of the Supreme People's Court on Issuing the Guiding Opinion of the Supreme People's Court on Carrying out the Case Quality Evaluation Work (for Trial Implementation), arts. 8 &10 (2008), Zuigao Renmin Fayuan Yinfa Zuigao Renmin Fayuan Guanyu Kaizhan Anjian Zhiliang Pinggu Gongzuo de Zhidao Yijian Shixing de Tongzhi.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

skills (Sun 2022). Silence relieves judges from 'the burden of reasoning with the Cases' (Sun 2018a, b). At the same time, legal doctrine and orthodoxy continue to have a hold on the judicial mind. Although some judges openly refer to cases—even foreign ones—in their decisions, it remains that judicial opinions are not a source of law in socialist China. As one judge attested, 'Guiding Cases are only for reference, no one dares to directly use them as the basis for adjudication in the specific case handling process' (Zhang 2013). It is enough for judges to hew to the language of Guiding Cases, thereby 'enhanc[ing] the acceptability of the[ir] judgments' and 'prevent[ing their] own judgments from being overturned on appeal' (Sun 2018a, b).

The SPC advisedly chose the phrase 'guiding case (*zhidaoxing anli*)' over the term 'precedent (*panli*)' to forestall any accusation of establishing a case law system (Deng 2015).[41] In applying Guiding Cases, local judges engage in statutory ventriloquy or jurisprudential retracing to avoid citing them as a source of legal authority. Both techniques serve to maintain the dogma of legislative supremacy even as statutory law is being supplemented—and sometimes modified—through judicial initiative.[42] It is frequently observed that superficial convergence in legal rules and terminology may belie substantive divergence in action.[43] But as the empirical operation of the Guiding Case system demonstrates, performative resistance can also disguise and even facilitate an undercurrent of legal adaptation and assimilation. Guiding Cases may, in the fullness of time, come to be accepted as precedent in socialist China.[44]

**Funding** The work described in this paper was substantially supported by a grant from the Research Grants Council of the Hong Kong Special Administrative Region, China (Project No. HKU 27603721). Preliminary research was supported in part by a start-up grant from the Lee Kuan Yew School of Public Policy, National University of Singapore, and in part by a seedcorn grant from Durham University.

**Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as

[41] As recently as 2018, a vice-president of the SPC emphasised that Guiding Cases were not precedential in the Western sense since precedent is binding whereas Guiding Cases only need to be referred to Fu (2018). Another justice of the SPC drew a conceptual distinction between de facto and de jure bindingness, explaining that Guiding Cases had the former property, not the latter. These theoretical subtleties must be very fine indeed for the same jurist goes on to warn that 'in cases of obvious departure resulting in unfair judgments, [judges] would face the punishment from judicial administration and the risk of discipline, and the cases would be remanded, reversed, or modified by retrial' (Liu 2017). If judges must follow Guiding Cases on pain of discipline and reversal, then adherence is not merely a matter of 'statistical regularity' (Peczenik 1997).

[42] For an argument that Guiding Cases permit the SPC to independently perform a legislative function, see (Wang 2019).

[43] Schlesinger and co-authors refer to this phenomenon as 'acoustic agreement' (Schlesinger et al. 1988).

[44] Indeed, in December 2021, the High People's Court of Liaoning remanded a case because the first-instance and appeal courts did not expressly address a Guiding Case despite the similarity between the basic facts, points of contention, and legal issues of that instant case and the Guiding Case. The failure of the appeal court to take reference from the Guiding Case resulted in an erroneous outcome. *See* Civil Ruling for the Retrial of Liu Ali, Mou Jufen, and Li Yanyan. Liu Qi and Huatai Property & Casualty Insurance Co., Ltd. Benxi Central Branch (2021).



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

Case 7:24-cv-00232-DC Document 214-26 Filed 09/04/26 Page 23 of 26



you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/.

