**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| COBBLESTONE WIRELESS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 7:24-cv-00232-DC<br><br>**JURY TRIAL DEMANDED** |

**DECLARATION OF PU (ALEXANDRA) YANG REGARDING CHINESE LAW**

I, Pu (Alexandra) Yang, hereby declare:

I submit this Declaration in support of Defendant Apple Inc. ("Apple") and to provide my opinions regarding Chinese law.

I submitted my first declaration on July 9, 2026, and, on August 27, 2026, received, as forwarded by Sheppard, responses to my first Declaration from Eunice Wu and Yuan Ma, Chinese-law experts appearing on behalf of Cobblestone.

I carefully reviewed WU's and MA's declarations and all evidence attached thereto, and, at 8:00 a.m. Beijing Time on September 1, 2026, participated in a videoconference with Dr. Harry Bims, the technical expert retained by Sheppard.

I have fully reviewed and considered the information in the record in this case, and I respond to WU's and MA's declarations as follows.

## I. RESPONSE TO THE DECLARATION OF EUNICE WU

### 1. The '437 Patent Is a Service Invention Belonging to Tongji University, and None of WU's Rebuttals Has Merit

#### 1.1 WU Repeatedly Relies on Case No. 1848 in Her Declaration, and Her Conclusions Are Based Principally on That Case; However, the Facts of Case No. 1848 Are Fundamentally Different from Those Here, and Different Statutory Provisions Apply; Moreover, Even Under the Analytical Framework Applied in Case No. 1848 to Determine Patent Ownership, the Technology at Issue Here Would Still Be Determined to Belong to Tongji University

WU repeatedly relies on Case No. 1848 in her declaration (WU Ex. 2). A count shows that 34 paragraphs of Wu's declaration mention and analyze Case No. 1848; Case No. 1848 constitutes WU's principal basis for addressing whether the patent is a service invention, and WU's conclusions are based principally on that case.

Case No. 1848 likewise involved a dispute between an employer and an employee concerning patent ownership, and the court held that the patent rights belonged to the individual employee. I would note, however, first, that the facts of Case No. 1848 are fundamentally different from those here and that different statutory provisions apply; and second, that, under the analytical framework employed in Case No. 1848 to determine patent ownership, the technology in this case in fact belongs to Tongji University.

**1.1.1 Case No. 1848 and This Case Implicate Two Different Constituent Requirements Under Rule 12 of the Implementing Regulations of the Patent Law; the Statutory Paths and Elements for Determining a Service Invention Differ, and Case No. 1848 Is Not Instructive Here**

Article 6 of the Patent Law of the People's Republic of China (2008 Amendment) (Exs. 2 and 3 to my first Declaration) provides: "*Article 6. An invention-creation, made by a person in execution of the tasks of the entity to which he belongs,* ***or*** *made by him mainly by using the material and technical means of the entity, is a service invention-creation. For a service invention-creation, the right to apply for a patent belongs to the entity. After the application is approved, the entity shall be the patentee...*"

Rule 12 of the Implementing Regulations of the Patent Law of the People's Republic of China (2002 Amendment) (Exs. 4 and 5 to my first Declaration) provides: "*'A service invention-creation made by a person in execution of the tasks of the entity to which he belongs' referred to in Article 6 of the Patent Law means any invention-creation made: (1) in the course of performing* ***his own duty****; (2) in execution of any task,* ***other than his own duty****, which was entrusted to him by the entity to which he belongs*."

In Case No. 1848, the employer did not dispute at all whether the employee's invention-creation had been made in the course of performing his own duty; the provision applied in that case was the third clause of Rule 12 of the Implementing Regulations, i.e., subparagraph (2), "in execution of any task, other than his own duty, which was entrusted to him by the entity to which he belongs." Specifically, page 16 of WU Ex. 2 expressly states: "On appeal . . . Xincai Company made clear in court that the basis for its claim to ownership of the patent at issue was that Song Junli was executing a task entrusted to him by Xincai Company **other than his own duty**, and mainly used the entity's material and technical means"; page 17 of WU Ex. 2 states: "(2) Concerning the determination of Song Junli's work tasks, Xincai Company expressly contended that Song Junli invented the patent at issue while performing a task entrusted to him by the entity **other than his own duty**."

The court in Case No. 1848 then considered, in sequence, whether the employer could prove that it had assigned a work task to the employee, whether it could be inferred that the employee had undertaken a research-and-development task, and whether the employee understood that he had accepted such a task, for the purpose of determining whether the facts satisfied the constituent requirement of "performing a task **other than his own duty.**" In other words, those factual determinations were made to ascertain whether the facts of Case No. 1848 satisfied Rule 12, subparagraph (2), of the Implementing Regulations of the Patent Law, concerning an "invention-creation made in execution of any task, other than his own duty, which was entrusted to him by the entity to which he belongs."

By contrast, YIN's work in this case included scientific and technological research and development (the reasoning and exhibits supporting this point are discussed in detail in Section 1.1.2 below); the provision applicable here is the second clause of Rule 12 of the Implementing Regulations, i.e., subparagraph (1), concerning an "invention-creation made in the course of performing **his own duty.**" That provision differs from the one applied in Case No. 1848, and the foregoing factual findings in Case No. 1848 therefore do not apply here.

In addition, under the standard for identifying a service invention in Article 6 of the Patent Law, the two requirements, "in execution of the tasks of the entity" and "mainly by using the entity's material and technical means," **are stated in the alternative, joined by "or."** Thus, satisfaction of either requirement warrants a determination that the invention is a service invention. Case No. 1848 addressed whether the employee had "mainly used the entity's material and technical means" because that case did not satisfy the requirement of "execution of the tasks of the entity." Put differently, if an invention-creation can clearly be determined to have resulted from the "execution of the tasks of the entity," there is no need to determine whether the requirement of "mainly using the entity's material and technical means" is also satisfied.

