**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| COBBLESTONE WIRELESS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | Case No. 7:24-cv-00232-DC<br><br>**JURY TRIAL DEMANDED** |

**REPLY DECLARATION OF MARK COHEN REGARDING CHINESE LAW**

I, Mark Cohen, hereby declare:

I have been retained by counsel for Defendant Apple Inc ("Apple") to submit this reply declaration addressing various aspects of Chinese law.

**Background**

**1.** I incorporate my prior declaration in this proceeding, dated August 8, 2026 in the above captioned proceeding (the "Declaration"), except as otherwise noted herein. A lack of disagreement with any points other than those discussed in my Declaration on subject areas other than service invention determinations should not be understood as agreement with the positions of the experts for plaintiff in this proceeding.

**Response to Ms. Wu's Declaration Regarding My Analysis**

**2.** Paragraphs 17-21 of my Declaration discussed relevant elements of China's Patent Law and Patent Law Implementing Regulations which are germane to this proceeding. Specifically, paragraph 18 identified Article 6 of the Chinese Patent Law (Ex. 4 to my

original declaration)[1] which defines a service invention and provides that service invention-creations manifest in the entity, rather than employee. Paragraph 21 then discussed the relevant Article 12 of the Patent Law Implementing Regulations (Ex. 6, the "Implementing Regulations") which provides three ways to determine whether an invention is a service invention. Article 12(1) provides that an invention-creation made in the course of performing an employee's duty is a service invention. 12(2) further adds that an invention created in the course of performing a task entrusted by an employer is also a service invention. Finally, 12(3) considers the scenario of a former employee and holds that an invention that relates to the employee's previous duties that is created within one year after his employment is also a service invention.

**3.** To further contextualize these regulations, I looked to the "Guiding Cases" of the Supreme People's Court ("SPC"). Paragraph 22 of the Declaration explains that Guiding Cases are cases designated to provide authoritative judicial guidance that lower courts are expected to refer to in adjudicating similar cases. The most relevant Guiding Case is Guiding Case 158 (Ex. 7), which determined whether an invention was a service invention under Article 12(3) of the Implementing Regulations. This case became a Guiding Case on July 23, 2021, when the SPC Judicial Committee approved it and the SPC released it. The SPC Judicial Committee is the highest adjudicative committee of the SPC, with an obligation to unify application of law nationwide, including through judicial interpretations, normative documents and guiding cases.

---

[1] "Ex." refers to exhibits from my original declaration while "Supp. Ex." refers to new exhibits to this supplemental declaration.

**4.** "Reference Cases" are a different designation of case that are approved through a different institutional process that ordinarily does not involve the Judicial Committee and that culminates in review and inclusion in the People's Court Case Database by the SPC Research Office. They typically involve "fewer approvals than guiding cases." Supp. Ex. 1 (Susan Finder, "Update on the People's Court Case Database," Supreme People's Court Monitor (Dec. 24, 2024)).

**5.** Paragraph 23 of my declaration discusses Guiding Case 158 and its guidance to the circumstances of this case. For the sake of clarification, I focused on Guiding Case 158 as an example of a quasi-precedential judicial document of *the highest hierarchical level* among cases within the Chinese legal system that demonstrates how a Chinese court could handle a service invention dispute, based on "the criteria of the patent law" (Para. 26) pursuant to Article 6 of the Patent Law. My Declaration was not intended to suggest that Article 12(3) itself applied directly to the issue in this case or that the inventor in this case was a former employee. Rather, I relied on Guiding Case 158 because it is the most applicable Guiding Case regarding whether an invention is a service invention and there are no similar Guiding Cases for Article 12(1) or 12(2) of the Implementing Regulations. Guiding Case 158 involves a departing employee under Article 12(3) of the Patent Law Implementing Regulations and the SPC considered whether the invention was "related" to the work (yǒuguān de fāmíng chuàngzào, 有关的发明创造) of a former employee's work or task, but when it applied the standard to the facts it found that it was "closely related" (mìqiè xiāngguān 密切相关). It also discussed the relevant factors that the Court considered to determine what makes an invention a service invention. My Declaration

further explained that this Guiding Case provided relevant guidance about the service invention question in the case.

6. For the avoidance of doubt, I relied on the Article 6 of the Patent Law and Article 12 of the Implementing Regulations (specifically Article 12(1) and 12(2)) to perform my ultimate analysis regarding whether this case involves an invention-creation made in the course of performing an employee's duty, or in execution of a task entrusted to him by the entity to which he belongs.

