**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| COBBLESTONE WIRELESS, LLC,<br>Plaintiff,<br>v.<br>APPLE INC.,<br>Defendant. | Case No. 7:24-cv-232-DC |

**SUPPLEMENTAL DECLARATION OF DR. TIM A. WILLIAMS IN SUPPORT OF COBBLESTONE'S SUR-REPLY IN OPPOSITION TO APPLE'S MOTION TO DISMISS FOR LACK OF STANDING**

I, Tim A. Williams, Ph.D. declare as follows:

1. I previously submitted expert reports in this matter which set out my qualifications.[1] I understand that on October 27, 2026, the Court ordered a sur-reply to Apple's September 11, 2026 reply to address "[w]hether the technology of the '347 patent falls under the 'Key Control Points' required for export of wireless communication technology." Dkt. 240. I have been asked by counsel for Cobblestone to respond to the technical opinions attributed to Dr. Harry Bims in Section II.3 of the Supplemental Declaration of Alexandra Yang ("Yang Supp. Decl."). Those

[1] As set forth in my opening expert report on infringement, I earned a Bachelor of Science degree in Electrical Engineering (BSEE) from Michigan Technological University in 1976. In 1982, I earned a Masters degree, also in Electrical Engineering (MSEE), from the University of Texas at Austin. I earned a Doctor of Philosophy (Ph.D.) also from the University of Texas at Austin, in 1985. My doctorate dissertation was "Digital Signal Processing Techniques for Acoustic Log Data." In 1991, I earned a Master of Business Administration degree from the University of Texas at Austin as well. I have over 45 years of professional experience in wireless communications and telecom technology, including roles in large corporations as well as start-ups and consulting work. I hold 27 United States patents in wireless and signal processing technology, as well as numerous patent applications in the same field. Additionally, I am a Patent Agent registered with the U.S. Patent and Trademark Office since January 2002. Based on my qualifications and experiences, I believe that I am qualified to testify as an expert witness relating to technical aspects of the case involving the '347 patent, including cellular communications. A true and accurate description of my work and academic experience and qualifications is provided in my Curriculum Vitae.

opinions concern whether U.S. Patent No. 8,891,347 ("'347 patent") falls within the key control points of Entry No. 054007X of the *Catalogue of Technologies Prohibited or Restricted from Export* (Yang Ex. 16).

2. My opinions are technical. I address what the '347 patent discloses and how a person of ordinary skill in the art ("POSITA") would understand the technical terms of the control points in relation to the '347 patent. I offer no opinion on Chinese law.

3. In forming my opinions, I considered the '347 patent; Yang Ex. 16; the Yang Supp. Decl.; the published PCT application WO 2013/013407 A1, including its International Search Report[2]; Chinese Patent No. CN 103733555 B[3]; S. Sesia et al., *LTE – The UMTS Long Term Evolution: From Theory to Practice* (2d ed. 2011) ("Sesia"); and NGMN Alliance, *Recommendation on Base Station Antenna Standards* v11.1 (2019) ("BASTA")[4] . I also relied on my education and experience.

## SUMMARY OF OPINIONS

4. Dr. Bims relies on only two control points: Control Point 1 (broadband antenna arrays exceeding one octave) and Control Point 4 (fast acquisition of CDMA burst signals with $C/N_0$ below 46 dB·Hz). Yang Supp. Decl. § II.3. The technology of the '347 patent does not fall within Control Point 1 or Control Point 4 of Entry No. 054007X, for three reasons. *First*, each control point corresponds to established patent classes, and neither the U.S. nor the Chinese patent office placed the '347 patent or its counterparts in any of them. *Second*, Control Point 1 requires

---

[2] Published PCT application WO 2013/013407 A1, including its International Search Report, is available on Google Patents at https://patentimages.storage.googleapis.com/0a/4e/4a/43bcb93d1b3aad/WO2013013407A1.pdf.
[3] Chinese Patent No. CN 103733555 B, which is available on Google Patents at https://patentimages.storage.googleapis.com/e5/59/6c/c5052db0606050/CN103733555B.pdf.
[4] Available at https://ngmn.org/wp-content/uploads/Publications/2019/190306_BASTA_Passive_Antenna_Whitepaper_V11.1.pdf.

an array whose bandwidth exceeds one octave, and no conventional cellular array meets that threshold or has a bandwidth of 100% of its center frequency. *Third*, Control Point 4 requires CDMA burst-signal acquisition below a specified $C/N_0$, and the ’347 patent discloses neither. Dr. Bims addresses neither threshold.

