REDACTED PUBLIC VERSION
FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

COBBLESTONE WIRELESS, LLC,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 7:24-cv-00232-DC

**JURY TRIAL DEMANDED**

**COBBLESTONE'S SUR-REPLY IN OPPOSITION TO APPLE'S RULE 12(B)(1) MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION**

REDACTED PUBLIC VERSION
FILED UNDER SEAL

**TABLE OF CONTENTS**

I. The technology does not fall under any export-controlled "Key Control Point" ..... 1

A. The '347 Patent is fundamentally not an export-controlled type of technology ..... 1

B. The '347 Patent Classifications Do Not Match Key Control Points (1) or (4) ..... 2

C. It does not fall into Key Control Point (1), "[b]roadband antenna arrays exceeding one octave [center frequency ≥ 100%]" ..... 3

D. It does not fall into Key Control Point (4) for "Fast acquisition technology for CDMA burst signals with C/No below 46 dB.Hz" ..... 5

II. Even if a Chinese export license was required, China cannot void US contracts ..... 6

III. Evidence shows that an export license was unnecessary ..... 7

IV. IDMC was not directly in the chain of title ..... 9

## TABLE OF AUTHORITIES

**Cases**

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
517 F.3d 1284 (Fed. Cir. 2008)........................................................ 6

*Duncan v. Cessna Aircraft Co.*,
665 S.W.2d 414 (Tex. 1984)........................................................ 7

*HTC Corp. v. IPCom GmbH & Co., KG*, No.,
CV 08-1897 (RMC), 2010 WL 11719073 (D.D.C. Nov. 5, 2010)........................................................ 6

*Int'l Nutrition Co. v. Horphag Rsch. Ltd.*,
257 F.3d 1324 (Fed. Cir. 2001)........................................................ 6

*Jaffe v. Pallotta Teamworks*,
374 F.3d 1223 (D.C. Cir. 2004)........................................................ 7

*Reliable Contracting Grp., LLC v. Dep't of Veterans Affs.*,
779 F.3d 1329 (Fed. Cir. 2015)........................................................ 10

*SiRF Tech., Inc. v. Int'l Trade Comm'n*,
601 F.3d 1319, 1328 (Fed. Cir. 2010)........................................................ 9

**Statutes**

35 U.S.C. § 261........................................................ 6

**Other Authorities**

Restatement (Second) of Conflict of Laws § 188 (1971)........................................................ 7

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8........................................................ 6

## I. The technology does not fall under any export-controlled "Key Control Point"

The technology of Patent 8,891,347 ("'347 Patent") does not fall under any export-controlled "Key Control Point." Apple argues[1] only two Key Control Points apply: (1) "Broadband antenna arrays exceeding one octave [center frequency ≥ 100%]," and (4) "Fast acquisition technology for CDMA burst signals with C/No below 46 dB.Hz." Dkt. 217 at 6; Dkt. 215-1 at 19–20 § II.3. Neither applies for four reasons: (1) the '347 Patent is fundamentally not a type of export-restricted technology because China independently exported it; (2) neither the U.S. nor the Chinese patent offices classified the '347 Patent or its counterpart in a classification corresponding to a Key Control Point; (3) Key Control Point 1 requires an array whose bandwidth exceeds one octave, but the '347 Patent describes only a conventional LTE or LTE-Advanced cellular antenna array—and no such conventional cellular array meets that threshold; and (4) Key Control Point 4 requires CDMA burst-signal acquisition below a specified $C/N_0$, but the '347 Patent does not disclose this. Williams Supp. Decl. (filed herewith) ¶¶ 4–20.

### A. The '347 Patent is fundamentally not an export-controlled type of technology

Export controls are used by countries to restrict sensitive technology, like military secrets. Chinese export controls are no exception. Supp. Ma Decl. (filed herewith) ¶¶ 9, 13–14 (citing Dkt. 156-6, Yang Ex. 5 at 3, Rule 7); Williams Supp. Decl. ¶ 17. The '347 Patent does not include anything that would have been considered a military technology or national secret. *Id*.