## References

Ahl B (2014) Retaining judicial professionalism: the new Guiding Cases mechanism of the Supreme People's Court. China Q 271:121–139

Altschul SF (2014) BLAST algorithm. In: Encyclopedia of life sciences. Wiley, Chichester

Ash E, MacLeod BW (2021) Reducing partisanship in judicial election can improve judge quality: evidence from US state supreme courts. J Public Econ 201:1–22

Baker S, Feibelman A, Marshall WP (2009) The continuing search for a meaningful model of judicial rankings and why it (unfortunately) matters. Duke Law J 58:1645–1666

Cohen M (2017) Spring time for IPR Case Law in China? Retrieved 31 Jan, 2022, from https://chinaipr.com/2017/03/12/spring-time-for-ipr-case-law-in-china/

Daum J (2017) The curious case of China's Guiding Cases System. Retrieved 1 24, 2022, from https://www.chinalawtranslate.com/the-curious-case-of-chinas-guiding-cases-system/?lang=en

Deng J (2015) The Guiding Case system in China's Mainland. Front Law China 10:449–474

Finder S (2017) China's evolving case law system in practice. Tsinghua China Law Rev 9:245–259

Frankenreiter J (2017) The politics of citations at the ECJ—policy preferences of EU Member State Governments and the citation behavior of judges at the European Court of Justice. J Empir Legal Stud 14:813–857

Frankenreiter J, Livermore MA (2020) Computational methods in legal analysis. Annu Rev Law Soc Sci 16:39–57

Fu Z (2018) The Supreme Court explicitly explains the case guidance system: Refer to and enforce, no binding force. Retrieved from China Economic Net: http://www.ce.cn/xwzx/gnsz/gdxw/201802/28/t20180228_28292364.shtml

Gechlik M, Zhang M, Ye L (2016) Cumulative analysis of all subsequent cases referring to Guiding Cases in China (2014 Q1–2015 Q4). Retrieved 01 22, 2022, from https://law.stanford.edu/2016/01/25/cgcp-announcement-20160125/

Gulati M, Choi SJ (2008) Bias in judicial citations: a window into the behavior of judges? J Legal Stud 37:87–129

Guo Y, Sun M (2019) Annual report of comparison and analysis on the adjudication application of the Supreme People's Court Guiding Cases. J Shanghai Univ Polit Sci Law 6:75–85

Guo Y, Sun M (2021) 2020 annual report of judicial practice of the Supreme People's Court Guiding Cases. Chinalawinfo, Beijing

Guo Y, Sun M (2022) 2021 annual report of judicial practice of the Supreme People's Court Guiding Cases. China J Appl Jurisprudence 4:199–221

Guo J, Xu B, Yang J (2017) Intellectual property case guidance system: from "Stare Decisis" to deciding like cases alike. Retrieved 4 4, 2022, from http://rmfyb.chinacourt.org/paper/images/2017-01/23/06/2017012306_pdf.pdf

Hazard JN (1965) Unity and diversity in socialist law. Law Contemp Probl 30:270–290

Howson NC (2008) The doctrine that dared not speak its name: Anglo-American fiduciary duties in China's 2005 company law and case law intimations of prior convergence. In: Milhaupt C, Kim K-S, Kanda H (eds) Transforming corporate governance in East Asia. Routledge, London, pp 193–254

Hu Y (2014) Several issues concerning the case guidance system. Retrieved from Guang Ming Daily. https://epaper.gmw.cn/gmrb/html/2014-01/29/nw.D110000gmrb_20140129_2-16.htm.

Jia M (2016) Chinese common law? Guiding Cases and judicial reform. Harvard Law Rev 129:2226–2228

Lei L (2015) Rethink the legal status of Guiding Cases. China Legal Sci 1:272–290

Levenshtein VI (1966) Binary codes capable of correcting deletions, insertions, and reversals. Sov Phys Dokl 10:707–710