Accordingly, the analytical path in Case No. 1848 concerning whether the employee "mainly used the entity's material and technical means" likewise does not apply here, because the record evidence establishes beyond any doubt that YIN created the technology at issue while performing his work duties for Tongji University. Nevertheless, I have also explained that the evidence at issue establishes that Tongji University furnished the material and technical means for the invention-creation in this case (see Section 1.2.4.2).

**1.1.2 The Facts of Case No. 1848 Are Fundamentally Different from Those Here: the Employee in Case No. 1848 Worked in Equipment Maintenance and Management, and His Duties Included Plant Safety, Sanitation, and Cleaning; by Contrast, YIN Joined Tongji University as a Researcher in 2008, Became Deputy Chair of Tongji University's Department of Electronic Science and Technology in 2010, and Taught Multiple Undergraduate and Graduate Courses as a Professor, Such That His Regular Employment Duties Were Directly Related to Scientific Research**

As discussed above, the employer in Case No. 1848 did not dispute whether the employee's regular duties included research and development relating to the patent at issue; the employer contended

only that the employee completed the invention-creation while performing a task outside his regular duties. This is a fundamental distinction between this case and Case No. 1848. Indeed, the employee in Case No. 1848 performed miscellaneous operational work of a kind markedly different from YIN's position as a university professor.

The decision in Case No. 1848 found: "Upon trial, it was found that, under the employment contract between Song Junli and Xincai Company, Song Junli's primary position was equipment maintenance and management... Song Junli's work primarily included: tendering and procurement; equipment installation, commissioning, and routine maintenance; conveyor-belt testing and communications with manufacturers; modification of conveyor belts using purchased high-temperature felt; and **plant safety, sanitation, and cleaning, among other tasks**." (WU Ex. 2 at 17-18.) This shows that most of Song Junli's work was relatively routine, required little intellectual labor, and had a relatively low threshold (that is, it did not require a high level of education or an extensive knowledge base).

The decision in Case No. 1848 summarized the nature of Song's work, whether within or outside his regular duties, as follows: "It can therefore be seen that Song Junli's work was relatively varied and transactional, and neither the relevant employment contract nor his position reflected any research-and-development requirement"; and "Song Junli's work was relatively varied, and a substantial portion consisted of miscellaneous tasks such as tendering and procurement, communications with suppliers, and **plant safety, sanitation, and cleaning, which are far removed from the public's understanding of scientific research work**." (WU Ex. 2 at 17-18.) By contrast, YIN joined Tongji University in 2008 with a doctorate in engineering, became Deputy Chair of Tongji University's Department of Electronic Science and Technology in 2010, and taught multiple undergraduate and graduate courses as a professor; the nature of his work was entirely different from, and bore no comparability to, the "work that included safety, sanitation, and cleaning" performed by the employee in Case No. 1848.

In this case, YIN's regular duties involved the research, development, and improvement of the technology at issue. First, as shown by Ex. 6, which I submitted on July 9, Yin's official faculty profile on the Tongji University website confirms his status as a researcher at an institution of higher education. Second, YIN's paper, "Research on Multiple-Antenna Technology Suitable for High-Speed Railway Communications" (Supp. Ex. 1), published in February 2011, likewise establishes that his regular duties included research and development in his technical field. That paper was supported by projects funded by the National Natural Science Foundation of China and the Shanghai Natural Science Foundation.

The National Natural Science Fund is funded by the State treasury, entities rather than individuals serve as the responsible bodies for funded projects and fund administration, and the Fund was established to develop scientific and technological talent and advance science and technology. Specifically:

Article 1 of the Regulations on the National Natural Science Fund[1] (Supp. Ex. 11) provides: "Article 1. These Regulations are formulated in accordance with the Law of the People's Republic of China on Progress of Science and Technology for the purposes of regulating the use and administration of the National Natural Science Fund, improving the efficacy with which the National Natural Science Fund is used, strengthening basic research, cultivating scientific and technological talent, enhancing independent innovation capacity, implementing the innovation-driven development strategy, and promoting high-level scientific and technological self-reliance and strength."

Article 9 of the Regulations on the National Natural Science Fund (Supp. Ex. 11) provides: "Article 9. The fund administration institution shall designate a **host institution** as the entity responsible for an NSFC-funded project and the administration of its funds. **Institutions of higher education**, scientific research institutions, and other public-interest institutions within the territory of the People's Republic of China that possess independent legal-person status and the capacity to conduct basic research, as well as other entities satisfying State requirements, may register with the fund administration institution as host institutions. The fund administration institution shall periodically publish a list of registered host institutions. A host institution shall establish and improve systems governing the administration of NSFC-funded projects, research integrity, and science-and-technology ethics, and shall comply with standards governing scientific and technological activities."

The Shanghai Natural Science Foundation likewise permits applications only by entities, not individuals, and was likewise established to encourage and support the development of scientific research. Specifically:

Article 1 of the Administrative Measures for the Shanghai Natural Science Foundation[2] (Supp. Ex. 12) provides: "Article 1. The Shanghai Natural Science Foundation (the 'Foundation') is hereby established in order to strengthen basic and applied basic research in Shanghai, encourage free exploration, cultivate scientific and technological innovation talent, enhance original innovation capacity, and consolidate the foundations for scientific and technological development."

Articles 8 and 9 of the Administrative Measures for the Shanghai Natural Science Foundation (Supp. Ex. 12) provide: "Article 8. To ensure the quality of project applications, the Foundation shall implement a system under which **entities** conduct selection and recommend the best applicants. Article 9. **An entity applying for a project** shall be a legal person or unincorporated organization registered in Shanghai and possessing sound basic-research capabilities."