**Guiding Cases and Reference Cases in China**

7. I agree with Ms. Wu that China "does not operate under the same doctrine of stare decisis as the United States common law." Wu Decl. Para. 9. There are some specific cases that are specifically designated as having persuasive (though not precedential) effect. Among these are two distinct types of cases: "Guiding Cases" and "Reference Cases." These types of caselaw have special relevance that general caselaw in China does not have.

8. In addition to these types of cases, China has a national platform for published judicial decisions (China Judgements Online (中国裁判文书网) ("CJOL")) that currently hosts 167 million legal documents and is widely used by the public. Other than Guiding Cases or Reference Cases, any de facto persuasive effect of cases in CJOL that are not Guiding Cases or Reference Cases is likely based on other factors such as their logic and reasoning or other form of official government recognition of the significance of a case.

9. Between Guiding Cases and Reference Cases, Guiding Cases have superior status. For example, Prof. Susan Finder of the Peking University School of Transnational Law has explained that Guiding Cases have a special status that distinguishes their use from reference cases, including their citation in the reasoning section of a case decision. Supp.

Ex. 2 (Susan Finder, "Supreme People's Court's New Guidance on Similar Case Search," Supreme People's Court Monitor (July 27, 2020)).

**10.** Ms. Wu's declaration, however, conflates distinct concepts of Chinese case law based legal practice with regard to the persuasiveness of Guiding Cases and Reference Cases. For example, Ms. Wu states: "Guiding cases remain subject to the separate Article 7 rule requiring reference when adjudicating similar cases, while Reference Cases are SPC-reviewed cases included in the Database for reference in similar cases" (Wu Decl. para 51). There are two types of "reference" that Ms. Wu is referring to, with distinct meanings in Chinese. In Guiding Cases, the term for reference is 参照 (cānzhào) and in reference cases it is 参考 (cānkǎo). Lu Xu, a Senior Lecturer at Lancaster University notes that *canzhao* has sometimes been translated into English merely as "refer to" or "consult," but explains that it means "consult and follow" while *cankao*, meaning "refer to" or "consult." Collapsing the two into one English word does not convey the enhanced authority of Guiding Cases as opposed to Reference Cases. Supp. Ex. 3 (Lu Xu, "Rethinking China's Emerging Case Law System: Empirical Insights and Challenges to Prevailing Assumptions," 45 Legal Studies 554, 554–576 (2025)).

**11.** The actual use by Judges or attorneys of guiding or reference cases as precedent raises several additional issues related to overall transparency and reluctance of the judiciary to specifically cite to Guiding Cases that may be due in part to China's own civil law traditions. For example, the People's Court Case Database (Wu Decl. para. 8) (hereinafter the "Case Database" 人民法院案例库) cited by Ms. Wu is a curated legal database in China with only about 5,300 cases. It is not the principal official database to search case decisions, which is CJOL. CJOL itself is a curated and incomplete universe of published judgments,

although much less selectively curated for doctrinal significance than the Guiding and Reference Cases in the People's Courts Case Database. Curation is especially concerning in determining how foreign-related cases are decided, as such cases constitute a relatively small portion of Chinese IP litigation, but have historically been politically significant, creating incentives to include or exclude these relevant cases. Supp. Ex. 4 (Chris Bailey, Douglas Clark, Mark Cohen & Aria Tian, "Chinese Patent Litigation Data: What It Tells Us and What It Doesn't," IAM (Nov. 17, 2021)). The Office of the U.S. Trade Representative observed that "A long-standing concern has been that Chinese courts publish only selected decisions rather than all preliminary injunctions and final decisions. Moreover, the number of verdicts uploaded online has consistently decreased over the past five years, further hampering transparency and making it more difficult for right holders to determine how China protects and enforces foreign IP." Supp. Ex. 5 at 57 (Office of the United States Trade Representative, 2026 Special 301 Report (Apr. 2026)).

**12.** A U.S. court may wish to consider Guiding Cases and Reference Cases as important normative materials in determining how Chinese courts apply Chinese law. The significance of these cases does not eliminate the need to consider the range of relevant authorities and the factual circumstances in which the principles they articulate are applied. The importance of Guiding Cases can be shown by examining the text reuse of Guiding Cases (with or without citation) to determine the influence of these cases. See Supp. Ex. 6 (Benjamin M. Chen et al., "Detecting the Influence of the Chinese Guiding Cases: A Text Reuse Approach." 32 Artificial Intelligence and Law, 463-496 (2023)).