## I. NEITHER PATENT OFFICE CLASSIFIED THE ’347 TECHNOLOGY IN ANY CLASS CORRESPONDING TO CONTROL POINT 1 OR 4

5. The control points referenced in the Supplemental Yang Declaration are reproduced here:

*"Entry No.: 054007X*
*Technology Name: Wireless communication technology*
*Control Points:*
*1. Antenna array technology*
*(1) Broadband antenna arrays exceeding one octave [center frequency ≥ 100%]*
*(2) Precision machining technology for broadband feeds [>800 MHz in the C-band}*
*2. Microwave direct modulation frequency division phase-locked solid-state source fabrication technology*
*3. Integrated acousto-optic heterodyne reception technology with bandwidth > 100 MHz and dynamic range > 90 Db*
*4. Fast acquisition technology for CDMA burst signals with C/No below 46 dB.Hz"*

6. Patent offices classify each patent by its technical subject matter under the International Patent Classification (IPC) and/or the Cooperative Patent Classification (CPC). Those schemes give a POSITA an objective, contemporaneous record of a patent’s technical field. Each control point at issue corresponds to specific classifications. Antenna arrays (Control Point 1) are classified in IPC and CPC subclass H01Q, “Antennas, i.e. Radio Aerials,” including group H01Q 21/00, “Antenna arrays or systems.” Acquisition of CDMA signals (Control Point 4) is classified in IPC and CPC group H04B 1/7075, “Synchronization aspects with code phase acquisition” of direct-sequence spread spectrum, and in IPC and CPC group H04J 13/00, “Code division multiplex systems.”

7. The U.S. Patent Office classified the ’347 patent using the IPC and CPC schemes. Likewise, the State Intellectual Property Office of P.R. China (the Chinese patent office), acting as International Search Authority, classified the corresponding PCT application WO 2013/013407 A1, and later classified the corresponding Chinese patent CN 103733555 B. None places the invention in any of the classes corresponding to Control Point 1 (H01Q) or Control Point 4 (H04B 1/7075, H04J 13/00):

| **Patent Office Record** | **Classification assigned** | **Control Point 1 (H01Q)?** | **Control Point 4 (H04B 1/7075 or H04J 13)?** |
|---|---|---|---|
| ’347 patent (USPTO, Nov. 18, 2014) | Int. Cl. H04J 11/00; H04W 4/00; H04B 1/04; H04L 5/00; H04W 24/02; H04L 1/00; H04L 27/01; H04L 1/12. CPC H04L 5/0001, 5/0003, 5/0014; H04L 1/0026, 1/12; H04L 27/01; H04W 24/02; Y02B 60/50 | None | None |
| International Search Report, PCT/CN2011/077718 (State Intellectual Property Office of the P.R. China, May 3, 2012) | Classified H04L 1/12; fields searched IPC H04L 1/- and H04B 7/- | None | None |
| CN 103733555 B (State Intellectual Property Office of the P.R. China, granted and published Aug. 25, 2017) | Int. Cl. H04L 1/12 | None | None |

8. Instead, the classes assigned to the ’347 patent are communication technique classes principally for digital transmission: dividing and allocating the transmission path (H04L 5), error control and link adaptation using a return channel (H04L 1), equalization (H04L 27/01), and network optimization (H04W 24/02). These are distinct from H01Q (Antennas), H01Q 21/00 (Antenna arrays or systems), H04B 1/7075, or H04J 13/00. Further, the ’347 patent’s IPC H04J 11/00 is “Orthogonal multiplex systems.” That class stands in contrast to H04J 13/00, which

applies when code division is used. H04J 11/00 therefore identifies the ’347 technology as orthogonal multiplexing, not CDMA.

9. According to the International Search Report, acting as International Searching Authority, the Chinese patent office classified the invention in H04L 1/12 and searched only the H04L 1 and H04B 7 transmission classes. The front page of the Chinese counterpart CN 103733555 B lists H04L 1/12. At no point did the U.S. PTO or Chinese patent office place the ’347 technology among antennas or CDMA acquisition.

## II. CONTROL POINT 1: NO CONVENTIONAL CELLULAR ARRAY EXCEEDS ONE OCTAVE

10. Control Point 1 covers “[b]roadband antenna arrays exceeding one octave [center frequency ≥ 100%].” Yang Ex. 16. A POSITA understands that an array’s bandwidth exceeds one octave only if its highest operating frequency is more than double its lowest. In music, a note one octave higher has double the frequency. Likewise, an array that operates from 1 GHz to 2 GHz spans exactly one octave. To exceed an octave, it would have to reach above 2 GHz while still operating at 1 GHz. Arrays whose bandwidth exceeds an octave are characteristic of specialized applications, such as electronic warfare and wideband radar, in which a single array must cover a wide range of frequencies. Commercial cellular arrays, by contrast, are designed for a particular band or band group, as I explain below. The bracketed “center frequency ≥ 100%” figure is more demanding still. It requires the array’s bandwidth (highest minus lowest frequency) to be at least as large as its center frequency (the midpoint of that range).[5] An array spanning 1 GHz to 2 GHz has a bandwidth of 1 GHz and a center frequency of 1.5 GHz, so its bandwidth (1 GHz) is only