Chinese publication CN103733555, from the same family as the '347 Patent and which contains the same technical disclosure, was published by the Chinese National Intellectual Property Administration (CNIPA). Ex. 1. If the Chinese wanted to keep the '347 Patent

[1] Apple's last-ditch attempt to shoehorn the '347 Patent into Key Control Points in hindsight, for the first time on reply, is procedurally improper. Apple initially overlooked the Key Control Points. Dkt. 156-1, Yang Decl. at 8; Dkt. 199, Ma Decl. ¶ 14.

technology a secret, they would not have published it to the world. Supp. Ma Decl. ¶¶ 9.

**B. The ’347 Patent Classifications Do Not Match Key Control Points (1) or (4)**

Patent offices classify patents by technical subject matter. These objective, third-party classifications show the ’347 Patent does not fall in Key Control Point (1) for “Broadband antenna arrays exceeding one octave” or Key Control Point (4) for “Fast acquisition technology for CDMA burst signals with C/No below 46 dB.Hz.” Key Control Points (1) and (4) correspond to standard classifications. Key Control Point (1) falls in Class H01Q for antenna arrays, and Key Control Point (4) falls in Classes H04B 1/7075 and H04J 13/00 for CDMA. Williams Supp. Decl. ¶¶ 6–9; Ex. 4; Ex. 5; Ex. 6. The table below shows that patent offices did not assign any export-controlled Classes to the technology:

| **Patent office record** | **Classification assigned** | **Key Control Point 1 or 4 classification?** |
|---|---|---|
| ’347 Patent (USPTO, Nov. 18, 2014). Dkt. 1-1, cover. | Int. Cl. H04J 11/00; H04W 4/00; H04B 1/04; H04L 5/00; H04W 24/02; H04L 1/00; H04L 27/01; H04L 1/12 (and corresponding CPC classes in H04L, H04W, and Y02B). Ex. 6; Ex. 8; Ex. 5; Ex. 7; Ex. 9. | No |
| International Search Report, PCT/CN2011/077718. Ex. 2 (State Intellectual Property Office of the P.R. China) | Classification: H04L 1/12;<br>Fields searched: IPC H04L 1/- and H04B 7/-. Ex. 2 at 3; Ex. 7; Ex. 5. | No |
| CN 103733555. Ex. 1 (State Intellectual Property Office of the P.R. China) | Int. Cl. H04L 1/12. Ex. 1, cover; Ex. 7. | No |

Instead of assigning classifications for improvements in antenna arrays or CDMA, the U.S. Patent Office assigned classes corresponding to communications techniques and signal processing, such as digital transmission. Williams Supp. Decl. ¶¶ 6–9. Likewise, it assigned IPC H04J 11/00, “Orthogonal multiplex systems,” placing the invention in OFDM (orthogonal frequency division multiplexing) and outside the CDMA classes. *Id.* Thus, the Patent Office independently classified

the ’347 Patent outside Control Points (1) and (4). *Id.* Moreover, China’s patent office examined the corresponding PCT application and counterpart patent, CN 103733555, and it similarly agreed with the U.S. Patent Office that this invention is not classified as antenna array or CDMA burst acquisition technology. *Id.* ¶¶ 7, 9. China’s office classified the invention in H04L 1/12 and searched only the H04L 1/12 transmission class—not antenna arrays, and not CDMA burst acquisition. *Id*. This Court should not retroactively change the classifications that the Chinese patent office *actually* assigned to the technology.

### C. It does not fall into Key Control Point (1), “[b]roadband antenna arrays exceeding one octave [center frequency ≥ 100%]”

The technology of the ’347 Patent does not fall into this category. Williams Supp. Decl. ¶¶ 7–9, 10–18. An array’s bandwidth exceeds one octave only if its highest operating frequency is more than double its lowest. Williams Supp. Decl. ¶ 10. The bracketed center frequency greater than or equal to 100% further requires the highest frequency to be at least three times the lowest frequency. *Id.* Arrays whose bandwidth exceeds an octave are characteristic of specialized applications, such as electronic warfare (e.g., jammers) and wideband radar, in which a single array covers a wide range of frequencies. *Id.* Commercial cellular arrays, by contrast, are designed for a particular band or band group that does not exceed an octave. *Id.* ¶¶ 10, 12–15.