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

Lin B (2015) How judges reason: Chinese experience and universal principles. China Legal Sci 5:99–117
Lipman DJ, Pearson WR (1985) Rapid and Sensitive Protein Similarity Searches. Science 1435–1441
Liu Z (2017) The applicability of the Guiding Cases. Retrieved 4 18, 2023, from People's Court Daily. http://rmfyb.chinacourt.org/paper/images/2017-07/19/02/2017071902_pdf.pdf
Liu Q (2021) The Chinese Guiding Case system through the lens of a CISG case. Hong Kong Law J 51:339–362
Liu J, Xing Q (2018) Analyzing the dilemma of the effectiveness of the Guiding Cases and its solution. Shandong Adjudic 227:49–60
Ma Y (2019) On the construction of China's unified and multi-level cases guidance system. China Legal Sci 1:185–191
Ng KH, Chan PC (2021) "What gets measured gets done": metric fixation and China's experiment in quantified judging. Asian J Law Soc 255–281
Olsen M, Russell H, Glenn R (2011) Something borrowed: sequence alignment and the identification of similar passages in large text collections. Digital Studies/le Champ Numérique.
Peczenik A (1997) The binding force of precedent. In: MacCormick D, Summers RS (eds) Interpreting precedents: a comparative study. Ashgate, p 465
Peng Z (2017) The Guiding Cases in judicial decisions. China Legal Sci 6:129–148
Peng N (2018) Practical dilemmas of the Guiding Cases and their causes. Tianfu New Ideas 2:108–116
Research Team of High People's Court of Sichuan Province (2012) Obstacles to the application of the guiding cases and relevant strategies. J Law Appl 5:67–71
Salmi H, Paju P, Rantala H, Nivala A, Vesanto A, Ginter F (2021) The reuse of texts in Finnish newspapers and journals, 1771–1920: a digital humanities perspective. Hist Methods J Quant Interdiscip Hist 54:14–28
Schlesinger RB, Baade HW, Damaska MR, Herzog PH (1988) Comparative law: cases, text, materials. The Foundation Press, Mineola
Shao P, Guo J (2022) The solution of legal localisation under legal globalisation—analysing the localisation of China's Case Law System. Soc Sci 3:122–129
Smith T, Waterman M (1981) Identification of common molecular subsequences. J Mol Biol 147:195–197
Sun H (2018a) The implicit application of the Guiding Cases and its correction. Glob Law Rev 2:144–164
Sun Y (2018b) Law and economic analysis of the Guiding Case system: practical dilemmas, causes, and solutions. Theory Mon 9:125–133
Sun Y (2021) How may the Guiding Cases be a source of law? Nanjing Univ Law J 1:151–166
Sun H (2022) The difficulty of referencing to the Guiding Cases and its solution. J Natl Prosecutors Coll 3–21
Tan Z, Shen X (2021) How Guiding Case No. 24 and its hundreds of subsequent cases have shaped the Chinese version of the eggshell-skull rule. China Law Connect 51–62
Vierthaler P, Mees G (2019) A BLAST-based, language-agnostic text Reuse algorithm with a MARKUS implementation and sequence alignment optimized for large Chinese Corpora. J Cult Anal 4:1–25
Wang S (2019) Guiding cases and bureaucratization of judicial precedents in China. Univ Pa Asian Law Rev 14:96–135
Wang R (2020) Decoding judicial reasoning in China: a comparative empirical analysis of Guiding Cases. Cleveland State Law Rev 68:521–580
Wang S (2022) 'Deciding on one's own' of the application and expression of the Guiding Cases and its reflection. J Chengdu Univ Technol (Soc Sci) 30:42–49
Xiang L (2016) From rare references to regular references. Stud Law Bus 5:96–105
Yang J (2017) The application of judicial precedents in IP Adjudication. China Patents & Trademarks 1:3–14. http://www.cqvip.com/qk/96985x/2017001/671424493.html
Yu X, Wu H (2019) The Municipality High Court established and improved three working mechanisms of 'strengthening case guidance, establishing an online consultation platform for difficult issues of law application, and compiling guidelines for the key elements of handling similar cases'. Retrieved 3 April, 2022 from Judicial Think Tank. https://www.sohu.com/a/339269265_100017141
Yu P, Gurgel S (2012) Stare decisis in China? The newly enacted Guiding Case system. In: Wan M (ed) Reading the legal case: cross-currents between law and the humanities. Routledge
Zhang J (2013) The present situation, problems, and future of China's case guidance system. Citizen Law 12:2–10
Zhang M (2017) Pushing the envelope: application of guiding cases in Chinese courts and development of case law in China. Washington Int Law J 26(2):269–306


Content courtesy of Springer Nature, terms of use apply. Rights reserved.