In sum, through his affiliation with Tongji University, YIN obtained dedicated support from the State treasury for scientific and technological innovation talent and projects (such dedicated State financial support is available only to entities, not individuals), further establishing that his regular duties at Tongji University included scientific and technological research and development.

[1] https://www.nsfc.gov.cn/p1/3381/2821/68772.html
[2] https://stcsm.sh.gov.cn/zwgk/kjzc/zcwj/kwzcxwj/20221110/07ce82ff47134c70ab8ec9b3a7674e57.html （Supp Ex. 12）

**1.1.3 Because Case No. 1848 Did Not Satisfy the "Execution of the Tasks of the Entity" Requirement, the Court Proceeded to Determine Whether the Entity Provided Material and Technical Support; the Object Improved by the Patent in Case No. 1848 Was Equipment Purchased by the Employer, Xincai Company, from Another Company, Not Equipment Developed by the Employer, and the Employer Merely Used That Equipment in Production and Made No Improvements to It; in Other Words, Song, the Employee in Case No. 1848, Improved a Piece of Equipment Unrelated to His Employer, Xincai Company**

First, as stated in Section 1.2.1, Case No. 1848 addressed whether the employee had "mainly used the entity's material and technical means" because the requirement of "execution of the tasks of the entity" was not satisfied in that case. Put differently, if an invention-creation can clearly be determined to have resulted from the "execution of the tasks of the entity," there is no need to determine whether the requirement of "mainly using the entity's material and technical means" is also satisfied.

The facts addressed in Case No. 1848 concerning whether the employer provided material and technical support were as follows:

As to material means, the court found: "With respect to the material means in this case, Xincai Company made no dedicated financial investment in research and development for the patent at issue." (WU Ex. 5 at 19.)

As to technical means, Case No. 1848 first stated that the equipment improved by the patent at issue came entirely from another enterprise, not the employer in that case, and that all updating and improvement of the equipment was performed by Weilang Company, the equipment supplier; the employer, Xincai Company, merely used the equipment and urged the equipment supplier to improve it, rather than undertaking any improvement itself. Case No. 1848 specifically states: "Xincai Company's principal purpose in purchasing Weilang's expansion equipment was to achieve mass production of graphene; as to the equipment's deficiencies, Xincai Company continuously communicated with the equipment supplier, Weilang Company, and urged Weilang Company to make corrections." (WU Ex. 2 at 14.)

The decision in Case No. 1848 further states: "The graphene microwave expansion furnace used by Xincai Company in this case was purchased from Weilang Company, and Xincai Company did not effectively prove that it had supplied the technical solution for that equipment"; and "Although Song Junli learned, during the production, maintenance, and modification of the graphene microwave expansion furnace, of the technical problem that cracking of the conveyor belt shortened the equipment's service life, as discussed above, that technical problem arose in the equipment manufactured by Weilang Company."

Thus, the employer in Case No. 1848 provided no material or technical support. I further note that, although the facts of this case do not require a determination whether Tongji University provided material and technical support to YIN (because, as discussed above, the technology at issue can

clearly be determined to have resulted from the "execution of the tasks of the entity," and it is therefore unnecessary to determine whether the requirement of "mainly using the entity's material and technical means" is also satisfied), even if such a determination were made, the answer would still be yes. See Section 1.1.4 below.

### 1.1.4 Even Under the Analytical Framework Applied in the Decision in Case No. 1848 to Determine Patent Ownership, the Technology Transferred in This Case in Fact Belongs to Tongji University

Under the analytical framework applied in the decision in Case No. 1848 to determine patent ownership, the inquiry is whether the employee's work duties included the corresponding research-and-development task or whether the employer provided material and technical means for that research and development. Although both requirements need not be satisfied, I believe that both are in fact satisfied here.

#### 1.1.4.1 YIN's Work Duties Included Scientific Research, and His Position as Deputy Chair of Tongji University's Department of Electronic Science and Technology Beginning in 2010 Likewise Demonstrates the Research-Oriented Nature of His Work

First, as to whether the employee's work duties included the corresponding research-and-development task, as discussed above, YIN received his doctorate in engineering in 2006, joined Tongji University as a researcher in 2008, became Deputy Chair of Tongji University's Department of Electronic Science and Technology in 2010, and taught multiple undergraduate and graduate courses as a professor; his duties at Tongji University, a public institution of higher education, therefore included scientific research.

#### 1.1.4.2 Tongji University Provided Material and Technical Means to YIN

Specifically, the decision in Case No. 1848 states: "The requirement in the first paragraph of Article 6 of the Patent Law that an invention-creation be 'made mainly by using the material and technical means of the entity' qualifies the role played by those material and technical means in the process of completing the invention-creation. This should be understood to mean, first, that the entity's material and technical means are indispensable and necessary conditions in the process of completing the invention-creation, such that the invention-creation could not have been achieved without their involvement; and second, that, as compared with material and technical means from other sources used by the inventor, the entity's material and technical means are predominant in importance and sufficient to outweigh the material and technical means from other sources, thereby permitting ownership of the disputed patent to be determined on that basis."

As applied here, it is a matter of common knowledge that public universities provide laboratories and research funding to their researchers. In addition, my Supp. Ex. 1 shows that YIN's paper, "Research on Multiple-Antenna Technology Suitable for High-Speed Railway Communications," published in February 2011, states that the paper was supported by projects funded by the National Natural Science Foundation of China and the Shanghai Natural Science Foundation.