**13.** Another way of assessing impact is by looking at similarly decided cases that have been designated as important by sub-national courts. Local courts typically use categorizations

such as "model" or "typical" cases to direct public attention to significant cases in their jurisdiction. Such research can also help determine how Chinese courts apply closely related concepts used in service-invention disputes, such as "related to" (yǒuguān, 有关), "relationship" (xiānghù guānxì, 相互关系), "relatedness" or "connection" (guānliánxì, 关联性), and a "high degree of relatedness" (gāodù guānliánxì, 高度关联性), while accounting for differences in their legal and factual context. *See* Ex. 7 (Guiding Case 158); Supp. Ex. 7 (Reference Case 403); Ex. 6 (Patent Law Implementing Regulations Article 12(1)–(3)). The incompleteness of the published record therefore mandates caution in determining how case concepts are applied in practice and in assessing the significance of the cited Guiding Cases, Reference Cases, and other cases.

**14.** Given the special status of Guiding Cases as opposed to Reference Cases and other cases, my Declaration considered the particular importance of Guiding Case 158. Again, my consideration of Guiding Case 158 does not mean that I assumed the same facts were present in this case, and my ultimate analysis was based on Article 6 of the Patent Law and Article 12 of the Implementing Regulations.

**The Missing Companion Case to Reference Case 1848**

**15.** In her Declaration, Ms. Wu discusses Reference Case 1848 at length, but declines to mention its companion Reference Case, No. 403. Supp. Ex. 7. The SPC's 2024 Working Procedures contemplate the inclusion of up to two Reference Cases as they provide that generally no more than two Reference Cases should be included for the same specific issue of legal application. Wu Ex. 11 at Art. 4. The SPC recognized that Reference Cases 1848 and 403 were complementary by placing 1848 and 403 consecutively as Nos. 26 and 27 in its Summary of Key Points of Adjudication. Supp. Ex. 8. The cases therefore can

reasonably be understood as complementary applications rather than competing statements of law.

**16.** Reference Cases 1848 and 403 address different aspects and factual circumstances of service-invention judicial determinations. The two cases involve materially different facts and correspondingly different applications of the governing service-invention provisions, with 1848 being more similar to Article 12(2) of the Implementing Regulations and 403 being more similar to Article 12(1).

**17.** These two Reference Cases also should not be read in isolation from Guiding Case 158. The three cases may therefore be appropriately read together, with Guiding Case 158 supplying additional guidance in methodological approaches. The SPC's case-law system expressly contemplates the concurrent use of Guiding Cases and other similar cases, while according Guiding Cases the higher status of cases that courts "shall follow by reference [canzhao]" (yingdangcanzhao 应当参照). The CJOL database can thereafter be used to further elaborate on how these principles have been applied in other published cases. As Susan Finder explains, the principal drafters of the 2024 Working Procedures characterize Reference Cases as a new category whose authority is "higher than other cases except for guiding cases." Supp. Ex. 1.

**18.** In Reference Case 1848 (Wu Ex. 2), the inventor was an ordinary employee principally engaged in equipment maintenance and management, and the SPC cautioned against deriving employer ownership merely from employment or access to employer resources. It required a showing that the employer's material and technical conditions were indispensable to the invention and occupied the principal position in its development.

**19.** In Reference Case 403 (Supp. Ex. 7), by contrast, the inventor's access to employer resources, including his ability to mobilize institutional resources, coupled with the relationship among his work, expertise, the institute's activities, and the invention, supported the service-invention determination. Reference Case 403 is particularly relevant here because the SPC addresses how the service-invention inquiry applies when the inventor occupies a position that enables him to mobilize the resources of his employer. In those circumstances, the court considered the "relatedness" (guānliánxì, 关联性, meaning "relationship," "relatedness," or "relevance/connection") between the invention and the inventor's daily work, professional background, as well as the entity's nature, principal business and relevance to the disputed patent.[2]

**20.** The inventor's authority over institutional resources can thus play a critical role in how the statutory and implementing-regulation factors are weighed. Guiding Case 158 (Ex. 7) provides an additional, less precise, but more authoritative point of reference, including for the required "relatedness" inquiry under the Patent Law Administrative Regulations. As Ms. Wu states, Guiding Case 158 is "within the scope of … stated key points because … its fact-specific methodology is informative" (Wu Decl. Para. 91).