[5] Engineers commonly express an antenna’s bandwidth either as the ratio of its highest to lowest frequency or as a percentage of its center frequency (the array’s fractional bandwidth). For example, the FCC defines fractional bandwidth as 2(fH-fL)/(fH+fL) and center frequency as (fH+fL)/2. See 47 C.F.R. § 15.503(b)-(c), available at https://www.ecfr.gov/current/title-47/chapter-I/subchapter-A/part-15/subpart-F/section-15.503.

about 67% of center frequency (1.5 GHz). An array just exceeding one octave would therefore still fail the center-frequency test. Reaching 100% requires a span of at least 1 GHz to 3 GHz (a bandwidth of 2 GHz at a center frequency of 2 GHz), meaning a highest frequency three times the lowest. An array that fails the octave test therefore fails both.

11. Dr. Bims opines that the ’347 patent relates to broadband antenna arrays exceeding one octave, but he identifies nothing in the patent that discloses such an array. He never applies this threshold to a particular antenna array. He identifies no specific array, no bandwidth, and no frequencies covered by a particular antenna array. Ms. Yang stated that Dr. Bims’s opinion is only that “the ’347 Patent discloses a cellular wireless communication system, which includes a base station with an antenna array to transmit signals to a receiver. Dr. Bims further explained that the transmitter and receiver communicate using radio frequency cellular communications (e.g., using 4G/LTE), and that a person of ordinary skill in the art would have understand [sic] that the RF and LTE frequency ranges exceed one octave.” Yang Supp. Decl. § II.3. That statement is conclusory, and it is not a statement about any antenna array that the ’347 patent discloses. Control Point 1 concerns ***broadband antenna arrays*** exceeding an octave, not the combined frequency ranges of a ***cellular standard***. While LTE is disclosed in the ’347 patent, that does not mean that it relates to broadband antenna arrays exceeding one octave. Notably, Dr. Bims does not opine that the antenna array disclosed in the ’347 Patent is a “broadband antenna array exceeding one octave.” Instead, he states that “LTE frequency ranges exceed one octave.” This does not mean that the disclosed antenna array exceeds an octave. Further, Dr. Bims does not address the “[center frequency ≥ 100%]” threshold at all.

12. A person of ordinary skill in the art would understand that the ’347 patent does not describe broadband antenna arrays exceeding one octave [center frequency ≥ 100%], nor does it

describe improvements in antenna array technology generally. As shown below, a person of ordinary skill in the art would understand that the antenna array disclosed in the ’347 Patent is a conventional array of the type used in LTE systems at the time, which is not a broadband antenna array exceeding an octave, nor does it have a bandwidth greater than or equal to 100% of center frequency.

13. The ’347 patent describes improvements to signal processing carried out through a conventional antenna array: estimating the parameters of individual propagation paths, feeding them back, and predistorting later transmissions. It teaches no improvement to the array itself. It describes its arrays only as including “one or more antennas.” ’347 patent, 4:12–14, 4:21–25. It adds a “modulation and pre-distortion block” to an otherwise conventional transmitter, RF front end, and antennas. *Id.* at FIGS. 5A–5B, 10:28–43. For the array, the patent relies on a POSITA’s knowledge of conventional cellular systems, such as the LTE and LTE-Advanced systems it identifies. *Id.* at 1:34–37, 7:60–62, 10:57–59, 12:54–57. A POSITA would therefore understand the array of the preferred embodiment to be a conventional cellular array of the type used in LTE systems at the time.

14. Arrays of the type used in LTE systems at the time of the invention of the ’347 patent each served one band or band group. With respect to Control Point 1, none spanned an octave, and none had a bandwidth of 100% of its center frequency. Using the LTE operating bands listed in Apple’s prior art, Sesia (Sesia tbls. 21.1–21.2, at 459–60), no antenna array for the Low Band Group, for the Mid Band group, or for Bands 42-43 exceeds an octave, and none has a bandwidth at least as large as its center frequency. For example, an LTE antenna array serving the Low band group spans 698 MHz to 960 MHz, which does not exceed one octave (as 960 MHz is not more than double 698 MHz) and for which the bandwidth as a percentage of center frequency

is less than 100% (2 x (960 – 698) / (960 + 698) = ~32%).[6] An array for the Mid Band group, or for Bands 42-43, also is beneath these thresholds:

| **Band group** | **Frequency span** | **Highest ÷ lowest (CP1's octave requires > 2.0)** | **Bandwidth ÷ center frequency (CP1 requires ≥ 100%)** |
|---|---|---|---|
| Low band | 698–960 MHz | 1.38 | ~32% |
| Mid band (every listed band from 1.4 to 2.7 GHz) | 1427.9–2690 MHz | 1.88 | ~61% |
| 3.4–3.8 GHz (Bands 42–43) | 3400–3800 MHz | 1.12 | ~11% |