A POSITA would understand the antenna array disclosed in the ’347 patent to be a conventional cellular array of the type used in LTE systems at the time, which does not exceed an octave. *Id.* ¶¶ 12–15. The ’347 patent does not describe broadband antenna arrays exceeding one octave, nor does it describe improvements in antenna-array technology. *Id.* ¶ 12. Indeed, it is not classified as antenna array technology. *Id.* ¶¶ 6–9. The ’347 Patent describes improvements to signal processing carried out through a conventional antenna array (*id.* ¶ 13), which it describes only as generically including “one or more antennas.” Dkt. 1-1, 4:12–14, 4:21–25. For the array,

the patent relies on a POSITA's knowledge of conventional cellular systems, such as the LTE and LTE-Advanced systems it identifies. *Id.* at 1:34–37, 7:60–62, 10:57–59, 12:54–62; Williams Supp. Decl. ¶ 13. The antenna array would be of the type used in LTE systems at the time. *Id.*

The antenna arrays of the type used in LTE systems at the time of the invention each served one band or band group, and none spanned an octave. *Id.* ¶¶ 14–15. LTE systems are multi-band, not broadband; unlike a broadband array spanning a wide range of frequencies that exceeds an octave, LTE base stations use separate arrays, each built for its own band group. *Id.* Apple's asserted prior art by Sesia shows that no LTE antenna array for any LTE band group exceeds an octave. *Id.* (citing Ex. 3, tbls. 21.1–21.2, at 459–60 (2d ed. 2011) ("Sesia")):

| **Band group** | **Frequency span** | **Highest ÷ lowest (KCP 1's octave requires > 2.0)** | **Bandwidth ÷ center frequency (KCP 1 requires ≥ 100%)** |
|---|---|---|---|
| Low band | 698–960 MHz | 1.38 | ~32% |
| Mid band (every listed band from 1.4 to 2.7 GHz) | 1427.9–2690 MHz | 1.88 | ~61% |
| 3.4–3.8 GHz (Bands 42–43) | 3400–3800 MHz | 1.12 | ~11% |

Apple's argument rests entirely on the following account of Dr. Bims's views:

> Dr. Bims opined that the '347 Patent relates to broadband antenna arrays that exceed one octave and therefore at least falls under Control Point 1 above. Dr. Bims explained that the '347 Patent discloses a cellular wireless communication system, which includes a base station with an antenna array to transmit signals to a receiver. Dr. Bims further explained that the transmitter and receiver communicate using radio frequency cellular communications (e.g., using 4G/LTE), and that a person of ordinary skill in the art would have understand [sic] that the RF and LTE frequency ranges exceed one octave.

Dkt. 215-1 (Yang Supp. Decl.) at 20. Apple's arguments fail because they are conclusory, incomplete, and misleading.

*First*, Dr. Bims did not identify where the '347 Patent discloses a broadband antenna array exceeding one octave. He identified no specific array, no bandwidth, and no frequencies covered

by any particular array. Williams Supp. Decl. ¶ 11. *Second,* while Dr. Bims states the '347 patent describes communications using 4G/LTE, he does ***not*** opine that a 4G/LTE antenna array would be a wideband array exceeding an octave. Dr. Bims's narrower opinion, which is that "the RF and LTE frequency ranges exceed one octave," is conclusory and misleading. Dkt. 215-1 (Yang Supp. Decl.) § II.3, at 20. This statement is about the entire LTE frequency range in the abstract, not about any antenna array disclosed in the '347 Patent. Williams Supp. Decl. ¶ 11. Dr. Bims appears to opine that the total spectrum allocated to LTE spans more than an octave, but he is not describing any antenna array in the '347 Patent. *Id.* ¶¶ 16, 18. Whether the LTE cellular standard ***total spectrum***, outside of the '347 Patent, exceeds an octave is irrelevant to Key Control Point 1. *Id.* ¶¶ 4, 16.