Case 7:24-cv-00232-DC Document 214-26 Filed 09/04/26 Page 25 of 26



Zhang H (2018) Analyzing the reference forces of the Guiding Cases. J Gansu Polit Sci Law Inst 2:119–135

Zhang H (2020) What kind of Guiding Cases does adjudication needs more: Taking Guiding Case No. 60 as analysis object. SJTU Law Rev 1:179–192

Zhou D (2010) Study of several issues concerning China's Guiding Cases system. China Law 1:30–34

Zuo W, Chen M (2015) The research on the guiding case system in China. Peking University Press, Beijing

**Publisher's Note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.



Content courtesy of Springer Nature, terms of use apply. Rights reserved.

# Terms and Conditions

Springer Nature journal content, brought to you courtesy of Springer Nature Customer Service Center GmbH (“Springer Nature”).

Springer Nature supports a reasonable amount of sharing of research papers by authors, subscribers and authorised users (“Users”), for small-scale personal, non-commercial use provided that all copyright, trade and service marks and other proprietary notices are maintained. By accessing, sharing, receiving or otherwise using the Springer Nature journal content you agree to these terms of use (“Terms”). For these purposes, Springer Nature considers academic use (by researchers and students) to be non-commercial.

These Terms are supplementary and will apply in addition to any applicable website terms and conditions, a relevant site licence or a personal subscription. These Terms will prevail over any conflict or ambiguity with regards to the relevant terms, a site licence or a personal subscription (to the extent of the conflict or ambiguity only). For Creative Commons-licensed articles, the terms of the Creative Commons license used will apply.

We collect and use personal data to provide access to the Springer Nature journal content. We may also use these personal data internally within ResearchGate and Springer Nature and as agreed share it, in an anonymised way, for purposes of tracking, analysis and reporting. We will not otherwise disclose your personal data outside the ResearchGate or the Springer Nature group of companies unless we have your permission as detailed in the Privacy Policy.

While Users may use the Springer Nature journal content for small scale, personal non-commercial use, it is important to note that Users may not:

1. use such content for the purpose of providing other users with access on a regular or large scale basis or as a means to circumvent access control;
2. use such content where to do so would be considered a criminal or statutory offence in any jurisdiction, or gives rise to civil liability, or is otherwise unlawful;
3. falsely or misleadingly imply or suggest endorsement, approval , sponsorship, or association unless explicitly agreed to by Springer Nature in writing;
4. use bots or other automated methods to access the content or redirect messages
5. override any security feature or exclusionary protocol; or
6. share the content in order to create substitute for Springer Nature products or services or a systematic database of Springer Nature journal content.

In line with the restriction against commercial use, Springer Nature does not permit the creation of a product or service that creates revenue, royalties, rent or income from our content or its inclusion as part of a paid for service or for other commercial gain. Springer Nature journal content cannot be used for inter-library loans and librarians may not upload Springer Nature journal content on a large scale into their, or any other, institutional repository.

These terms of use are reviewed regularly and may be amended at any time. Springer Nature is not obligated to publish any information or content on this website and may remove it or features or functionality at our sole discretion, at any time with or without notice. Springer Nature may revoke this licence to you at any time and remove access to any copies of the Springer Nature journal content which have been saved.

To the fullest extent permitted by law, Springer Nature makes no warranties, representations or guarantees to Users, either express or implied with respect to the Springer nature journal content and all parties disclaim and waive any implied warranties or warranties imposed by law, including merchantability or fitness for any particular purpose.

Please note that these rights do not automatically extend to content, data or other material published by Springer Nature that may be licensed from third parties.

If you would like to use or distribute our Springer Nature journal content to a wider audience or on a regular basis or in any other manner not expressly permitted by these Terms, please contact Springer Nature at

onlineservice@springernature.com