As shown by the discussion in Section 1.1.2, through his affiliation with Tongji University, Yin Xuefeng obtained dedicated support from the State treasury (which is available only to entities, not individuals); there can be no doubt that Tongji University financially supported Yin Xuefeng's academic research.

In addition, Yin Xuefeng's paper, "Research on Multiple-Antenna Technology Suitable for High-Speed Railway Communications," [redacted]

Moreover, as a leading Chinese institution of higher education, Tongji University maintains comprehensive platforms and facilities for researchers, including multiple research centers and research bases;[3] its provision of technical support to Tongji University personnel likewise cannot reasonably be disputed.

In sum, even under the analytical framework of Case No. 1848, YIN's work in this case included scientific research, Tongji University provided YIN with financial and technical support, and YIN's invention-creation therefore constitutes a service invention.

**1.2 Ownership of the Patent Technology at Issue Should Not Vest in SAGE, Because [redacted] (I Believe SAGE Actually Provided No Material or Technical Means)**

[redacted]

[redacted] I disagree.

[redacted]

[redacted]

3 https://sec.tongji.edu.cn/kygz/ptyjd.htm (Supp Ex. 13)

[redacted]

ii. In the chain of assignment from YIN to SAGE, YIN had even executed the "Certificate of Patent Assignment" before SAGE was formed (SAGE was formed on April 15, 2010, whereas YIN executed the Certificate of Patent Assignment on February 4, 2010) (WU Ex. 8 at 4), further demonstrating that the company was formed for the purpose of transferring the technology.

iii. [redacted] I also searched multiple search engines on Chinese- and English-language internet platforms for news and other information concerning SAGE, and found no recruiting information or any other information concerning the company. [redacted]

[redacted] [redacted]

**1.2.2 Even Assuming That YIN Was Simultaneously Employed by SAGE (as Discussed Above, I Do Not Believe SAGE Was a Genuine Company or Had a Will Independent of YIN), as Between Tongji University's Material and Technical Means and Those of SAGE (Even Assuming That SAGE Provided Some Material and Technical Means), Tongji University's Material and Technical Means Were Predominant in Importance and Sufficient to Outweigh Material and Technical Means from Other Sources, Thereby Permitting Ownership of the Disputed Patent to Be Determined on That Basis**

The decision in Case No. 1848 (WU Ex. 2) states: "The requirement in the first paragraph of Article 6 of the Patent Law that an invention-creation be 'made mainly by using the material and technical means of the entity' qualifies the role played by those material and technical means in the process of completing the invention-creation. This should be understood to mean, first, that the entity's material and technical means are indispensable and necessary conditions in the process of completing the invention-creation, such that the invention-creation could not have been achieved without their involvement; and second, that, as compared with material and technical means from other sources used by the inventor, the entity's material and technical means are predominant in importance and sufficient to outweigh material and technical means from other sources, thereby permitting ownership of the disputed patent to be determined on that basis."

As applied here, first, any reasonable and prudent person would recognize that the quantity of resources provided to researchers by a nationally leading institution of higher education is not remotely comparable to the resources of SAGE, [redacted]

[redacted]

In addition, as discussed above, through his affiliation with Tongji University, YIN obtained support from the National Natural Science Fund, and, in 2010, support from that Fund was approximately RMB 347,000 for each General Program project, RMB 2.21 million for each Key Program project, and RMB 10 million for each Major Program project.[4] Each of those amounts far exceeded SAGE's registered capital [redacted] As discussed above, Tongji University also provided technical support through research platforms and other resources. Accordingly, as compared with material and technical means from other sources used by the inventor YIN (although I believe that SAGE did not in fact provide any such means), Tongji University's material and technical means were predominant in importance and sufficient to outweigh material and technical means from other sources, thereby establishing that ownership of the disputed patent should belong to Tongji University.

**1.3 In Contrast to Case No. 1848, I Offer for Reference a Decision Whose Facts More Closely Resemble Those Here; That Decision Likewise Involved a University and a Professor, as Well as a Second Entity for Which the Professor Worked (Corresponding to SAGE), and the Court Ultimately Held That the Patent Rights Belonged to the University**

As discussed above, Case No. 1848 involved an equipment custodian at a private enterprise (who was also responsible for security and cleaning) and an improvement to equipment that was neither developed nor modified by the employer, but merely used by the employer. The facts of that case differ substantially from those here, and its disposition provides no guidance here. Of course, even under the analytical framework applied in the decision in Case No. 1848, the patent rights here should belong to Tongji University.

I offer a decision whose facts are more closely analogous to those here than the decision in Case No. 1848.

The principal facts of (2023) Zui Gao Fa Zhi Min Zhong No. 2454 (Supp. Ex. 6) were as follows: on July 30, 2013, **a certain Chinese university of technology** employed **an individual surnamed Wang** as a professor; on July 11, 2016, **a certain Wuhan company** entered into an expert-engagement agreement with Wang, which provided that intellectual property arising during the term of that agreement would belong to the Wuhan company; on April 18, 2019, an application was filed for the patent at issue, naming Wang as the inventor. The Wuhan company and the Chinese university of technology disputed ownership of the patent rights. As can be seen, **the facts of that case closely resemble those here, where YIN joined Tongji University and later formed SAGE, and YIN, a member of the university faculty, was the inventor.**

4 https://www.edu.cn/gaoxiao_keyan_1140/20101122/t20101122_542496.shtml?spm=7054cd9.c9c7dab.0.0.160699adPGbYrK(Supp Ex. 14)

Case No. 2454 ultimately held that the patent rights belonged to the Chinese university of technology, principally for the following four reasons, each of which I compare below to the facts here.

Case No. 2454 found: "First, the patent at issue did not fall within the scope agreed upon in the contract at issue (entered into between the Chinese university and the Wuhan company)." Correspondingly, there was no contractual agreement between SAGE and Tongji University here.