**21.** Relevant factual questions arising from Reference Case 403 to determine whether the patent in suit was a service invention include the inventor's actual authority to mobilize university resources; the relationship between his university responsibilities and research

---

[2] To ensure that the reader does not infer a difference in the underlying Chinese terminology where none exists, I note that the certified translations submitted herein render guānliánxì (关联性) variously as "relevance," "connection," and "correlation." (Ex. 7, Guiding Case 158 and Supp. Ex. 7, Reference Case 403). I use "relatedness" consistently to translate guānliánxì in this Declaration. My references to "closely related" (mìqiè xiāngguān, 密切相关) are the same as the certified translation.

and the specific technical problem and solution embodied in the patent; the university's related research; and the independent provenance (the source and development) of the claimed invention. Supp. Ex. 7

**Application of the Guidance and Reference Cases to the Facts of this Case**

**22.** Applying Reference Case 403 to the facts in suit, Yin's current English- and Chinese-language Tongji biography (Supp. Ex. 9) explains that Yin joined the College of Electronics and Information Engineering at Tongji University in 2008, became Deputy Head of the Department of Electronic Science and Technology in 2010, became Vice Dean of the College in March 2016, and moved to a university-level planning position in October 2021. Thus, according to his current Chinese biography, at the time of the relevant 2010 invention, Yin was Deputy Department Head.

**23.** Yin Xuefeng's institutional position as Deputy Department Head in 2010 suggests a potentially significant institutional role requiring further inquiry into his regular work as a faculty member, and his authority and ability to mobilize university resources in accordance with Reference Case 403. Among his faculty work, there were multiple research projects during 2009–2012 involving wireless-channel measurement, statistical modeling, distributed MIMO propagation channels, high-speed railway and microwave channel modeling, and broadband wireless propagation-channel characterization that he was involved in. Supp. Ex. 9. In these projects he is listed as the "person responsible" or "principal researcher" (fùzérén, 负责人), or as having "led" or "presided over" the project (zhǔchí, 主持). Supp. Ex. 9. One project, "Multidimensional Power-Spectrum Feature Extraction and Modeling of Broadband Wireless Propagation Channels," was funded by the Shanghai Natural Science Foundation and conducted at Tongji from April 2010 through

March 2012. Supp. Ex. 9. The priority filing date of the patent in suit is contemporaneous with this project (July 28, 2011). These documents suggest that Yin was conducting wireless-communications research, including MIMO propagation channels at Tongji with support provided by the Chinese government, as well as by universities, and industrial or research collaborators such as Huawei and the Electronics and Telecommunications Research Institute of Korea (ETRI). Supp. Ex. 9. These materials provide a "contemporaneous document defining the scope of [Yin Xuenfeng's] regular post responsibilities." Wu Decl. Para. 98. They thereby demonstrate there was as well a "connection/relationship" (guānliánxì 关联性), similar to the "relationship" (xiānghù guānxì 相互关系) identified by the SPC in Reference Case 403 between the disputed patent and the inventor's daily work, knowledge background, and the nature and principal activities of the institution.

**24.** In addition to these technical projects, Yin was named as an inventor on a number of Tongji-owned patents and patent applications involving closely related fields of wireless-channel measurement and antenna technology. For example, Tongji filed an August 14, 2009 application naming Yin for a "High-Precision Wireless Channel Testing Platform and Method Based on a Virtual Antenna Array," subsequently granted as CN101656971B (Supp. Ex. 10), which concerns antennas, antenna arrays, scanning, and wireless-channel measurement. Tongji filed another application the same day, also naming Yin, for a "Wireless Channel Analysis Platform and Method Based on Diversity of Antenna Radiation Patterns," published as CN101631318A. Supp. Ex. 11. Both identify Tongji University as the applicant. These Tongji-owned patents or patent applications invented by Yin may also provide additional evidence relevant to Yin's research and institutional role

in managing outside resources under Reference Case 403, based on a comparison of the claims with the research projects, and whether the patent in suit presented any different circumstances that would justify the patent not being a service invention.

25. Another factor in assessing whether the patent in suit was a service invention is the [redacted] leaves unresolved whether Tongji (or potentially other parties) has rights in the proposed technical solution and raises concerns regarding their potential interests in the patent in suit.

**Burdens of Proof**

26. In her declaration, Ms. Wu quotes Article 64 of the then applicable Civil Procedure Law that "It is the duty of a party to an action to provide evidence in support of his allegations; otherwise, he shall bear the adverse consequences of failure of proof." Wu Decl. Para. 66, citing Art. 64 of the CPL, Wu Ex. 2 at 40.