15. Cellular equipment serving these band groups and of the type described in the '347 Patent did not at the time of the '347 Patent include any broadband antenna array exceeding an octave, and instead it served different band groups with separate arrays. Cellular equipment serving different band groups is multi-band, not broadband. A broadband array uses one set of radiating elements operating continuously across its full range. A multi-band installation instead uses separate arrays, each built for its own band, and covers nothing between them. The industry's antenna recommendation defines an array as "a logical group of single or dual polarized radiators inside the antenna radome supporting a common frequency band and a common beam shape and tilt." BASTA § 2.3, at 16. Sesia likewise treats equipment for different bands at one site as separate. Base stations may be "co-located (i.e. antennas mounted at the same cell-site)." Sesia at 536. Each base station's out-of-band blocking requirement is defined "excluding the operating band," and a separate "co-located blocking" requirement applies to "co-located (e)NodeBs operating in other frequency bands." *Id.* at 578. Arrays for different bands may share a radome or a site, but each remains a separate array. None spans an octave.

---

[6] See footnote 5.

16. To the extent Dr. Bims means that the total spectrum allocated to LTE spans more than an octave, that describes the band plan, not an antenna array. Control Point 1 recites a numeric threshold for an array. No conventional cellular array meets it, and Dr. Bims does not contend otherwise.

17. Additionally, the ’347 Patent is unrelated to military, radar, or jamming technology. I generally understand that export controls are sometimes used by countries to keep their military technologies secret. Control Point 1 covers “[b]roadband antenna arrays exceeding one octave [center frequency ≥ 100%].” Yang Ex. 16. This description suggests that the export control was intended to prevent the export of military technologies such as broadband radars or broadband jammers. The ’347 Patent is not such a technology.

18. In conclusion, the ’347 Patent does not fall under Control Point 1(1), “*Broadband antenna arrays exceeding one octave [center frequency ≥ 100%].”* The ’347 Patent does not teach or disclose how to design or operate an antenna array in this manner, and Dr. Bims does not identify or cite to any specific part of the ’347 Patent that allegedly does so. I disagree with Dr. Bims’s opinion, as reported by Ms. Yang. That “the RF and LTE frequency ranges exceed one octave” in a generic sense untethered to any particular antenna array does not mean that the ’347 Patent discloses how to use an antenna array that spans those entire LTE frequency ranges. I have reviewed the ’347 Patent. The ’347 Patent does not teach anything about the use or design of antenna arrays to exceed one octave or to have a bandwidth of at least 100% its center frequency. On the contrary, a POSITA would understand the array of the preferred embodiment to be a conventional cellular array of the type used in LTE systems at the time, which is not a broadband antenna array exceeding an octave, nor does it have a bandwidth of 100% of its center frequency.

## III. CONTROL POINT 4: THE ’347 PATENT IS NOT CDMA BURST-ACQUISITION TECHNOLOGY

19. Control Point 4 covers “[f]ast acquisition technology for CDMA burst signals with $C/N_0$ below 46 dB.Hz.” Yang Ex. 16. Dr. Bims identifies no CDMA signal, no burst acquisition, and no $C/N_0$ figure in the ’347 patent. He says only that the patent “may” relate to signal processing that “may be used in” CDMA synchronization. Yang Supp. Decl. § II.3. The ’347 patent recites no spreading code, no burst detection, and no sensitivity threshold. It does not disclose applying its technique to the acquisition of CDMA burst signals or discuss applying it where the $C/N_0$ is below 46 dB.Hz, or any other threshold. Indeed, Dr. Bims does not identify any technology in the patent that relates to environments in which $C/N_0$ is below 46 dB.Hz, and he does not explain how the ’347 technology would apply in that environment.

20. The ’347 patent is not CDMA technology. It carries no spread-spectrum or CDMA classification, and its IPC H04J 11/00 identifies it as orthogonal multiplexing. *See* Part I. The cellular systems it identifies, LTE and LTE-Advanced (see ’347 Patent, 1:36, 7:61, 10:58, 12:54-62), use OFDM and SC-FDMA, which Sesia contrasts with “UMTS’s single-carrier Wideband Code Division Multiple Access (WCDMA) modulation.” Sesia at 458.

21. The ’347 patent estimates path parameters from known “preambles or training sequences” and feeds them back for the next transmission. ’347 patent, 8:9–11, 9:1–15. That is not CDMA burst-signal acquisition.

## IV. CONCLUSION

22. In my opinion, the technology of the ’347 patent does not fall within Control Point 1 or Control Point 4 of Entry No. 054007X. I reserve the right to supplement these opinions if additional information becomes available.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 5, 2026, in Danville, California.

Dr. Tim Williams