**D. It does not fall into Key Control Point (4) for "Fast acquisition technology for CDMA burst signals with C/No below 46 dB.Hz"**

As Dr. Williams confirms, the '347 Patent does not relate to CDMA burst acquisition, let alone to $C/N_0$ acquisitions below 46 dB.Hz. Williams Supp. Decl. ¶¶ 19–21. Dr. Bims says only that the '347 Patent "may" relate to signal processing that "may be used in" CDMA synchronization, but Dr. Bims did not opine that the '347 Patent "does" do so. Dkt. 215-1, Yang Supp. Decl. § II.3. "May" does not satisfy a control point limited to "[f]ast acquisition technology for CDMA burst signals with $C/N_0$ below 46 dB.Hz." Dkt. 156-17, Yang Ex. 16. The '347 patent says nothing about fast or burst detection or $C/N_0$ thresholds, and Dr. Bims identifies none. Williams Supp. Decl. ¶ 19. The LTE systems it identifies use OFDM and SC-FDMA, not CDMA. Even Apple's asserted prior art, Sesia, contrasts OFDM with CDMA. *Id.* ¶ 20 (citing Ex. 3, Sesia at 458). Moreover, the '347 Patent estimates path parameters from known training sequences, which is not CDMA burst-signal acquisition. *Id.* ¶ 21 (citing '347 patent, 8:9–11, 9:1–15).

## II. Even if a Chinese export license was required, China cannot void US contracts

China has no power to regulate the assignments of U.S. patents. Only "Congress shall have Power To … promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Even if the Chinese government passed a law that all worldwide patents are assigned to the Chinese government, it would have no effect within the U.S.

U.S. patents are not an export of China, so Chinese laws based on export controls are inapplicable. U.S. patents are rights created by the U.S. Patent and Trademark Office in Virginia, so no Chinese export laws apply unless parties agree through choice-of-law provisions.

Congress permits parties to assign their patent rights. 35 U.S.C. § 261. Because Congress authorized assignments, courts respect a choice-of-law provisions and forum selection clauses. *See Int'l Nutrition Co. v. Horphag Rsch. Ltd.*, 257 F.3d 1324, 1330 (Fed. Cir. 2001) (applying French law due to forum clause selecting France). By default, questions regarding standing are matters of U.S. federal laws (not Chinese laws), and state laws govern contract *interpretation*. *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).

The assignment at issue is for the '347 Patent from SAGE (a Shanghai entity) to Empire (a Delaware LLC). Dkt. 109-2. The assignment has no choice of law or forum selection clause. Dkt. 109-2. Thus, U.S. federal laws apply by default, and U.S. federal laws do not include Chinese export laws. *DDB Techs.,* 517 F.3d at 1290. The analysis ends here.

Alternatively, the Court may apply conflict of law principles to determine whether U.S. or Chinese laws govern the assignment. *HTC Corp. v. IPCom GmbH & Co., KG*, No. CV 08-1897 (RMC), 2010 WL 11719073, at *3 (D.D.C. Nov. 5, 2010) (interpreting a Patent Purchase Agreement). When construing a contract where the conflicting laws of two jurisdictions are involved, the Court applies the law of the place that has the more substantial interest. *Jaffe v.*

*Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004). The Restatement (Second) of Conflict of Law considers: (1) the place of contracting; (2) the place where the contract was negotiated; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws § 188 (1971); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984) (adopting this analysis in Texas).

The U.S. naturally has the greater interest in a contract assigning U.S. patent rights. Factors 3 (place of performance) and 4 (location of subject matter of the contract) weigh toward U.S. laws because U.S. patents are enforced within the U.S. The places of contracting and negotiation remain unknown. SAGE likely executed the contract in China, and Jerome Hewlett likely executed his acceptance on behalf of Empire in Delaware, making these factors neutral. Dkt. 109-2 at 7–8. However, both SAGE's witness and Jerome Hewlett on behalf of Empire executed their attestations "under the laws of the United States of America," indicating that they foresaw a more substantial U.S. interest. *Id.* at 7–8. Factor 5, the place of business, is neutral because SAGE was in Shanghai, and Empire was in Delaware. Overall, the interests favor applying U.S. federal laws which do not include Chinese export controls, and no interest favors Chinese laws.

Apple's reply identified provisions of the [redacted] The [redacted] is irrelevant because it is a separate contract, not the assignment at issue.

**III. Evidence shows that an export license was unnecessary**

The disclosure of the '347 Patent and the publication of CN 103733555 are both evidence that no export license was necessary because the technology does not fall under Chinese export controls. *See* Section I, above.