Case No. 2454 found: "**Second, based on the sequence in which the employment relationships were formed, the patent rights in a service invention should, in principle, belong to the entity with which the earlier employment relationship was formed.** Because the patent rights in a service invention are originally acquired by operation of the Patent Law, once the service invention-creation is completed, the right to apply for a patent belongs to the entity with which the earlier employment relationship was formed. Where two sequential employment relationships coexist and no other agreement exists, the entity with which the later employment relationship was formed cannot, based on an employment contract subsequently entered into with the employee, alter the original vesting of the patent rights in the service invention. In this case, the Chinese university entered into an employment contract with Wang first; the patent at issue was a service invention made by Wang while working at the Chinese university, and the patent rights originally vested in the Chinese university. In the absence of any other agreement between the Wuhan company and the Chinese university, the Wuhan company had no right, based on the later-formed employment relationship, to alter the original vesting of the patent rights at issue." Correspondingly, YIN and Tongji University formed an employment relationship first, and YIN formed SAGE later; the invention-creation made by YIN was a service invention made during his employment at Tongji University, and the patent rights originally vested in Tongji University. SAGE had no right, based on a later-formed employment relationship (and, in fact, no employment relationship existed between SAGE and YIN), to alter the original vesting of the patent rights at issue.

Case No. 2454 found: "**Third, based on the relative magnitude of the parties' contributions, the Chinese university contributed more to completion of the technical solution underlying the patent at issue than did the Wuhan company.**" Correspondingly, as discussed above, Tongji University provided YIN with technical and financial support, and its contribution was plainly greater than SAGE's.

Case No. 2454 found: "**Fourth, based on the degree of fault and the nature of the conduct of the two parties, the Wuhan company failed to exercise its duty of due care when entering into the employment contract with Wang and was manifestly at fault.**... The Wuhan company knew that Wang was a professor retained by the Chinese university and had an employment contract with the Chinese university, and it should have known that the invention-creation made by Wang was a service invention belonging to the Chinese university. Moreover, there was no evidence that the Wuhan company communicated with the Chinese university regarding its execution of an employment contract with Wang, much less that it consulted with the Chinese university regarding potential conflicts over intellectual-property ownership; the Wuhan company was therefore manifestly at fault. As the party at fault, the Wuhan company could not obtain the patent rights at

issue merely on the basis of the later employment contract." As applied here, [redacted] **(the Wuhan company in Case No. 2454 'should have known,' whereas SAGE here had 'actual knowledge')**; SAGE was not merely manifestly at fault, but acted in subjective bad faith.

Accordingly, under the determination in Case No. 2454, the patent rights here should belong to Tongji University.

I further note that, in determining under Article 6 of the Patent Law whether the patent rights belong to Tongji University, the dispute has nothing whatsoever to do with SAGE.

**1.4 In Chinese Judicial Practice, the Standard of Proof in Civil Litigation Is a High Degree of Probability; My Evidence and Reasoning Satisfy That Standard and Establish That YIN's Invention-Creation Was a Service Invention Belonging to Tongji University**

I further note that, in Chinese judicial practice, the standard of proof in civil litigation is a high degree of probability, and the standard of proof in civil litigation is lower than the standard in criminal proceedings.

Article 108 of the currently effective Interpretation of the Supreme People's Court on the Application of the Civil Procedure Law of the People's Republic of China (Supp. Ex. 3) provides: "With respect to evidence submitted by a party bearing the burden of proof, where the people's court, upon examination and in light of the relevant facts, is convinced that the existence of the fact to be proved **is highly probable**, it shall find that the fact exists."

In (2021) Zui Gao Fa Min Shen No. 273 (Supp. Ex. 2), the Supreme People's Court stated, regarding application of the standard of proof in civil litigation: "From the perspective of the standard of proof, the standard in civil litigation is a 'high degree of probability,' meaning, according to ordinary experience, **which of two conflicting factual propositions is more likely**." The term "high degree of probability" means "a method of finding facts pursuant to which, when the evidence of one party is substantially more persuasive than that of the other, the judge may, through the exercise of discretion, form a firm conviction" (Supp. Ex. 4).

As applied here, the foregoing discussion provides sufficient evidence and reasoning to establish that YIN's invention-creation was a service invention belonging to Tongji University; my foregoing reasoning and evidence satisfy the high-degree-of-probability standard.

If Cobblestone or YIN himself contends that YIN was the original rights holder in the technology at issue, then it must prove that YIN's research and development were wholly independent of his work duties at Tongji University and that he received no material or technical support whatsoever from Tongji University. If it fails to do so, it must bear the adverse consequences of failing to carry its burden of proof.

Regarding the burden of proof, (2021) Zui Gao Fa Zhi Min Zhong No. 403 (Supp. Ex. 18 at 5) found: "The Yi Ethnic Medicine Research Institute submitted evidence establishing that, before and after the application for the disputed patent, it had purchased certain traditional Chinese medicinal ingredients recited in the disputed patent, including sour jujube seed, arborvitae seed, Rhodiola rosea, and finger citron, whereas Yang Benlei submitted no evidence that he had expended any funds to purchase raw medicinal materials for research and development relating to the disputed patent."

Here, I have submitted sufficient evidence establishing that YIN's research into the technology of the patent at issue received material and technical support from Tongji University; the burden of proof should therefore shift to YIN or Cobblestone. If they cannot prove that YIN conducted his research entirely on his own, independently of Tongji University's material and technical means, they must bear the adverse consequences of failing to carry their burden of proof.