**27.** Correctly translated, CPL Article 64 states that "It is the duty of a party to an action to provide evidence in support of his allegations." (dāngshìrén duì zìjǐ tíchū de zhǔzhāng, yǒu zérèn tígōng zhèngjù, 当事人对自己提出的主张，有责任提供证据). See, for example, the English translation of the Civil Procedure Law by the National People's Congress (China's legislature) that is hosted by the SPC on its website. Supp. Ex. 12. The law does not state that the party who bears the burden of producing evidence "shall bear the adverse consequences of a failure of proof." Wu Decl. Para 45, 66. Ms. Wu's translation thus adds a consequence for "failure of proof" that does not appear in the text of Article 64 itself, and thereby creates a potentially draconian effect of equating a failure to produce evidence at the initial stages of a proceeding with a failure to satisfy a burden of proof.

**28.** As the above language, correctly translated, suggests, Chinese civil litigation practice generally focuses on a concept that is similar to a burden of production in addressing a party's responsibility to provide evidence under Article 64 (currently Article 67, if the current text is otherwise found applicable). Translating this as a "burden of proof" is a common mistranslation in much of the literature on this concept, including in some of the cited sources. These concepts therefore also need to be considered functionally. As one law review article noted, China's Civil Evidence Rules "place significant reliance on the production of evidence by the parties." Supp. Ex. 13 at 435 (Mo Zhang & Paul J. Zwier, "Burden of Proof; Developments in Modern Chinese Evidence Rules", 10 Tulsa J. Comp. & Int'l Law 419, 435 (2003)). Article 64/67 means that the "parties to a civil action" must "produce evidence in support of their allegations." *Id.* This burden "does not remain objectively with one party but shifts" as the evidentiary record develops. Supp. Ex. 14 at 836 (Yang Chen, "Rebalancing the Burden of Proof for Trade Secrets Cases in China: A

Detailed Scrutiny and Comparative Analysis of Article 32," 84 University of Pittsburgh Law Review 827 (2023)). The operation of this evidentiary process can be seen in Reference Case 403. Supp. Ex. 7. There, the court noted that because the employer/Institute asserted that the patent was a service invention, it initially had the obligation to produce supporting evidence. After the Institute produced circumstantial evidence supporting its claim, the SPC examined whether the inventor had produced "contrary evidence," including evidence concerning his alleged personal expenditures. The court specifically emphasized that the Institute's "means and ability to collect evidence" concerning how the inventor completed the invention was limited because that information was within the inventor's knowledge and control. The inventor's failure to produce contrary evidence contributed to the court's conclusion that the Institute's account had a "high degree of probability" (高度可能性). A more precise formulation of China's evidentiary regime is not that Article 64 /67 establishes a burden of proof with consequences for the success of a litigation at the initial stage of a litigation. Rather, Chinese law begins with the principle that the party asserting a claim bears the responsibility to produce evidence supporting it. However, this evidentiary responsibility is "not unchangeable" and can shift during litigation. Supp. Ex. 15 (Chenyang Zhang & Ran Ren, "Burden of Proof in China—Guide to China's Civil Evidence Rules (12)" (2020)).

**Conclusion**

**29.** Together, Reference Cases 403, 1848, and Guiding Case 158 provide important evidence of the SPC's judicial principles governing service inventions, including the inventor's responsibilities, institutional authority and resources, the relationship between the invention and institutional work, and source and development of the invention. These cases

are well within the ambit of Rule 44.1, which provides that court "may consider any relevant material or source . . . whether or not submitted by a party" in its determination of foreign law is a question of law.

**30.** As noted by Ms. Wu, SPC Guiding and Reference Cases are specifically and deliberately selected materials intended to guide or provide reference to Chinese courts, rather than precedents operating through American stare decisis. Wu Decl. Para 47. A question before this court is, therefore, how to determine the role of curated case law by the Supreme People's Court of China as representative of the law as applied in China. In determining the weight given to a foreign government's statement on applicable law, the Supreme Court has determined that "Relevant considerations include the statement's clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions." *Animal Science Products, Inc. v Hebei Welcome Pharmaceutical Co.*, 585 U.S. 33, 46-47 (2018). I believe the discretion afforded both U.S. and Chinese judges leaves room to consider the relevant Reference cases, the Guiding case, and other materials, including any available background information and empirical data in the context of a complex judicial system in which the relevant public case law databases are curated rather than comprehensive, and the environment is not wholly transparent.

I, Mark Cohen, declare, under penalty of perjury under the laws of the United States of America, that this declaration is true and correct. I reserve the right to supplement the foregoing.

Dated: Sept 4, 2026
By: ______________________
Mark Cohen