There is additional evidence that an export license was deemed unnecessary in the Purchase [redacted] the

Declaration of Yuan Ma (Dkt. 199), and the Supplemental Declaration of Yuan Ma (herewith).

In the [redacted] The evidence shows they were aware of and contracted to discharge any export-control duties.

Ms. Yang's inability to find[2] any export license is consistent with the fact that no export license was ever needed. "Chinese technology export law does not establish a separate procedure for issuing a 'no-license-required' certificate for freely exportable technology." Supp. Ma Decl. ¶ 43. Notably, Apple never attempts to explain why China published CN 103733555 if it is an export-restricted technology.

All evidence should be viewed in Cobblestone's favor at this procedural stage, and the Court should deny Apple's motion unless it is certain that the plaintiff "cannot prove any set of facts" to show standing. Dkt. 206 at 4. The public recording of the assignment from SAGE to Empire at the USPTO "creates a presumption of validity as to the assignment and places the burden

[2] Ms. Yang's methods should not be trusted. To look for Shanghai-based documents from around 2011, Ms. Yang conducted a woefully inadequate search of an incomplete, Beijing-document database that only contains documents from 2016 onward. Supp. Ma Decl. ¶¶ 30–34.

to rebut such a showing on one challenging the assignment." Dkt. 109-2; *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1328 (Fed. Cir. 2010). Similarly, under Chinese law, "[t]he party claiming the alteration or extinction of a legal relationship or the infringement of a right shall bear the burden of proof for the basic facts concerning the alteration or extinction of the legal relationship or the infringement of the right." Dkt. 199, Ma Decl., ¶ 31–32. Either way, Cobblestone has met its burden of proof as to standing. Apple has the burden of overcoming the presumption of validity and proving its facts are "certain" under U.S. laws, and Apple bears the burden of proof under Chinese laws.

Apple's reply argued for the first time that the burden of proof can shift back to Cobblestone under Chinese law. But Ms. Yang did not identify any such Chinese laws. Supp. Ma Decl. ¶¶ 36–39. Ms. Yang merely cited articles with academic opinions, not laws. *Id.* ¶ 39.

## IV. IDMC was not directly in the chain of title

The unbroken chain of title from the inventor Yin to Cobblestone is recorded at the USPTO. Dkt. 109-1 (Yin to SAGE); Dkt. 109-2 (SAGE to Empire); Dkt. 109-6 (Empire to Cobblestone). IDMC managed patent applications and assignments but is **not** directly in the chain of title.

[redacted]

[redacted]

REDACTED PUBLIC VERSION
FILED UNDER SEAL

[redacted] The designee was Empire, so all rights were transferred to Empire. Supp. Ma Decl. ¶¶ 49–53. Empire's status as the designee is further confirmed in writing and recorded in SAGE's execution of the assignment to Empire effective January 18, 2011, consistent with the business arrangement. Dkt. 109-2; *see* Dkt. 200, Wu Ex. 7 at 13:3–16:19, 35:18–37:13.

If there is any ambiguity as to whether IDMC or the designee Empire received the patent rights, courts may consider extrinsic evidence under both US and Chinese laws. *Reliable Contracting Grp., LLC v. Dep't of Veterans Affs.*, 779 F.3d 1329, 1333 (Fed. Cir. 2015); Supp. Ma Decl. ¶¶ 45–48. Both the ongoing business of the parties and their recorded, contemporaneous confirmatory assignment clarify that the rights were transferred directly from SAGE to Empire.

Dated: November 6, 2026

Respectfully submitted,

/s/ Reza Mirzaie
Marc Fenster
Reza Mirzaie
Benjamin T. Wang
Brian Ledahl
Dale Chang
Neil A. Rubin
Jacob Buczko

James N. Pickens
Minna Jay
Jonathan Ma
Christian W. Conkle
Joshua Scheufler
Mackenzie Paladino
Matthew Aichele
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Telephone: 310-826-7474

Qi (Peter) Tong
RUSS AUGUST & KABAT
8080 N. Central Expy., Suite 1503
Dallas, TX 75206

Attorneys for Plaintiff
Cobblestone Wireless, LLC

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed via the Court's sealing procedures and served on all counsel of record via email on November 6, 2026.

/s/ *Reza Mirzaie*