**2. Each of the Assignments of the '437 Patent Was an Unauthorized Disposition, and Ample Evidence Establishes That the Assignees Did Not Act in Good Faith; I Disagree with WU's Assertions That the Assignor at Each Link in the Assignment Chain Held Title and That Each Assignee Acted in Good Faith**

As discussed in the preceding section, the patent rights at issue should belong to Tongji University, and YIN's transfer of the conception underlying the technology at issue was an unauthorized disposition. WU's assertion that "Apple failed to establish the predicate under Article 6 that Tongji University held the initial rights and that Professor Yin therefore lacked authority to dispose of those rights" has been fully addressed in the preceding section; I have established that Tongji University held the rights in the technical solution, and my evidence satisfies the high-degree-of-probability standard.

Second, in the series of transactions following the initial vesting of the rights, all existing evidence demonstrates that the assignees did not act in good faith and therefore could not acquire the rights through good-faith acquisition.

**2.1 The Assignment from YIN to SAGE Was Made by an Assignor Without Authority to Dispose of the Rights, and the Assignee Did Not Act in Good Faith**

WU again relies in this section on Case No. 1848 to argue that the invention did not result from YIN's performance of his duties at Tongji University. As discussed above, however, the facts of Case No. 1848 are fundamentally different from those here, and, even under the analytical framework applied in Case No. 1848, the patent at issue should be determined to belong to Tongji University.

As to WU's assertion that there is "no indication that Tongji University ever made any claim, initiated any proceeding, or gave any notice concerning ownership of the patent," that defense plainly fails. Tongji University is a large organization and could not review individually every

patent held in the names of its faculty and staff. Tongji University did not assert its rights because it was unaware that a State-owned intangible asset had been unlawfully transferred; that is a matter of the rights holder's subjective state of knowledge, not an expression of intent to waive its rights. Indeed, I have not seen any evidence that Tongji University was ever made aware of the present dispute. A rights holder's failure to discover an infringement of its rights does not constitute ratification of the infringing conduct and does not result in forfeiture of those rights. There is no legal basis under Chinese law for negating a rights holder's rights merely because it did not assert them promptly.

WU further contends that [redacted] As discussed above, however, [redacted] therefore provides further evidence of its subjective bad faith.

I further note that, in the [redacted]. It bears emphasis that, in Case No. 2454, when a professor at the Chinese university entered into an employment contract with the Wuhan company, the court found that the Wuhan company was "manifestly at fault" solely because it **failed to exercise its duty of due care when entering into the employment contract with Wang**. A [redacted] **SAGE was not merely manifestly at fault, but acted in subjective bad faith.**

**2.2** [redacted]

The most recent evidence I have reviewed shows that SAGE was formed on the same day that [redacted] and [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**2.3 The Assignment from Empire to Cobblestone Was Made by an Assignor Without Authority to Dispose of the Rights, and the Assignee Did Not Act in Good Faith**

WU again asserts in this section that there is "no indication that Tongji University ever made any claim, initiated any proceeding, or gave any notice concerning ownership of the patent." As discussed above, that defense plainly fails. Tongji University did not assert its rights because it was unaware that a State-owned intangible asset had been unlawfully transferred; that is a matter of the rights holder's subjective state of knowledge, not an expression of intent to waive its rights. A rights holder's failure to discover an infringement of its rights does not constitute ratification of the infringing conduct and does not result in forfeiture of those rights. There is no legal basis for negating a rights holder's rights merely because it did not assert them promptly. Cobblestone failed to exercise its duty of due care and did not act in good faith.

The chain of patent assignments from the U.S. Patent and Trademark Office that Cobblestone itself submitted shows that, in the assignment from YIN to SAGE, YIN's address of record and SAGE's address of record were identical: both were No. 77 Tongji New Village. Cobblestone was represented by professional counsel in acquiring the patent (WU Ex. 8, and the assignment from Empire to Cobblestone recorded with the U.S. Patent and Trademark Office bears an attorney docket number).

I likewise stated in my first Declaration that "Cobblestone Wireless LLC had full visibility of the entire patent assignment chain and was reasonably capable of noticing the service invention issue concerning the original applicant of the patent; in other words, it knew or ought to have known that disputes existed over the patent's ownership." I stated that Cobblestone knew or ought to have known that disputes existed over the patent's ownership because each assignee in the assignment chain had a duty to exercise due care and conduct appropriate due diligence, and Cobblestone did not affirmatively produce any evidence concerning such due diligence. This further demonstrates that the assignees did not act in good faith.

In sum, each link in the assignment chain satisfies the elements that the assignor lacked authority to dispose of the rights and that the assignee did not act in good faith; Cobblestone did not acquire valid rights.

I further clarify that, in the foregoing assignment chain, the assignment from YIN to SAGE was a transaction between Chinese parties within China and unquestionably is governed by Chinese law; as to the assignment from SAGE to [redacted], Article 5 of the Provisions of the Supreme People's Court on Issues Concerning the Application of Law in the Trial of Foreign-Related Civil or Commercial Contractual Disputes,[5] promulgated in 2007, provides: "*Where the parties have not selected the law applicable to a contractual dispute, the law of the country or region having the closest connection with the contract shall apply. . . . (1) For a contract of sale, the law of the seller's domicile at the time the contract was concluded shall apply.*" That assignment likewise is therefore governed by Chinese law. As to the assignment from Empire to Cobblestone, I express no opinion regarding how U.S. law governs the transaction; I opine only that, from the perspective of Chinese law, it likewise satisfies the elements that the assignor lacked authority to dispose of the rights and that the assignee did not act in good faith.

In sum, my ultimate opinion regarding WU's declaration is as follows: none of her arguments has merit; the '437 Patent is a service invention, ownership of which vested in Tongji University from the outset; none of the series of assignments involving the '437 Patent actually transferred substantive ownership of the patent, and Cobblestone never acquired any rights. A State-owned intangible asset belonging to Tongji University from the outset was unlawfully transferred, and this series of transfers was fundamentally invalid.

## II. RESPONSE TO THE DECLARATION OF MA

1. **Lists of Technology Export Licenses Are Among the Matters Publicly Disclosed by Government Authorities and Are Not Confidential Information as MA Contends; My Exhaustive Search Found No Publicly Disclosed Information Showing That an Export License Was Obtained for the Patent at Issue; the Proposition That "the Technology of the Patent at Issue Was Not Reported or Approved" Is a Negative Fact, for Which the Burden of Proof Is Inherently Lower Than for an Affirmative Fact; Cobblestone Would Face No Evidentiary Impediment in Proving the Fact (Had an Export License Been Obtained for the Patent at Issue), Yet Failed to Do So, and Must Therefore Bear the Adverse Consequences of Failing to Carry Its Burden of Proof**

### 1.1 Lists of Technology Export Licenses Are Among the Matters Publicly Disclosed by Government Authorities and Are Not Confidential Information as MA Contends; My Exhaustive Search Found No Publicly Disclosed Information Showing That an Export License Was Obtained for the Patent at Issue

MA contends that approval of a technology export involves specific technical information, the identities of the parties to the transaction, and information concerning the underlying commercial transaction, and that an individual Technology Export License and the information contained therein generally are not disclosed to the public.

[5] http://www.jxzycourt.gov.cn/lawdb/show.php?fid=120327(Supp Ex. 15)

MA's foregoing contention is plainly incorrect. For example, the Beijing Municipal Commerce Bureau publicly discloses the technology export licenses of various entities[6] (Supp. Ex. 16); each license identifies only a serial number, the legal basis for the license, the name of the matter, the name of the administrative counterparty, and the approving authority, among other items, and discloses no trade secrets. MA's contention that technology export licenses are not disclosed to the public therefore fails.

Indeed, I conducted an exhaustive search for publicly disclosed information showing that a license was obtained for the technical solution corresponding to the patent at issue and found none; I therefore reasonably infer that the technology was not approved for export.

**1.2 The Proposition That "the Technology of the Patent at Issue Was Not Reported or Approved" Is a Negative Fact, for Which the Burden of Proof Is Inherently Lower Than for an Affirmative Fact; I Have Fully Carried My Burden as to That Fact, and the Burden Should Shift to Cobblestone; Cobblestone Would Face No Evidentiary Impediment in Proving the Fact (Had an Export License Been Obtained for the Patent at Issue), Yet Failed to Do So, and Must Therefore Bear the Adverse Consequences of Failing to Carry Its Burden of Proof**

It is a matter of common knowledge that, in any judicial system, including China's, a party faces greater difficulty in proving a negative fact. It is easy to prove that something exists and difficult to prove that it does not. Accordingly, the burden of proving a negative fact is inherently lower than the burden of proving an affirmative fact.

In his paper, "On the Burden of Proving Negative Facts," Chen Xiangui, a lecturer at Huaqiao University Law School, a researcher at Huaqiao University's Center for Local Rule of Law, and a Doctor of Laws (Supp. Ex. 7), states: "*Generally, a negative fact does not exist or does not exist in an express form and is therefore more difficult to prove than an affirmative (existing) fact*"; "*because a negative fact ordinarily has not occurred, a fact that has not occurred often is difficult to prove*"; and "*in a particular civil action, facts asserted by the parties often include negative facts, such as that 'a certain fact does not exist.' How to prove such a 'nonexistent fact' is a question that has long confounded scholars, such that some scholars believe it is 'entirely unduly burdensome' to require a party asserting a negative fact to bear the burden of proof.*"

Professor Li Hao of Nanjing Normal University Law School believes that requiring a party to prove a negative fact is entirely unduly burdensome and that reversing the burden of proof can resolve that problem. Specifically, in his paper, "Reversal of the Burden of Proof: Doctrinal Analysis and Examination of Issues" (Supp. Ex. 8), Professor Li states: "*Asserting a negative fact often means asserting that a fact did not occur, and a fact that did not occur is difficult or even impossible to prove. For example, requiring a creditor to prove that a debtor did not demand performance by a secondary obligor, or requiring a copyright owner to prove that it never granted the opposing party a license, would be entirely unduly burdensome. By denying the assertion, the opposing party asserts an affirmative fact, which naturally is easier and possible to prove. Accordingly, evidentiary*

[6] https://sw.beijing.gov.cn/phone/bsfw/jggsp/xzxk/jckjsxk/

*difficulty should be introduced as a substantive consideration, and reversal of the burden of proof should be used to alter the allocation resulting from the theory of classification by legal elements."* As applied here, Cobblestone is in the best position to know whether an export license was obtained for the technical solution at issue, and it would face no evidentiary difficulty if such a license in fact existed. The burden of proof as to that fact should shift to Cobblestone; if the patent-right holder fails to carry its burden, the technical solution at issue should be presumed not to have received an export license.

In his paper, "Constructing and Regulating a Reduced Standard of Proof for Substantive Facts" (Supp. Ex. 17), Wang Gang, a postdoctoral researcher and Doctor of Laws at East China University of Political Science and Law, states: "*As to a 'fact that has never occurred,' the Roman-law maxim holds that 'a party who denies bears no burden of proof'; a fact that has not occurred cannot be proved, or is difficult to prove effectively. The most typical example is a claim for restitution of unjust enrichment, one element of which is the absence of a legal basis, a negative fact that should not be subjected to the ordinary standard of proof in litigation; rather, the fact should be found so long as the plaintiff proves through indirect evidence that the existence of the negative fact is more probable than not.*"

In sum, I have carried my burden of proof as to the negative fact that "the technical solution at issue did not receive an export license," and the burden should shift to Cobblestone. Cobblestone is in the best position to know whether the technology at issue received an export license and faces no evidentiary difficulty. If Cobblestone fails to carry its burden, it must bear the adverse consequences of that failure.

**2. MA Contends That, in Exporting the Technical Solution at Issue, the Parties to the Transaction Expressly Took the Technology-Export Formalities into Account in Structuring the Transaction and [redacted]; However, Evidence [redacted] into Question, and It Is Therefore Unlikely [redacted]**

MA contends that, [redacted]

I believe, however, that this inference is unlikely to be correct. [redacted]

[redacted] Chen Jian likewise served as the legal representative/person in charge, key management person, executive director, and general manager of Beijing Fuyitongda Customs Declaration Services Co., Ltd.; and both companies engaged in import-export trade. Thus, although the two companies were registered as separate legal persons, their corporate personalities were extensively commingled and they operated as a single enterprise.

According to Supp. Ex. 9 at 5, Beijing Fuyitongda Customs Declaration Services Co., Ltd. was designated by the General Administration of Customs as a "**seriously untrustworthy entity in the field of customs supervision of imports and exports." Beijing Fuyitongda Customs Declaration Services Co., Ltd., which likewise was under Chen Jian's actual control and was commingled with the other company, should likewise receive an adverse assessment as to its commercial reputation.** [redacted]

It bears repeating that whether a technology export license for the technology at issue was obtained is a fact known solely to, and entirely within the control of, Cobblestone, which faces no evidentiary difficulty whatsoever on that issue.

Yet, throughout all of Cobblestone's contentions, it has consistently relied on the text of contractual provisions to advance various inferential arguments, while never submitting a single item of direct, concrete evidence. Its decision not to prove a fact that it could readily establish, and to substitute inference for proof, is itself sufficient to demonstrate that no technology export license was ever obtained for the technology at issue.

**3. I Disagree with MA's Contention That the Technology at Issue Does Not Fall Within the Core Control Points for Wireless Communications Technologies Restricted from Export.**

The Catalogue of Technologies Prohibited or Restricted from Export (Ex. 16 to my first Declaration) states:

*"Entry No.: 054007X*
*Technology Name: Wireless communication technology*
*Control Points:*
*1. Antenna array technology*
*(1) Broadband antenna arrays exceeding one octave [center frequency ≥ 100%]*
*(2) Precision machining technology for broadband feeds [>800 MHz in the C-band]*
*2. Microwave direct modulation frequency division phase-locked solid-state source fabrication technology*
*3. Integrated acousto-optic heterodyne reception technology with bandwidth >100 MHz and dynamic range > 90 Db*
*4. Fast acquisition technology for CDMA burst signals with C/No below 46 dB.Hz"*

At 8:00 a.m. Beijing Time on September 1, 2026, I met online with Dr. Harry Bims, the technical expert retained by Sheppard, principally to discuss whether the technology at issue falls within the core control points for wireless communications technologies restricted from export.

Dr. Bims opined that the '347 Patent relates to broadband antenna arrays that exceed one octave and therefore at least falls under Control Point 1 above. Dr. Bims explained that the '347 Patent discloses a cellular wireless communication system, which includes a base station with an antenna array to transmit signals to a receiver. Dr. Bims further explained that the transmitter and receiver communicate using radio frequency cellular communications (e.g., using 4G/LTE), and that a person of ordinary skill in the art would have understand that the RF and LTE frequency ranges exceed one octave. Additionally, Dr. Bims opined that the '347 Patent may also satisfy Control Point 4 because the patent relates to signal processing techniques that may be used in the synchronization (i.e., fast acquisition) of a wireless communication system using CDMA, which according to Dr. Bims, would include burst signals with a C/No ratio below 46 dB Hz.

Accordingly, the technology of the patent at issue is a technology restricted from export (which makes sense, given that an Import-Export Enterprise was specifically included as part of the transaction).

**4. Even Assuming, as MA Contends, That the Patent Technology at Issue Is Freely Exportable (Although I Disagree), Freely Exportable Technology Still Must Be Registered with the Competent Department Under the State Council; Exporting Freely Exportable Technology Without Registration Still Violates Laws and Regulations and Is Invalid**

Article 40 of the Regulations of the People's Republic of China on Administration of the Import and Export of Technologies (2011 Revision) (Exs. 14 and 15 to my first Declaration) provides: "*Article 40. When freely exportable technology is to be exported, registration shall be made with the competent foreign trade department under the State Council, and the following documents shall be submitted:*
*(1) an application for registration of the technology export contract;*
*(2) a copy of the technology export contract; and*
*(3) documents proving the legal status of both parties to the contract.*"

Thus, even freely exportable technology remains subject to registration formalities; exporting such technology without completing those formalities violates laws and administrative regulations and is invalid (see Section 4.3 attached to my first Declaration for further details).

In sum, I offer the following ultimate opinions:

WU's and MA's statements lack factual and legal support. The technology at issue belonged to Tongji University from the outset; each of the series of transfers was unauthorized, and each assignee failed to act in good faith; Cobblestone therefore never acquired valid rights. In addition, the technology at issue is restricted from export; its direct export without export approval violated

laws and administrative regulations, and the export was invalid. Even apart from the technology's status as restricted from export, if it were freely exportable, registration would still have been required; exporting it without registration would still have violated laws and administrative regulations and would still have been invalid.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge. I reserve the right to supplement the foregoing.

Dated: Sep. 4, 2026

By: ____________________
Pu (Alexandra) Yang